IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LISA BARNETTE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:05-cv-00473-WKW |
| | ) | |
| CITY OF PHENIX CITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF HEATH TAYLOR

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF RUSSELL | ) |

BEFORE ME, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Heath Taylor, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.      My name is Heath Taylor.  I am over the age of nineteen and competent to make this affidavit.

2.      I am the Lieutenant in charge of Investigations (Chief Investigator) for the Russell County Sheriff's Department in Russell County, Alabama, and am Commander of the Russell County Sheriff's Department SWAT Team.  I have been a law enforcement officer for over 20 years.

3.      On February 10, 2005, I was contacted by Investigator Len Wills of the City of Columbus, Georgia Police Department regarding a felony warrant for the arrest of Kenneth D. Thrower.  Officer Wills advised me that the City of Columbus Police Department needed our help in apprehending Mr. Thrower.  I also received a copy of the Georgia arrest warrant which

DEFENDANT'S EXHIBIT
B

Officer Wills had faxed to my office. Officer Wills informed me that Mr. Thrower was believed to be at his mother's address on or near Highway 80 in Russell County, and he gave me a description of the truck Mr. Thrower was driving. He also informed me that Mr. Thrower was armed and potentially suicidal and/or homicidal. I immediately instructed Russell County Sheriff's Investigator Grover Goodrich to take the Georgia warrant to a Russell County Circuit Court judge and have the warrant domesticated as a fugitive warrant.

4.     At the time I received the telephone call from Officer Wills, the Phenix City SWAT team was at the Sheriff's Department being debriefed from operations which they had been executing earlier that morning. Because of the potential volatility of the situation, I determined that a SWAT operation was the safest way to apprehend Mr. Thrower without injury either to him, innocent parties, or the arresting officers. I therefore briefed the SWAT team on the information I had, and instructed them to assemble some distance down Highway 80 from Mr. Thrower's mother's house.

5.     Upon leaving the Sheriff's Office, I proceeded towards the address where Officer Wills indicated that Mr. Thrower would be located. However, while I was surveilling the area, Officer Wills called and indicated that Mr. Thrower was at his sister, Lisa Barnette's, house on Highway 80, and gave me an address a couple of houses down from Mr. Thrower's mother's address. I advised Officer Wills that I had driven by Mr. Thrower's sister's house and did not see Mr. Thrower's truck. However, Officer Wills informed me that Lisa Thrower, Mr. Thrower's wife, was on her cell phone speaking with Mr. Thrower at that very moment, and that the caller identification feature of her phone indicated that Mr. Thrower had called her and was talking from his sister's house. Officer Wills also advised me that Ms. Barnette's house was very close to Mr. Thrower's mother's house, and that his truck could be parked at that location. He also

advised me that there was a large supply of guns and ammunition at his sister's house. He emphasized to me Mr. Thrower's apparent desperate and homicidal condition, and communicated to me that the situation was tense and serious, with a very real potential for violence.

6.     Upon surveying the Barnette's house, I considered setting up a perimeter of officers to covertly observe the house and attempt to arrest Mr. Thrower when he exited the house. However, I determined that, given the topography of the land and the lack of adequate cover for the observing officers, there would be no way to adequately secure the perimeter of the house without alerting the occupants to our presence and potentially initiating a shootout or hostage situation; the perimeter officers would have easily been seen.

7.     At that time I had very little intelligence on the house. I did not know who was present beyond Mr. Thrower, and therefore had to assume that innocents were present in the residence, possibly including children. I did have information from Officer Wills that there were a substantial number of weapons and ammunition inside the house, in addition to information that Mr. Thrower himself was armed and potentially suicidal and/or homicidal. I was also of the belief, from information provided by Officer Wills, that Mr. Thrower was not going to be present for very long, and that he was determined not to be arrested and put in jail. I therefore determined that exigent circumstances existed to justify entering the house without a search warrant to effect the arrest. That determination was based on the belief that Mr. Thrower was a danger to himself and to others, and that during the hour or more that it would have taken to obtain a search warrant Mr. Thrower would almost certainly have become alerted to the presence of officers outside the residence, potentially triggering a hostage or gunfight situation.

8.      I notified the SWAT team to prepare to enter the house, and I drove down Highway 80 to turn around and approach the house. At that time I also called Investigator Goodrich, who informed me that he had a fugitive warrant signed by a Russell County judge. Those preparations took approximately five (5) minutes. I subsequently learned that Mr. Thrower left the house during those five minutes.

