IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| LISA BARNETTE, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 3:05-cv-00473-WKW |
| CITY OF PHENIX CITY, et al., | ) |
| Defendants. | ) |

### AFFIDAVIT OF GROVER GOODRICH

| | |
|---|---|
| STATE OF ALABAMA | ) |
| COUNTY OF RUSSELL | ) |

BEFORE ME, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Grover Goodrich, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1. My name is Grover Goodrich. I am over the age of nineteen and competent to make this affidavit.

2. I am a Sheriff's Deputy assigned to the Investigations Division (Investigator) for the Russell County Sheriff's Department in Russell County, Alabama. I am specifically assigned to investigate juvenile sex crimes. I have been a law enforcement officer for over 9 years.

3. On February 10, 2005, I was instructed by Russell County Sheriff's Department Chief Investigator Lieutenant Heath Taylor to take a Georgia warrant to a Russell County Circuit Court judge and have the warrant domesticated as a fugitive warrant. The warrant was a felony warrant for the arrest of Kenneth D. Thrower. The charge contained in that warrant was

**DEFENDANT'S EXHIBIT C**

Aggravated Child Molestation in violation of Georgia Code § 16-6-4. Pursuant to those instructions, I had a fugitive warrant prepared by Sheriff's Department administrative personnel, and proceeded to the Russell County Courthouse in search of a judge to sign the warrant.

4. I arrived at the Russell County Courthouse close to lunch time and there were no judges in the building. As I was aware of the time-sensitive nature of the situation, I searched several nearby restaurants in an attempt to locate a judge. Upon returning to the Courthouse, I found that Judge Johnson had returned from lunch early, and got the warrant signed. I then notified Lieutenant Taylor via cell phone that I had a signed warrant in hand, and proceeded to Lieutenant Taylor's location.

5. When I arrived at the Barnette residence, the SWAT team had secured the house and was preparing to leave. I heard Ms. Barnette tell Lieutenant Taylor that Mr. Thrower had just left, and that he had gone to meet his mother for lunch at El Vaquero restaurant.

6. I followed the team out to El Vaquero restaurant, where I entered the restaurant with Lieutenant Taylor and a Phenix City police officer and arrested Mr. Thrower without incident.

7. Russell County continuously battles the theft of four-wheeler vehicles; however, these thefts increase during hunting season, which starts in October and runs through the end of January, because four-wheelers are used extensively by hunters, making them both (a) more desirable, and (b) readily available, and thus easier to steal. The area along Highway 80 is especially susceptible to these particular thefts. These thefts were even worse than usual in 2005, to the point that all investigators had been tasked with investigating four-wheeler theft cases in addition to their regular cases. The Russell County Sheriff's Department had even posted deputies

along Highway 80 with instructions to stop every vehicle towing or carrying a four-wheeler and require proof of ownership.

8. Because of the foregoing problem of four-wheeler theft, after securing Mr. Thrower's arrest, I accompanied Lieutenant Taylor back to the Barnette residence in his car to follow up on a suspicious four-wheeler discovered at that residence. When we arrived at the residence, an employee of the Russell County Sheriff's Department, along with Russell County Jail inmates, were already present, securing the Barnette's front door. Because the front door was temporarily secured in a fashion that did not permit it to open, we approached the back door and Lieutenant Taylor announced himself to Ms. Barnette.

9. After re-introducing ourselves, I heard and observed Lieutenant Taylor inform Ms. Barnette that Mr. Thrower had been arrested without incident or injury. He then explained to her about the problem with four-wheeler thefts, and informed her that she possessed a four-wheeler that appeared to be stolen because of the "popped" ignition. She informed us that the ignition on that vehicle had been broken out when they bought it. I heard and observed Lieutenant Taylor ask her if she had a bill of sale for that vehicle, and she indicated that she did. At that point I observed Ms. Barnette call her husband to inquire about the purchase of that four-wheeler, and to ask him where the bill of sale was. However, upon searching, she was unable to locate a bill of sale for that vehicle. I heard and observed Lieutenant Taylor suggest to Ms. Barnette that she may have bought a stolen four-wheeler, and explained that she would not necessarily be arrested for that, but that our main concern was getting any potentially stolen property back to its rightful owner. Ms. Barnette adamantly indicated that she did not want to own a stolen vehicle.

10.     I heard and observed Lieutenant Taylor ask Ms. Barnette if we could inspect her four-wheeler and check the Vehicle Identification Number (VIN) against a stolen vehicle database. She gave her consent, and we proceeded to the outbuildings in the back yard of the property.

