IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LISA BARNETTE, et al.,             *
                                   *
        Plaintiffs,                *
                                   *
v.                                 *        CASE NO. 3:05-cv-473-WKW
                                   *
CITY OF PHENIX CITY, et al.,       *
                                   *
        Defendants.                *

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS CITY OF PHENIX CITY, ALABAMA, GREG LAHR, TERRANCE WALKER, MICHAEL BAILEY, STEVE NOLIN, CURTIN MITCHEL, LUIS COREANO, WARREN McLAUGHLIN AND JARROD BARR

COME NOW the Defendants, City of Phenix City, Alabama; Greg Lahr; Terrance Walker; Michael Bailey; Steve Nolin; Curtin Mitchell; Luis Coreano; Warren McLaughlin and Jarrod Barr (hereinafter referred to collectively as "the Defendants") and submit the following brief in support of their motion for summary judgment:

## I.    NARRATIVE SUMMARY OF UNDISPUTED MATERIAL FACTS

### A.    BRIEF OVERVIEW

On February 10, 2005, Defendants (and others) entered Plaintiffs' residence in search of Plaintiff, Lisa Barnette's brother, Kenneth Thrower. (See Compl.). Mr. Thrower was wanted for arrest for Aggravated Child Molestation of his 12-year-old daughter. (See Aff. of Len Wills, attached hereto as Ex. "A"). At the time of entry, Plaintiffs Lisa Barnette, Sara Cruz and C.B., a minor, were present in the residence. (See Compl.). However, Mr. Thrower was not present. (Id.) The Plaintiffs bring this action

for physical, emotional and property damages arising from the entry.  (Id.)

**B.**    **FACTS**

During and prior to February 2005, Officer Len Wills, a detective for the City of Columbus Police Department in Columbus, Georgia investigated crimes committed by Kenneth Thrower.  (See Ex. "A").  The investigation was prompted by a report given to Officer Wills by Mr. Thrower's 12-year-old daughter that she was being sexually molested by her father.  (Id. at ¶ 3).  After conducting an investigation, Officer Wills issued a felony warrant for Mr. Thrower's arrest on the charge of Aggravated Child Molestation.  (Id.)

On February 10, 2005, Officer Wills was visited by Mr. Thrower's wife, Lisa Thrower. (Id. at ¶ 4). Mrs. Thrower told Officer Wills that Mr. Thrower had fled Georgia to Russell County, Alabama, where his family lived. (Id.)  Mrs. Thrower also informed Officer Wills that Mr. Thrower (1) was aware of the arrest warrant, (2) had made statements to the effect that he "was not going to be taken to jail," (3) was armed (that he had a handgun in his truck), (4) was potentially homicidal and/or suicidal, and (5) was a flight risk.[1]  (Id.)

Subsequent to receiving this information, Officer Wills contacted Lieutenant Steve Osteen with the Russell County Sherriff's department requesting his assistance in apprehending Mr. Thrower.  (Id. at ¶ 6). Officer Wills faxed a copy of the felony warrant to the Russell County Sheriff's Department. (Id.)

---

[1] Officer Wills has testified that he has known the Thrower family for at least thirty (30) years.  (Id. at ¶ 5). As such, he knew that Mr. Thrower's brother had committed suicide. (Id.)  With this family history, Officer Wills was concerned about Mr. Thrower becoming desperate with regard to his position as a felon fugitive. (Id.)

After speaking with Lieutenant Osteen, Officer Wills relayed information he had obtained regarding Mr. Thrower's condition to Lieutenant Heath Taylor, Chief Investigator for the Russell County Sheriff's Office. (Id. at ¶ 7). Officer Wills also informed Lt. Taylor at that time that Mrs. Thrower believed Mr. Thrower to be at his mother's residence on or near Highway 80 in Russell County and provided him with a description of Mr. Thrower's truck. (See Aff. of Heath Taylor, attached hereto as Ex. "B").

Lt. Taylor immediately instructed Russell County Sheriff's Investigator Grover Goodrich to take the Georgia warrant to a Russell County Circuit Court Judge for domestication as a fugitive warrant. (Id. at ¶ 3). Investigator Goodrich had a fugitive warrant prepared by Sheriff's Department administrative personnel, and proceeded to the Russell County Courthouse in search of a judge to sign the warrant. (See Aff. of Grover Goodrich, attached hereto as Ex. "C").

On the morning of February 10th, members of the Russell County SWAT team and members of the Phenix City SWAT team (the Defendants) were at the Russell County Sherriff's Office being debriefed from operations which they executed jointly earlier that morning. (See Aff. of Robert Casteel, attached hereto as Ex. "D" and Id. at ¶ 4). Lt. Taylor determined that a SWAT operation was the safest way to apprehend Mr. Thrower without injury to him, innocent parties, or arresting officers. (See Ex. "B"). Since Mr. Thrower's mother's residence existed beyond Phenix City's limits, Lt. Taylor assumed jurisdictional command over the joint SWAT team that included both City and County officers. (See Ex. "D"). Since the County maintained jurisdiction, the role of the members of Phenix City's SWAT team was strictly supportive. (Id).

Subsequent to assuming command, Lt. Taylor passed on to the SWAT team all information he had received regarding Mr. Thrower. (Id.) Lt. Taylor instructed the team to assemble some distance down Highway 80 from Mr. Thrower's mother's house and await further instructions. (Id.)

Lt. Taylor subsequently left the Sheriff's office and proceeded toward the address Lt. Taylor had received indicating Mr. Thrower's location. [2] (See Ex. "B"). While Lt. Taylor was surveying the area, he received information from Officer Wills in Columbus -- who was in direct contact with Mrs. Thrower -- that Mr. Thrower was at the home of his sister, Lisa Barnette, also on Highway 80, and was given addresses for a couple of houses down from Mr. Thrower's mother. (Id.) Officer Wills informed Lt. Taylor that since Ms. Barnette's house was located very close to Mr. Thrower's mother's house, his truck could be parked at that location. (Id.) Officer Wills further communicated that Mrs. Thrower believed Mr. Thrower would have access to a large number of guns and ammunition at Ms. Barnette's house. (Id.)

