**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA BARNETTE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:05-cv-473-DRB** |
| | ) | |
| **PHENIX CITY, ALABAMA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS HEATH TAYLOR AND GROVER GOODRICH'S
MEMORANDUM BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

FACTS .................................................................................................................... 2

PROCEDURAL POSTURE ....................................................................................... 10

SUMMARY JUDGMENT STANDARD...................................................................... 11

ARGUMENT ........................................................................................................... 13

I.     LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH ACTED WITHIN
       THEIR DISCRETIONARY AUTHORITY. ....................................................... 13

II.    LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH DID NOT VIOLATE
       ANY OF THE PLAINTIFFS' FEDERALLY PROTECTED RIGHTS........................... 15
       A.     The Warrantless Entry Into the Barnette Residence Was Lawful Due to Exigent
              Circumstances.................................................................................. 15
       B.     Lieutenant Taylor and Investigator Goodrich Did Not Use Excessive Force
              During the Entry and Search.............................................................. 20
              1.     These Defendants Did Not Exercise Any Force Against the Plaintiffs. ... 21
              2.     The Degree of Force Used on the Plaintiffs Was Justified Under the
                     Circumstances. ...................................................................... 23
              3.     The Plaintiffs' Injuries were *de minimis*................................... 28

III.   NO CLEARLY ESTABLISHED LAW PROVIDED FAIR WARNING TO
       LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH THAT THEIR
       CONDUCT WAS UNLAWFUL. ....................................................................... 30

CONCLUSION ....................................................................................................... 31

CERTIFICATE OF SERVICE ................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Creighton, 483 U.S. 635 (1987) ................................................................ 13, 25, 30, 31

Arkansas v. Sanders, 442 U.S. 753 (1979) .............................................................................. 16

Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912 (9th Cir. 2001) .............................. 29

Barker v. Norman, 651 F.2d 1107 (5th Cir. 1981) ...................................................................... 14

Bennett v. Parker, 898 F.2d 1530 (11th Cir. 1990) .................................................................... 29

Bing v. City of Whitehall, Ohio, 456 F.3d 555 (6th Cir. 2006) .................................................... 27

Brigham City, Utah v. Stuart, 126 S. Ct. 1943 (2006) ............................................................ 15, 16

Carr v. Tatangelo, 338 F.3d 1259 (11th Cir. 2003) ................................................................ 20, 21

Celotex Corp. v. Catrett, 477 U.S. at 317 (1986) ....................................................................... 11

Courson v. McMillian, 939 F.2d at 1479 (11th Cir. 1991) ........................................................... 25

Crosby v. Monroe County, 394 F.3d 1328 (11th Cir. 2004) ......................................................... 20

Elliott v. Leavitt, 99 F.3d 640 (4th Cir. 1996) ............................................................................ 21

Flippo v. West Virginia, 528 U.S. 11 (1999) .............................................................................. 15

Florida v. Royer, 460 U.S. 491 (1983) ...................................................................................... 26

Garrett v. Athens-Clarke County, 378 F.3d 1274 (11th Cir. 2004) ............................................... 20

Godby v. Montgomery County Bd. of Educ., 996 F. Supp. 1390 (M.D. Ala. 1999) .................. 14

Graham v. Connor, 490 U.S. 386 (1989) ................................................................................ 20, 27

Greason v. Kemp, 891 F.2d 829 (11th Cir. 1990) ....................................................................... 11

Groh v. Ramirez, 540 U.S. 551 (2004) ..................................................................................... 15

Harbert Int'l., Inc. v. James, 157 F.3d 1271 (11th Cir. 1998) ...................................................... 14

Hayden, 387 U.S. 294 (1967) ............................................................................................... 18, 19

Hernandez v. Conde, 442 F. Supp. 2d 1141 (D. Kan. 2006) ....................................................... 27

Jackson v. Sauls, 206 F.3d 1156 (11th Cir. 2000) ..................................................................... 26

Jenkins v. Talladega Bd. of Educ., 115 F.3d 821 (11th Cir. 1997) .............................................. 13

Jones, 214 F.3d 836 (7th Cir. 2000) ........................................................................................ 28

Jordan v. Doe, 38 F.3d 1559 (11th Cir. 1994) .......................................................................... 14

Kirk v. Watkins, 182 F.3d 932 (10th Cir. 1999) ........................................................................ 27

Lancaster v. Monroe County, 116 F.3d 1419 (11th Cir. 1998) .................................................... 13

Marsh v. Butler County, 268 F.3d 1014 (11th Cir. 2001) ....................................................... 12, 21

Mass. School of Law v. American Bar, 142 F.3d 26 (1st Cir. 1998) ............................................. 12

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).................................... 11

Mincey v. Arizona, 437 U.S. 385 (1978)................................................................................ 15, 17

Minnesota v. Olson, 495 U.S. 91 (1990) .............................................................................. 16, 17

Muehler v. Mena, 544 U.S. 93 (2005) .................................................................................. 23, 24

Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000) ....................................................................... 28

Payton v. New York, 445 U.S. 573 (1980) ................................................................................. 15

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)............................................ 11

Rich v. Dollar, 841 F.2d 1558 (11th Cir. 1988) ..................................................................... 13, 14

Rodgers v. Horsley, 39 F.3d 308 (11th Cir. 1994)...................................................................... 12

Saucier v. Katz, 533 U.S. 194 (2001) ................................................................................... 12, 31

Siegert v. Gilley, 500 U.S. 226 (1991) ..................................................................................... 12

Smith v. Freland, 954 F.2d 343 (6th Cir. 1992)......................................................................... 21

Storck v. City of Coral Springs, 354 F.3d 1307 (11th Cir. 2003).................................................. 30

Thompson v. City of Lawrence, 58 F.3d 1511 (10th Cir. 1995) ................................................... 25

U.S. v. Aldridge, 719 F.2d 368 (11th Cir. 1983) ........................................................ 25
U.S. v. Burgos, 720 F.2d 1520 (11th Cir. 1983).................................................... 16, 17
U.S. v. Jacobs, 715 1343 (9th Cir. 1983) ...................................................................... 26
U.S. v. Kingsley, No. 97-40095-01-RDR, 1998 WL 295577, *1 (D. Kan. May 21, 1998) ........ 28
U.S. v. Kreimes, 649 F.2d 1185 (5th Cir. 1981)............................................... 15, 16, 17
U.S. v. Merritt, 695 F.2d 1263 (10th Cir. 1982)........................................................... 25
U.S. v. Myers, 106 F.3d 936 (10th Cir. 1997) .............................................................. 27
U.S. v. Roper, 702 F.2d 984 (11th Cir. 1983)............................................................... 25
U.S. v. Taylor, 716 F.2d 701 (9th Cir. 1983)......................................................... 26, 27
Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002) ...................................................... 30
Wayne v. U.S., 318 F.2d 205 (D.C. Cir. 1963)............................................................. 17
Willingham v. Loughnan, 321 F.3d 1299 (11th Cir. 2003) ...................................... 12, 30

**Statutes**

28 F.3d at 1149 .......................................................................................................... 30

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA BARNETTE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:05-cv-473-DRB** |
| | ) | |
| **PHENIX CITY, ALABAMA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS HEATH TAYLOR AND GROVER GOODRICH'S MEMORANDUM BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants Lieutenant Heath Taylor (hereafter, "Lieutenant Taylor") and Investigator Grover Goodrich (hereafter, "Investigator Goodrich") (collectively, the "Defendants"), and submit this Brief in support of their Motion for Summary Judgment. Defendants show unto the Court that there are no genuine issues as to the material facts, and that Defendants are entitled to judgment as a matter of law on all remaining claims.

