# EXHIBIT  B – Part One
# Deposition of Lisa Barnette

**FREEDOM COURT REPORTING**



Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5    CASE NUMBER:  3:05CV473-B        **COPY**

6    LISA BARNETTE, et al.,

7              Plaintiffs,

8              vs.

9    CITY OF PHENIX CITY, et al.,

10             Defendants.

11

12            S T I P U L A T I O N

13            IT IS STIPULATED AND AGREED by and

14   between the parties through their respective

15   counsel, that the deposition of Lisa

16   Barnette may be taken before Angela Smith,

17   RPR, CRR, at the offices of McKoon, Thomas &

18   McKoon, at 925 Broad Street, Phenix City,

19   Alabama 36867, on the 3rd day of October,

20   2006.

21

22            DEPOSITION OF LISA BARNETTE

23



**FREEDOM COURT REPORTING**

1      A.     James Thrower, Junior.

2      Q.     And how about your sisters?

3      A.     Their names, is that what

4  you're asking me?

5      Q.     Yes.

6      A.     Mary Jane Pate.

7      Q.     And where does she live?

8      A.     Phenix City.

9      Q.     And your other sister?

10     A.     Tina Abney.

11     Q.     Abney?

12     A.     A-B-N-E-Y.

13     Q.     Where does she live?

14     A.     Columbus.

15     Q.     When did your brother, James

16  Thrower, pass away?

17     A.     In '96.

18     Q.     What of?

19     A.     He was shot in the head.

20     Q.     I'm so sorry.  And your other

21  brother?

22     A.     Kenneth Thrower.

23     Q.     If you need to take a break,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

1    Q.    And that would be Lisa

2  Thrower?

3    A.    Yes.

4    Q.    Kenny's wife?

5    A.    Ex-wife.

6    Q.    Well, was it ex at the time?

7    A.    No.  They're divorced now.

8    Q.    But at the time they were

9  married?

10    A.    Yeah.

11    Q.    And you have Caller I.D., so

12  you recognized her cell phone?

13    A.    Yes, sir.

14    Q.    Okay.  Now, when you were

15  talking with Kenny, did he mention why he

16  was there?

17    A.    Yeah.  He come to see my mama.

18  He had some clothes and stuff in the truck.

19  He said he was going to stay with my mama

20  because -- I guess because of all of the

21  blow up with that and her calling us and

22  telling us and stuff.  I really don't know.

23  He just had clothes with him.

# FREEDOM COURT REPORTING

Page 38

1      Q.     Okay.  When did they tell you

2  who they were looking for?

3      A.     I kept asking the officer over

4  me, "What's going on?  What's wrong?"  He

5  said, "He'll be here in a minute."  And

6  that's when Heath Taylor came to my bedroom

7  door.

8      Q.     Uh-huh.

9      A.     And asked me did I know where

10  my brother was -- No.  Did I know where my

11  -- "Where was my brother's truck?"

12      Q.     Uh-huh.

13      A.     And he told me to tell him, he

14  says, "I'm going to keep coming back over

15  and over until you tell me where your

16  brother is."

17      Q.     Did you not tell him where

18  your brother was?

19      A.     Yeah.  I told him where.  I

20  told him he was at El Vaquero on 280, after

21  he told me he was going to keep coming back,

22  which, I would have told him anyway.  But he

23  said that -- I told him, "He went to El



**FREEDOM COURT REPORTING**

Page 39

1  Vaquero to meet my mom."  And then that's

2  pretty much when everybody was running out

3  of my house and pretty much getting gone.

4      Q.    What do you mean?  I'm sorry.

5  That was when everybody was running out of

6  your house?

7          MR. NELMS:  If you don't

8  understand his question, tell him you don't

9  understand it.

10     A.    I don't understand.

11     Q.    Okay.  Well, you mentioned

12 that that was when everybody was running out

13 of your house.  And I'm right now trying to

14 say, "When did that happen?"

15     A.    After they -- After I said

16 where my brother was.

17     Q.    Then everybody left?

18     A.    Well, they were on their way

19 out the door, yeah.  They were kind of like

20 huddling up outside in front of my house.

21 And then everybody got in their cars and

22 pretty much sped away.

23     Q.    And did Heath Taylor say

**FREEDOM COURT REPORTING**

Page 50

1  don't know their conversation.

2      Q.      What else did your

3  brother-in-law say?

