# Exhibit  B – Part Two
# Deposition of Lisa Barnette

# FREEDOM COURT REPORTING

Page 84

1    Q.    Did you call him on his cell

2    phone?

3    A.    No, sir.  I called his shop

4    phone.

5    Q.    The shop phone.  From your

6    home phone?

7    A.    Yes, sir.

8    Q.    And what did you talk with him

9    about?  What did you ask him?

10    A.    I was just upset.  And I told

11    my dad that they were there, and they were

12    taking our four-wheelers, you know, it was

13    like we were thieves.  He just told me not

14    to worry about it, just to let them take it

15    and everything was going to be okay.

16    Q.    And so you let them take them?

17    A.    Yes, sir.

18    MR. NELMS:    Object to the

19    form.

20    Q.    Did you ask your dad if it was

21    okay for them to use the trailer?

22    A.    No, sir.

23    (Defendant's Exhibit 2 was

**FREEDOM COURT REPORTING**

Page 86

1   why we were given this document?  This is

2   part of the documents you produced.

3                MR. NELMS:  It's a document

4   related to one of the ATVs that they had.

5   Is it an initial disclosure?

6                MR. WEBB:  No.  This is part

7   of discovery that we requested, but this

8   wasn't one of the ATVs that were -- that's

9   at issue.

10               MR. NELMS:  Ask her.

11       Q.      Okay.  Do you know why this

12  was produced to us?

13       A.      No, sir.  Not unless that

14  Jerry just took receipts of all

15  four-wheelers and that one just got stuck in

16  there with it.

17       Q.      Okay.

18                    (Off-the-Record discussion

19                    was held.)

20       Q.      I'm going to go back over

21  Defendant's Exhibit 1.  Would you please

22  reconfirm that Defendant's Exhibit 1 is a

23  copy of the receipt that you showed

**FREEDOM COURT REPORTING**

Page 95

1          A.      Yes, sir.

2          Q.      And that's the red Honda?

3          A.      Yes, sir.

4          Q.      You also had another one that

5    also did not have a receipt?

6          A.      Yes, sir.

7          Q.      And which one was that?

8          A.      It was a Polaris --

9                  MR. NELMS:   Just tell him what

10   you know.

11         A.      A Polaris.

12         Q.      Okay.   And then you had a

13   third one that you had a receipt that did

14   not have a VIN number?

15         A.      Yes, sir.

16         Q.      Where were these ATVs kept?

17         A.      In the shed.

18         Q.      Was the shed locked?

19         A.      I don't remember.

20         Q.      Do you know how the officers

21   got into the shed?

22         A.      I assume they walked through

23   one of the doors.   There wasn't nothing

# FREEDOM COURT REPORTING

Page 96

1  broke loose.

2       Q.      Now, what do you claim was

3  damaged in the house as a result of the

4  entry into the house?

5       A.      My carpet was burnt, the

6  laundry room door, part of it was off the

7  hinge.  I had some seahorse figurine things

8  hanging on my bathroom wall that were broke.

9  I had a collection of hummingbirds and some

10 crystal that was broken.  The speakers in my

11 TV were blown.

12      Q.      Anything else?

13      A.      We had had a patch in the

14 ceiling that got blown out.  There was a

15 little hole and black splatter stuff on my

16 living room wall.  And then my living room,

17 my front door and storm door that they

18 repaired, were fixed, replaced.  And I had a

19 lamp, a tall lamp that got broke.

20      Q.      Anything else?

21      A.      That's all I can remember

22 right offhand.

23      Q.      Now, the carpet that was

**FREEDOM COURT REPORTING**

Page 97

1   burned, have you gotten any estimate on

2   replacing the carpet in the living room?

3          A.      My homeowners replaced it.

4          Q.      Okay.   Do you know how much it

5   was?

6          A.      Not right off.

7          Q.      Did they write you a check or

8   did they write a check to the carpet place?

