# EXHIBIT F
# Deposition of Jerry Barnette

**FREEDOM COURT REPORTING**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

CASE NUMBER: 3:05CV473-B    **COPY**

LISA BARNETTE, et al.,

    Plaintiffs,

vs.

CITY OF PHENIX CITY, et al.,

    Defendants.


S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of Jerry Barnette may be taken before Angela Smith, RPR, CRR, at the offices of McKoon, Thomas & McKoon, at 925 Broad Street, Phenix City, Alabama 36867, on the 4th day of October, 2006.

DEPOSITION OF JERRY BARNETTE

1  asked for permission to take them?
2      A.   No.  She -- They didn't --
3  They didn't ask permission to take them.
4      Q.   So, she didn't tell you that?
5      A.   No, sir, she didn't tell me
6  that.
7      Q.   I mean, you weren't there;
8  right?
9      A.   No, sir.
10     Q.   Let me talk about those ATVs
11 that are in question in this suit.  Now, one
12 of those ATVs you did not own; is that
13 correct?
14     A.   Yes, sir.
15     Q.   And which one was that?
16     A.   It was a Polaris 500.  The
17 only way I know to differentiate -- to split
18 them apart is the four-wheeler that I was
19 working on that belonged to Ron Osman was a
20 two-stroke four-wheeler.  It's -- I don't
21 know the -- I don't know the other name --
22 the brand name of it.
23     Q.   Was it a Polaris 500?

FREEDOM COURT REPORTING

Page 28

```
 1        A.    Yeah.  It was a Polaris 500,
 2   but mine is a Sportsman and his was a
 3   something else.
 4        Q.    Okay.  So, you also had a
 5   Polaris 500 Sportsman?
 6        A.    Yes, sir.  That belongs to me.
 7        Q.    Now, this was the one that you
 8   had a receipt on without a VIN number; is
 9   that correct?
10        A.    Yes, sir.
11        Q.    That is identified in
12   Defendant's Exhibit 4, and the original is
13   actually Plaintiff's Exhibit -- Excuse me,
14   it's Defendant's Exhibit 1 and Plaintiff's
15   Exhibit 4; is that correct?
16        A.    Yes, sir.
17        Q.    Okay.  And that was the --
18   your Polaris 500 Sportsman --
19        A.    Yes, sir.
20        Q.    -- that you had a receipt for
21   without a VIN number?
22        A.    Yes, sir.  My wife made out
23   this receipt while me and the man I bought
```

1  it from was unloading it out of the back of
2  his truck.
3        Q.    And then the third one, what
4  type of ATV was that?
5        A.    It's a Honda 250 X.
6        Q.    And that was one that had the
7  -- the ignition switch was missing?
8        A.    Yes, sir.
9        Q.    And at that time, you did not
10 have a receipt; is that correct?
11       A.    No, sir.
12       Q.    And --
13       A.    When I bought that
14 four-wheeler, the guy I bought it from had
15 bought a brand-new four-wheeler, because
16 this four-wheeler, the chain had come off
17 and knocked a hole in the crank case, in one
18 of the side covers.
19             When I bought that
20 four-wheeler, I gave him two hundred and
21 fifty dollars, and two weeks later I gave
22 him a hundred and fifty dollars, which was
23 still probably a week or so before this

1   happened.
2           I gave him two hundred and
3   fifty dollars, I took possession of the
4   four-wheeler, and I did not ask for a bill
5   of sale because I still owed him money on
6   it.
7           I did pay him the hundred and
8   fifty dollars and did not get a receipt on
9   it.  I went back after this happened and got
10  a receipt on it, because of all the
11  controversy.
12          Honestly, I didn't feel that a
13  bill of sale was necessary.
14          MR. NELMS:  Just answer his
15  question.
16      Q.    Okay.  So, the truth is, you
17  had no bill of sale or receipt on this Honda
18  250 X; is that correct?
19      A.    Yes.
20          MR. NELMS:  At which time?
21      Q.    On February 10, 2005.
22      A.    Yes, sir.
23      Q.    And it was a little over a

Page 31

1  month after the incident that you received a
2  bill of sale that has -- you've got a copy
3  of it as Defendant's Exhibit 3 and the
4  original is Plaintiff's Exhibit 3; is that
5  correct?
6          A.     Yes, sir.
7          Q.     And this is dated March 14,
8  2005; is that correct?
9          A.     Yes, sir.
10         Q.     Was the Polaris 500 Sportsman,
11 the one that you owned, was that the only
12 one in working order at the time, or was
13 that in working order on February 10th?
14         A.     Both of the Polarises, if I'm
15 not mistaken, were in working order at that
16 time.  I had did a lot of work to it.  And
17 shortly after that, I took it back to the
18 man that owned it.
19         Q.     Okay.  The one that you were
20 working on for Don Osman?
21         A.     Yes, sir.  I think I still did
22 a few things to it.
23         Q.     It was in working order?

