IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LISA BARNETTE, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. 3:05-CV-473-WKW |
| | * | |
| CITY OF PHENIX CITY, et al., | * | |
| | * | |
| Defendants. | * | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS HEATH TAYLOR AND GROVER GOODRICH'S MOTION FOR SUMMARY JUDGMENT**

COME NOW Plaintiffs, in the above styled cause, by and through their counsel of record, and respond to the defendants HEATH TAYLOR and GROVER GOODRICH'S motion for summary judgment as follows:

**I. STATEMENT OF MATERIAL FACTS**

1.     On February 10, 2005, without a search warrant, probable cause, exigent circumstances, or consent, the City of Phenix City Police Officers and/or SWAT team members Michael Bailey, Steve Nolin, Louis Coreano, Greg Lahr, Terrance Walker, Curtin Mitchell, Warren McLaughlin and Jarrod Barr, and Russell County Deputy Sheriffs Heath Taylor and Grover Goodrich entered upon the property lawfully occupied by Plaintiffs at 3 Chapman Street, Phenix City, Alabama. (Exhibit 1, Depo. of Lisa Barnette, 11:15-11:18; 14:21-14:22; Exhibit 4, Bailey's Answers to First Interrog. and Request for Production, number 11 and 15; Exhibit 2, Depo. of Jerry Barnette, 10:5-10:7).

2.     The defendants gained entry to Plaintiffs' residence by means of a forceful and dynamic

entry.  Upon arrival at Plaintiffs' home, the defendants forced entry using a ram, breaking down the front door, and then deployed a "flash bang" (percussion bomb) which exploded in Plaintiffs' living room.  The defendants, cloaked in masks and assault garb and carrying assault weapons, then proceeded to storm the home.  (Exhibit 5, Barr's Answers to First Interrog. and Request for Prod., number 15; Exhibit 4, Bailey's Answers to First Interrog. And Request for Prod., number 15; Exhibit 1, Depo. of Lisa Barnette, 37:1-37:6; 144:18-145:3; 197:19-198:5).

3.      Plaintiff Lisa Barnette, her son Plaintiff C.B. (who was approximately 11 years old at the time), and Barnette's niece, Plaintiff Sara Cruz (who was approximately 17 years old at the time of the incident) were all present in the home when the defendants forcefully entered their home.  (Sara currently lives with Ms. Barnette, and has for almost her entire life). (Exhibit 1, Depo. of Lisa Barnette, 30:13-30:14; 30:18-31:5; 31:11-31:12; 51:17-51:20; Exhibit 3, Depo. of C.B. Barnette, 9:15-9:16).

4.      The defendants did not knock.  The defendants did not ring the doorbell.  There was no indication that the defendants were on Plaintiffs' property.  (Exhibit 1, Depo. of Lisa Barnette, 145:7-145:22; Exhibit 3, Depo. of C.B. Barnette, 73:19-73:21; 74:1-74:9; 74:7-74:9).

5.      The defendants never gave Ms. Barnette (or any other plaintiff) a warrant; nor did they offer to show her any warrant.  (Exhibit 1, Depo. of Lisa Barnette, 194:21-195:1).

6.      The only "warrant" produced by the defendants was to Plaintiffs' attorneys and was an arrest warrant for Kenneth D. Thrower issued by the State of Georgia, Muscogee County, dated February 10, 2005.  The warrant commands "[t]o any Sheriff or His Deputy, Coroner, Constable, Marshall, Policeman or any Law Enforcement Officer of Said State."  (Exhibit 7, Arrest Warrant).

7. Defendant Nolin, in recalling the events of February 10, 2005, stated he was at the Barnette home for approximately twenty minutes. (Exhibit 6, Nolin's Answers to First Interrog. and Request for Prod., number 15).

8. Kenneth Thrower's address is 1802 51st Street, Columbus, Georgia. (Exhibit 8, Columbus Police Department Arrest Report). Kenneth Thrower is Ms. Barnette's brother. (Exhibit 1, Depo. of Lisa Barnette, 13:20-13:22).