9.      On my signal, the SWAT team deployed a "flashbang" distraction and diversionary device into the front door of the residence, and then proceeded to secure the house, including the occupants. The team took approximately thirty (30) seconds to secure the house, at which time I entered the residence. During the search, the SWAT team discovered over thirty (30) weapons, including handguns, long guns and shotguns, and over one thousand (1,000) rounds of ammunition. However, Mr. Thrower was not present.

10.     At this time, I was also informed by an officer that, during the search of an outbuilding, a red Honda four-wheeler was discovered with the ignition "popped" out (e.g. missing). I know, and knew at that time, due to my training and experience as a law enforcement officer and an investigator, that a "popped" ignition is a significant indication that a particular four-wheeler had been stolen, and therefore I made a mental note of this for future investigation.

11.     Upon entering the residence, I encountered Lisa Barnette, who informed me that we just missed Mr. Thrower, that he had just left, that he was going to meet his mother for lunch at the El Vaquero restaurant, and that she was surprised that we did not encounter him on the road as we drove up.

12.     It is the policy of the Russell County Sheriff's Department to repair any damage caused by the operations of its officers, including the SWAT team. The forceful entry of the SWAT team, as well as the use of a flashbang, resulted in some damage to the front door and some

singing of the carpet in the Barnette residence. I informed Ms. Barnette that, pursuant to policy, the Russell County Sheriff's Department would replace her door and repair her carpet, as well as any other damage to her house resulting from the operation.

13.     At this time I, along with the SWAT team, left the Barnette residence and proceeded to the El Vaquero restaurant, based on the information given by Ms. Barnette. Upon arrival, I observed a truck matching the description given to me by Officer Wills. I instructed the SWAT team to surround the restaurant, and I, along with Investigator Goodrich and a Phenix City police officer, entered the restaurant and arrested Mr. Thrower without incident.

14.     Upon investigation after the arrest, I personally observed several packed bags in Mr. Thrower's truck as well as a loaded handgun.

15.     Russell County continuously battles the theft of four-wheeler vehicles; however, these thefts increase during hunting season, which starts in October and runs through the end of January, because four-wheelers are used extensively by hunters, making them both (a) more desirable, and (b) readily available, and thus easier to steal. The area along Highway 80 is especially susceptible to these particular thefts. These thefts were even worse than usual in 2005, to the point that all investigators had been tasked with investigating four-wheeler theft cases in addition to their regular cases. The Russell County Sheriff's Department had even posted deputies along Highway 80 with instructions to stop every vehicle towing or carrying a four-wheeler and require proof of ownership.

16.     Because of the foregoing problem of four-wheeler theft, after securing Mr. Thrower's arrest, I, along with Investigator Goodrich, returned to the Barnette residence in my car to follow up on the suspicious four-wheeler discovered at that residence. When I arrived at the residence, an employee of the Russell County Sheriff's Department, along with Russell County Jail

inmates, were already present, securing the Barnette's front door. Because the front door was temporarily secured in a fashion that did not permit it to open, I approached the back door and announced myself to Ms. Barnette.

17.    After re-introducing myself, I informed Ms. Barnette that Mr. Thrower had been arrested without incident or injury. I then explained to her about the problem with four-wheeler thefts, and informed her that she possessed a four-wheeler that appeared to be stolen because of the "popped" ignition. She informed me that the ignition on that vehicle had been broken out when they bought it. I asked her if she had a bill of sale for that vehicle, and she indicated that she did. At that point I observed Ms. Barnette call her husband to inquire about the purchase of that four-wheeler, and to ask him where the bill of sale was. However, upon searching, she was unable to locate a bill of sale for that vehicle. I suggested that she may have bought a stolen four-wheeler, and explained that she would not necessarily be arrested for that, but that my main concern was getting any potentially stolen property back to its rightful owner. Ms. Barnette adamantly indicated that she did not want to own a stolen vehicle.

18.    I asked Ms. Barnette if we could inspect her four-wheeler and check the Vehicle Identification Number (VIN) against a stolen vehicle database. She gave her consent, and we proceeded to the outbuildings in the back yard of the property.

19.    I did not have any "consent to search" forms in my car for Ms. Barnette to sign; nevertheless, such forms are not mandated by law, and I believed that she was giving her consent to search freely and without coercion. Had I believed otherwise, I would have obtained a search warrant as required by law.