11.     I believed that Ms. Barnette was giving her consent to search freely and without coercion or intimidation.

12.     The four-wheeler with the "popped" ignition was located in an unlocked storage shed. We also observed a padlocked garage-type building with two four-wheelers visible from a window. I heard and observed Lieutenant Taylor ask Ms. Barnette if we could enter that building and inspect those vehicles. Ms. Barnette consented, apparently willingly, and, after some searching, had her son bring us the key to the building. Ms. Barnette informed us that she and/or her husband had bought one of those two vehicles new, and that the other was a friend's vehicle that her husband was working on.

13.     We entered and inspected those vehicles as well. However, upon inspection, we were unable to locate the VINs on one or two of the vehicles. Had we been able to locate the VINs for the three four-wheelers, we nevertheless would have been unable to call them in to the Sheriff's dispatch to check them against a stolen vehicle list, due to the fact that our mobile radios were not transmitting or receiving a signal at that location. Further, even had we been able to reach the dispatch office and check the computer, such a cursory check would have been insufficient. Despite the fact that four-wheelers do have VINs, most owners do not record that information, and therefore do not have it when reporting their four-wheeler stolen. Consequently, reports of stolen four-wheelers are predominantly dependant on vehicle descriptions, such as color, decals, and identifying marks and scratches. This information is not recorded in the stolen vehicle computer database, and must be checked manually when a stolen or potentially stolen vehicle is recovered.

14. At this time I had the following probable cause to believe that one or more of the four-wheelers was stolen: (a) one four-wheeler had a "popped" ignition; (b) Ms. Barnette could only produce a bill of sale for one of the four-wheelers, and that bill of sale did not contain a VIN number; and (c) Ms. Barnette had admitted that one of the four-wheelers did not belong to them. Because we could not locate the VINs on some of the vehicles, we could not radio in the VINs from the residence, and it was getting dark, I heard and observed Lieutenant Taylor ask Ms. Barnette if we could take the four-wheelers to the Sheriff's Department and check them there. She consented to this. She did not indicate that there was any sense of urgency to get the four-wheelers back. Lieutenant Taylor specifically asked her if she or her family were intending to use the four-wheelers, because we did not want to interfere with their plans or use of the vehicles. She informed us that they did not intend to use the vehicles until the next weekend, when they intended to go camping. Lieutenant Taylor asked her if her husband was in town, and if she wanted to call him to check. He told her that she would be able to pick up the vehicles the next day (Friday). However, she indicated to us that they would pick up the four-wheelers on Saturday.

15. Upon receiving consent from Ms. Barnette to take the four-wheelers, Lieutenant Taylor called Sheriff's Department employee Amanda Jenkins to meet us at the residence. Ms. Jenkins is a Road Crew Supervisor and at the time was driving a Suburban sports utility vehicle and towed a trailer that we believed could carry all three four-wheelers. However, upon her arrival, we determined that her trailer would only be able to carry one (1) four-wheeler.

16. We had observed a trailer parked on the Barnette property, and Lieutenant Taylor asked Ms. Barnette whether we could borrow that trailer to transport the four-wheelers. At this time I observed Ms. Barnette call her husband and ask him if we could use the trailer to transport

the four-wheelers to the Sheriff's Department. She then indicated to us that we could use the trailer, and that it was no problem.

17. I am a trained juvenile sex crimes investigator, and a trained and certified forensic interviewer. I am trained to notice and understand a person's -- particularly a child's -- body language and demeanor. I deal firsthand on a daily basis with intimidated, frightened, and oppressed people, particularly children.

18. The entire time we were at her residence investigating the four-wheelers Ms. Barnette was warm, friendly, talkative, smiling, cooperative and helpful. She did not appear to be nervous, intimidated or fearful. Further, her son was also friendly and helpful. I observed him happy and playing, running around, eager to assist us, and smiling. He approached us and talked to us without apparent fear, apprehension or intimidation.

19. We transported the four-wheelers to the Sheriff's Department, where we located and checked the VINs against the stolen vehicle database on Thursday night or Friday. The check did not reveal that the vehicles were stolen.

20. I swear to the best of my present knowledge that the above statements are true; that I am competent to make this affidavit; and, the above statements are made by drawing from my personal knowledge of the situation.

_____
GROVER GOODRICH

SWORN TO and SUBSCRIBED before me this 13 day of April, 2007.

_____
NOTARY PUBLIC
My Commission Expires: 9/30/07