After surveying Ms. Barnette's house, Lt. Taylor considered setting up a perimeter of officers to covertly observe the house in an attempt to arrest Mr. Thrower when he exited. (Id.) However, given the topography of the land and the lack of adequate cover for the observing officers, Lt. Taylor determined there would be no way to adequately secure the perimeter without alerting occupants, potentially initiating a shootout or hostage situation. (Id.)

Based on all information available, Lt. Taylor determined that exigent circumstances existed to justify entering the house without a search warrant to effectuate

---

[2] Lt. Taylor was accompanied by Capt. Robert Casteel, Commander for the Phenix City SWAT team. (See Ex. "D").

Mr. Thrower's arrest. (Id.) It would have taken more than an hour to obtain a search warrant. (Id.)

Lt. Taylor subsequently directed the SWAT team to prepare to enter the house. (Id.) Prior to ordering entry, he received information from Investigator Goodrich that Russell County Judge Al Johnson had signed the fugitive arrest warrant. (Id.)

At Lt. Taylor's direction, the SWAT team opened the front door of the residence and deployed a "flash bang" distraction and diversionary device before entering to secure the house and its occupants. (Id.) The SWAT team secured the house in under thirty (30) seconds, at which time Lt. Taylor and Capt. Casteel entered.[3] (Id.) At the time of entry, there were three individuals present: Plaintiffs Lisa Barnette, Sara Cruz and C.B., a minor. (See Compl.). However, Mr. Thrower was not present. (Id.)

Mr. Thrower's sister, Lisa Barnette, told Lt. Taylor and Capt. Casteel that they had just missed Mr. Thrower. (Id.) He had left the premises moments before to meet his mother for lunch at a local restaurant, El Vaquero. (Id.)

Subsequent to learning Mr. Thrower's location, Lt. Taylor, Capt. Casteel, and the SWAT team immediately left the Barnette residence and proceeded to El Vaquero. (Id.) Upon arrival, Lt. Taylor observed a truck matching the description of the vehicle Mr. Thrower was reportedly driving. (Id.) Lt. Taylor instructed the SWAT team to surround the restaurant. (Id.) Investigator Goodrich, Lt. Taylor and Capt. Casteel entered the restaurant and arrested Mr. Thrower without incident. (Id.)

A search of Mr. Thrower's truck revealed several packed bags and a loaded handgun. (Id.)

---

[3] During the search, the SWAT team discovered over thirty (30) weapons, including handguns, long guns, shotguns, and over one thousand (1,000) rounds of ammunition, validating information received from Mrs. Thrower. (Id.)

The undisputed evidence shows that that the Defendants were acting under the direct control and jurisdiction of the Russell County Sheriff's Department; specifically, under the direction of Lt. Taylor at all times relevant to this operation. (See Ex. "D"). The Defendants were not in a position to gather any information regarding Mr. Thrower and relied on information provided to them by Lt. Taylor in determining whether probable cause or exigent circumstances existed to enter Plaintiffs' premises. (Id.) Since the County maintained jurisdiction over this operation, the role of the Defendants was strictly supportive to the County. (Id.)

Information gathered during the course of Mr. Thrower's arrest proved that Defendants' reliance on information provided to them by Lt. Taylor was justified. For example, when Plaintiffs' house was entered, it was determined that Mr. Thrower did, indeed, have access to a substantial number of weapons including handguns, long guns, shotguns and over one thousand (1,000) rounds of ammunition he could have utilized against the officers in resisting arrest. (See Ex. "B" at ¶ 9). He was arrested in possession of a handgun. (See Ex. "B").

Moreover, all of the information presented to the Defendants regarding Mr. Thrower's location in Russell County proved true; Mrs. Thrower correctly identified: (1) the fact that Mr. Thrower had fled to Russell County, (2) that Mr. Thrower had family living in Russell County, (3) that Mr. Thrower had gone to Russell County to meet his mother, (4) that Mr. Thrower's mother and Mr. Thrower's sister lived on Highway 80 in Russell County, (5) that Mr. Thrower was armed, (6) that Mr. Thrower had sexually molested their daughter, and (7) that Mr. Thrower had access to

a number of weapons at Plaintiffs' residence.  (See Ex. "B").  Tellingly, Mr. Thrower left Plaintiffs' residence only moments before entry took place. (Id.)

## C.    **PROCEDURAL NARRATIVE**

On May 25, 2005, Lisa Barnette; her husband, Jerry Barnette; Sara Cruz (an adult female in the house at the time of entry); and C.B. (a minor present at the time of entry) filed suit against the Defendants arguing that the Defendants violated their constitutional rights by entering their property without a search warrant in attempting to apprehend Mr. Thrower.[4]  (See Complaint). The Plaintiffs claim that exigent circumstances did not exist to validate warrantless entry of Plaintiffs' residence and that the SWAT team used excessive force in entering the residence.  (Id.)  The Plaintiffs have set forth no evidence supporting these assertions.

The Plaintiffs purport to maintain this action pursuant to 42 U.S.C. §§ 1983, 1985 and 1986; 28 U.S.C. §§ 1331, 1343, 2201 and 2202 as well as a number of common law  causes of action including unlawful entry, unlawful search and seizure, unlawful taking, excessive force, conspiracy to violate civil rights, neglect to prevent violation of civil rights, trespass, assault and battery, invasion of privacy, intentional infliction of emotional distress, conversion and/or intermeddling with chattels, false arrest and false imprisonment. (See Compl.).

The Plaintiffs demand eight million dollars ($8,000,000.00) in compensation for physical and emotional distress damages as well as property damages incurred during the entry.  (See Compl). They also claim injunctive relief and declaratory judgment. (Id.)

---

[4] The Plaintiffs named Investigator Grover Goodrich and Investigator Heath Taylor as Defendants.  (See Compl.).

## II.    ARGUMENT

### A.    The Plaintiffs' Claims Against the Defendants Under 42 U.S.C.§ 1983 are due to be Dismissed Because the Defendants are Entitled to Qualified Immunity.

Whether a government official is entitled to protection under the doctrine of qualified immunity is a "purely legal question," proper for determination at summary judgment. See Acierno v. Cloutier, 40 F.3d 597, 609 (3d Cir. 1994). Public officials, including law enforcement officers, are entitled to assert the defense of qualified immunity in § 1983 civil rights suits for discretionary acts occurring in the course of their official duties. See Ex parte Ala. Dep't of Youth Servs., 880 So. 2d 393 (Ala. 2003).