1.      The only remaining claims in this action are 42 U.S.C. § 1983 claims for unlawful search and seizure and excessive force related to the Defendants' attempts to apprehend fugitive Kenneth Thrower on February 10, 2005.

2.      The Defendants are immune from liability in this action under the doctrine of qualified immunity because (a) Lieutenant Taylor and Investigator Goodrich acted within their discretionary authority; (b) Lieutenant Taylor and Investigator Goodrich did not violate any of the Plaintiffs' federally protected rights; and (c) no clearly established law provided fair warning to Lieutenant Taylor and Investigator Goodrich that their conduct was unlawful.

3.      Specifically, the warrantless entry into the Barnette residence was lawful due to the presence of exigent circumstances.

4.      Lieutenant Taylor and Investigator Goodrich did not use excessive force during the entry and search because:

- These Defendants did not exercise any force against the Plaintiffs;

- The degree of force used on the Plaintiffs was justified under the circumstances; and

- The Plaintiffs' injuries were de minimis.

## FACTS[1]

Sometime prior to February, 2005, the 12-year-old step-daughter of Kenneth D. Thrower (hereafter, "Mr. Thrower") contacted the Detective Len Wills (hereafter, "Detective Wills") and Detective Sherry Zieglar at the Columbus Police Department in Columbus, Georgia, and reported that Mr. Thrower had been molesting her.  (Exhibit A, Affidavit of Len Wills dated April 12, 2007, "Wills Aff.," at ¶¶ 2, 3.)   Detectives Wills and Zieglar investigated this charge, and pursuant to that investigation a felony warrant for the arrest of Mr. Thrower was issued.  (Id. at ¶ 3.)  The charge contained in that warrant was Aggravated Child Molestation in violation of Georgia Code § 16-6-4.  (Id.)

On February 10, 2005, Mr. Thrower's wife, Lisa Thrower (hereafter, "Ms. Thrower"), met Detective Wills in his office and told him that Mr. Thrower was aware of the arrest warrant and had fled to Russell County, Alabama, where his family lived.  (Wills Aff. at ¶ 4.) Mrs. Thrower told Detective Wills that Mr. Thrower was going to Russell County to see his

---

[1] These facts are here conceded and undisputed for the purposes of this Motion for Summary Judgment only.  In the event this Motion is not granted in its entirety, these "facts" are not to be construed as an admission for any other purposes related to this litigation.

mother for a few minutes or hours, but was not intending to stay there for any significant amount of time. (Id.) Ms. Thrower also told Detective Wills that Mr. Thrower was armed, potentially homicidal and/or suicidal, and that he had told her that he was not going to be taken to jail. (Id.) Ms. Thrower informed Detective Wills that Mr. Thrower had a handgun in his truck. (Id.) Detective Wills had personally known the Thrower family, including Kenneth Thrower, for at least thirty (30) years, and was personally aware that Mr. Thrower's brother had committed suicide. (Id. at ¶ 5; Exhibit B, Deposition of Lisa Barnette dated October 3, 2006, "L. Barnette Depo.," at 13:15-19.) Therefore, he was greatly concerned at Ms. Thrower's statement that Mr. Thrower was armed and potentially homicidal and/or suicidal. (Wills Aff. at ¶ 5.)

Based on Ms. Thrower's information, and while she was still in his office, Detective Wills contacted the Russell County Sheriff's Department for assistance in apprehending Mr. Thrower. (Wills Aff. ¶ 6.) He initially spoke with Lieutenant Steve Osteen, informed him of the situation, and faxed him a copy of the arrest warrant. (Id.) After speaking with Lieutenant Osteen, Detective Wills contacted Lieutenant Heath Taylor, Chief Investigator for the Russell County Sheriff's Office. (Id. at ¶ 7; Exhibit C, Affidavit of Heath Taylor dated April 13, 2007, "Taylor Aff.," at ¶¶ 2, 3.) Detective Wills informed Lieutenant Taylor of the situation and the need for assistance, and informed him that Mr. Thrower was believed to be at his mother's address on or near Highway 80 in Russell County.[2] (Wills Aff. at ¶ 7; Taylor Aff. at ¶ 3.) Detective Wills also gave Lieutenant Taylor a description of the truck Mr. Thrower was driving, and informed him that Mr. Thrower was armed and potentially homicidal and/or suicidal. (Wills Aff. at ¶¶ 7, 8; Taylor Aff. at ¶ 3.) Lieutenant Taylor immediately instructed Investigator Grover Goodrich

---

[2] Mr. Thrower's mother lives at 10 Chapman Street, just off of Highway 10, and behind the Plaintiffs' house. (L. Barnette Depo. at 12:12-16.)

to take the Georgia warrant to a Russell County Circuit Court judge and have the warrant domesticated as a fugitive warrant. (Taylor Aff. at ¶ 3; Exhibit D, Affidavit of Grover Goodrich dated April 13, 2007, "Goodrich Aff.," at ¶ 3.)

At the time Lieutenant Taylor received the telephone call from Officer Wills, the Phenix City SWAT team was at the Sheriff's Department being debriefed from operations which they had been executing earlier that morning. (Taylor Aff. at ¶ 4.) Because of the potential volatility of the situation, i.e. an armed and potentially homicidal/suicidal fugitive, Lieutenant Taylor determined that a SWAT operation was the safest way to apprehend Mr. Thrower without injury either to him, innocent parties, or the arresting officers. (Id.) Lieutenant Taylor briefed the SWAT team on the information provided by Detective Wills, and instructed the team to assemble some distance down Highway 80 from the address provided by Detective Wills, which was reportedly Mr. Thrower's mother's house. (Id.) Lieutenant Taylor and the SWAT team then left the Russell County Sheriff's Department.

Upon leaving the Sheriff's Department, Lieutenant Taylor proceeded towards the address where Officer Wills indicated that Mr. Thrower would be located. (Taylor Aff. at ¶ 5.) However, while he was surveying the area, Officer Wills contacted him and indicated that Mr. Thrower was at the Plaintiffs Jerry and Lisa Barnette's house on Highway 80.[3] (Id.; Wills Aff. at ¶ 8.) Lisa Barnette (hereafter, "Ms. Barnette") is Mr. Thrower's sister, and lives at an address a couple of houses down from Mr. Thrower's mother's address. (Taylor Aff. at ¶ 5; L. Barnette Depo. at 149:14-16.) While on the telephone with Detective Wills, Lieutenant Taylor drove by the Barnette house, and advised Detective Wills that he did not see Mr. Thrower's truck at that

---

[3] The Barnettes' address is actually 3 Chapman Street. (L. Barnette Depo. at 11:15-18; Exhibit F, Deposition of Jerry Barnette dated October 4, 2004, "J. Barnette Depo.," at 10:5-7.) The house sits on the corner of Chapman Street and Highway 80. (Id. at 147:4-148:23.)