4      A.      That was pretty much it.  We

5  didn't want to get him involved.  He has to

6  have his job.  So -- I mean, that was pretty

7  much it.  And that was them talking, I

8  guess, on a friend-to-friend basis, just

9  talking in conversation.  I don't know.

10     Q.      Do you have any guns in your

11 house?

12     A.      Yes, sir.

13     Q.      How many guns do you have in

14 your house?

15     A.      Maybe twenty.

16     Q.      Would you be surprised if it

17 was closer to thirty?

18     A.      Yeah.  There are probably no

19 more than twenty.

20     Q.      Okay.

21     A.      Like, rifles and shotguns.

22     Q.      Did you say about twenty?

23     A.      Yes, sir.

# FREEDOM COURT REPORTING

Page 51

1       Q.      Rifles and shotguns?

2       A.      Yes, sir.

3       Q.      Do you and your husband

4   collect guns?

5       A.      I don't.  He does.

6       Q.      So, these are your husband's?

7       A.      Yes, sir.

8       Q.      So, he has about twenty rifles

9   and shotguns?

10      A.      Yes, sir.

11      Q.      And does he also have

12  ammunition for those guns?

13      A.      Yes, sir.

14      Q.      During this incident, did

15  anybody touch you physically?

16      A.      No, sir.

17      Q.      And the people that were at

18  the house at this time were you, your niece,

19  Sara Cruz, and your son, C.B.?

20      A.      Yes, sir.

21      Q.      Did you see anybody touch

22  either of them physically?

23      A.      No, sir.

# FREEDOM COURT REPORTING

Page 52

1       Q.     Do you remember anybody else

2  saying anything else during this first

3  entry, that you haven't already told me?

4       A.     No, sir.

5       Q.     Okay.  Do you remember

6  anything else you might have told them?

7       A.     No, sir.

8       Q.     After they left, did you call

9  your mom, to let her know that they were

10  coming to get --

11       A.     No, sir.  No, sir.

12       Q.     And why?

13       A.     The first phone call I made

14  was to Russell County Sheriff's Department.

15       Q.     Okay.  Who did you call?

16       A.     I spoke to a man.  He said his

17  name was Alexander.  I told him that my

18  house had been tore up.  And he said that he

19  would send someone out there right away to

20  assess the damages.

21       Q.     And when did that person come

22  out to your house?

23       A.     I would say within forty-five

# FREEDOM COURT REPORTING

Page 53

1    minutes after I called.

2         Q.    So, was that your next contact

3    with somebody, with a law enforcement

4    officer on this day?

5         A.    The sheriff's department

6    maintenance man came to my house with two

7    prisoners.

8         Q.    Okay.  When was that?  That

9    was about forty-five minutes after the

10   officers left the first time?

11        A.    Yes, sir.  Yes, sir.

12        Q.    And do you know who the

13   maintenance man was?

14        A.    McKenzie, Richard McKenzie.

15        Q.    And what did they do when they

16   got there?

17        A.    One of the prisoners drew a

18   picture of my front door.  And they was

19   pretty much there just to secure the house

20   for the night.

21        Q.    What did they do to secure the

22   house?

23        A.    Pretty much it wasn't really

**FREEDOM COURT REPORTING**

1    secured.  I had a storm door and I kind of

2    like locked the latch.  There's a top latch

3    and I locked it.  And the door was just kind

4    of propped to.  It really wouldn't stay

5    shut.

6          Q.    What did they do to try and

7    secure the door?

8          A.    They were trying to nail it.

9          Q.    Okay.  Did they come back

10   later to fix the door?

11         A.    Yes, sir.

12         Q.    When was that?

13         A.    It was more like five o'clock

14   maybe that afternoon, six o'clock, they came

15   back with a door.

16         Q.    And this was on February 10th?

17         A.    Yes, sir.

18         Q.    So, they brought a new door?

19         A.    Yes, sir.

20         Q.    Okay.  And this was Richard

21   McKenzie, the maintenance guy?

22         A.    Sheriff's department.

23         Q.    From the sheriff's department,

**FREEDOM COURT REPORTING**

Page 55

1   and two prisoners?

2           A.      Yes, sir.

3           Q.      And they came back with a door

4   about five or six o'clock?

5           A.      Yes, sir.

6           Q.      And did they install the door?

7           A.      No, sir.

8           Q.      Okay.  What did they do with

9   the door?

10          A.      Left it on my side porch.

11  They asked me if it was okay if they could

12  come back the next day and put the door up

13  since it was getting late, and I told them

14  yes.