9          A.      Yes, sir.   They wrote us a

10  check for all the damages.

11         Q.      Okay.   And did they also

12  include the laundry room door off the hinge?

13  Did they replace that or repair that?

14         A.      Yes, sir.

15         Q.      Okay.   How much did that cost

16  to repair?

17                 MR. NELMS:   Tell him what you

18  know.

19         A.      I don't know right off.

20         Q.      How about the seahorses on the

21  bathroom wall?

22         A.      It was just a lump-sum check.

23         Q.      Okay.   How much was the check?

# FREEDOM COURT REPORTING

Page 98

1    A.    I don't remember right off.

2    Q.    Who was your homeowner's

3    insurance with?

4    A.    Liberty Mutual.

5    Q.    When did you make a claim

6    under your homeowner's policy?

7    A.    I didn't, Jerry did it.

8    Q.    Do you know when you got a

9    check?

10   A.    No, sir.

11   Q.    Did that cover all of the

12   damages that were not repaired by the

13   sheriff's department?

14   A.    Yes, sir.

15   Q.    What else do you claim as

16   damages as a result of this incident, of the

17   entry into the home?

18        MR. NELMS:  You mean as

19   physical damage to the house?

20   Q.    No.  Damages not related to

21   the house, to you personally.

22   A.    What are you asking me, now?

23   Q.    Yeah.  What do you claim that

# FREEDOM COURT REPORTING

Page 149

1    Q.      Okay.  Will you draw in

2    Chapman for me and label it Chapman?

3          A.      (Witness complies.)

4          Q.      Okay.  And do you know how big

5    the lot that your house sits on is, in feet,

6    maybe?

7          A.      No, sir.

8          Q.      Okay.  Is it a single lot?  Do

9    you know what I mean when I say that?

10         A.      It's an average-sized yard.

11         Q.      Okay.  Just an average-sized

12   yard?

13         A.      Yes, sir.

14         Q.      Okay.  And you say your

15   mother's house is behind your house?

16         A.      Yes, sir.

17         Q.      Okay.  Can you write in where

18   your mother's house is, please?

19         A.      Okay.  I have a neighbor that

20   lives right next door to me.  And then

21   there's her backyard.  And then there's

22   Ms. Posey's house right here (indicating).

23   Ms. Matthews' house right here (indicating).

# FREEDOM COURT REPORTING

Page 164

1          Q.      Okay.  So, we have you laying

2    on the ground, there are two officers in

3    your room, what exactly happens next in the

4    time frame?

5          A.      I kept asking them what was

6    going on, what did they want?  And one of

7    the officers told me that they would let me

8    know in a minute.  And then after that,

9    that's when Heath Taylor came to my bedroom

10   door and asked me where my brother was.

11         Q.      All right.  And quote for me

12   exactly what he said to you, as best you

13   recall it.

14         A.      He asked me where was my

15   brother's truck?  I told him, "I didn't know

16   where my brother's truck was."  He said,

17   "I'm going to keep coming over and over --

18   He said, "I'm going to keep coming back here

19   until you tell me where your brother is."

20               And then I told him that he

21   was going to meet my mama at El Vaquero's.

22   And that's when everybody was pretty much

23   walking out of -- walking down the hallway

# FREEDOM COURT REPORTING

Page 165

1    and they let us get up.  And they started

2    going out the front door.

3         Q.      Okay.  To the best of your

4    knowledge, did all the law enforcement

5    officers leave your house after you told

6    them that Kenny was at El Vaquero's?

7         A.      Everybody left.

8         Q.      Okay.  They didn't leave

9    anybody behind?

10        A.      No, sir.

11        Q.      Okay.  All right.  During the

12   period of time that the officers were in

13   your house, did they search anywhere, to the

14   best of your knowledge?

15        A.      When they were in my bedroom,

16   the black officer looked in my bedroom

17   closet, and that's all I know.

18        Q.      Okay.  Did you see anybody

19   look under a bed?