1   A.   She pretty much told me what
2   had happened, what had went on that day.
3   Said that she was laying in the -- she was
4   back in the bedroom. She was laying on the
5   bed. She said the kids were in their
6   bedroom -- or in Sara's room. She said that
7   she had heard a large explosion.
8         She said she jumped up off the
9   bed and started to come out of the bedroom.
10  She said she seen a couple of men standing
11  in the hallway, hollering at her, telling
12  her to get down.
13        She told me that she had told
14  the men that she had heart trouble, and that
15  she didn't want to get down or she wasn't
16  getting down. She said they come into the
17  bedroom and made her get down on the floor.
18        She said that she was
19  hollering to them that she had kids in the
20  other bedroom, not to hurt them. She told
21  me about C.B. jumping out of the window and
22  climbing back in the window. She told me
23  that he had hurt his leg when he done it.

1    She told me that Heath had
2    come into the house and asked her where
3    Kenny -- where Kenny was.  She said that --
4    She said that she said he was at El
5    Vaquero's.
6              She told me about C.B. using
7    the bathroom on hisself.  I was making sure
8    he wasn't here.  I couldn't remember.
9              She told me that after she
10   told them where Kenny was, she said it was
11   like everybody had just run out of the
12   house, they were gone.
13             And then she told me about the
14   four-wheelers, about Heath coming back to
15   the house.  She said she was in her bedroom,
16   and she heard somebody calling her name in
17   the house.  And she said she walked to the
18   bedroom and looked up the hallway.  She said
19   that Heath was standing in the dining room
20   and told her that he come back to get the
21   four-wheelers.
22             And I think she asked him why.
23   And he told her that he thought one of them

1  was stolen because the ignition switch was
2  out of one of them. And I think she said he
3  went out into the yard and come back once or
4  twice, talking to her.
5           She said that he came back and
6  needed the key to my trailer. And she said
7  that she told him that the trailer wasn't
8  stolen, that I had made the trailer. And I
9  think -- I think she told me that he said he
10 didn't think the trailer was stolen, that he
11 needed to use it to carry the four-wheelers
12 to the sheriff's department.
13      Q.    Do you recall her telling you
14 anything else?
15      A.    That was pretty much the
16 conversation, as far as what had happened
17 that day.
18      Q.    And when did you leave the
19 next morning?
20      A.    Probably about five o'clock in
21 the morning, to get to Atlanta by seven.
22      Q.    Where were you working in
23 Atlanta?

1  Q.    So, you think you might have
2  gone out on some type of work project on
3  Saturday?
4  A.    No. I'd have been piddling
5  around the shop.
6  Q.    Okay. You would have gone
7  into Columbus?
8  A.    Yes, sir. I just don't
9  remember being home on that Saturday.
10 Q.    Okay. What time did you get
11 back home on Saturday -- Excuse me. Do you
12 know about what time you left for work on
13 Saturday?
14 A.    No.
15 Q.    Do you know about what time
16 you got home?
17 A.    I know we went and picked the
18 four-wheelers up about six or six-thirty.
19 And I got home right around dark with them.
20 Q.    And you got home about dark?
21 A.    Yes, sir.
22 Q.    Do you remember talking with
23 anybody while you were at work about this