9. At the time of the entry of the defendants, Ms. Barnette was in her bedroom watching television. She was surprised by a loud explosion. She got up from her bed, looked out of her bedroom door, and saw smoke and the cloaked defendants at the end of her hallway. (Exhibit 1, Depo. of Lisa Barnette, 156:14-157:8). The defendants were shouting loudly at her, demanding that she get down on the floor. (Exhibit 1, Depo. of Lisa Barnette, 157:9-157:12). At no time did they indicate to her that they were law enforcement officers. (Exhibit 1, Depo. of Lisa Barnette, 157:13-157:16).

10. Ms. Barnette obeyed the defendants' commands to "lie down." (Exhibit 1, Depo. of Lisa Barnette, 158:5-158:7). While she lay on the floor, Ms. Barnette kept screaming to the defendants that her children were in the back room, and asked them to please not hurt them. (Exhibit 1, Depo. of Lisa Barnette, 161:17-161:20).

11. Ms. Barnette told the officers that she had serious health conditions regarding her heart before they forced her on the floor. (Exhibit 1, Depo. of Lisa Barnette, 161:21-162:2).

12. At the time of the entry of the defendants, Sara was in her bedroom working on her computer, and C.B. was in Sara's bedroom, lying on her bed because he did not feel well. (Exhibit 3, Depo. of C.B. Barnette, 25:11-25:18).

13.     When the "flash bang" (percussion bomb) was detonated in Plaintiffs' home, C.B. was so scared by the loud explosion that he jumped out of the window. He immediately was confronted by a non-uniformed defendant who pointed an automatic weapon at him, telling him to get down on the ground. (Exhibit 3, Depo. of C.B. Barnette, 25:22-26:14; 26:20-27:6). At the time, C.B. thought someone was breaking into his home. (Exhibit 3, Depo. of C.B. Barnette, 25:3-25:6).

14.     While outside, C.B. complied with the defendant's orders to get down on the ground. (Exhibit 3, Depo. of C.B. Barnette, 27:12-27:14). The defendant never told C.B. he was a law enforcement officer. (Exhibit 3, Depo. of C.B. Barnette, 28:12-28:14).

15.     However, because he was extremely frightened by these events, C.B. then re-entered the house by means of jumping back through the same window, that leading to the bedroom of Sara, and he fell onto Sara, who had by then been forced onto the floor by the defendants. (Exhibit 3, Depo. of C.B. Barnette, 28:1-28:5; 28:21-29:8).

16.     C.B. sustained certain injuries in the process of jumping in and out of the bedroom window. (Exhibit 3, Depo. of C.B. Barnette, 52:7-52:13). C.B. was so shaken by the invasion that he soiled his clothing. (Exhibit 3, Depo. of C.B. Barnette, 76:6-76:23).

17.     Ms. Barnette, Sara, and C.B. were all held on the floor and guarded by certain defendants who pointed assault rifles directly at their heads. (Exhibit 1, Depo. of Lisa Barnette, 57:6-57:12; Exhibit 3, Depo. of C.B. Barnette, 88:21-89:8). Two or three defendants pointed their weapons at Sara and C.B. (Exhibit 3, Depo. of C.B. Barnette, 88:21-89:8). C.B. saw the defendants look in the closet. (Exhibit 3, Depo. of C.B. Barnette, 89:9-89:11). Two defendants guarded Ms. Barnette in her bedroom. (Exhibit 1, Depo. of Lisa Barnette, 159:10-159:16). Ms. Barnette saw one defendant look in her bedroom closet. (Exhibit 1, Depo. of Lisa Barnette, 165:11-165:17).

18. Ms. Barnette kept asking the defendants "what was going on" and "what did they want," but they would only say she would be told later. Finally, Defendant Taylor came into Ms. Barnette's bedroom and asked the whereabout of her brother, Kenneth Thrower. Taylor also wanted to know the whereabouts of her brother's truck. Taylor told her he was going to keep returning to her home over and over again until she revealed her brother's whereabouts. (Exhibit 1, Depo. of Lisa Barnette, 164:5-164:19). Ms. Barnette told Taylor her brother was meeting their mother for lunch at a local restaurant. The defendants then released Ms. Barnette, Sara, and C.B. and left their home. (Exhibit 1, Depo. of Lisa Barnette, 39:11-39:22; 164:20-165:2).