20.    The four-wheeler with the "popped" ignition was located in an unlocked storage shed. We also observed a padlocked garage-type building with two four-wheelers visible from a

window. I asked Ms. Barnette if we could enter that building and inspect those vehicles. Ms. Barnette consented, apparently willingly, and, after some searching, had her son bring us the key to the building. Ms. Barnette informed me that she and/or her husband had bought one of those two vehicles new, and that the other was a friend's vehicle that her husband was working on.

21.     We entered and inspected those vehicles as well. However, upon inspection, we were unable to locate the VINs on one or two of the vehicles. Had we been able to locate the VINs for the three four-wheelers, we nevertheless would have been unable to call them in to the Sheriff's dispatch to check them against a stolen vehicle list, due to the fact that our mobile radios were not transmitting or receiving a signal at that location. Further, even had we been able to reach the dispatch office and check the computer, such a cursory check would have been insufficient. Despite the fact that four-wheelers do have VINs, most owners do not record that information, and therefore do not have it when reporting their four-wheeler stolen. Consequently, reports of stolen four-wheelers are predominantly dependant on vehicle descriptions, such as color, decals, and identifying marks and scratches. This information is not recorded in the stolen vehicle computer database, and must be checked manually when a stolen or potentially stolen vehicle is recovered.

22.     At this time I had the following probable cause to believe that one or more of the four-wheelers was stolen: (a) one four-wheeler had a "popped" ignition; (b) Ms. Barnette could only produce a bill of sale for one of the four-wheelers, and that bill of sale did not contain a VIN number; and (c) Ms. Barnette had admitted that one of the four-wheelers did not belong to them. Because we could not locate the VINs on some of the vehicles, we could not radio in the VINs from the residence, and it was getting dark, I asked Ms. Barnette if we could take the four-wheelers to the Sheriff's Department and check them there. She consented to this. She did not indicate that there was any sense of urgency to get the four-wheelers back. I specifically asked her if she or her family

were intending to use the four-wheelers, because I did not want to interfere with their plans or use of the vehicles. She informed me that they did not intend to use the vehicles until the next weekend, when they intended to go camping. I asked her if her husband was in town, and if she wanted to call him to check. I told her that she would be able to pick up the vehicles the next day (Friday). However, she indicated to me that they would pick up the four-wheelers on Saturday.

23.    Upon receiving consent from Ms. Barnette to take the four-wheelers, I called Sheriff's Department employee Amanda Jenkins to meet us at the residence. Ms. Jenkins is a Road Crew Supervisor and at the time was driving a Suburban sports utility vehicle and towed a trailer that I believed could carry all three four-wheelers. However, upon her arrival, we determined that her trailer would only be able to carry one (1) four-wheeler.

24.    I had observed a trailer parked on the Barnette property, and I asked Ms. Barnette whether we could borrow that trailer to transport the four-wheelers. At this time I observed Ms. Barnette call her husband and ask him if we could use the trailer to transport the four-wheelers to the Sheriff's Department. She then indicated to me that we could use the trailer, and that it was no problem.

25.    Although Ms. Barnette did mention to me about her shock and fear during the entry into her home earlier that day, the entire time we were at her residence investigating the four-wheelers she was warm, friendly, talkative, smiling, cooperative and helpful. She did not appear to be nervous, intimidated or fearful. Further, her son was also friendly and helpful. I observed him happy and playing, running around, eager to assist us, and smiling. He approached us and talked to us without apparent fear, apprehension or intimidation.

26.     We transported the four-wheelers to the Sheriff's Department, where we located and checked the VINs against the stolen vehicle database on Thursday night or Friday. The check did not reveal that the vehicles were stolen.

27.     On Saturday afternoon or evening, Jerry Barnette and Lisa Barnette met me at the Sheriff's Department to pick up the four-wheelers. I spoke to the Barnettes for about an hour, during which they asked me a number of questions concerning the entry into their house, the arrest of Mr. Thrower, and the four-wheelers. This conversation was very friendly. During that conversation, I assured the Barnettes that their carpet would be fixed. By this time, I was informed that their front door had been replaced. Further, after discussing the reason for the SWAT entry into their house, I specifically remember Mr. Barnette commenting to his wife that it was a reasonable decision, and that he would probably have done things the same way. The Barnettes retrieved the four-wheelers and departed.

28.     I swear to the best of my present knowledge that the above statements are true; that I am competent to make this affidavit; and, the above statements are made by drawing from my personal knowledge of the situation.

HEATH TAYLOR

SWORN TO and SUBSCRIBED before me this 13 day of April, 2007.

NOTARY PUBLIC
My Commission Expires: 9/30/07