In deciding whether a law enforcement officer is entitled to qualified immunity in a § 1983 action, the court employs the following two-step analysis. See Couch v. City of Sheffield, 708 So. 2d 144, 155 (Ala. 1998). The defendant officer must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful act occurred. Id. Once the officer satisfies this initial burden, the burden shifts to the plaintiff to show that the officer failed to operate in good faith. Id. The only way for the Plaintiff to meet this burden is to show that the officer violated clearly established constitutional law. Id.

With regard to the initial analysis, there is no allegation here that the Defendants were not operating within the line and scope of their employment on the date in question. (See Compl.). In fact, Plaintiffs have asserted in their Complaint that the Defendants were "acting within the line and scope of their authority" at the time of the incident in question, and that they were engaged in acts typically performed by police officers (search and seizure of a house believed to be occupied by an armed and dangerous felon)

at the time of the incident.[5]  (See Comp. at ¶ 21).  Since the Defendants were acting within their discretionary authority in entering Plaintiffs' house, qualified immunity attaches unless the Plaintiffs can set forth evidence showing that the Defendants' conduct was so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith. See Couch, supra at 154. Liability does not attach to any of the Defendants unless "his act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." See Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994).  The Plaintiffs have established no such evidence.

With regard to the application of this analysis to the Defendants (who were acting under the direction and control of the Russell County Sheriff's Department), it is well established that when a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest or search provided that it was "objectively reasonable" for him to believe, on the basis of the statements, that probable cause existed. See Rogers v. Powell, 120 F.3d 446 (3d Cir. 1997). Since the Defendants were operating under the jurisdiction and control of the Russell County Sherriff's Department during entry, none of the Defendants were directly privy to information regarding the operation.  (See Exs. "B" and "D").  Moreover, the Defendants were not responsible for determining whether circumstances existed justifying a warrantless search of the Plaintiffs' residence.  (Id.)

---

[5] This Court has already rendered judgment in this case that Co-Defendants Goodrich and Taylor were acting within their discretionary authority on the date in question. See Memorandum and Order dated March 15, 2006. The Defendants (City of Phenix City and members of Phenix City's SWAT team) were acting directly under Lt. Taylor's direction. As such, similar analysis will determine the scope of these Defendants actions as well.

Since the Defendants were dependent upon information provided to them by Lt. Taylor, they can be held liable if and only if the Court determines that it was "objectively unreasonable" for the Defendants to have relied on that information provided by Lt. Taylor establishing the existence of probable cause and exigent circumstances in entering Plaintiffs' residence.

### A-1.    The Defendants are Entitled to Qualified Immunity with Regard to Plaintiffs' Claims under the Fourth Amendment Because Exigent Circumstances Existed Validating Entry into Plaintiffs' Residence without a Search Warrant.

As a general proposition, pursuant to the Fourth Amendment to the United States Constitution, a police officer must have a warrant to enter residential premises for purposes of arrest. See Welsh v. Wisconsin, 466 U.S. 740, 749-53 (1992). However, there are numerous exceptions to this general requirement. See Chevere v. State, 607 So. 2d 361, 368 (Ala. Cr. App. 1992) and Welsh, supra at 749-53. Police officers may enter onto a residential premises for purposes of search and seizure without a warrant under any of the following well known exceptions: (1) plain view; (2) consent; (3) incident to a lawful arrest; (4) hot pursuit or emergency; (5) probable cause coupled with exigent circumstances; (6) stop and frisk situations; and/or (7) inventory searches. See Ex parte Hilley, 484 So. 2d 485, 488 (Ala. 1985); Chevere, supra, 607 So. 2d at 368.

The principle of probable cause linked with "exigent circumstances" (noted as (9) above) exists here to validate entry onto Plaintiffs' residence in search of Mr. Thrower. See Seamon v. Rokosik, 1995 U.S. Dist. LEXIS 12481 (D. Ill. 1995). An "exigent circumstance" is generally defined as a situation whereby an "immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate [for a warrant]." See Norman v. United States of America, 435 F.2d 385 (D.C. 1970).

In determining whether exigent circumstances exist, courts may consider a broad analysis in determining the validity of a warrantless residential entry including whether: (1) there was a "grave offense" involved, particularly one that involved a crime of violence, see McDonald v. United States, 335 U.S. 451, 459 (1948), (2) the suspect was reasonably believed to be armed, see Warden v. Hayden, 387 U.S. 294 (1967), (3) there existed a source of "reasonably trustworthy information" to lead an officer to believe that the suspect committed the crime involved, see Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), (4) there existed a strong reason to believe that the suspect was in the premises being entered, see Warden, supra. and (5) there existed a likelihood that the suspect would escape if not swiftly apprehended. See Chappell v. United States, 342 F.2d 935, 938 (1965).

Exigent circumstances more likely exist (1) where there was an imminent danger of destruction of evidence and/or the possibility of escape, id. or (2) where law enforcement officers are seeking a felony arrest rather than an arrest for a misdemeanor or civil charge. See Payton v. New York, 445 U.S. 573 (U.S. 1980).

Here, there can be no doubt that exigent circumstances -- as determined by the criteria noted above -- existed to justify the Defendants entry onto Plaintiffs' property in search of Mr. Thrower. First and foremost, the Defendants were informed by Lt. Taylor that Mr. Thrower was wanted for arrest pursuant to a felony warrant in Georgia which had been domesticated as a fugitive from justice warrant in Russell County. (See Ex. "B"). Mr. Thrower was wanted for charges of Aggravated Child Molestation of his twelve-year old daughter, certainly a crime of violence. See McDonald, supra, and Ex. "B".

11

Second, the Defendants were informed that Mr. Thrower was armed and dangerous. Specifically, the Defendants were told that Mr. Thrower was (1) in possession of a handgun; (2) that he would have access to a large number of firearms at the Plaintiffs' residence; and (3) that he was potentially homicidal or suicidal. (See Ex. "B"). Of course, this information proved correct when the SWAT team discovered a large number of weapons in the Plaintiffs' residence as well as a handgun in Mr. Thrower's vehicle at the time of his arrest. See Warden, supra, and Ex. "B."