4

location.  (Taylor Aff. at ¶ 5; Wills Aff. at ¶ 8.)  However, Detective Wills told Lieutenant Taylor that Ms Thrower was still in his office, and was on her cell phone at that very moment speaking with Mr. Thrower.  (Id.)  Ms. Thrower informed Detective Wills that Mr. Thrower was speaking to her from his sister's house telephone.  (Id.; L. Barnette Depo. at 23:20-13; 25:17-28:5; Exhibit E, Deposition of C.B. Barnette dated October 3, 2006, "C.B. Barnette Depo." at 20:19-23:17.) Detective Wills advised Lieutenant Taylor that the Barnette house was very close to Mr. Thrower's mother's house, and that Mr. Thrower's truck could be parked at his mother's house, rather than at the Barnette residence.  (Taylor Aff. at ¶ 5; Wills Aff. at ¶ 8.)  Detective Wills also advised Lieutenant Taylor that there was a large supply of guns and ammunition at the Barnette house, and emphasized to him that the situation was tense and serious, with a very real potential for violence, due to Mr. Thrower's apparent desperate and homicidal condition.  (Id.)  This warning was prompted in part by Ms. Thrower's repeated statements to Detective Wills that her husband was dangerous, and that he had indicated that he was not going to prison.  (Wills Aff. at ¶ 9.)  Both Detective Wills and Lieutenant Taylor took these statements to mean that Mr. Thrower may violently resist arrest.  (Id.)

After surveying the Barnette house, Lieutenant Taylor considered setting up a perimeter of officers to covertly observe the house and attempt to arrest Mr. Thrower when he exited the house. (Taylor Aff. at ¶ 6.)  However, the topography of the land, the vegetation, and other characteristics of the immediate curtilage of the Barnette property made it plain that there was inadequate cover and/or concealment for the observing officers to utilize, and there would be no way to adequately secure the perimeter of the house without alerting the occupants, including Mr. Thrower, to police presence outside the house.  (Id.)  Lieutenant Taylor was convinced that the perimeter officers

5

would have easily been seen, and that if Mr. Thrower became alerted to the presence of officers outside the residence, he could potentially trigger a hostage or gunfight situation.  (Id. at ¶¶ 6, 7.)

At that time Lieutenant Taylor had very little intelligence on the house.  (Taylor Aff. at ¶ 7.) He did not know who was present in the house in addition to Mr. Thrower, and therefore he had to assume out of an abundance of caution that innocents, possibly including children, were present in the residence.  (Id.)  He did have information from Detective Wills that there were a substantial number of weapons and a great deal of ammunition inside the house, in addition to information that Mr. Thrower himself was armed with at least a handgun, and was potentially homicidal and/or suicidal.  (Id.)  Lieutenant Taylor was also of the belief, from information provided to Detective Wills by Ms. Thrower, that Mr. Thrower was not going to be present at the house for very long, and that he was determined not to be arrested and put in jail.  (Id.)  Lieutenant Taylor therefore determined that exigent circumstances existed to justify entering the house without a search warrant to effect the arrest.  (Id.)  That determination was based on the belief that Mr. Thrower was a danger to himself and to others, and that during the hour or more that it would have taken to obtain a search warrant Mr. Thrower would almost certainly have left the premises.  (Id.)  Lieutenant Taylor therefore notified the SWAT team to prepare to enter the house, and began to make his own preparations.  (Id. at ¶ 8.)  At this time, Lieutenant Taylor contacted Investigator Goodrich to inquire about the status of the fugitive warrant.  (Id.; Goodrich Aff. at ¶ 4.)

While Lieutenant Taylor was engaged in the foregoing activities, Investigator Goodrich had caused a fugitive warrant to be prepared by Sheriff's Department administrative personnel.  (Goodrich Aff. at ¶ 3.)  He then proceeded to the Russell County Courthouse in search of a judge to sign the warrant.  (Id.)  However, by this time the lunch hour was approaching, and there were no judges to be found in the Courthouse.  (Id. at ¶ 4.)  Because he

was aware of the time-sensitive nature of the situation, Investigator Goodrich searched several nearby restaurants in an attempt to locate a judge.  (Id.)  Not having any luck, he returned to the Courthouse, and found that Judge Johnson had returned from lunch early.  (Id.) Investigator Goodrich got Judge Johnson to sign the fugitive warrant, and notified Lieutenant Taylor via cell phone that he had a signed warrant in hand.  (Id.)  He then proceeded to Lieutenant Taylor's location at the Barnette residence.  (Id.)

It took Lieutenant Taylor approximately five (5) minutes to ready the SWAT team, verify that Investigator Goodrich had a signed fugitive warrant, turn around down the road, and get in position to enter the Barnette residence.  (Taylor Aff. at ¶ 8.)  Mr. Thrower left the Barnette house unobserved during those few minutes.  (Id. at ¶ 11; C.B. Depo. at 23:21-24:25.)

On Lieutenant Taylor's signal, the SWAT team drove onto the Barnette property and approached the front door of the house.  The SWAT team made a "dynamic" approach and entry, which means that they were attempting to be fast rather than stealthy.  The team deployed a "flashbang" distraction and diversionary device into the front door of the residence, and then proceeded to enter the house and search and secure it, including the occupants.  (Taylor Aff. at ¶ 9.) The only occupants of the house at that time were Ms. Barnette, her minor son (plaintiff) C.B., and her niece (plaintiff) Sara Cruz.  (L. Barnette Depo. at 51:17-20.)  Ms. Barnette was ordered to get on the floor, and she responded that she did not want to get down or was not going to get down.  (J. Barnette Depo. at 37:13-16.)  Nevertheless, the officers made her get down on the floor.  (Id.) Though C.B. and Ms. Cruz were made to get on the floor of the house, neither of them was touched during the entry and search of the residence, and they were only on the floor for about a minute.  (L. Barnette Depo. at 51:21-23; C.B. Barnette Depo. at 30:22-31:13; Taylor Aff. at ¶ 9.)  C.B. did jump out a window, and then jumped back into the house through the window, sustaining some minor

scrapes to his legs, but exhibited no bruises or blood.  (L. Barnette Depo. at 207:3-209:8; C.B. Barnette Depo. at 26:1-4; 28:4-8; 52:1-21; J. Barnette Depo. at 37:20-23.)   The team took approximately thirty (30) seconds to secure the house, at which time Lieutenant Taylor entered the residence.  (Taylor Aff. at ¶ 9.)  Lieutenant Taylor did not deploy the flashbang, or enter the house with the entry team.  (Id.)  During the search of the house, the SWAT team discovered over thirty (30) weapons, including handguns, long guns and shotguns, and over one thousand (1,000) rounds of ammunition.  (Id.; L. Barnette Depo. at 50:10-51:13, 170:19-172:4.)  However, Mr. Thrower was not present.  (Taylor Aff. at ¶ 9.)  Not finding Mr. Thrower, the SWAT team prepared to leave.

Upon entering the residence, Lieutenant Taylor encountered Ms. Barnette.  (Id. at ¶ 11.)  At or about this time Investigator Goodrich arrived at the residence and also entered the house. (Goodrich Aff. at ¶ 5.)  Ms. Barnette informed Lieutenant Taylor that they had just missed Mr. Thrower, that he had just left the house, that he was going to meet his mother for lunch at the El Vaquero restaurant, and that she was surprised that they did not encounter him on the road as they drove up.  (Id.; Taylor Aff. at ¶ 11; L. Barnette Depo. at 38:17-39:1; 164:20-21; J. Barnette Depo. at 38:1-5.)