15          Q.      And did they come back the

16  next day and install it?

17          A.      Yes, sir.

18          Q.      Did they do any other work at

19  your house?

20          A.      No, sir.  My storm door, the

21  doorknob was broke off of it, they replaced

22  it and the door.

23          Q.      Okay.  Now, when did you hear

# FREEDOM COURT REPORTING

Page 58

1        A.        And he told me he come back to

2    seize our three four-wheelers.

3        Q.        Came back to seize what?

4        A.        We had three four-wheelers.

5    He came back to get the four-wheelers.

6        Q.        Okay.  What exactly did he

7    tell you?

8        A.        Excuse me?

9        Q.        What exactly did he tell you?

10        A.        He said when they were

11    checking the premises, that there was a

12    four-wheeler in our shed that just had

13    suspicions that maybe it was stolen.

14        Q.        Did he tell you anything else?

15        A.        He went outside and came back

16    in and told me that he needed the keys to

17    our four-wheeler trailer.  I told him that

18    that was our four-wheeler trailer; that, you

19    know, we didn't steal it.  He said, "I have

20    to have the trailer to take the

21    four-wheelers down," because the one he had

22    would only hold one four-wheeler, that the

23    County has or whatever.  I don't know.

# FREEDOM COURT REPORTING

Page 59

1    Q.    Did he ask you if it was okay
2 to take the trailer?
3    A.    No.  He told me he had to have
4 the keys to the four-wheeler trailer to take
5 the four-wheelers down.
6    Q.    Did he ask you if he could
7 take the four-wheelers?
8    A.    No, sir.  He told me he had
9 to.
10    Q.    Did he tell you that at least
11 one of the ignitions on the four-wheelers
12 was popped?
13    A.    Yes, sir.
14    Q.    Were you able to produce any
15 receipts for them?
16    A.    Yes, sir.  Two of them.  No.
17 One of them.  I'm sorry.
18                (Defendant's Exhibit 1 was
19                marked for identification
20                purposes.)
21    Q.    I'm going to hand you what
22 I've marked as Defendant's Exhibit 1.  Is
23 that the receipt that you gave to Lieutenant

## FREEDOM COURT REPORTING

Page 60

1    -- or showed Lieutenant Heath Taylor?

2          A.      Yes, sir.

3          Q.      Does that receipt have the VIN

4    number of the four-wheeler on the receipt?

5          A.      No, sir.

6          Q.      This is the only receipt you

7    had for the three four-wheelers?

8          A.      Yes, sir.

9          Q.      Who else was there with you

10   and Lieutenant Taylor?  You said there was

11   the maintenance guy was working on the door

12   with the two prisoners.

13         A.      Yes, sir.

14         Q.      And who else was present?

15         A.      Goodrich.

16         Q.      Is this the first time you

17   remember seeing Grover Goodrich that day?

18         A.      Yes, sir.

19         Q.      Did he say anything?

20         A.      No, sir.  No -- Well, yeah,

21   they had a piece of paper, and all it had on

22   it was the -- He stated for me to sign that

23   piece of paper, just showing that they took

# FREEDOM COURT REPORTING

1   that correct?

2                   MR. NELMS:  Object to the

3   form.

4           A.      Yes, sir.

5           Q.      Now, did he tell you that you

6   could pick them up the next day?

7           A.      Yes, sir.

8           Q.      Was it Lieutenant Taylor that

9   told you that?

10          A.      Yes, sir.

11          Q.      Did you, during this time,

12  ever call your husband?

13          A.      Yes, sir.

14          Q.      Did you do that from your home

15  phone or your cell phone?

16          A.      My home phone.

17          Q.      And when was this that they

18  came by the second time?  Or, actually, when

19  Heath Taylor came by the second time?

20          A.      Maybe one o'clock.

21                  MR. GRAHAM:  Is that one

22  o'clock p.m.?

23                  THE WITNESS:  Yes, sir.

# FREEDOM COURT REPORTING

Page 65

1          MR. NELMS:  Object to the

2    form.

3          Q.     Isn't that what he said?  Did

4    he tell you he thought the ATVs might have

5    been stolen?

6          A.     Yes, sir.

7          Q.     Okay.  Did anybody else come

8    by while he was there the second time,

9    besides Grover Goodrich?

10         A.     There was a lady that had a

11   trailer, she was from the sheriff's

12   department.  She was pulling a trailer.