20        A.      No, sir.

21        Q.      Did you see anybody look in

22   closets?

23        A.      Just my bedroom closet.

# FREEDOM COURT REPORTING

Page 170

1  popped.

2          A.      Yes, sir.

3          Q.      Okay.  Do you understand what

4  that means?

5          A.      I assume they thought it was

6  stolen.  It was broke or something.

7          Q.      So, when he says popped, you

8  understand that to mean broken?

9          A.      Yes, sir.

10         Q.      Okay.  Do you know of the

11  condition of the ignition switches or the

12  switches on the other two ATVs on February

13  10, 2005?

14         A.      Huh-uh.  I didn't mess with

15  the four-wheelers.

16         Q.      So, you don't know one way or

17  the other?

18         A.      Huh-uh.  I don't ride them.

19         Q.      Okay.  There was testimony

20  earlier about there being some guns in the

21  house; is that correct?

22         A.      Yes, sir.

23         Q.      Describe the guns that are in

## FREEDOM COURT REPORTING

Page 174

1    and where you testified that you just turned

2    around and he was standing in your living

3    room?

4            A.      My dining room.

5            Q.      Dining room.  Okay.  And he

6    indicated that -- What did he first ask you

7    in regard to the ATVs?

8            A.      I just heard somebody call my

9    name.  And I walked out of my bedroom, and

10   he was standing in my dining room and he

11   told me he had to come back to get the

12   four-wheelers.

13           Q.      Okay.  Did you ask him why?

14           A.      He told me that when they were

15   searching the house, that there was one of

16   them in the back that they believed that it

17   was stolen.

18           Q.      Okay.  So, he indicated that

19   he believed one of them to be stolen?

20           A.      Yes, sir.

21           Q.      Okay.  Did he indicate that he

22   would be taking all three of the ATVs?

23           A.      He just said he had to take

## FREEDOM COURT REPORTING

Page 175

1    the four-wheelers down to make sure they

2    weren't all stolen.

3         Q.      Did you understand that he

4    would be taking all three of the ATVs?

5         A.      I just assumed he was taking

6    all three, when he said four-wheelers.

7         Q.      If he indicated that one of

8    them might be stolen, did he give you any

9    indication as to why he was taking the other

10   two?

11        A.      No, sir.

12        Q.      Okay.  Did you feel that you

13   had a choice, or that Mr. Taylor was going

14   to take the ATVs whether you agreed that he

15   could take them or not?

16        A.      Well, at the time, I figured

17   they were law enforcement, I had to do what

18   they say.  I didn't know.

19        Q.      Okay.  So, you felt like you

20   did not have a choice?

21             MR. WEBB:  Object to the form.

22        A.      Yes, sir.

23        Q.      Did you ever tell Mr. Taylor,

# FREEDOM COURT REPORTING

Page 176

1  that, no, he could not take the three ATVs?

2          A.      No, sir.

3          Q.      Why not?

4          A.      Because I felt like they were

5  the law.  I had to do whatever they said.  I

6  didn't know.

7          Q.      Okay.  There was some talk

8  about you signed a piece of paper.  Was that

9  on February 10, 2005?

10          A.      Yes, sir.

11          Q.      Was that before he took the

12  ATVs?

13          A.      Before they left with them.

14          Q.      Okay.  What did the paper say?

15          A.      I was all nervous and crying

16  and upset, and Goodrich had came and asked

17  me, he said, "Ma'am, I need you to sign this

18  piece of paper."  He said, "All this piece

19  of paper is saying is the property that

20  we're taking from your house," and I signed

21  it.

22          Q.      Okay.  And did he leave a copy

23  with you?

# FREEDOM COURT REPORTING

Page 177

1        A.      I don't remember.

2        Q.      Okay.  And then later -- This

3  was on Thursday, when he took the ATVs.  And

4  then later on Saturday afternoon, you picked

5  the ATVs back up?