**FREEDOM COURT REPORTING**

Page 52

```
1   pick them up.
2       Q.    Did y'all arrange a time to
3   come?
4       A.    Yes, sir.
5       Q.    And what happened when you got
6   there to the sheriff's office at about six
7   or six-thirty?
8       A.    We knocked on the door of the
9   sheriff's department.  Mr. Taylor opened the
10  door.  We went into his office and we talked
11  for a little while.
12      Q.    Okay.  What did you talk
13  about?
14      A.    We talked about the
15  four-wheelers.  He said that he thought the
16  red one was stolen but he couldn't prove it.
17  He couldn't get anything back on his
18  computer about it.
19      Q.    Now, the red one, was that the
20  Honda?
21      A.    Yes, sir.  The Honda 250.
22      Q.    The one with the ignition
23  switch that was missing?
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

it was stolen.

Q. Okay. Did he tell you anything else?

A. We talked about the house and about the damage to the house. He said that he would -- he would replace a section of the carpet in the middle of my living room, but he wouldn't replace the whole carpet.

The carpet in my house was a couple of years old, and there is no way you can match up a carpet with a square in the middle of your living room.

Q. Did he tell you anything else?

A. I asked him -- I asked him why he -- We got to talking about the house, and he asked me -- or I asked him -- I can't remember exactly how I asked him. I asked him if he had a search warrant, and he told me no, that he didn't need one; that he had probable cause to come into the house.

I'm trying to think of what we said in his office. I asked him how come -- I asked him where -- I don't remember

Page 67

1  A. A week or so before that. He
2  come out and gave us an estimate, and come
3  out the next week and put it in.
4  Q. And how much of the house was
5  recarpeted?
6  A. The living room.
7  Q. And that's it, just the living
8  room?
9  A. Yes, sir.
10 Q. How big is the living room?
11 A. Twenty-seven feet by thirteen
12 feet. It's an L shape, and probably
13 eighteen foot.
14 Q. Now, when did you submit an
15 insurance claim on this?
16 A. I couldn't tell you the date.
17 I looked for the receipt last night, and I
18 can't find it.
19 Q. Who is your homeowners
20 insurance with?
21 A. You'd have to ask my wife. I
22 think it's Liberty Mutual.
23 Q. And do you remember how much

Page 68

1  you received from Liberty Mutual?
2       A.    The check was, I think,
3  fifty-two hundred dollars, and I think the
4  total was around seventy-five hundred, minus
5  the depreciation. I got a check for
6  fifty-two hundred.
7       Q.    Who is your agent?
8       A.    I don't know.
9       Q.    Did you talk with anybody at
10 Liberty Mutual about the homeowners claim?
11      A.    Yeah. But I couldn't tell you
12 his name right now.
13      Q.    Did you receive any other
14 estimates on the carpeting, besides Rusty's
15 Floor Covering?
16      A.    No, sir.
17      Q.    What was the next thing you
18 remember that happened with regard to any of
19 this incident? Did you -- Who did you talk
20 to next about it?
21      A.    I ain't talked to nobody.
22      Q.    Okay. Did you talk with
23 anybody -- Have you talked with anybody at

FREEDOM COURT REPORTING

Page 72

1  Exhibit Number 7 over there that we looked
2  at earlier.
3          A.      Yes, sir.
4          Q.      And all I'm saying is, is one
5  of the things you're asking for in this
6  lawsuit, you're asking for money damages,
7  and is one of the items of damage you're
8  asking for to have the carpet replaced?
9                  Forget about this number right
10 now.  Are you asking for the carpet to be
11 replaced as part of your damages?
12         A.      I've done replaced the carpet.
13         Q.      Okay.  How much did it cost
14 you to replace the carpet?
15         A.      It was twelve hundred and
16 something dollars.
17         Q.      This amount right here
18 (indicating)?
19         A.      Yes, sir.
20         Q.      That's twelve hundred and
21 fifty-eight dollars and thirty-seven cents?
22         A.      Yes, sir.
23         Q.      All right.  And did you pay

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 73

1  for that yourself?
2     A.    No, sir. My insurance company
3  paid for that.
4     Q.    Who was that?
5     A.    I think it was Liberty Mutual.
6     Q.    Liberty Mutual. Okay. So,
7  you made a claim with them for that?
8     A.    Yes, sir.
9     Q.    And they paid for it?
10    A.    Yes, sir.
11    Q.    All right. And that's been
12 done?
13    A.    Yes, sir.
14    Q.    Are you asking that you be
15 paid for that again in this case, as far as
16 the carpet goes?
17    A.    No, sir.
18    Q.    All right. So maybe that was
19 the confusion about that. Is there any
20 other items of personal property that you
21 lost that were inside the house, that were
22 either damaged or damaged to the extent that
23 they were made worthless, that you're

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

1   in the lawsuit about taking the
2   four-wheelers from you. And I believe --
3   How long were they gone, again? Well, from
4   the time they took them until the time you
5   got them back, how long was it?
6         A.     Two days.
7         Q.     Two days. Okay. Do you know
8   what days of the week they were gone? Was
9   it a weekday or was it a weekend?
10        A.     Three days. Thursday, Friday,
11  and Saturday.
12        Q.     All right. Thursday, Friday
13  and Saturday. So you got them back on
14  Saturday or Sunday?
15        A.     Saturday afternoon.
16        Q.     Saturday afternoon. Okay.
17  Any particular event you were planning on
18  participating in with the four-wheelers on
19  any of those days?
20        A.     Not any particular event.
21        Q.     In other words, you didn't
22  have them for your use, but you weren't
23  planning -- you didn't have any plans to use

Page 79

1  them on those days?
2      A.    Me and my son do a lot of
3  four-wheeling.
4      Q.    I understand that. But I'm
5  talking about as far as any organized event,
6  like going to some race or four-wheeling
7  deal somewhere, nothing like that?
8      A.    No, sir.
9      Q.    All right. So, the personal
10 property damage, if I'm correct, would be
11 whatever you submitted to the insurance
12 carrier, it would be on there.
13          Is there anything -- any other
14 personal property that you say was damaged
15 that would not have been covered in the
16 insurance claim, other than the fact that
17 the four-wheelers were taken for two and a
18 half days?
19     A.    My wife had things broke that
20 were sentimental to her.
21     Q.    I saw that in one of her
22 interrogatory answers or something.
23     A.    Other than that damage and

1  what --
2         Q.      I'm talking about property,
3  now.
4         A.      Property?
5         Q.      Yeah.  Just property.
6         A.      No.  There is -- The insurance
7  company took care of all of my property
8  damage.
9         Q.      Okay.  This fellow that was
10 ultimately arrested, the person that they
11 came to the house looking for him, how did
12 you know him, or did you know him?
13        A.      He's my brother-in-law.
14        Q.      Okay.  To your knowledge, when
15 was the last time he had been at your home
16 prior to this incident that we're here about
17 today?
18        A.      I'd say probably a year.
19        Q.      About a year?
20        A.      Yes, sir.
21        Q.      Do you know whether or not --
22 Well, that's a bad question.  You wouldn't
23 know that.