19. Mr. Thrower was arrested by Defendants Taylor, Goodrich, and Phenix City Police Officers at the local restaurant without incident. (Defendants' Exhibit D, Affidavit of Goodrich, ¶ 6).

20. At approximately 1:00 p.m., after arresting Mr. Thrower, defendants Taylor and Goodrich returned to the Barnette residence. Taylor entered the Barnette residence without a warrant and without the consent of anybody dwelling therein, yelling "Lisa" while standing in her dining room. (Exhibit 1, Depo. of Lisa Barnette, 57:14-57:22; 60:9-60:15; 62:17-62:23). Ms. Barnette was in her bedroom at the time she heard Taylor calling her name. (Exhibit 1, Depo. of Lisa Barnette, 174:5-174:12). Taylor entered the residence absent a warrant, probable cause, or exigent circumstances.

21. Taylor told Ms. Barnette that he suspected that one of the three four-wheeled all-terrain vehicles on her property might be stolen. (Exhibit 1, Depo. of Lisa Barnette, 65:3-65:6; 174:14-174:17). He told her that he was seizing all of the ATVs. (Exhibit 1, Depo. of Lisa Barnette, 174:21-175:2). Taylor did not ask for Ms. Barnette's consent to take the ATVs. (Exhibit 1,

Depo. of Lisa Barnette, 75:13-75:23). Taylor did not show Ms. Barnette a warrant to seize the ATVs nor did he tell her he had a warrant that allowed him to seize those vehicles. (Exhibit 1, Depo. of Lisa Barnette, 178:19-179:5). Taylor told Ms. Barnette that he needed the keys to the ATVs and her trailer, because the trailer he had was not large enough to transport all three of the ATVs. (Exhibit 1, Depo. of Lisa Barnette, 58:14-59:9). Taylor also had no warrant for Plaintiffs' trailer that he seized to transport the ATVs. (Exhibit 1, Depo. of Lisa Barnette, 180:12-180:15). Taylor never indicated to Ms. Barnette that he had been told by a third party that the ATVs were stolen. (Exhibit 1, Depo. of Lisa Barnette, 180:19-180:23).

22. Ms. Barnette complied with Taylor's instructions because she felt that she had no choice and had to do whatever the defendants said since they were armed law enforcement officers. Taylor, Goodrich and other deputies seized a trailer and three of the all-terrain vehicles and left with the said chattels. (Exhibit 1, Depo. of Lisa Barnette, 175:23-176:6).

23. Taylor and Goodrich maintained possession and control of the all-terrain vehicles until Mr. Barnette was allowed to retrieve them on February 12, 2005, at approximately 6:00 p.m. (Exhibit 2, Depo. of Jerry Barnette, 50:10-50:19). At that time, Mr. Barnette spoke with Defendant Taylor. Taylor told Mr. Barnette that he had asked the Columbus Police Officer (who alerted him that Mr. Thrower was at Plaintiffs' home) if he needed a SWAT team in order to effectuate the arrest of Mr. Thrower. The Columbus Police Officer did not give him an answer one way or the other; it was to be at Defendant Taylor's discretion. (Exhibit 2, Depo. of Jerry Barnette, 55:13-56:16). At some point after the incident, Defendant Taylor told Mr. Barnette that there was no warrant for Mr. Thrower at the time of the incident. (Exhibit 2, Depo. of Jerry Barnette, 92:8-92:18).

24. While at Plaintiffs' house on February 10, 2005, Kenneth Thrower answered his wife's calls to Plaintiffs' house phone at approximately 9:00 a.m. and spoke with his wife only one time for about thirty minutes. (Exhibit 1, Depo. of Lisa Barnette, 25:18-26:6; 26:23-27:5; 27:22-28:5).