Third, since Mr. Thrower was charged with molesting Mr. and Mrs. Thrower's daughter, the Defendants had no reason to suspect that information given to them by Ms. Thrower would be inaccurate. In fact, all of the information provided to the Defendants by Lt. Taylor proved trustworthy.[6] See Spinelli, supra.

Due to the reliability of the information provided to Lt. Taylor by Mrs. Thrower, the Defendants had no reason to believe that Mr. Thrower was not in Plaintiffs' residence at the time of entry. See Warden, supra. The SWAT team missed Mr. Thrower at the Plaintiffs' residence by a matter of minutes. (See Ex. "B").

Moreover, the testimony before the Court shows that Lt. Taylor considered establishing an observation perimeter around the house to apprehend Mr. Thrower, but, based on his interpretation of the topography of the area surrounding the house, he ultimately determined that such a plan would place the Defendants at risk of harm by increasing the possibility of a hostage or shootout situation. (See Ex. "B" at ¶ 7). Since Lt. Taylor did not have complete information regarding the existence and/or identities of

---

[6] Mrs. Thrower correctly identified: (1) the fact that Mr. Thrower had fled to Russell County, (2) the fact that Mr. Thrower had family living in Russell County, (3) the fact that Mr. Thrower had gone to Russell County to meet his mother, (4) that Mr. Thrower's mother and Mr. Thrower's sister lived on Highway 80 in Russell County, (5) that Mr. Thrower was armed, (6) that Mr. Thrower had sexually molested their daughter, and (7) that Mr. Thrower had access to a number of weapons at Plaintiffs' residence. (See Ex. "B").

other persons within the home, his decision to enter the house in efforts to avoid a potential hostage situation was justified since Mr. Thrower was well armed. It would have taken in excess of one hour to secure a search warrant. (Id.) Lt. Taylor had been informed that Mr. Thrower was a flight risk and that he had made statements to the effect that he "would not be taken to jail" prior to fleeing Georgia. (Id.) At the time of his arrest, Mr. Thrower was found to be in possession of packed bags. (Id. at ¶ 14).

Under the doctrine of qualified immunity for § 1983 purposes, immunity inquiry must be filtered through the lens of an officer's perceptions at the time of the incident in question. See Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994). A court should not "second-guess" reasonableness of an officer's actions with the benefit of 20/20 hindsight. Id.

Based on the totality of the objective facts--taken with regard to the circumstances as they existed at the time-- it was certainly reasonable for the Defendants to rely on information provided to them by Lt. Taylor in believing that probable cause and exigent circumstances existed validating a warrantless entry of Plaintiffs' residence.

Since it was objectively reasonable for the Defendants to rely on that information provided to them by Lt. Taylor, the Defendants are protected by qualified immunity from Plaintiffs civil claims. Summary judgment is due to be granted.

### A-2.  The Defendants did not use Excessive Force in Entering Plaintiffs' Residence.

In determining whether facts support a § 1983 claim based upon excessive force, the court must apply the Fourth Amendment's standard of reasonableness. See Lodato v. Evesham, 782 F. Supp. 957, 960 (D.N.J. 1992). As discussed above, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on

the scene, rather than with the benefit of 20/20 hindsight. See Terry v. Ohio, 392 U.S., at 20-22, 88 S.Ct., at 1879-1881. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation. Id., 109 S. Ct. at 1872. Succinctly stated,

> Under the Fourth Amendment, the question is whether the defendants' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation. Whether the force used in making an arrest was unreasonable is an issue to be determined in light of all the circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and actively resists arrest or attempts to evade arrest by flight.

See Berry v. Phillipsburg, 796 F. Supp. 1400, 1404 (D. Kan. 1992).

In Commonwealth v. Garner, 423 Mass. 735 (Mass. 1996), two men robbed a convenience store and raped the store clerk. Id. at 738. After the robbery, one of the suspect's girlfriends provided the police with an address to where the suspects were staying. Id. She also informed the police that the suspects were armed with similar weapons to those used during the rape. Id. at 736. After identifying the suspects' residence, the police discovered that another male, two small children and a pregnant woman were also living at the residence. Id. Based solely on the understanding that the men were armed (and potentially violent), the police made a decision to forcefully enter the premises. Id.

In preparation for entering the house, one of the officers broke a window in a back bedroom and dropped a flash-bang devise inside.[7] Id. at 737. A four year old child was

---

[7] A flash-bang devise is a light/sound diversionary device designed to emit a brilliant light and loud noise upon detonation. Its purpose is to stun, disorient, and temporarily blind its targets, creating a window of

in the bedroom when the device exploded with a bright flash, filling the apartment with smoke. Id. Immediately, police officers in black military outfits stormed the apartment. Id. In the ensuing excitement the pregnant woman was struck in the face and abdomen by a door. Id. The police swept through the apartment and secured it within three to four minutes. Id. No one offered any resistance. Id.

After the entry, the woman complained of feeling ill and was taken to a hospital. Id. The child was screaming and gagging from the smoke in the apartment, and was treated a few days later for a health complaint associated with smoke inhalation as well as continued complaints for nervousness, crying and nightmares. Id.

One of the alleged rapists filed suit against the Commonwealth of Massachusetts alleging, among other things, that the police officers used excessive force in entering the house. Id. at 738. In granting Defendant's motion to suppress evidence gathered in the search, the trial Court determined that the police officers used excessive force in entering the premises by (1) deploying a flash-bang devise in a child's bedroom, (2) failing to determine whether the house was barricaded and (3) failing to recognize that there was not a valid potential for the development of a hostage situation. Id. The police department appealed.