It is the policy of the Russell County Sheriff's Department to repair any damage caused by the operations of its officers, including the SWAT team.  (Taylor Aff. at ¶ 12.)  The forceful entry of the SWAT team, as well as the use of a flashbang, resulted in some damage to the front door and some singing of the carpet in the Barnette residence.  (Id.)  Therefore, at that time Lieutenant Taylor assured Ms. Barnette that, pursuant to policy, the Russell County Sheriff's Department would replace her door and repair her carpet, as well as any other damage to her house resulting from the operation.  (Id.)

Based on the information given by Ms. Barnette to Lieutenant Taylor, all Phenix City police officers and Russell County sheriff's deputies, including Lieutenant Taylor and Investigator Goodrich, immediately left the Barnette residence and proceeded to the El Vaquero restaurant.  (Id. at ¶ 13; Goodrich Aff. at ¶ 6; L. Barnette Depo. at 38:17-39:22; 164:20-165:7; 200:2-8; J. Barnette Depo. at 38:9-12.)  The SWAT team was at the Barnette residence for a total of less than ten (10) minutes.  (L. Barnette Depo. at 200:2-8; C.B. Barnette Depo. at 32:8-10.)

Upon arrival in the restaurant parking lot, Lieutenant Taylor observed a truck matching the description given to him by Detective Wills.  (Taylor Aff. at ¶ 13.)  He instructed the SWAT team to surround the restaurant, and he, Investigator Goodrich, and a Phenix City police officer entered the restaurant and arrested Mr. Thrower without incident.  (Id.; Goodrich Aff. at ¶ 6.)  After the arrest, Lieutenant Taylor noted several packed bags and a loaded handgun in Mr. Thrower's truck. (Taylor Aff. at ¶ 14; see also L. Barnette Depo. at 24:18-23; 215:10-216:10.)

Richard McKenzie, an employee of the Russell County Sheriff's Department, and two county inmates arrived at the Barnette residence within approximately forty-five (45) minutes after the SWAT team left the Barnette residence to begin assessing and repairing the damage.  (L. Barnette Depo. at 52:13-53:14; C.B. Barnette Depo. at 53:3-54:12.)  Mr. McKenzie temporarily secured the front door and bought a new door that day (Thursday, February 10th), and installed the new door the following day (Friday, February 11th).  (Id. at 53:15-55:17, 69:1-21; C.B. Barnette Depo. at 54:5-55:18.)  Mr. McKenzie and the inmates also replaced the Barnettes' storm door doorknob and fixed the door frame.  (Id. at 69:6-21.)  Subsequent to February 10, 2005, the Barnettes' carpet was replaced by their homeowners' insurance company.  (L. Barnette Depo. at 96:23-97:3.)  In fact, their insurance company wrote the Barnettes a check for Five Thousand Two Hundred Dollars ($5,200) to cover all of the damages to the house caused by the SWAT team's

entry.  (L. Barnette Depo. at 97:7-22, 98:11-14, 220:8-11; J. Barnette Depo. at 67:23-68:6, 72:10-73:17, 80:2-8.)

## **PROCEDURAL POSTURE**

This action was filed on May 20, 2005.  In their Complaint, Plaintiffs sued the Defendants in, presumably, their official and individual capacities, alleging claims of (a) unlawful entry, search and seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution; (b) violation of their procedural and substantive due process rights under the Fourteenth Amendment; (c) unlawful seizure in violation of the Fifth and/or Fourteenth Amendments; (d) excessive force in violation of the Fourth Amendment; (e) conspiracy to violate civil rights under 42 U.S.C. § 1985(3); (f) neglect to prevent violation of civil rights under 42 U.S.C. § 1986; (g) state law trespass; (h) state law assault and battery; (i) state law invasion of privacy; (j) state law intentional infliction of emotional distress; (k) state law conversion and/or intermeddling with chattels; and (l) state law false arrest/false imprisonment.  Plaintiffs prayed for declaratory relief, as well as compensatory and punitive damages.

On June 20, 2005, Defendants Taylor and Goodrich filed their Motion to Dismiss, asking this Honorable Court to dismiss all claims against them on various grounds, including sovereign immunity and qualified immunity.   On March 15, 2006, this Honorable Court issued its Memorandum Opinion and Order dismissing, as to Defendants Taylor and Goodrich, all of the Plaintiff's state law claims, all official capacity claims, the Fifth Amendment claim(s), all of the Fourteenth Amendment procedural and substantive due process claims, the §§ 1985 and 1986 conspiracy claims, and all declaratory claims.  This Court also declared any § 1983 conspiracy claims and any injunctive claims moot.  However, this Court recognized that law enforcement officers may not, absent exigent circumstances, execute an arrest warrant in the home of a third party without first obtaining a search warrant for that residence, and therefore denied the

Defendants' motion to dismiss the Plaintiff's Fourth Amendment search and seizure claims (Memorandum Opinion and Order dated March 15, 2006, at 12-13.), and Fourth Amendment excessive force claims with respect to the SWAT team's warrantless entry and search of the residence for Mr. Thrower. Therefore, these two claims are the only ones that still survive.

## SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. at 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327.

On a motion for summary judgment, the court should view the evidence in the light most favorable to the non-movant. Greason v. Kemp, 891 F.2d 829, 831 (11th Cir. 1990). However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Only reasonable inferences with a foundation in the record inure to the non-movant's benefit. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000). "[T]he court should give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Id. (quoting 9A C. Wright & A. Miller, Federal Practice

and Procedure § 2529, p. 299).[4]  "A reviewing court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'"  Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) (quoting Mass. School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998)).

Lieutenant Taylor and Investigator Goodrich are entitled to judgment in their favor as a matter of law on the Plaintiffs' remaining claims because they are entitled to qualified immunity. Once a defendant has asserted the defense of qualified immunity, the threshold inquiry a court must undertake is whether the plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001).  This initial inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The second inquiry is, if a constitutional violation is stated, were these rights "clearly established" to the degree that Lieutenant Taylor and Investigator Goodrich had "fair warning" that his conduct violated the Plaintiffs' constitutional rights?  Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).

In making an assessment of whether the particular conduct of these Defendants was clearly established as being violative of constitutional dictates, the reviewing court must examine the state of law at the time the alleged deprivation occurred.  See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994).  A constitutional right is clearly established only if its contours are "sufficiently clear

---

[4] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); Lancaster v. Monroe County, 116 F.3d 1419, 1424 (11th Cir. 1998). "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).

Lieutenant Taylor and Investigator Goodrich are entitled to qualified immunity for three reasons. First, the undisputed evidence in the record shows that the Defendants were acting within their discretionary authority. Second, the Plaintiffs cannot meet their burden of showing a constitutional violation. Third, even if the evidence in the record did show a constitutional violation, the Plaintiffs cannot point to any contemporaneous clearly established law that provided Defendants with "fair warning" that their conduct was illegal.