13         Q.     Was she pulling a trailer when

14   she came up?

15         A.     Yes, sir.  She had it on the

16   back of a pickup truck.

17         Q.     And she was pulling a trailer

18   on the back of a pickup truck?

19         A.     Yes, sir.

20         Q.     Do you know who this lady was?

21         A.     No, sir.

22         Q.     And then what did she do?

23   What do you remember her doing?

# FREEDOM COURT REPORTING

Page 66

1     A.      Just leaving.

2     Q.      Okay.  Did she -- Was she the

3 one that towed off the ATVs?

4     A.      I'm not sure who took them

5 off.

6     Q.      Okay.  Do you know who loaded

7 the four-wheelers or ATVs on the trailer?

8     A.      No, sir.

9     Q.      Did they load it onto your

10 trailer?

11     A.      Yes, sir.

12     Q.      Okay.  And you said they had

13 mentioned that you could come and pick them

14 up the next day?

15     A.      Yes, sir.

16     Q.      And was that because your

17 husband was supposed to be back the next

18 day?

19     A.      Yes, sir.

20     Q.      And where was he at the time,

21 your husband?

22     A.      In Atlanta, working.

23     Q.      And what's his job?

**FREEDOM COURT REPORTING**

Page 69

1    Q.    Now, on Friday, you mentioned

2    that was when the maintenance man from the

3    sheriff's department and two prisoners came

4    and put up your door?

5    A.    Yes, sir.

6    Q.    And they replaced the doorknob

7    on your storm door?

8    A.    Yes, sir.

9    Q.    Did they -- Did they need to

10   or did they fix the door jamb, or was that

11   necessary?

12   A.    My whole door frame was busted

13   up.

14   Q.    Did they fix that?

15   A.    Yes, sir, they fixed that.

16   Q.    So, they did fix the door

17   frame?

18   A.    Yes, sir.

19   Q.    They did that on Friday?

20   A.    Yes, sir.

21   Q.    Now, did you have any other --

22   Did you have any conversations on Friday,

23   February 11th, with anyone from the Russell

**FREEDOM COURT REPORTING**

Page 76

1    Q.    Did you ever object to him

2  taking the four-wheelers?

3    A.    No, sir.

4    Q.    Now, when did you and your

5  husband get the four-wheelers back?

6    A.    The following Saturday.

7    Q.    Would that be Saturday,

8  February the 12th?

9    A.    The 12th, yes, sir.

10    Q.    What time?

11    A.    We were to meet Heath Taylor

12  there at six-thirty.

13    Q.    In the morning?

14    A.    No, sir.  In the afternoon.

15    Q.    In the evening.  Is that what

16  time you met him there?

17    A.    Yes, sir.

18    Q.    And what did y'all talk about

19  when you met him there?

20    A.    Just -- He just told us that

21  he didn't find anything with the

22  four-wheelers as to being stolen, but he

23  still believed that the red four-wheeler was

**FREEDOM COURT REPORTING**

Page 77

1    stolen, but --

2          Q.      The what one?

3          A.      He believed that the red

4    four-wheeler was stolen, but he couldn't

5    prove that it was, so he gave them all back.

6          Q.      Which one was the red one?

7          A.      The Honda 250 EX.

8          Q.      Is that the one that had the

9    popped ignition?

10         A.      Yes, sir.

11               MR. NELMS:    Object to popped

12   ignition.

13         Q.      And did the -- Now, you had

14   mentioned that you signed something before

15   Lieutenant Taylor -- or when the sheriff's

16   department, excuse me, took the

17   four-wheelers.  Do you have a copy of what

18   you signed?

19         A.      I'm sure I do.  I don't -- Not

20   right now, I don't.

21         Q.      Okay.  Have you provided a

22   copy of that to your attorney?

23         A.      Yes, sir.

# FREEDOM COURT REPORTING

Page 78

1        MR. WEBB:  Is there any way we

2    can get a copy of that?

3        MR. NELMS:  I'm not aware of

4    having such a thing, but if I do have it,

5    I'll let you have it.

6        MR. WEBB:  Okay.

7        MR. NELMS:  The answer is yes.

8        Q.    Okay.  But you remember

9    signing a document?

10       A.    Yes, sir.

11       Q.    And that was on Thursday,

12   February the 10th?

13       A.    Yes, sir.

14       Q.    And this document on Thursday,

15   February 10th, what did it say?

16       A.    It just had the serial numbers

17   -- No.  Not -- I think it just had the name

18   of the items they were taking.