6        A.      Yes, sir.

7        Q.      Did they give you any

8  paperwork to sign when you picked the ATVs

9  back up?

10       A.      Yes, sir.  Jerry did.

11       Q.      Okay.  Did they give you a

12 copy of the paperwork that you signed then?

13       A.      I don't remember.

14       Q.      Okay.  If you had either

15 copies of the paperwork that you signed on

16 Thursday, the 10th, that we've referred to

17 just now, or copies of the paperwork that

18 you signed the following Saturday, when you

19 picked up the ATVs, would you keep them in a

20 special place?

21       A.      Yeah.

22       Q.      Where?

23       A.      With all of our paperwork that

# FREEDOM COURT REPORTING

Page 179

1      A.      No, sir.

2      Q.      Did he ever at any time tell

3  you that he had a warrant that allowed him

4  to take that property?

5      A.      No, sir.

6      Q.      Okay.  And I believe you

7  testified that someone from the sheriff's

8  department showed up with a truck and a

9  trailer.

10     A.      Yes, sir.

11     Q.      But they were not able to take

12 the ATVs on the trailer that they showed up

13 with; is that correct?

14             MR. WEBB:  Object to the form.

15     A.      Yes, sir.

16     Q.      Okay.  Why is that?

17     A.      Because it was, like, only

18 would hold one of them.  It was a

19 little-bitty trailer.

20     Q.      Okay.  So, Mr. Taylor used

21 your trailer or Jerry's trailer to haul the

22 three ATVs; is that correct?

23     A.      Yes, sir.

## FREEDOM COURT REPORTING

Page 183

1  can help make a Record.

2      A.    That's the 250 EX

3  (indicating). And this is the Polaris 500

4  that was taken that day (indicating).

5      MR. WEBB: Would you like to

6  mark them?

7      MR. NELMS: Do you have them?

8  Do you have those pictures?

9      MR. WEBB: All I have is

10  photocopies of them. I don't have the

11  copies. I'd like to get copies.

12      MR. NELMS: Well, lets's do

13  that, then. Let's do that.

14      (Off-the-Record discussion

15      was held.)

16      (Plaintiff's Exhibit 3 was

17      marked for identification

18      purposes.)

19      Q.    What is Plaintiff's Exhibit 3?

20      A.    The paper for bill of sale for

21  the 250 four-wheeler.

22      Q.    And it's dated March 14, 2005;

23  is that correct?

## FREEDOM COURT REPORTING

Page 184

1    A.      Yes, sir.

2    Q.      And that's obviously after the

3  event that brings us here today?

4    A.      Yes, sir.

5    Q.      Okay.  Is this one of the

6  four-wheelers that's referenced here, this

7  Honda 250 X4 Track four-wheeler that's on

8  Plaintiff's Exhibit 3, is this one of the

9  four-wheelers that was taken by Heath Taylor

10  on the 10th?

11    A.      Yes, sir.

12    Q.      Okay.  Did you draft this

13  document?

14    A.      No, sir.

15    Q.      Do you know who did?

16    A.      No, sir.

17    Q.      Okay.  It says, "I, Jason

18  Keith Jowers, J-O-W-E-R-S, sell one Honda

19  four-wheeler, et cetera," and there's a

20  serial number on there; is that correct?

21    A.      Yes, sir.

22    Q.      Okay.  Is this a bill of sale

23  for that Honda to Mr. Barnette?

# FREEDOM COURT REPORTING

Page 186

1    another original document.  We'll mark it as

2    Plaintiff's Exhibit 4, and see if you

3    recognize that document?

4              A.      Yes, sir.

5              Q.      Now, what is it?

6              A.      It's for the Polaris 500.

7              Q.      Okay.  Is that one of the

8    four-wheelers that was taken by Heath

9    Taylor?

10             A.      Yes, sir.

11             Q.      Okay.  When, if you know --

12   Well, I see it says it was dated October 19,

13   2003.