25. Lisa Barnette had not seen her brother, Kenneth Thrower, for nine or ten months before seeing him at approximately 8:15 a.m.-8:30 a.m. on February 10, 2005. (Exhibit 1, Depo. of Lisa Barnette, 16:20-16:22; 17:2-17:5). Ms. Barnette stated it was because her sister-in-law, Lisa Thrower, was always causing trouble in her family. Therefore, they had no relationship with Ms. Thrower and had not seen Mr. Thrower for those nine or ten months prior to February 10, 2005. (Exhibit 1, Depo. of Lisa Barnette, 18:11-19:8).

26. Mr. Thrower left Plaintiffs' house at approximately 11:45 a.m. Approximately thirty minutes to an hour later, the defendants broke into Plaintiffs' home. (Exhibit 1, Depo. of Lisa Barnette, 34:10-34:13; 35:4-36:16; Exhibit 2, Depo of Jerry Barnette, 14:3-14:17). The defendants broke into Plaintiffs' house some three hours after the Throwers' conversation had concluded.

27. Ms. Barnette has not known her brother to be a violent person. She does not know him to carry weapons on his person regularly. She was also unaware of any criminal charges against him before this incident. (Exhibit 1, Depo. of Lisa Barnette, 195:2-195:14).

28. Jerry Barnette has a gun collection that he keeps under lock in a specific cabinet. Ammunition is kept in the same cabinet but under a different lock. (Exhibit 1, Depo. of Lisa Barnette, 171:12-172:4).

29. When Ms. Barnette called her husband, Jerry Barnette, at approximately 12:30 p.m. to

7

1:00 p.m. on February 10, 2005, to tell him what had happened, Mr. Barnette could not understand her because she was crying and hysterical. He had to calm her down in order to understand what she was saying. (Exhibit 2, Depo. of Jerry Barnette, 14:3-14:17; 14:21-15:11).

30.     C.B. was traumatized by this incident. He saw a counselor regularly for months afterward in order "to find a way to get the incident off his mind." The problem C.B. discussed with the counselor was how the police could come into someone's house without warning and frighten people. (Exhibit 3, Depo. of C.B. Barnette, 61:10-61:16; 63:17-63:23; 84:6-84:10). C.B. still has trouble dealing with the incident at nighttime. He often looks out his window to see if someone is going to break into his house. (Exhibit 3, Depo. of C.B. Barnette, 64:7-64:11; 66:7-67:2). C.B. no longer trusts police officers because of this incident. (Exhibit 3, Depo. of C.B. Barnette, 85:22-86:3).

31.     There was approximately $7,500.00 worth of economic damages to Plaintiffs' home as a result of this incident. (Exhibit 2, Depo. of Jerry Barnette, 67:19-68:6; 74:14-75:1).

## II.  LEGAL ARGUMENT

### A.  SUMMARY JUDGMENT STANDARD

Under the provisions of Rule 56 ( c), F.R.C.P., summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex v. Cattrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant "always bears the initial responsibility of informing the district court of the basis for its motion"... and ... must "demonstrate the absence of a genuine issue of material fact." *Id*.

After the movant has met its burden under Rule 56( c ), the non-movant must set forth "specific facts showing that there is a genuine issue for trial" *Id*. In ruling, the Court "must

believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); cited in *Reeves v. Thigpen*, 879 F.Supp 1153, 1166 (M.D.Ala. 1995).

In entertaining a motion for summary judgment, the court should review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but the court may not make credibility judgments or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990). Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence supporting the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 299-300 (2d Ed. 1995); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

**B.  ARGUMENT-QUALIFIED IMMUNITY**

The defendants maintain that they are immune from liability under the doctrine of qualified immunity. Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An officer will be entitled to qualified immunity if his actions were objectively reasonable, that is, if an objectively reasonable officer in the same situation could have believed it was lawful to enter and search Plaintiffs' premises without a search warrant and

no excessive force was used. *See Anderson v. Creighton*, 483 U.S. 635, 638-41 (1987). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Id.* Here, it is undisputed that the defendants were acting within the course and scope of their discretionary authority in their conduct toward Plaintiffs. Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate. The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 122 S.Ct. 2508, 2513 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If a constitutional right would have been violated under the plaintiff's version of the facts, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.