In reversing the trial court's decision, the Supreme Court of Massachusetts held that the police officers were, indeed, justified in using force in entering the residence with a flash-bang devise during a military style operation. Id. at 744. Specifically, the Court determined that the police were justified in using aggressive tactics in attempting to avoid

---

time in which police officers can safely enter and secure a potentially dangerous area. Flash-bang devises are not so inherently dangerous as to necessitate prior judicial authorization for use. See Commonwealth v. Garner, 423 Mass. 735 (Mass. 1996).

a gun battle. <u>Id</u>. The following is relevant in its entirety:

> A surprise entry with overwhelming force, accompanied by a strong and stunning diversion, may well have seemed the best way to avoid a deadly gun battle. True, it cannot be said that the methods used were, in the judge's words, "necessary, and thus reasonable conduct, to effect a safe entry into the dwelling." The police might have secretly surrounded the apartment and waited until [Garner] left. Or they might have taken a chance on a less dramatic and less overwhelming show of force. <u>But these are exactly the kinds of speculations that we must not engage in under the aegis of determining whether police action in executing a valid no-knock warrant was reasonable in the circumstances. The question is not whether the methods of the police entry were "necessary," but whether they were reasonable.</u>

<u>Id</u>. at 744. (emphasis added). In so holding, the Court refused to substitute its judgment in hindsight for the judgment of an officer on the scene. <u>Id</u>.

In expounding upon its finding, the Court determined that use of a flash-bang devise in the room of a young child (which caused injury to the child from smoke inhalation) was appropriate. "[O]nce the decision to enter was made, the use of the device within the apartment cannot be described as an unreasonable part of a plan designed to get the operation over with as quickly as possible and to minimize the possibility of a gun battle that might have been truly lethal. While it is regrettable that the device was deployed in a room where the little girl happened to be, it cannot be said to have contributed greatly to the inherent dangerousness of the situation as a whole, nor indeed to whatever ill effects she suffered." <u>Id</u>. at 745. Aggressive action was justifiable because the suspects were armed. <u>Id</u>. at 744. The police were justified in using a flash-bang devise even though it caused injury to a four year old child. <u>Id</u>.

The Court further determined that the police were justified in using "military style" SWAT tactics in entering the home even though a pregnant female was struck in the head and abdomen by a swinging door during entry. <u>Id</u>.

16

In <u>United States v. Myers</u>, 106 F.3d 936 (10th Cir. 1997), the Kansas Bureau of Investigation (KBI) received information that the Defendant, Mr. Myers, was maintaining an indoor marijuana growing operation. <u>Id</u>. at 938. The county police had received the information from subjects in two separate investigations. <u>Id</u>. One of them provided Mr. Myers's home address and phone number. <u>Id</u>.

While observing the premises, the KBI determined that Mr. Myers's attic windows were covered with a black opaque material, and that the snow from a recent snowfall had melted from Mr. Myers's roof, while the snow remained on the roofs of surrounding residences. <u>Id</u>. A check of Mr. Myers's utility accounts revealed that Mr. Myers's electricity and water usage was unusually high between December 1993 and February 1994, both in comparison to the previous year's amounts at the same residence, and to a nearby house of comparable size. <u>Id</u>. Further investigation revealed that Mr. Myers had used unissued social security numbers for his telephone and utility accounts. <u>Id</u>.

In researching Mr. Myer's criminal history, KBI agents discovered that Mr. Myers had prior convictions for burglary, theft and cocaine trafficking. <u>Id</u>. They also discovered that, as a juvenile, Mr. Myers had been involved in the fire bombing of a jail or police vehicle and had been convicted of possession of an unregistered firearm and possession of a fire bomb. <u>Id</u>. KBI agents determined that safety was a concern because of Mr. Myers's criminal history, and because manufacturers and distributors of narcotics often maintain firearms to protect themselves and their operations. <u>Id</u>

On March 9, 1994, KBI agents, dressed completely in black and wielding automatic machine guns, knocked on Mr. Myers' front door and announced that they had

a search warrant. Id. The agents waited approximately (10) seconds, before battering down the door and rolling a "flash-bang" devise into the living room. Id. at 939. The device exploded, and the agents stormed the house, finding Mr. Myers, his wife, a nineteen-year-old stepson, a nine-year-old stepdaughter, and a seventeen-month-old daughter. Id. at 939.

The Myers Court determined that the police officers did not use excessive force in violation of Defendants' Fourth Amendment rights when they entered the house with a battering ram followed by deployment of a flash-bang devise. Id. Entry was validated because Mr. Myers (1) had a history of illegal drug trafficking, and (2) had spent time in federal prison for a fire bombing incident. Id.

In applying the analysis of the Garner and Myers decisions to the facts here, there is no question that the Defendants did not use excessive force in entering Plaintiffs' residence. The Defendants entered the Plaintiffs' property with the understanding that Mr. Thrower was fleeing a warrant issued for his arrest in Columbus, Georgia for charges of Aggravated Child Molestation of his 12 year-old daughter. (See Ex. "B"). The Defendants were told that Mr. Thrower was armed, that he had made statements to the effect that he "would not be taken to jail," and that he had access to numerous weapons at Plaintiffs' residence. (Id.) Moreover, the Defendants were told that Mr. Thrower was homicidal and/or suicidal and as such dangerous to himself and others. (Id.)

Lt. Taylor surveyed the area surrounding the Plaintiffs' residence in analyzing whether it was possible under covert a operation to apprehend Mr. Thrower as he exited. (Id.) Lt. Taylor determined that the topography of the area did not lend itself to a successful covert operation. (Id.) He believed that if the team attempted to surround the

18

premises, there was a high probability that the officers would be discovered by Mr. Thrower which could lead to a hostage/shootout situation. (Id.) Since Lt. Taylor did not have complete information regarding the occupants of the house, he surmised that an entry maneuver was the safest, most efficient method of apprehending Mr. Thrower safely under the circumstances. (Id.) A search warrant would have taken over an hour to secure. (Id.)

During entry, the Defendants deployed a "flash bang" devise through the front door. (See Ex. "B"). Unlike the Defendants in Garner, the flash-bang devise caused Plaintiffs no physical injury. (Id.) In fact, none of the occupants in the home were in a position to witness or be effected by the concussion or light production caused by the device. (See depo. of Lisa Barnette at p. 35). As the officers cleared the house room by room in search of Mr. Thrower, they located the Plaintiffs in rooms toward the back of the house, away from the point of entry. (Id.) The officers were in the home for a total of approximately 30 seconds. (See Ex. "B").

Based on the information possessed by the Defendants at the time of entry regarding the totality of the circumstances (and pursuant to the analysis presented by Garner and Myers) the SWAT team's decision to aggressively clear the residence subsequent to using a "flash-bang" devise did not constitute the use of excessive force.