## ARGUMENT

As demonstrated herein, there are no disputed material facts, and Defendants are entitled to summary judgment as a matter of law due to the fact that the Defendants are immune from liability under the doctrine of qualified immunity. Specifically, the Plaintiffs have failed to establish a constitutional violation by Investigator Goodrich and Lieutenant Taylor.

## I.    LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH ACTED WITHIN THEIR DISCRETIONARY AUTHORITY.

As set forth by the Eleventh Circuit, once a public official has asserted the defense of qualified immunity, he bears the burden of proving that he was acting within his discretionary authority. Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988). In order to establish that he is acting within his discretionary authority, a public official asserting qualified immunity need only show "objective circumstances which would compel the conclusion that his actions were

undertaken pursuant to the performance of his duties and within the scope of his authority." <u>Id.</u> at 1564 (quoting <u>Barker v. Norman</u>, 651 F.2d 1107, 1121 (5th Cir. 1981)).  Courts should not be "overly narrow" in interpreting this requirement.  <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994).  To determine this question "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."  <u>Harbert Int'l., Inc. v. James</u>, 157 F.3d 1271, 1282 (11th Cir. 1998) (citation omitted).  As one district court observed, "the determination that an officer was acting within his discretionary authority is quite a low hurdle to clear."  <u>Godby v. Montgomery County Bd. of Educ.</u>, 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).

As made clear by the facts set forth above, the Defendants were acting within their discretionary authority.  In fact, the Plaintiffs, in their Complaint, allege in Counts I through IV that "[a]t all times material hereto, Taylor and the other officers were acting as municipal and state law enforcement officers pursuant to State statute and the ordinances, customs, and policies of the City."  (<u>See, generally</u>, the Complaint.)  All of the Defendants' actions, including (a) obtaining the information regarding the Georgia warrant on Kenneth Thrower; (b) obtaining the fugitive warrant; (c) surveying the Barnette property; (d) deciding how to effect the arrest of Mr. Thrower; and (e) actually entering and searching the Barnette residence, were taken in furtherance of their duties as law enforcement officers.  They would not have been in the Plaintiffs' home or interacted with the Plaintiffs at all but for their duties with the Russell County Sheriff's Department.  It is clear that a deputy sheriff's duties, in particular an investigator's duties, include executing warrants and arrests.  As Lieutenant Taylor and Investigator Goodrich engaged in the aforementioned actions while on duty and carried out the functions of their

offices, they clearly were within their discretionary authority at all times relevant to the Plaintiffs' Complaint.

## II.    LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH DID NOT VIOLATE ANY OF THE PLAINTIFFS' FEDERALLY PROTECTED RIGHTS.

The Plaintiffs have alleged two violations of their federally protected rights under the Fourth Amendment to the United States Constitution: unlawful search and seizure, and excessive force. As set forth below, the Plaintiffs cannot meet their burden of showing that Lieutenant Taylor and Investigator Goodrich violated their Fourth Amendment rights. The warrantless entry and search of the home due to exigent circumstances was valid, and Lieutenant Taylor and Investigator Goodrich did not use excessive force.

### A.    The Warrantless Entry Into the Barnette Residence Was Lawful Due to Exigent Circumstances.

It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Groh v. Ramirez, 540 U.S. 551, 559 (2004) (quoting Payton v. New York, 445 U.S. 573, 586 (1980)). However, the touchstone of the Fourth Amendment is "reasonableness," and therefore the warrant requirement is subject to certain exceptions. Brigham City, Utah v. Stuart, 126 S. Ct. 1943, 1947 (2006); Flippo v. West Virginia, 528 U.S. 11, 13 (1999). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-94 (1978). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Brigham City, 126 S. Ct. at 1948. However, there must be more than mere reasonableness to justify an exception to the search warrant requirement. U.S. v. Kreimes, 649 F.2d 1185, 1192 (5th Cir. 1981). Therefore, the United

States Supreme Court has permitted warrantless searches and seizures of a residence where both probable cause and exigent circumstances exist. U.S. v. Burgos, 720 F.2d 1520, 1525-1526 (11th Cir. 1983). "Such exceptions, founded upon the public interest requirement for some flexibility in the application of the general rule, arise in 'those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for recourse to a neutral Magistrate.'" Id. (quoting Arkansas v. Sanders, 442 U.S. 753, 759 (1979)); Burgos, 720 F.2d at 1520, 1526.

Probable cause to search exists where the facts lead a reasonably cautious person to believe that the search will uncover evidence of a crime. Burgos, 720 F.2d at 1525. In the case at bar, the Defendants had clear evidence that a search of the Plaintiff's residence would yield Mr. Thrower. The Defendants had a valid Georgia warrant for Mr. Thrower's arrest in hand; further, prior to instigating entry into the house, they had obtained a valid fugitive warrant. They had very recent and credible reports that Mr. Thrower was talking to his wife from the Plaintiffs' house phone. There was certainly probable cause to search the house.

A warrantless entry, however, must not only be justified by probable cause, but also by exigent circumstances. Burgos, 720 F.2d at 1525. "[A] warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence . . . , or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." Minnesota v. Olson, 495 U.S. 91, 100 (1990) (internal citations omitted); Brigham City, supra; Kreimes, supra; Burgos, supra. In assessing the risk of danger, "the gravity of the crime and likelihood that the suspect is armed should be considered." Olson, supra. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise

16

illegal absent an exigency or emergency." <u>Mincey</u>, 437 U.S. at 392 (quoting <u>Wayne v. U.S.</u>, 318 F.2d 205, 212 (D.C. Cir. 1963)).

In the case at bar, the Defendants entered the Plaintiffs' house without a search warrant because the time required to obtain a search warrant would have allowed Mr. Thrower to escape. The Defendants had information that Mr. Thrower was only at that location for a few minutes, and was imminently going to leave for destinations unknown, thereby eluding capture and arrest. "The Fourth Amendment does not require police officers to delay in the course of an investigation to let fugitives escape once the net has been thrown, nor to endanger the lives of the police or the public while procuring a warrant." <u>Kriemes,</u> 649 F.2d at 1192-93.

The Defendants also had information that Mr. Thrower was armed, and further, that there were multiple weapons in the house. Inasmuch as the residence was not Mr. Thrower's abode, there was every reason for the Defendants to believe that there may be innocent bystanders inside the house who could become victims or hostages of Mr. Thrower if he chose to violently resist arrest. The Eleventh Circuit Court of Appeals found exigent circumstances existed under similar circumstances in <u>U.S. v. Burgos</u>, where it stated that:

> "[t]he [defendant ATF agents] were faced with a house laden with arms and an unknown number of people inside. The officers could reasonably believe that the household was an arsenal. The threat of injury to the neighborhood and arresting officers justified the avoidance of delay involved in obtaining a warrant. Quick action increased the likelihood that no one would be injured. . . . Only by entering the house and searching for persons and weapons could the agents have control of all weapons which could be used against them or to effect an escape. The societal costs of delay outweighed the social interest in resort to a neutral magistrate in this instance. The exigencies of this situation made the warrantless entry lawful.

<u>Burgos</u>, 720 F.2d at 1526.