19       Q.    Now, on Saturday, February

20   12th, what else -- did he tell you anything

21   else about the four-wheelers?

22       A.    No, sir.

23       Q.    Did you talk to him any about

## FREEDOM COURT REPORTING

1  what happened on February 10th?

2        A.      Yes, sir.

3        Q.      What did you say?

4        A.      I asked him about replacing my

5  living room carpet that had a big burn hole

6  in it.

7        Q.      And what did he say?

8        A.      He said that they could cut a

9  square patch in my living room carpet and

10  repair it for me.

11       Q.      And what did you -- Did you

12  have a response to that?  Did you say that

13  was okay?

14       A.      No, sir.  I wanted my whole

15  living room carpet replaced.

16       Q.      What did he say?  Did he say

17  he'll check in on that, or what?

18       A.      I don't remember.

19       Q.      Now, what happened -- Did he

20  say anything else?  Or did you say anything

21  else when you talked on Saturday, February

22  the 12th?

23       A.      I really didn't really say a

# FREEDOM COURT REPORTING

Page 80

1  whole lot that day, not me and him.

2       Q.     Okay.  Did your husband say

3  anything to him?

4       A.     Yes, sir.

5       Q.     Did they talk?

6       A.     Yes, sir.

7       Q.     What did they say?

8       A.     They were talking about the

9  search warrant, why didn't they have a

10  search warrant to come in our house?  And he

11  said they didn't have to because he had

12  probable cause.

13      Q.     Okay.  And did he say anything

14  else?

15      A.     Really, they kept talking, but

16  I wasn't really paying any attention to

17  everything they were saying.

18      Q.     Okay.  And do you remember

19  anything else from that conversation?

20      A.     No, sir.

21      Q.     Okay.  So, y'all picked up the

22  trailers about six-thirty p.m., on Saturday,

23  February 12th?

**FREEDOM COURT REPORTING**

Page 81

1     A.     Yes, sir.

2     Q.     Now, did you talk with your

3  husband, or anybody else, on Saturday?

4     A.     When we went and got the

5  four-wheelers?

6     Q.     No.  About this incident,

7  about anything that's happened.

8     A.     Yeah.  We talked every day

9  about it.

10    Q.     Okay.  You and your husband,

11 or others, with others?

12    A.     Yeah.  I mean, I talked to him

13 and I talked to my mother.

14    Q.     Did you talk to anybody else?

15    A.     A couple of my neighbors.

16    Q.     Okay.  What neighbors did you

17 talk to?

18    A.     Linda Posey.

19    Q.     Where does she live?

20    A.     Behind me.

21    Q.     What's her address?

22    A.     I want to say 6 Chapman

23 Street.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 82

1    Q.    Are you sure?

2    A.    No, sir.

3    Q.    Okay.  Who else did you talk

4  to?

5    A.    Jewell Matthews.

6    Q.    How do you spell the first

7  name?

8    A.    J-E-W-E-L-L.

9    Q.    And who is Jewell Matthews?

10    A.    My neighbor.

11    Q.    Where does Jewell Matthews

12  live?

13    A.    8 Chapman Street.

14    Q.    And where is that in relation

15  to your home?

16    A.    Behind me.

17    Q.    Did you talk to anybody else?

18    A.    My father.

19    Q.    And when did you talk with

20  him?

21    A.    When?

22    Q.    Yes.

23    A.    I talked to him the day it

# FREEDOM COURT REPORTING

Page 83

1  happened, while they were there getting the

2  four-wheelers.  I was on the phone with him

3  then.

4       Q.       Okay.  What's his address?

5       A.       I'm not sure.

6       Q.       Do you know where he lives?

7       A.       Yeah.  He lives in LaFayette,

8  Alabama.  He has a shop in Columbus,

9  Georgia.

10      Q.       What's the name of his shop?

11      A.       Transco Transmission.

12      Q.       Was the one -- Did he own any

13  of the four-wheelers?

14      A.       No, sir.

15      Q.       Did he own the trailer?

16      A.       No, sir.

17      Q.       Did you call him when they

18  were there to pick up the four-wheelers?

19      A.       Yes, sir.

20      Q.       Why did you call him?

21      A.       My dad knows a lot of law

22  enforcement.  I just -- I don't know.  I

23  just asked him what should I do.