14             A.      Yes, sir.

15             Q.      And it says you're the buyer;

16   is that correct?

17             A.      Yes, sir.

18             Q.      Now, was this document

19   actually drafted on October 19, 2003, to the

20   best of your knowledge?

21             A.      Yes, sir.

22             Q.      Okay.  So, you had this on

23   February 10, 2005?

# FREEDOM COURT REPORTING

Page 187

1    A.    Yes, sir.

2    Q.    Okay.  Did you show it to

3 Heath Taylor?

4    A.    Yes, sir.

5    Q.    Okay.  And forgive me, just

6 because I've gotten completely confused.

7 Four-wheelers have always confused me.

8 Which four-wheeler was the four-wheeler that

9 had the bad ignition switch?

10    A.    The 250 EX.

11    Q.    Okay.  So, it's the one that

12 has the March 14, 2005, bill of sale that

13 we've marked as Plaintiff's Exhibit Number

14 3?

15    A.    Yes, sir.

16    Q.    Okay.  And do you know Jason

17 Jowers personally?

18    A.    I know of him.  I mean, I've

19 seen him.  I know him when I see him.

20    Q.    Okay.  On February 10, 2005,

21 did you attempt to give Heath Taylor any

22 other documents related to the four-wheeler?

23    A.    No, sir.

# FREEDOM COURT REPORTING

Page 188

1      Q.     Okay.  How is it that you

2 tried to give him Plaintiff's Exhibit Number

3 4?

4      A.     I just wanted him to see that

5 it wasn't stolen.

6      Q.     Okay.  So, were you trying to

7 tell him that none of the four-wheelers were

8 stolen?

9      A.     Yeah.  I mean, I said that

10 from the start, when he said he'd come back

11 to get the four-wheelers.  I told him that,

12 you know, we weren't thieves, that we

13 wouldn't steal anything, that my husband

14 works hard for his money.

15      Q.     Okay.  All right.  Let's talk

16 for a minute about Sara.  Does she know the

17 difference between right and wrong, in your

18 estimation?

19      A.     Yes, sir.

20      Q.     And you have been her

21 caretaker for approximately the last fifteen

22 years?

23      A.     Yes, sir.

## FREEDOM COURT REPORTING

Page 200

1    so, no, the speakers weren't fixed.

2         Q.    Okay.  So, now, you -- Now,

3    right after you told the officers that your

4    brother was at El Vaquero, they left, didn't

5    they?

6         A.    They gathered up in the front

7    yard for I would say maybe two or three

8    minutes, I assume, and then everybody left.

9         Q.    Okay.  Do you know where the

10   VIN numbers are located on your ATVs?

11        A.    Yes, sir.

12        Q.    Where are they located?

13        A.    Down at the bottom.  Or one of

14   them it's down at the bottom by where the

15   clutch thing is, where you push the clutch

16   on the four-wheeler, on a piece of bar like.

17        Q.    Okay.  Facing down toward the

18   ground?

19        A.    Yes, sir.

20        Q.    And how about the other ones?

21        A.    I just know about the two that

22   we looked at the VIN numbers on.

23        Q.    Okay.  When did you look at

# FREEDOM COURT REPORTING

Page 201

1  the VIN numbers?

2        A.      Not too long ago we were out

3  there looking at them.

4        Q.      Now, you mentioned you had

5  three ATVs, but one of them -- Did I

6  understand you correctly, one of them did

7  not belong to you?

8        A.      Yes, sir.

9        Q.      Okay.  Who did it belong to?

10       A.      Ron Osman.

11       Q.      How do you spell Osman?

12       A.      O-S-M-A-N.

13       Q.      Where does he live?

14       A.      In Lee County.

15       Q.      Which ATV was his?

16       A.      The -- One of the Polaris.

17       Q.      There were two Polaris?

18       A.      Yes, sir.

19       Q.      And why did you have Ron

20  Osman's ATV?

21       A.      Jerry was working on it.

22       Q.      Was it in running order at the

23  time that it was taken?