"When, as here, qualified immunity is asserted in the context of a motion for summary judgment, the court looks at the evidence in the record, interpreted in the light most favorable to the plaintiff. Based on this evidence, the court must determine if there is a reasonable dispute of material fact over whether the defendant violated the plaintiff's clearly established constitutional rights." *Urbanique Production v. City of Montgomery,* 428 F. Supp. 1193, 1205 (M.D. Ala. 2006) (citing *O'Rourke v. Hayes,* 378 F. 3d 1201, 1206 (11th Cir. 2004)) (some citations

omitted).

**1. Plaintiffs have established a constitutional violation by the defendants Taylor and Goodrich because the warrantless entry and search of the home was clearly unlawful, in violation of the Fourth Amendment.**

It has been clear since the Supreme Court so held in *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), that, absent exigent circumstances or consent, the police cannot search for the subject of an arrest warrant in the home of a third party, without first obtaining a search warrant directing entry.

In the present case, the defendants *allegedly* had an arrest warrant for Kenneth Thrower. Mr. Thrower did not reside at the Barnettes' home. The Barnettes were a third party. The defendants did not procure a search warrant for the Barnettes' home. The Barnettes gave no consent for their home to be searched. Therefore, the defendants' entry into the Barnettes' home was unconstitutional, unless the defendants can show exigent circumstances existed. Plaintiffs maintain the facts show no exigent circumstances existed.

First, there is disputed material fact that an arrest warrant for Mr. Thrower existed prior to the defendants forceful and dynamic entry into Plaintiffs' home. In fact, at some point after the incident, Defendant Taylor told Jerry Barnette that there was no warrant for Mr. Thrower at the time of the incident. (Exhibit 2, Depo. of Jerry Barnette, 92:8-92:18). The defendants rely on this alleged arrest warrant in order to establish probable cause to search the Barnettes' home.

"Probable cause to search exists where the facts lead a reasonably cautious person to believe that the search will uncover evidence of a crime." *U.S. v. Burgos,* 720 F.2d 1520, 1525 (11th Cir.1983). There were no facts, even if there was an arrest warrant for Mr. Thrower, that

searching the Barnettes' home, not Mr. Thrower's home, would uncover any evidence of a crime. The mere presence of a person who has an arrest warrant issued for him does not in itself constitute a crime. There was no evidence that Ms. Barnette was harboring Mr. Thrower. Statements paint a picture to the contrary, Mrs. Thrower's alleged testimony to Detective Len Wills was that Mr. Thrower was going "to see his mother for a few minutes or hours, but was not intending to stay there for any significant amount of time." (Def. brief, p. 2-3).[1] Thrower's vehicle was not even parked or in sight of the Barnettes' home. At the time, there was no linkage between Thrower's alleged misconduct and the Barnette residence. The defendants clearly had no probable cause, with or without a valid arrest warrant, to search Plaintiffs' home.

Further, despite claims to the contrary, the defendants have produced no documentary evidence that an arrest warrant existed prior to the incident. There were no time-stamped sheets and no time-line evidence produced showing that this warrant existed prior to the incident. Allegedly Wills faxed a copy of the felony warrant to the Russell County Sheriff's Department. (Defendants' Exhibit A, Affidavit of Wills, ¶ 6). The defendants have never produced said faxed copy.

Assuming, in the alternative, that a valid arrest warrant was issued for Mr. Thrower, the defendants were then authorized to seize Mr. Thrower. However, as in *Steagald,* the agents in this situation sought to do more than use the warrant to arrest Mr. Thrower in a public place or in his home; instead, they relied on the warrant as legal authority to enter the home of a third person based on their belief that Mr. Thrower might be a guest there.

---

[1] This testimony in Mr. Wills' affidavit should be stricken per Plaintiffs' Motion to Strike.