**A-3.**  **The Defendants were Justified in Using Forced Entry to Gain Access into Plaintiffs' Residence.**

Police officers are justified in forcibly entering a residence in search of a perpetrator under both federal procedure and Alabama law. 18 U.S.C.A. § 3109 provides, an "officer may break open any outer or inner door or window of a house ... to execute a search warrant, if, after notice of his authority and purpose, he is refused

admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."[8] Id. Notably, section 3109 requires that an officer notify the inhabitants of a house of his authority and purpose before using force to gain entry. See United States v. Wallace, 931 F. Supp. 1556, 1558 (D. Ala. 1996). If the officer is refused admittance, he or she may break open a window or door to enter the premises. Id.

Inaction by a house's inhabitants after an officer's announcement constitutes "constructive refusal" and permits an officer's forcible entry.[9] "There is no set time in which an officer must wait before he uses force to gain entry under the knock and announce statute." See Shaneyfelt v. State, 494 So. 2d 804 (Ala. Crim. App. 1986).

Constructive refusal is determined on a case by case basis. However, Courts have found constructive refusal to exist after very short periods of time. See United States v. Garcia, 983 F.2d 1160 1168 (1st Cir. 1993) (constructive refusal permitted forced entry after police waited ten seconds after knocking); United States v. Markling, 7 F.3d 1309, 1318 (7th Cir. 1993) (constructive refusal after seven seconds when entry to motel room sought); United States v. Lucht, 18 F.3d 541, 549 (8th Cir.) (constructive refusal after twenty seconds), cert. denied, 130 L. Ed. 2d 316, 115 S. Ct. 363 (1994).

Here, Officer Michael Bailey has testified that the SWAT team announced their presence at Plaintiffs' residence and subsequently knocked on the front door three times. (See Ex. "E"). Officer Bailey estimates that that this process took approximately four seconds. (Id.) After announcing their presence and knocking three times, the SWAT team waited an additional four seconds for a response. (Id.) There was no response from

---

[8] The Supreme Court has held that the common-law knock-and-announce requirement for search warrants applies under a fourth amendment reasonableness analysis. See Wilson v. Ark., 514 U.S. 927 (U.S. 1995).
[9] The refusal requirement codified by § 1309 is embedded within Alabama's common law knock-and-announce principle and utilizes similar reasoning. See United States v. Wallace, 931 F. Supp. 1556, 1559 (D. Ala. 1996).

within the residence. (Id.) It was reasonable for the SWAT team to find constructive refusal having received no response from within the house for approximately eight seconds. (Id.)

Even Assuming that forced entry was not justified under the "constructive refusal" doctrine (it was), section 3109's "refusal requirement" is not rigid and may be dispensed with if there are "exigent circumstances" which excuse compliance. It is well established that exigent circumstances justify even unannounced and immediate entry into a premises. See United States v. Wallace, 931 F. Supp. 1556, 1561 (D. Ala. 1996) ("A reasonable fear of violence will excuse compliance under both the statutory and constitutional standards."); Wilson, supra, U.S. at 115 S. Ct. at 1918-19 (indicating exception under constitution because "the [common-law] presumption in favor of announcement would yield under circumstances presenting a threat of physical violence"); United States v. Pearson, 746 F.2d 787, 792 (11th Cir. 1984) (exigent circumstances excuse knock-and-announce requirements of § 3109 where suspects armed, had prior felony convictions, and agents had reason to believe house contained enormous cache of firearms); United States v. Hromada, 49 F.3d 685 (11th Cir. 1995) (affirmative refusal of entry not required where officers would have to wait in vulnerable position); United States v. Pearson, 746 F.2d 787 (11th Cir. 1984) (exigent circumstances where officers reasonably believed that armed suspect and cache of automatic weapons were in the house); United States v. Garcia, 741 F.2d 363 (11th Cir. 1984) (real possibility of officer injury, suspect escape or destruction of evidence constitutes exigent circumstances) and United States v. Kane, 637 F.2d 974, 979 (3rd Cir. 1981) ("We hold that a police officer's reasonable belief that announcement might place him or his

associates in physical peril constitutes another 'exigent circumstance,' that justifies non-compliance with the announcement provisions of the statute.")

As discussed at length above, exigent circumstances existed validating the Defendants' use of force to gain entry to Plaintiffs' residence in search of Mr. Thrower.

**B.    The City of Phenix City may not be held Liable for the Actions of Members of Phenix City's SWAT team.**

Under 42 U.S.C.S. § 1983, a municipality may not be held liable on a theory of *respondeat superior*. See Ledbetter v. City of Topeka, 318 F.3d 1183, 1189 (10th Cir. 2003). Instead, a plaintiff must show that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action. Id. When the plaintiff proceeds on a theory that the alleged constitutional violation was caused by an official with policymaking authority the touchstone for determining "official policy" is distinguishing acts of the municipality from acts of employees of the municipality, and thereby making clear that municipal liability is limited to action for which the municipality is actually responsible. Id.

Municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.  Id.

Here, the Plaintiff has failed to establish evidence that any representative of the City of Phenix City has instituted any policy or developed any custom that would expose the City to liability for damages caused subsequent to entry into Plaintiffs' residence. (See Compl.).  To the contrary, the undisputed evidence shows that the Defendants were

acting directly under the control and jurisdiction of the Russell County Sheriff's department during the operation leading to and including the entry in question. (See Ex. "B"). All information gathered, assessed and disseminated in furtherance of Mr. Thrower's apprehension was accumulated by County officers. (Id.) The Defendants assisted and supported the County in a County operation. (See Ex. "D"). The Defendants were not operating under any City policy or procedure. (Id.) As such, the City of Phenix City is due to be dismissed from this action.

**C.**    **The Defendants have Qualified Immunity with regard to Plaintiffs' state law causes of action under Ala. Code § 6-5-338(a) and (b).**

Generally, the State of Alabama, its officers and political subdivisions are not subject to suit. See Ala. Const. 1901, Art. I, § 14. Constitutional immunity does not extend to municipalities. However, as discussed above with regard to § 1983 claims, public officials -- including municipal employees -- have substantive immunity for actions taken while they are acting in the line and scope of their official duties and are engaged in the exercise of a discretionary function. See Phillips v. Thomas, 555 So. 2d 81, 84 (Ala. 1989). Alabama's Legislature has extended this immunity to municipal police officers.