Finally, Mr. Thrower had indicated to his wife that he would not permit the authorities to arrest him and take him to jail. <u>Compare</u>, <u>Olson</u>, 495 U.S. at 101 (holding that no exigent

circumstances existed to justify warrantless entry into a residence because the police had already recovered the suspect's weapon, there was no suggestion of danger to other residents of the house, and that there was no evidence that the suspect was going anywhere). This indication was sufficient to justify the Defendants' concern that violence might ensue if Mr. Thrower was not arrested quickly.

Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294 (1967) is both foundational to this point of law, and directly on point in a factual sense. In Hayden, an armed robber held up a business and fled. Id. at 298. The police were called and given the robber's description and the address of a residence that the robber had fled into. Id. The police officers knocked at the door of the residence and announced themselves. Id. The suspect's mother answered the door and did not object to the officers' request to search the house. Id. The officers found the suspect, along with weapons and clothes matching the description of the robber, in the house. Id. Upon conviction for armed robbery, the suspect brought a habeas corpus petition, challenging the validity of the search of the residence and the seizure of the weapons and clothing. Id. at 296-97. The petition was unsuccessful in the District Court for Maryland, but was reversed by the Fourth Circuit, which held that the search was valid, but the evidence was unlawfully seized. Id. The United States Supreme Court reversed the Court of Appeals, stating:

> We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, 'the exigencies of the situation made that course imperative.' *McDonald v. United States*, 335 U.S. 451, 456, 69 S. Ct. 191, 193, 93 L. Ed. 153. The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could

have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

. . . Here, the seizures occurred prior to or immediately contemporaneous with Hayden's arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived. The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape.

Hayden, 387 U.S. at 298-99.

It is significant to note that the Supreme Court did not find it necessary to address the fact that the suspect's mother had, at least tacitly, given permission for the officers to search the house. The Court appeared to adopt the lower court's holding that "resolution of the issue [regarding whether the suspect's mother gave consent to search the house] would be unnecessary, because the officers were 'justified in entering and searching the house for the felon, for his weapons and for the fruits of the robbery.'" Id. at 297, n.4.

The fact in the case at bar are directly on point with Hayden. Here the Defendants were given a description of Mr. Thrower and the vehicle he was driving. In fact, in this case the Defendants were provided with a valid arrest warrant for Mr. Thrower. Further, just as in Hayden, the Defendants were given the location of a residence Mr. Thrower was known to be at, and were under the very reasonable belief that Mr. Thrower was armed and dangerous. Again, though in Hayden the police officers knocked and announced themselves, whereas in the case at bar, for the safety of the officers and the residents of the house, the Defendants chose to make a "no-knock" entry, the fact of the "knock and announce" procedure in the Hayden case clearly was irrelevant to the Supreme Court in its analysis. In other words, that Court did not deem consent to be relevant; sufficient exigent circumstances existed for the officers to enter and search the house even absent consent.

The abundant foregoing case law makes it very clear that the Defendants' entry in to the Plaintiffs' house was reasonable under the exigent circumstances. Therefore, no constitutional violation occurred, and the Defendants are entitled to qualified immunity with regard to this claim.

**B.    Lieutenant Taylor and Investigator Goodrich Did Not Use Excessive Force During the Entry and Search.**

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97. The Eleventh Circuit has added "[w]e must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction would prove fatal." Crosby v. Monroe County, 394 F.3d 1328, 1333-34 (11th Cir. 2004).

"In analyzing whether excessive force was used, courts must look at the totality of the circumstances." Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280 (11th Cir. 2004). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (citation omitted). "We must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene." Garrett, 378 F.3d at 1281. "Graham requires an evaluation of the officers' reasonable apprehension to assess their responses to the circumstances confronting them, particularly in a rapidly evolving situation." Carr v. Tatangelo, 338 F.3d 1259, 1268 n.17 (11th Cir. 2003).

20

"Government officials are not required to err on the side of caution." Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc). "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." Carr, 338 F.3d at 1270 (citation omitted). "We must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992). "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Elliott v. Leavitt, 99 F.3d 640, 641 (4th Cir. 1996).

The Plaintiffs cannot establish that Lieutenant Taylor and Investigator Goodrich used excessive force for three reasons. First, there is no evidence that these Defendants used any force whatsoever on the Plaintiffs. Second, because this case involves the arrest of a fugitive felon reported to be armed, homicidal and/or suicidal, and determined not to be arrested, Lieutenant Taylor and Investigator Goodrich were entitled, as a matter of law, to exercise temporary control over everyone on the premises for their safety and for the safety of others. Third, the Plaintiffs have adduced no evidence that they suffered any injury whatsoever as a result of being detained.

### 1. These Defendants Did Not Exercise Any Force Against the Plaintiffs.

It is clear from Ms. Barnette's deposition testimony, as well as from Lieutenant Taylor's and Investigator Goodrich's affidavits, that the Defendants were not on the entry team, and did not employ any force whatsoever against the Plaintiffs. Ms. Barnette's own testimony reveals that Lieutenant Taylor entered the house well after the entry team had secured the premises, and she never even saw Investigator Goodrich.

Q.      Do you know who came in to the – Do you know who was part of the entry team?

A.      They had ski masks on their face, shields in their hands, and assault rifles in their hands.

        Mr. Nelms:      Answer his questions.

Q.      So the answer is no?

A.      No, sir, I didn't know.  I only knew two people that were there.

Q.      Okay.  Who were the two people that were there?

A.      Heath Taylor and Grover Goodrich.

Q.      Did either Heath Taylor or Grover Goodrich have any ski masks on?

A.      No, sir.  No, sir, I don't remember ski masks on either one of them.

. . .

Q.      Okay.  When did they tell you who they were looking for?

A.      I kept asking the officer over me, "What's going on?  What's wrong?"  He said, "He'll be here in a minute."  And that's when Heath Taylor came to my bedroom door.

. . .

Q.      Do you – Did Grover Goodrich say anything to you?

A.      Not the first time they were there, no, sir.

Q.      Did you see him the first time they were there?

A.      No, sir.

. . .

Q.      . . . Was Grover Goodrich at your house the first time?

        Mr. Nelms:      Object to the form.

Q.      You can answer the question.

A.      I didn't know what that meant.  I'm not sure.  No.  I mean . . .

22

Q.     Do you remember seeing him there the first time?

A.     No, sir.

Q.     So, the first time the officers were there, the only person that you know for sure was there was Heath Taylor; is that correct?

A.     Yes, sir.

(L. Barnette Depo. at 37:1-42:18.)

This testimony is consistent with Lieutenant Taylor's and Investigator Goodrich's uncontroverted testimony that they entered the house after it was secured.  (Taylor Aff. at 9; Goodrich Aff. at 5.)  Therefore, given that these Defendants were not on the entry team, and there is no evidence whatsoever in the record that Lieutenant Taylor or Investigator Goodrich employed any force at all against the Plaintiffs, or even drew their weapons, it is clear that they cannot have used excessive force, and this claim against them is due to be dismissed.

> **2.     The Degree of Force Used on the Plaintiffs Was Justified Under the Circumstances.**

"An officer's authority to detain incident to a search is categorical."  The United States Supreme Court explained the rationale behind this categorical authority to detain in Muehler v. Mena, 544 U.S. 93, 98 (2005).  In that case, a judge issued a search warrant for the plaintiff's home that authorized officers to search for, *inter alia*, deadly weapons and evidence of gang membership.  Id. at 95-96.  When the warrant was executed, the plaintiff was alone in the house at the time and was asleep.  Id. at 96.  The plaintiff was awoken by the officers, immediately placed in handcuffs, and escorted to a converted garage.  Id.  Two other persons who lived in trailers on the property were also brought to the converted garage in handcuffs.  Id.  Two officers were detailed to guard the detainees while the rest of the officers searched the premises.  Id.  The search took two to three hours during which time the plaintiff remained in handcuffs.  Id. at 100.