# FREEDOM COURT REPORTING

Page 202

1          A.      I don't honestly know.

2          Q.      What was wrong with it?

3          A.      I don't know.

4          Q.      Okay.  So, one of the ATVs

5    that -- One of the three ATVs that was taken

6    belonged to Ron Osman, and Jerry had it

7    because he was working on it, trying to fix

8    it; right?

9          A.      Yes, sir.

10         Q.      And the other one was the red

11   Honda ATV; right?

12         A.      Yes, sir.

13         Q.      And that was the one that had

14   its ignition popped out; right?

15         A.      Yes, sir.

16         Q.      And you could see the wires;

17   right?

18         A.      I don't know about the wires.

19   I just know they said the ignition switch

20   was not there.  I mean, I never visibly went

21   back and looked at it.  I don't know.

22         Q.      Okay.  You don't know whether

23   the ignition switch was there or not?

# FREEDOM COURT REPORTING

Page 203

1     A.     Yeah.   Jerry told me it wasn't

2  there.

3     Q.     Okay.   So, there wasn't an

4  ignition switch on the Honda ATV?

5     A.     Yes, sir.

6     Q.     That's a correct statement,

7  there was not an ignition switch?

8     A.     Yes, sir.

9     Q.     Okay.   So, it wasn't that it

10  was a bad ignition switch, it wasn't there?

11     A.     I don't know if it was a bad

12  one or not.   I mean, I just know what I was

13  told.   I don't know.

14     Q.     Okay.   Jerry told you it

15  wasn't there?

16     A.     Yes, sir.

17     Q.     Okay.   And didn't the officer

18  say that one of the ignition switches was

19  popped out?

20     A.     Yes, sir.

21     Q.     And then the one that the --

22  The Polaris that belonged to Jerry was the

23  one that you had the receipt on?

## FREEDOM COURT REPORTING

Page 204

1        A.      Yes, sir.

2        Q.      But the receipt did not

3  contain the VIN number; correct?

4        A.      No, sir.

5        Q.      And that would be the same one

6  that is listed in Exhibit 4, Plaintiff's

7  Exhibit 4?

8        A.      Yes, sir.

9        Q.      And it's also Defendant's

10  Exhibit 1?

11        A.      Yes, sir.

12        Q.      But that's the one that you

13  actually bought, but you bought it for

14  Jerry?

15        A.      Me and him was together when

16  we got it.

17        Q.      Did you tell the officers that

18  one of the three ATVs did not belong to you

19  or Jerry?

20        A.      I don't remember.

21        Q.      Do you know Ron Osman?

22        A.      Yes, sir.

23        Q.      Where in Lee County does he

# FREEDOM COURT REPORTING

Page 207

1  to about making copies and then marking

2  them, then I'll know what you want to do.

3          Q.      There are some pictures of

4  some legs.  Do you know who took these

5  pictures?

6          A.      Yes, sir.

7          Q.      Who?

8          A.      Jerry.

9          Q.      Do you know whose legs these

10 are?

11         A.      Yes, sir.

12         Q.      Who?

13         A.      C.B..

14         Q.      Okay.  These are all pictures

15 of C.B.'s legs?

16         A.      Yes, sir.

17         Q.      And why were these pictures

18 taken?

19         A.      Ask Jerry.  I don't know.

20 Because that's where C.B. scraped his legs.

21         Q.      Okay.  Do you know how he

22 scraped his legs?

23         A.      Yes, sir.

**FREEDOM COURT REPORTING**

Page 208

1          Q.      How?

2          A.      He jumped out the window.

3          Q.      So, when the law enforcement

4    officers were entering the home, your son

5    tried to jump out the window?

6          A.      He did jump out the window.

7          Q.      He jumped out the window.  And

8    these pictures just simply show some minor

9    scrapes?