> Regardless of how reasonable this belief might have been, it was never subjected to the detached scrutiny of a judicial officer. Thus, while the warrant in this case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect petitioner's privacy interest in being free from an unreasonable invasion and search of his home. Instead, petitioner's only protection from an illegal entry and search was the agent's personal determination of probable cause. In the absence of exigent circumstances, we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant. We see no reason to depart from this settled course when the search of a home is for a person rather than an object.

*Id.* at 213-214 (Citations omitted).

"The exigent circumstances exception recognizes a warrantless entry by criminal law enforcement officials my be legal when there is compelling need for official action and no time to secure a warrant." *United States v. Holloway,* 290 F.3d 1331, 1334 (11th Cir.2002). In the present case, the facts do not demonstrate any emergency or exigent circumstances.

First, while Defendant Taylor was speaking with Detective Wills, Wills testified that Mrs. Thrower was on her cell phone in his office speaking with Mr. Thrower. According to her caller identification feature, Mr. Thrower was calling her from the Barnettes' home phone. Wills relayed this information regarding Mr. Thrower's whereabouts to Defendant Taylor. (Defendants' Exhibit A, Affidavit of Wills, ¶ 8). Mr. Thrower spoke with Mrs. Thrower from the Barnettes' home telephone from approximately 9:00 a.m. until 9:30 a.m. (Exhibit 1, Depo. of Lisa Barnette, 25:18-26:6; 26:23-27:5; 27:22-28:5). The defendants did not enter the Barnettes' home until approximately 12:15 p.m., almost three hours after Defendant Taylor knew Mr. Thrower was at Plaintiffs' home. (Exhibit 1, Depo. of Lisa Barnette, 34:10-34:13; 35:4-36:16; Exhibit 2, Depo. of Jerry Barnette, 14:3-14:17).

Second, Defendant Taylor allegedly instructed Defendant Goodrich to have the Georgia arrest warrant domesticated. Goodrich had an arrest warrant prepared by Russell County Sheriff's administrative personnel and then proceeded to the Russell County Courthouse for a judge to sign. When he arrived it was "close to lunch time" and there were no judges in the building. Goodrich searched local restaurants for a judge, though, because of the alleged time-sensitive nature of the situation. When he returned to the courthouse he found a judge to sign the arrest warrant. (Defendants' Exhibit D, Affidavit of Goodrich, ¶¶ 3 and 4). Defendant Taylor took the time to have the Georgia arrest warrant domesticated. If time was of the essence and exigent circumstances existed, why domesticate the arrest warrant? Perhaps in the time it took to get the arrest warrant domesticated, Defendants Taylor and Goodrich should have used that time to obtain a search warrant instead. Once again, Taylor knew Thrower had been at the Barnette home since about 9:15 a.m. Goodrich was looking for a judge to sign the domesticated arrest warrant at "lunch time." Clearly, time was not of the essence in the minds of the defendants.

Third, on February 10, 2005, while Mrs. Thrower met with Wills, she allegedly told Wills that her husband knew about the arrest warrant and had fled to Russell County, where his family lived, telling her he would not be taken to jail. (Defendants' Exhibit A, Affidavit of Wills, ¶ 4). The only arrest warrant produced by the defendants was one obtained by Detectives Wills and Zieglar, issued on Feb. 10, 2005. How then was Kenneth Thrower aware of the arrest warrant, when it had been issued that same day? Given her clear inaccuracy of this crucial issue, it was not reasonable for the defendants to believe Mrs. Thrower.

Mrs. Thrower also had had no contact with the Barnettes for approximately one year. Her information regarding the Barnettes' residence was not "reasonably trustworthy information."

14

The defendants' assertion that Mrs. Thrower was correct when she stated Thrower would have access to a large number of firearms in the Barnette home is inaccurate. Mr. Barnette's gun collection was stored in a locked cabinet, with ammunition further stored in another locked compartment. Thrower did not have access to Mr. Barnette's private gun collection.