Ala. Code § 6-5-338(a) reads in pertinent part:

Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully

charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, **shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.**

Id. (emphasis added).  Section 6-5-338(a) gives police officers "immunity from tort liability" under certain circumstances by extending state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties.  See Moore v. Crocker, 852 So. 2d 89, 90 (Ala. 2002).  Whether a peace officer is due Ala. Code § 6-5-338(a) immunity is judged by the restatement of state-agent immunity articulated by Ex parte Cranman, 792 So. 2d 392 (Ala. 2000).  See Hollis v. City of Brighton, 2006 Ala. LEXIS 180 (Ala. 2006).

Under the directives established in Ex parte Cranman, municipal police officer is immune from tort liability for incidents occurring while "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." Id. This immunity is absolute unless an officer's conduct is so egregious as to amount to "willful or malicious conduct or conduct engaged in bad faith." See Couch v. City of Sheffield, 708 So. 2d 144, 154 (Ala. 1998) and Ex parte Butts, 775 So. 2d 173, 178 (Ala. 2000).

In analyzing discretionary immunity, courts must make a "pragmatic assessment of what, if any, degree of immunity is necessary to enable the particular governmental function to be effectively performed." See Bell v. Chisom, 421 So. 2d 1239, 1241 (Ala. 1982). Alabama's Supreme Court has stated that discretionary-function immunity exists to allow officers to do their duty without being required to "ponder and ruminate over decisions that should be made in a split second." See White v. Birchfield, 582 So. 2d

24

1085, 1087 (Ala. 1991). Discretionary-function immunity is justified by "'the need to attract and keep capable [police] officers, the allocation of scarce resources for law enforcement, and the need for officers to make decisions based on the requirements of the circumstances rather than on their potential for personal liability.'" See Nunnelee v. City of Decatur, 643 So. 2d 543, 546 (Ala. 1993) (quoting Thetford v. City of Clanton, 605 So. 2d 835, 843 (Ala. 1992)).

Here again, there is no allegation that the Defendants were not operating within the line and scope of their employment during the entry in question. (See Compl.). In fact, the Plaintiffs asserted in their Complaint that the Defendants were "acting within the line and scope of their authority" at the time of the incident (see Compl. at ¶ 21), and that the Defendants were engaged in acts typically performed by police officers (search of a house believed to be occupied by an armed and dangerous suspected felon). (Id.) As such, the Defendants were acting within the scope of their discretionary authority.[10]

Since the Defendants were acting within their discretionary authority in entering Plaintiffs' residence, qualified immunity attaches unless the Plaintiffs can set forth evidence showing that the Defendants' conduct was so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith. See Couch, supra at 154.

The Plaintiffs have established no evidence showing that the Defendants acted with malicious, willful and egregious conduct. To the contrary, the evidence shows that Defendants acted appropriately in response to information provided to them by the County which was, by all accounts, reliable. As such, qualified immunity applies and Plaintiffs' state law tort claims are due to be dismissed.

---

[10] As noted above, this Court has already determined that Defendants Goodrich and Taylor were acting within their discretionary authority on the date in question. See Memorandum and Order dated March 15, 2006. Similar reasoning should apply to these Defendants.

**C-1.** **Plaintiffs' state law claims against the City of Phenix City are due to be dismissed pursuant to Ala. Code § 6-5-338(b).**

With regard to the Plaintiffs' state law claims against the City of Phenix City, it is well established if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune. See Larry Terry Contractors, Inc. v. Bogle, 404 So. 2d 613, 614 (Ala. 1981) ("When [a] principal and his agent are sued in [a] joint action in tort for misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of respondeat superior, a verdict in favor of the servant entitles the master to have the verdict against him set aside.") As such, all state law claims against the City are due to be dismissed..

**D.** **Plaintiffs' Claims Against the Defendants Under the Fifth Amendment are Due to be Dismissed.**

The Plaintiffs also allege violations of their Fifth Amendment rights against the Defendants. (See Plaintiffs' Comp. at ¶¶ 1, 87). Specifically, the Plaintiffs seek relief pursuant to the Fifth Amendment's Just Compensation Clause as it applies to state actions. See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 307 (2002).

In the present case, the Plaintiffs allege that the Defendants violated the Fifth Amendment's Just Compensation Clause by causing damage to the Plaintiffs' house during entry. (See Compl.). In order to recover under the Just Compensation Clause, the claimant must prove (1) that there was a compensable "taking" of property such that (2) the claimant has suffered some pecuniary harm. See Reahard v. Lee County, 968 F.2d 1131 (11th Cir. 1992). In order to maintain a claim under the Just Compensation Clause, Plaintiffs must be able to show that they suffered some monetary loss. (Id.)

With regard to the damage inflicted upon the Plaintiffs' residence, courts have been reluctant to find that this type of harm amounts to a "taking" under the Fifth Amendment. While it is true that Plaintiffs have alleged pecuniary harm in their Complaint, the damage in question was incurred during a police search. (See Compl). The Third Circuit recently examined a similar case and found that "a temporary seizure of property in order to search that property is a permissible exercise of the government's police- as opposed to its eminent – power." See Jones v. Philadelphia Police Dept., 57 Fed. Appx. 939, 942 (3rd Cir. 2003) and Memorandum and Court Order in this case dated March 15, 2006.

Since courts have not recognized property damage or loss resulting from a police search as compensable under the 5th Amendment's Just Compensation Clause, Plaintiffs have failed to allege any cognizable constitutional violations under the Fifth Amendment. As such, Plaintiffs' claims against the Defendants pursuant to Fifth Amendment are due to be denied.

### E. Plaintiffs' Claims Against The Defendants Under the Fourteenth Amendment are Due to be Dismissed.

Counts One and Two of the Plaintiffs' Complaint allege an improper search and seizure by the Defendants. (See Compl.). The Plaintiffs characterize these claims as a violation of both the Fourth Amendment and due process under the Fourteenth Amendment. (Id.) The Plaintiffs' claims based upon the due process clause of the Fourteenth Amendment are due to be dismissed regardless of whether they attempt to assert substantive or procedural rights.