Reversing the Ninth Circuit's affirmation of a jury verdict in the plaintiff's favor, the United States Supreme Court held that the plaintiff was not subjected to a violation of her federally protected rights. Muehler, 544 U.S. at 98. In so holding, the Court reasoned as follows:

> In *Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L.Ed.2d 340 (1981), we held that officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." Id., at 705, 101 S. Ct. 2587. Such detentions are appropriate, we explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial. *Id.*, at 701-705, 101 S. Ct. 2587. We made clear that the detention of an occupant is "surely less intrusive than the search itself," and the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home. Id., at 701, 101 S. Ct. 2587. Against this incremental intrusion, we posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force." *Id.*, at 702-703, 101 S. Ct. 2587.
>
> . . .
>
> Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention. See *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). Indeed, *Summers* itself stressed that the risk of harm to officers and occupants is minimized "if the officers routinely exercise unquestioned command of the situation." 452 U.S., at 703, 101 S. Ct. 2587.

Meuhler, 544 U.S. at 98-99.

The case at bar involves the execution of a felony arrest warrant. The Defendants had reliable information that the arrestee, Mr. Thrower, was armed and dangerous, homicidal and/or suicidal, and determined not to be arrested. The short detention of the Plaintiffs – less than five minutes – was necessary to ensure the safety of the officers, the safety of the Plaintiffs, and the

orderly completion of the search of the house. However, whereas in <u>Meuhler</u> the plaintiffs were handcuffed for two to three hours, here the Plaintiffs were merely made to lie on the floor for a couple of minutes, and were never touched. (L. Barnette Depo. at 51:21-23; C.B. Barnette Depo. at 30:22-31:13.) Surely if the detention in <u>Muehler</u> was reasonable, the detention in the case at bar is equally if not more reasonable.

The Plaintiffs complain that the defendants pointed firearms at them. Initially, as stated above, while some defendants may have – and probably did -- draw their weapons and point them at the Plaintiffs, it is clear that defendants Taylor and Goodrich did not enter the house with the entry team, and Ms. Barnette's testimony does not indicate that these Defendants ever even drew their firearms, much less pointed them at the Plaintiffs. (Complaint at ¶¶ 27, 31, 94.) Further, even had the Defendants employed their firearms, the use of a gun in connection with a detention is permissible when an officer reasonable believes it is necessary for his protection. <u>See</u> <u>Thompson v. City of Lawrence</u>, 58 F.3d 1511, 1516 (10th Cir. 1995) (holding that it was not unreasonable for police officers to carry weapons into a home and handcuff a suspect who had a reputation for possessing firearms); <u>Anderson v. U.S.</u>, 107 F. Supp. 2d 191, 199 (E.D. N.Y. 2000) (holding that "there is nothing inherently unreasonable about an officer conducting a protective sweep with his or her weapon drawn[;] nor is it unreasonable to expect the officer to sometimes aim that weapon at an individual until an assessment can be made as to whether the individual poses a threat"). <u>See also</u> <u>U.S. v. Aldridge</u>, 719 F.2d 368, 371 (11th Cir. 1983); <u>Courson v. McMillian</u>, 939 F.2d at 1479, 1494, n.25 (11th Cir. 1991); <u>U.S. v. Roper</u>, 702 F.2d 984, 988 (11th Cir. 1983); <u>U.S. v. Merritt</u>, 695 F.2d 1263, 1273 (10th Cir. 1982).

Plaintiffs also state in their Complaint that the Defendants "place[d] their hands and feet on [them]." (Complaint at ¶ 94.) However, in her deposition testimony, Ms. Barnette revealed that neither she nor Ms. Cruz nor C.B. was touched during the entry and search of the house.

> Q.    During this incident, did anybody touch you physically?
>
> A.    No, sir.
>
> Q.    And the people that were at the house at this time were you, your niece, Sara Cruz, and your son, C.B.?
>
> A.    Yes, sir.
>
> Q.    Did you see anybody touch either of them physically?
>
> A.    No, sir.

(L. Barnette Depo. at 51:14-23.)

In short, forcing the Plaintiffs to lie on the ground for less than five minutes, and aiming firearms at them during that time, was not an unreasonable use of force under the circumstances, and therefore did not constitute a constitutional violation.  See also, Florida v. Royer, 460 U.S. 491, 504 (1983) (holding that officers may detain a person without probable cause while executing a search warrant if justified by the circumstances); U.S. v. Taylor, 716 F.2d 701 (9th Cir. 1983) (agent was within the confines of a Terry stop when he approached a vehicle with his gun drawn, aimed at the passenger, and directed the passenger to lie face down in a ditch where he was handcuffed and frisked); U.S. v. Jacobs, 715 1343, 1346 (9th Cir. 1983) (deputy was within Terry confines when he ordered occupants of vehicle to "prone out" at gunpoint while he investigated); Jackson v. Sauls, 206 F.3d 1156, 1171-72 (11th Cir. 2000).

Plaintiffs also complain of the use of the distraction and diversionary device, sometimes referred to as a "flashbang," in their home.  However, use of a flashbang does not constitute excessive force in violation of the Fourth Amendment.  "The reasonableness of [the use of a

flashbang] depends on the facts and circumstances of each case." Hernandez v. Conde, 442 F. Supp. 2d 1141, 1157 (D. Kan. 2006); U.S. v. Myers, 106 F.3d 936, 940 (10th Cir. 1997); Kirk v. Watkins, 182 F.3d 932 (10th Cir. 1999). The use of a flashbang is analyzed under the Graham v. Connor test (490 U.S. 386, 396 (1989)). Taylor v. City of Middletown, 436 F. Supp. 2d 377, 386 (D. Conn. 2006). As explained by the Sixth Circuit in Bing v. City of Whitehall, Ohio, 456 F.3d 555 (6th Cir. 2006):

> *Graham* requires this court to determine the reasonableness of the police use of . . . the flashbang devices by performing a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." [Graham, 490 U.S. at 396.] When judging the objective reasonableness of a use of force, this court may not use 20/20 hindsight. *See id.* at 396-97. The court must adopt the perspective of a reasonable policeman on the scene. *See id.* The court weighs [the plaintiff's] interest in avoiding . . . the . . . flashbang against the officers' interest in using these methods as measured by the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

> Under *Graham's* balancing test, the officers' use of . . . the . . . flashbang were reasonable because their interest in employing these devices outweighed [the plaintiff's] interest in avoiding them. [The plaintiff] of course has a significant interest in . . . avoiding having a flashbang device explode in his home. But the police's interest here outweighed [the plaintiff's] interest because, as noted above regarding exigency, [the plaintiff] posed a serious and immediate threat to others and refused to come out of his house to be arrested. The police had a great need to disarm [the plaintiff] and place him under arrest to abate the threat that he posed to people in the area. This interest outweighed [the plaintiff's] significant interest in avoiding this use of force.