10              MR. NELMS:  Object to the

11   form.

12         A.      Yes, sir.

13         Q.      I mean, it doesn't show any

14   blood or anything like that; correct?

15         A.      No, sir.

16              MR. WEBB:  Is there a better

17   way to describe it besides minor scrapes?

18              MR. NELMS:  It's a

19   characterization, that's all.  They would be

20   scrapes.  They would be bruises.  Whether

21   they're minor or not, I guess, would be very

22   subjective.

23         Q.      This doesn't show any bruises,

# FREEDOM COURT REPORTING

Page 209

1    does it?

2         A.      No, sir.

3         Q.      Do you have any pictures of

4    any bruises?

5         A.      No, sir.

6         Q.      Do you claim he had any

7    bruises?

8         A.      No, sir.

9              MR. WEBB:   Let me take a break

10   just to see if we need to get into all these

11   pictures.

12             MR. NELMS:   Sure.

13                  (Recess taken.)

14             MR. NELMS:   For the Record,

15   there are two pictures of the Barnette's

16   house.  I'll ask Ms. Barnette to identify

17   these two pictures.

18             EXAMINATION CONTINUED

19   BY MR. NELMS:

20        Q.      Do you recognize those two

21   pictures?

22        A.      Yes, sir.

23        Q.      Okay.  Is this -- We see one

# FREEDOM COURT REPORTING

Page 215

1        THE WITNESS:  Yes, sir.

2        MR. WEBB:  We will

3   individually with these, if the court

4   reporter does not mind, will label each one

5   7-A, 7-B, 7-C, et cetera, until we go

6   through all the numbers, and then after Z,

7   do AA, and then BB.

8        EXAMINATION CONTINUED

9   BY MR. WEBB:

10       Q.    Now, were you aware there were

11   weapons in your brother's truck?

12       A.    After they brought the truck

13   to my house.

14       Q.    Okay.

15       A.    After my brother went to jail.

16       Q.    That you were aware that there

17   were weapons inside his truck?

18       A.    Yes, sir.

19       Q.    Okay.  And what were the

20   weapons that were inside his truck?

21       A.    All I know is there was a gun.

22       Q.    A handgun?

23       A.    Yes, sir.

# FREEDOM COURT REPORTING

Page 216

1     Q.     Okay.  Was there also any

2 rifle or shotguns?

3     A.     I didn't see any.  I just knew

4 there was a gun in there.

5     Q.     Okay.  Do you know whether

6 there was one or two handguns?

7     A.     No, sir.

8     Q.     But you know there was at

9 least one handgun inside the truck?

10     A.     Yes, sir.

11     Q.     And were you also aware that

12 this handgun was loaded?

13     A.     No, sir.

14     Q.     Okay.  You don't -- Did you

15 not check it?

16     A.     I don't touch a gun, no, sir.

17     Q.     Okay.  Did you -- Do you know

18 who did?

19     A.     Lisa came out to my house and

20 got the truck and the gun that was in the

21 truck and left with it.

22     Q.     And when did she do that?

23     A.     February the 10th.

## FREEDOM COURT REPORTING

Page 220

1   phone and he said he was coming back in a

2   little bit.

3        Q.     Okay. Did you think anybody

4   was going to call him?

5        A.     No, sir.

6        Q.     Did you intend to call him?

7        A.     No, sir.

8        Q.     Now, I believe you said you

9   received an insurance check from the

10   insurance company.

11        A.     Yes, sir.

12        Q.     Do you have a copy or a part

13   of that check that you received that shows

14   the amount and so forth and who it was from?

15        A.     Yes, sir. I'd have to go get

16   my paperwork.

17        Q.     All right. Would you please

18   give that to your attorney where he could

19   give us a copy of it.

20        A.     Yes, sir.

21        MR. GRAHAM: That's all I

22   have.

23        MR. WEBB: I'm sorry, I will