Defendant Taylor knew that Thrower was on the phone once at 9:30 a.m., calling from the Barnettes' home. Taylor knew Thrower did not live at the Barnettes' home. Taylor knew that Thrower's vehicle was not at the Barnettes' home. What led Taylor to believe that approximately three hours later, at 12:15 p.m., Thrower would still be at the Barnettes' residence? There is disputed material fact such that the defendants claims of exigent circumstances are not plausible.[2]

A key difference between the factual circumstances in *U.S. v. Burgos* and the present case is that the warrantless search was of Burgos' residence, not the residence of a third party. *U.S v. Burgos,* 720 F.2d 1520, 1522 (11th Cir.1983). Another difference was the type of investigation conducted. In *Burgos*, the facts show the particulars of the investigation, which differs greatly from the investigation claimed by Detective Len Wills in his affidavit. All that is stated was "[i]n and prior to February 2005, I investigated, along with Detective Sherry Zieglar, crimes committed by Kenneth D. Thrower....After conducting an investigation, a felony warrant for the arrest of Kenneth D. Thrower was issued....A true and correct copy of that arrest warrant is

---

[2] When defendants Taylor and Goodrich returned to the Barnettes' home the second time, Taylor entered *without* a warrant and *without* consent. The defendants do not even argue that exigent circumstances existed on the second illegal entry.

15

attached hereto as Exhibit "1" and incorporated herein as if fully set forth."[3] That Wills allegedly "conducted an investigation" is a mere conclusory statement which is due to be stricken.

The defendants Taylor and Goodrich violated Plaintiffs "clearly established" Fourth Amendment constitutional rights by the unlawful entry and search of the home. Any reasonable law enforcement officer knows or should know that the warrantless search of a home absent exigent circumstances is violative of Plaintiffs' rights under the Fourth Amendment to the United States Constitution. Any reasonable law enforcement officer knows or should know that seizing personal property without a warrant or probable cause is violative of Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

Alternatively, if the Court should find there were exigent circumstances, the method of execution of the entry and search of the home was unreasonable given the excessive force that the defendants used.

**2. The defendants Taylor and Goodrich used excessive force in violation of Plaintiffs "clearly established" Fourth Amendment constitutional rights.**

The proper standard in assessing a Fourth Amendment claim of excessive force is whether, under the circumstances, the officers' conduct was objectively reasonable. *Cottrell v. Caldwell,* 85 F. 3d 1480, 1492 (11th Cir.1996).

It is apodictic that the use of <u>any</u> force against a person who has not committed a crime is wrong and that any such force used is unreasonable and excessive.

Any reasonable law enforcement officer knows or should know that holding an innocent

---

[3] There is no "Exhibit '1'" attached to Wills' affidavit. Plaintiffs move to strike said Exhibit 1 and all references to it as well as the conclusory statements that Wills "conducted an investigation," as set forth in their motion to strike.

person on the floor with a firearm pointed at her head constitutes unreasonable and excessive force in violation of Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

"Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Dominguez v. Metropolitan Miami-Dade County,* 167 Fed. Appx. 147, 150 (11th Cir. 2006) (citations omitted). Here, the reasonableness of the defendants' actions is an issue for the factfinder, not the Court.

The defendants were at the Barnettes' home pursuant to an arrest warrant issued for Mr. Thrower. It was obvious that C.B (an eleven year old boy), Sara (a seventeen year old teenage girl) and Ms. Barnette were not the 32 year old white male they were seeking. (Exhibit 8, Columbus Police Department Arrest Report). In addition, the officers launching an explosive device into Plaintiffs' home (without first complying with the "knock and announce" rule) that exploded in their living room and damaged their property was excessive. The reasonableness of this particular use of force should be determined by the jury, not by the Court on a motion for summary judgment.

The Eleventh Circuit has stated that "[i]t is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Fundiller v. City of Cooper City,* 777 F. 2d 1436, 1441-42 (11th Cir.1985). Even if Defendant Taylor did not personally point assault weapons at Plaintiffs or throw the "flashbomb," he did not protect Plaintiffs from other officers' excessive force. It was actually Defendant Taylor who ran the

17

operation, instructing and directing the SWAT team's actions.