With regard to substantive due process, "where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of

27

government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" See Albright v. Oliver, 510 U.S. 266, 273 (1994). In Albright, the Court held specifically that the proper claim in an unreasonable search and seizure case is a Fourth Amendment claim and not a Fourteenth Amendment Substantive Due Process Claim. Id. at 274. As such, the Fourth Amendment governs the Plaintiffs' claims for unreasonable search and seizure.   The Plaintiffs' substantive due process claims under the Fourteenth Amendment are due to be dismissed as to these Defendants.[11]

In order to establish a procedural due process claim under the Fourteenth Amendment to the United States Constitution, a plaintiff must allege that state law provides him no adequate remedy. See Cotton v. Jackson, 216 F.3d 1328, 1331 (11th Cir. 2000).   The Plaintiffs' make no such allegation. As such, Plaintiffs' procedural due process claims under the Fourteenth Amendment fail as well.

**F.  The Plaintiffs' claims against these Defendants for Conspiracy Pursuant to 42 U.S.C. §§ 1985 and 1986 are Due to be Dismissed.**

The Plaintiffs have argued that they have valid conspiracy claims under both 42 U.S.C. 1985 and 42 U.S.C. § 1986.  However, to state a claim for conspiracy under 42 U.S.C. § 1985(3), Plaintiffs must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of privilege of citizenship." See Zezulewicz v. Port

---

[11] The Court has limited Plaintiffs' search and seizure claims against Defendants Taylor and Goodrich to claims arising under the Fourth Amendment. Similar reasoning should apply here. See Court Order dated March 15, 2006.

28

Authority of Allegheny County, 290 F.Supp.2d 583, 599 (W.D. Pa. 2003) (citing Carpenters v. Scott), 463 U.S. 825 (1983)).  While it is possible that these basic elements may be found in Plaintiffs' Complaint, there is one overarching element of a § 1985(3) conspiracy claim that has not been alleged in this case, and that is a discriminatory intent on the part of the Defendants.

The Supreme Court held that the language of § 1985(3) requires "'intent to deprive of equal protection, or equal privileges and immunities,'" meaning that "'there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions.'"  See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268-69 (1993) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).  In this case, Plaintiffs' Complaint does not allege that any of the actions taken by the Defendants were in any way motivated by racial or other class-based animus.  The Plaintiffs, therefore, have not properly alleged a conspiracy claim under 42 U.S.C. § 1985(3).

The Plaintiffs have also alleged violations under 42 U.S.C. § 1986, which creates a cause of action against any person who knows of a § 1985(3) conspiracy and does not act to prevent such conspiracy from being carried out. (See Compl.).  However, § 1986 claims are entirely derivative of § 1985 claims, and without a valid § 1985 claim, Plaintiffs also lack a valid § 1986 claim.

**G.  Plaintiffs' Claims against the Defendants for Injunctive Relief and Declaratory Judgment are Due to be Dismissed.**

Plaintiffs argue that they are entitled to ask for declaratory judgment because 42 U.S.C. § 1983 authorizes Plaintiffs to seek equitable remedies.  It is true that § 1983 allows a party to pursue "an action of law, suit in equity, or other proper proceeding for

redress." 42 U.S.C. § 1983.  However, a claim for declaratory judgment requires either an ongoing and continuous controversy or the significant likelihood of harm in the future. "Past exposure to illegal conduct does not in itself show a present case of controversy . . . if unaccompanied by any continuing, present adverse effects.  To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future.  Similar reasoning has been applied to suits for declaratory judgments."  Bauer v. Texas, 341 F.3d 352, 358 (5th Cir. 2003) (internal quotations and citations omitted).

In the present case, Plaintiffs have alleged multiple violations of their constitutional rights, but all of these violations occured in the past.  (See Compl.). Plaintiffs have not alleged ongoing or continuous harm currently being caused by Defendants, nor have they demonstrated the existence of a threat of future harm.  Because Plaintiffs have not asserted that there is any harm other than past injury in this case, they lack standing to seek a declaratory judgment under federal law.

The requirement is similar for a plaintiff seeking a remedy under Alabama's Declaratory Judgment Act, which gives courts the "power to declare rights, status, and other legal relations."  Ala. Code § 6-6-222.  The Alabama Supreme Court has held that in cases "in which a cause of action has already accrued, a court will not enter a declaratory judgment if there is not an anticipated future injury."  See Carrell v. Masonite Corp., 775 So.2d 121, 125 (Ala. 2000).  Because the cause of action in this case has already accrued, and the Plaintiffs have not alleged any anticipated future injury, the Plaintiffs lack standing to seek a declaratory judgment under Alabama state law.

### III.    CONCLUSION

There is no genuine issue of material fact remaining for determination in this action with regard to Plaintiffs' claims against Defendants.  As such, the Defendants are entitled to a judgment as a matter of law.

Respectfully submitted this the 20th day of April, 2007.

> *s/ Ronald G. Davenport*
> *s/ R. Brett Garrett*
> RONALD G. DAVENPORT (DAV044)
> R. BRETT GARRETT (GAR085)
> Attorneys for Defendants City of Phenix City,
> Officer Lahr, Officer Walker, Officer Bailey,
> Officer Nolin, Officer Mitchell, Officer
> Coreano, Officer McLoughlin and
> Officer Barr.

OF COUNSEL:

Rushton, Stakely, Johnston & Garrett, P.A.
P. O. Box 270
Montgomery, AL 36101
(334) 206-3100
(334) 481-0808 (fax)
bg@rsjg.com (email)

## CERTIFICATE OF SERVICE

      I hereby certify that on April 20, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jay Lewis, Esq.
Keith Anderson Nelms, Esq.
LAW OFFICES OF JAY LEWIS, LLC
P. O. Box 5059
Montgomery, AL 36103-5059

C. Richard Hill, Jr., Esq.
Kendrick E. Webb, Esq.
Scott W. Gosnell, Esq.
WEBB & ELEY, P.C.
P. O. Box 240909
Montgomery, AL 36124

                                 *s/ R. Brett Garrett*
                                   OF COUNSEL