Bing, 456 F. 3d at 569-70.[5]

Here, as in Bing, the Defendants had a significant, overriding interest in employing all the force used, including the flashbang. The crime for which Mr. Thrower was being arrested

---

[5] The use of flashbangs in law enforcement dates back to at least the early 1970s. However, their use has not been the subject of litigation until approximately the last ten years. After a careful search, the undersigned has located only approximately two dozen cases nationwide that address the use of flashbangs. The undersigned could find no cases at all from the United States Supreme Court, the Eleventh Circuit, or the State of Alabama.

was Aggravated Child Molestation, a felony and a crime against a person. Mr. Thrower was believed to be armed, in a house containing multiple weapons and potentially innocent bystanders, homicidal and/or suicidal, and had verbalized an intention to resist arrest. Further, the whole reason that the Defendants, Alabama law enforcement officers, were executing a Georgia arrest warrant was that Mr. Thrower was actively fleeing Georgia to evade arrest. Therefore, all of the Graham factors were satisfied, and justified the amount of force used. See also U.S. v. Jones, 214 F.3d 836, 844-45 (7th Cir. 2000) (find that the use of a flashbang is an appropriate means of disorienting the occupant of a building so that officers can protect themselves when entering in order to search the premises); U.S. v. Kingsley, No. 97-40095-01-RDR, 1998 WL 295577, *1 (D. Kan. May 21, 1998) (finding the use of a flashbang reasonable where officers knew, *inter alia*, that individuals who frequented the defendant's residence carried firearms, and officers knew about a recent incident at the residence where an armed individual fled upon arrival of police officers).

### 3.  The Plaintiffs' Injuries were *de minimis*.

The *de minimis* nature of the Plaintiffs' alleged injuries also mandates judgment in Lieutenant Taylor and Investigator Goodrich's favor as a matter of law. Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000) (holding that the application of *de minimis* force will not support a claim for excessive force in violation of the Fourth Amendment). In Nolin, the defendant officer grabbed the plaintiff from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back, pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and placed the plaintiff in handcuffs. Nolin, 207 F.3d at 1255. The plaintiff allegedly suffered bruising to his forehead, chest, and wrists. Id. Here, there is no evidence that any plaintiff suffered any injury whatsoever from the actions of the Defendants. Indeed, the only physical injury sustained at all were some minor scrapes to Plaintiff C.B.'s legs

resulting from his own actions of jumping out and back in a bedroom window.  C.B.'s own testimony, as well as the testimony of his mother, were that the scrapes were minor, and did not hurt or exhibit any blood or bruising.  (L. Barnette Depo. at 207:3-209:8; C.B. Barnette Depo. at 52:1-21.)

In fact, on the record before the Court, there was no injury inflicted whatsoever, as the Plaintiffs have failed to offer any medical testimony or other evidence to substantiate their claims of physical injury.  See, e.g., Bennett v. Parker, 898 F.2d 1530, 1534 (11th Cir. 1990) (reversing district court's denial of summary judgment and holding that a conclusory allegation of injury without supporting physical evidence, medical records, or corroborating witness testimony were insufficient to raise a genuine issue of material fact where qualified immunity is at issue); Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (finding that plaintiff's claim that injury was caused by handcuffing was conclusory and without supporting facts or medical records could not create a genuine issue of material fact).

Further, the Plaintiffs' household damage is also de minimus, inasmuch as the Plaintiffs have already been reimbursed for the damage done to their house by the entry of the Defendants. It is undisputed that the Russell County Sheriff's Department has already replaced the Plaintiffs' front door, door frame, and door handle.  (L. Barnette Depo. at 52:13-53:14; 69:6-21; C.B. Barnette Depo. at 53:3-54:12.)  The Plaintiffs were without a front door only for a period of a few minutes, perhaps a couple of hours.  (Id.)  In addition, the Plaintiffs' insurance company has already compensated them for the carpet and other household items damaged or destroyed by the Defendants' entry, by way of a check for five thousand two hundred dollars ($5,200).  (L. Barnette Depo. at 97:7-22, 98:11-14, 220:8-11; J. Barnette Depo. at 67:23-68:6, 72:10-73:17, 80:2-8.)

Given the extreme initial risk to the officers and the persons present at the house, and the lack of any injury whatsoever, the use of force here cannot be said to be unreasonable as a matter of law.  Accordingly, the Defendants are entitled dismissal of this claim.

### III.  NO CLEARLY ESTABLISHED LAW PROVIDED FAIR WARNING TO LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH THAT THEIR CONDUCT WAS UNLAWFUL.

Assuming, *arguendo*, that the Plaintiffs could demonstrate a constitutional violation, they must still show that clearly established law provided Lieutenant Taylor and Investigator Goodrich with fair warning that their conduct was unlawful.  The Plaintiffs may do so by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision are specific enough to demonstrate conduct was illegal, even in the total absence of case law.  Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted).  The Eleventh Circuit has identified the latter method as an "obvious clarity" case.  Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002).  In order to show that the conduct of Lieutenant Taylor and Investigator Goodrich was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent." Willingham, 321 F.3d at 1301.  "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit."  Storck, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

The United States Supreme Court has applied this standard to cases involving the warrantless search of a residence.  In Anderson v. Creighton, 483 U.S. 635 (1987), the Court stated:

> . . . It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [the defendant's] search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that

probable cause is present, and we have indicated that in such cases those officials-like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable. See *Malley, supra*, 475 U.S., at 344-345, 106 S. Ct., at 1097-1098. The same is true of their conclusions regarding exigent circumstances.

It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials. . . . The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the defendant's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.

Anderson, 483 U.S. at 641. See also, Saucier v. Katz, 533 U.S. 194, 206 (2001).

In light of Anderson, as well as the case law extensively cited in the previous sections, it is plainly evident that no clearly established law existed to put the Defendants on notice that their conduct was unconstitutional. Accordingly, these Defendants are entitled to qualified immunity, and dismissal of the Plaintiffs' claims.

## **CONCLUSION**

It is clear from the foregoing case law that the Defendants are immune from liability under the doctrine of qualified immunity. Therefore, Defendants pray that this Court will enter summary judgment in their favor, finding that the doctrine of qualified immunity shields them from liability for their actions in entering the Plaintiffs' residence and searching for Mr. Thrower in order to apprehend him pursuant to a valid arrest warrant.

WHEREFORE, PREMISES CONSIDERED, the Defendants move this Court to enter summary judgment in their favor and against the Plaintiffs as to all remaining claims.

Respectfully submitted this the 20th day of April, 2007.

> **s/Scott W. Gosnell**
> KENDRICK E. WEBB, Bar Number: WEBB022
> SCOTT W. GOSNELL, Bar Number: GOS002
> Attorneys for Defendants Goodrich and Taylor
> WEBB & ELEY, P.C.
> 7475 Halcyon Pointe Road (36117)
> P. O. Box 240909
> Montgomery, Alabama 36124
> Telephone: (334) 262-1850
> Fax: (334) 262-1889
> E-mail: sgosnell@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the **20th day of April, 2007**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Jay Lewis, Esq.; Keith Anderson Nelms, Esq.;** and **Ronald G. Davenport, Esq.**

> **s/Scott W. Gosnell**
> OF COUNSEL