A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation. *Zatler v. Wainwright,* 802 F. 2d 397, 401 (11th Cir. 1986). Defendant Taylor's admission that he directed and participated (quite extensively according to his affidavit—he was the chief investigator on this incident for the Russell County Sheriff's Department; he spoke with Officer Wills regarding Mr. Thrower; he instructed Goodrich to domesticate the "arrest warrant"; he determined a SWAT operation was necessary; he surveilled the area; he determined that setting up a perimeter was not adequate; he determined "exigent circumstances" existed, thereby nullifying the need for a search warrant; he notified the SWAT Team to enter the Barnettes' house; he directed the SWAT team to deploy a "flashbang"; and he returned to the Barnette residence to seize ATVs) in the operation and that he entered Plaintiffs' home without invitation or consent twice, in conjunction with no search warrant (and no exigent circumstances) provides such an affirmative causal connection that Taylor can be held liable. (See Defendants' Exhibit C, Affidavit of Taylor). Taylor and Goodrich seized ATVs from the Barnettes home without a warrant or probable cause. Taylor, Goodrich and the other officers were acting together to effectuate this search and seizure.

The Eleventh Circuit has held that at times there is a "slender category of cases in which the unlawfulness of the conduct is readily apparent even without clarifying caselaw." *Smith v. Mattox,* 127 F. 3d 1416, 1418-19 (11th Cir. 1997). Plaintiffs believe that this is such a case. Breaking down the front door and launching what amounts to a hand grenade into a third party's living room, without any "knock and announce," without a search warrant, without an arrest warrant, without probable cause and exigent circumstances in order to gain entry into a residence

18

occupied by a mother, her eleven year old boy and her seventeen year old niece is excessive. Holding them on the floor with assault weaponry pointed at them is clearly excessive.

An officer will be entitled to qualified immunity if his actions were objectively reasonable, that is if an objectively reasonable officer in the same situation could have believed that exigent circumstances existed in order to search Plaintiffs' premises without a search warrant and said search was conducted lawfully and without excessive force. That was not the case here. Taylor and Goodrich engaged in their duties in an unconstitutional manner by entering Plaintiffs' home and searching said home without a search warrant, without probable cause, without consent and without exigent circumstances. Under Plaintiffs' version of the facts, Plaintiffs' Fourth Amendment rights were violated by Defendants Taylor and Goodrich when Plaintiffs were subjected to the unreasonable search and seizure of their home, and that right was "clearly established." *Saucier*, 533 U.S. at 201. Defendants Taylor and Goodrich are not entitled to qualified immunity.

Additionally, it is uncontested that Defendants Taylor and Goodrich had already seized Mr. Thrower at the restaurant where Ms. Barnette told Taylor her brother would be prior to their second unlawful entry and search and seizure of Plaintiffs' home without consent or exigent circumstances. Therefore, there was no reason for Taylor or Goodrich to enter her home and seize Plaintiffs' property since the person of interest, Mr. Thrower, was already in custody.

The defendants Taylor and Goodrich violated Plaintiffs "clearly established" Fourth Amendment constitutional rights by the use of excessive force. It is a clearly established that "[p]olice use of excessive force is a constitutional violation" under the Fourth Amendment. *McKinney v. DeKalb County,* 997 F.2d 1440, 1443 (11th Cir.1993).

19

## CONCLUSION

There is substantial dispute on material facts; therefore, the defendants are not entitled to judgment as a matter of law and their motion for summary judgment must be denied.

RESPECTFULLY SUBMITTED this __5th__ day of June, 2007.

/s/ CAROL GERARD
Carol Gerard
Jay Lewis
Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Fax)
carolgerard@JayLewisLaw.com
ASB-1075-L66G

## CERTIFICATE OF SERVICE

I hereby certify that on the _5th_ day of June, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties or counsel:

Kendrick E. Webb, Esq.
Scott W. Gosnell, Esq.
Ronald G. Davenport, Esq.
R. Brett Garrett, Esq.

/s/ CAROL GERARD
OF COUNSEL