# FREEDOM COURT REPORTING

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4
 5   CASE NUMBER:  3:05CV473-B
 6   LISA BARNETTE, et al.,
 7          Plaintiffs,
 8          vs.
 9   CITY OF PHENIX CITY, et al.,
10          Defendants.
11
12          S T I P U L A T I O N
13      IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel, that the deposition of Lisa
16   Barnette may be taken before Angela Smith,
17   RPR, CRR, at the offices of McKoon, Thomas &
18   McKoon, at 925 Broad Street, Phenix City,
19   Alabama 36867, on the 3rd day of October,
20   2006.
21
22          DEPOSITION OF LISA BARNETTE
23
```

Page 2

```
 1      IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and the reading
 3   of the deposition by the witness is waived,
 4   the deposition to have the same force and
 5   effect as if full compliance had been had
 6   with all laws and rules of Court relating to
 7   the taking of depositions.
 8      IT IS FURTHER STIPULATED AND
 9   AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17      IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21          * * * * * * * * * * * *
22
23
```

PLAINTIFF'S
EXHIBIT

tabbies    1

Page 3

```
 1          * * * * * * * * * * * *
 2              I N D E X
 3              EXAMINATION
 4                          PAGE
 5   By Mr. Webb ........................ 8
 6   By Mr. Graham ..................... 127
 7   By Mr. Nelms ..................... 144
 8          EXAMINATION CONTINUED
 9                          PAGE
10   By Mr. Webb ...................... 140
11   By Mr. Graham ..................... 143
12   By Mr. Webb ...................... 197
13   By Mr. Nelms ..................... 209
14   By Mr. Webb ...................... 215
15   By Mr. Graham ..................... 217
16   By Mr. Webb ...................... 221
17          PLAINTIFF'S EXHIBITS
18                          PAGE
19   Exs. 1 and 2 - Photographs ........ 182
20   Ex. 3 - Bill of sale for the
21              Honda 250 EX
22              four-wheeler ............ 183
23   Ex. 4 - Bill of sale for the
```

Page 4

```
 1              Polaris 500 ............. 185
 2   Ex. 6 - A list of damages to the
 3              house ................... 192
 4   Ex. 5-A - A photograph of the
 5              front of house with
 6              faux well ............... 211
 7   Ex. 5-B - Photograph of the front
 8              of the house ............ 212
 9   Exs. 7-A through 7-BB - An
10              envelope of photographs . 214
11          DEFENDANT'S EXHIBITS
12                          PAGE
13   Ex. 1 - The receipt for the
14              four-wheeler ............. 59
15   Ex. 2 - A bill of sale for one of
16              the four-wheelers ........ 84
17   Ex. 3 - The receipt for the 250
18              EX four-wheeler .......... 87
19   Ex. 4 - The diagram made by
20              Ms. Barnette of her
21              house ................... 89
22   Ex. 5 - A receipt from the Family
23              Counseling Center ....... 113
```

# FREEDOM COURT REPORTING

Page 9

1    A.    Lisa Michelle Barnette.
2    Q.    How do you spell Barnette?
3    A.    B-A-R-N-E-T-T-E.
4    Q.    And Ms. Barnette, do you know
5    what we're doing here today?
6    A.    Yes, sir.
7    Q.    Okay. And you understand that
8    I'm going to be -- By the way, my name is
9    Ken Webb. I introduced myself to you before
10   the deposition. And I'm here representing
11   Lieutenant Heath Taylor and Investigator
12   Grover Goodrich.
13         And we're here to -- I'm here
14   to ask you questions about this lawsuit that
15   you and your husband and that your son and
16   Ms. Cruz filed against our clients, and also
17   the City of Phenix City and some police
18   officers from the City of Phenix City. Do
19   you understand?
20   A.    Yes, sir.
21   Q.    This is a lawsuit you filed
22   last year.
23         Now, Ms. Barnette, I'm going

Page 10

1    to be asking you a set of questions. And
2    sometimes I speak in kind of a low tone.
3    I'm not really a loud person. And if you
4    can't hear me, if you would just tell me
5    that, you know, "I'm sorry, I can't hear
6    you, would you please repeat the question."
7    A.    Yes, sir.
8    Q.    And I'll be happy to do that.
9    Also, sometimes, you know, because I'm a
10   lawyer, I sometimes ask questions that
11   nobody can figure out what I'm asking. So
12   if ever I ask you a question that you don't
13   understand, I want you just to say, "I don't
14   understand your question, would you please
15   rephrase it," and I'll be happy to rephrase
16   it. Is that okay?
17   A.    Yes, sir.
18   Q.    Otherwise, if I ask a question
19   and you answer it, I'm going to assume that
20   you heard my question and that you
21   understood my question, and that you
22   answered it to the best of your ability. Is
23   that fair?

Page 11

1    A.    Yes, sir.
2    Q.    How old are you, Ms. Barnette?
3    A.    Thirty-eight.
4    Q.    And where did you grow up?
5    A.    Columbus, Georgia.
6    Q.    And how long did you live in
7    Columbus?
8    A.    All my life, until eighteen
9    years ago.
10   Q.    Until you were twenty?
11   A.    Yes, sir.
12   Q.    And where did you move after
13   that?
14   A.    Where I live now, Alabama.
15   Q.    Okay. And what's your
16   address?
17   A.    3 Chapman Street, Phenix City,
18   Alabama 36869.
19   Q.    And is that part -- Do you
20   know if that's within the city limits of the
21   city of Phenix City?
22   A.    It's outside the city limits.
23   Q.    How far out?

Page 12

1    A.    I'm not sure.
2    Q.    And how long have you lived
3    there now?
4    A.    Eighteen years.
5    Q.    Eighteen years. What are your
6    parents' names?
7    A.    Jim Thrower and Vera Williams.
8    Q.    Is your father still alive?
9    A.    Yes, sir.
10   Q.    Okay. Where does he live?
11   A.    LaFayette, Alabama.
12   Q.    And how about your mother?
13   A.    She's alive. She lives at 10
14   Chapman Street. Behind me.
15   Q.    Behind your house?
16   A.    Uh-huh.
17   Q.    How many brothers and sisters
18   do you have?
19   A.    I have one brother that's
20   deceased. I have two sisters and another
21   brother.
22   Q.    Your brother that's deceased,
23   what's his name?

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1    A.    James Thrower, Junior.
2    Q.    And how about your sisters?
3    A.    Their names, is that what
4  you're asking me?
5    Q.    Yes.
6    A.    Mary Jane Pate.
7    Q.    And where does she live?
8    A.    Phenix City.
9    Q.    And your other sister?
10    A.    Tina Abney.
11    Q.    Abney?
12    A.    A-B-N-E-Y.
13    Q.    Where does she live?
14    A.    Columbus.
15    Q.    When did your brother, James
16  Thrower, pass away?
17    A.    In '96.
18    Q.    What of?
19    A.    He was shot in the head.
20    Q.    I'm so sorry. And your other
21  brother?
22    A.    Kenneth Thrower.
23    Q.    If you need to take a break,

Page 14

1  that's fine.
2    A.    That's okay.
3    Q.    If ever you need to take a
4  break during this deposition, you let me
5  know and we'll take a break. Okay?
6    A.    Uh-huh.
7    Q.    Kenneth Thrower, how old is
8  Kenneth Thrower?
9    A.    Thirty-three.
10    Q.    Where does he live now?
11    A.    He's in Wheeler County
12  Correctional Facility.
13    Q.    Where is that?
14    A.    Alamo, Georgia.
15    Q.    And how long has he lived
16  there?
17    A.    Since February the 10th of --
18    MR. NELMS: I'm sorry. Did
19  she say Alamo, Georgia?
20    MR. WEBB: Yes.
21    Q.    Since February 10th of 2005?
22    A.    Yes, sir. When this happened.
23    Q.    Do you know why your brother

Page 15

1  is in prison?
2    A.    It was for child molestation.
3    Q.    Do you know how long the
4  sentence was?
5    A.    Five years, and five years
6  probation.
7    Q.    Were you there at the hearing
8  when he was convicted?
9    A.    No, sir.
10    Q.    Were you at the sentencing
11  hearing?
12    A.    No, sir.
13    Q.    Have you visited him,
14  Mr. Kenneth Thrower, your brother, since
15  he's been in prison?
16    A.    Yes, sir.
17    Q.    How many times have you
18  visited him?
19    A.    Maybe five, six.
20    Q.    When was the last time?
21    A.    About a month ago.
22    Q.    Okay. I want to talk with you
23  about the incident that's alleged in the

Page 16

1  complaint, which occurred on February 10,
2  2005. Would you just take me through that
3  day. What was the first time you had any
4  conversations with your brother, or anybody,
5  about what happened?
6    A.    Start that day?
7    Q.    Yeah. If you will start that
8  day.
9    A.    I got up like a normal day.
10  And I -- My mother lives behind me, so I --
11  you know, I can see out my window and see
12  down at her house. And I just so happened
13  to look out the window and I seen my brother
14  standing in my mama's front yard, knocking
15  on her bedroom window.
16    So I knew my mother wasn't
17  there, because I knew she had a doctor's
18  appointment and she had already left to go
19  to her doctor's appointment.
20    And I hadn't seen my brother
21  for about maybe nine or ten months before I
22  seen him that day. I knew she wasn't there,
23  so I went on my back porch and flagged for

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1  him to come up to my house.
2      Q.    What time was this in the
3  morning?
4      A.    I would say between
5  eight-fifteen and eight-thirty.
6      Q.    Okay.  What happened next?
7      A.    He came up to my house and he
8  -- We just talked.  And I had asked him
9  about his wife calling and making
10  accusations that he molested her daughter.
11     Q.    I'm sorry.  Would you back up
12  for me.  When was this -- When did his wife
13  call and make accusations?
14     A.    The day before, on the 9th.
15     Q.    The day before.  Okay.  I'm
16  sorry.  I'm going to have to do this, but
17  would you go back to February 9th, then, and
18  tell me how all of this happened, and if it
19  started before February 9th, take me back
20  before then.
21     A.    No.  It was February the 9th.
22     Q.    Okay.
23     A.    What it was, was my sister had

1  -- little boy called and said that Lisa,
2  which is my ex-sister-in-law that was
3  married to my brother, Kenny --
4      Q.    Would that be Lisa Thrower?
5      A.    Uh-huh.
6      Q.    A boy said -- I'm sorry?
7      A.    My nephew.
8      Q.    Your nephew.  What was his
9  name?
10     A.    Blake Turnham.
11     Q.    Told you what?
12     A.    Yeah.  He called and said,
13  "Lisa was calling his mama's house and
14  leaving a message on the phone, saying that
15  it was an emergency, that she needed to talk
16  to somebody in our family."
17         Well, my mother doesn't talk
18  to her, so she wouldn't call, so I called.
19     Q.    Now, why wouldn't anybody else
20  call?
21     A.    We didn't have anything to do
22  with her.  We didn't socialize with her.
23     Q.    Is there a reason?

1      A.    Yeah.  She always caused
2  trouble in our family.
3      Q.    Okay.
4      A.    So we really didn't mess with
5  her or anything.  That's one of the reasons
6  why we didn't have a relationship with my
7  brother, that it had been so long since I
8  seen him.
9          But, anyway, when I called her
10  on the phone she told me, she said, "Lisa,
11  I've known about this for a week."  She
12  said, "But I found out that Kenny had been
13  molesting Miranda," which is her daughter by
14  a previous marriage.
15     Q.    And what time of day on
16  February 9th did you call her?
17     A.    I guess -- I really can't say.
18  It was just sometime that day.  I don't
19  remember if it was the morning or if it was
20  the afternoon.
21     Q.    And would you tell me
22  everything that was said in that
23  conversation.

1      A.    She had told me that she had
2  known for a week that my brother had been
3  molesting her daughter.  I told her I didn't
4  believe it was true, because me, as a
5  parent, I would have something done right
6  off the bat, I wouldn't wait no week and be
7  living with somebody in my house if I
8  thought anything like that.  I didn't
9  believe anything she said.  You know, me, as
10  a parent, I couldn't understand it.
11     Q.    Uh-huh.
12     A.    And she said that they were
13  going to work everything out, and that, you
14  know, that, you know, wasn't nothing going
15  to be done.  Well, like I said, I didn't
16  believe it anyway.
17         So that was pretty much all of
18  the conversation I had with her, just
19  telling her I didn't believe what she was
20  saying was true.
21         And then that's when the next
22  day come -- Well, I told my mom about it.
23  My mama had talked to my brother.  That's

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1    Q.    Where did he park his truck?
2    A.    His truck was up at my house
3  when he was at my house.
4    Q.    Okay.
5    A.    On the side of my house.
6    Q.    Well, did he park there first
7  or did he park over at your mom's house?
8    A.    No.  He was down at my mom's
9  house and then he got in his truck and drove
10  his truck up to my house.
11    Q.    Okay.  But you can see your
12  mom's house from your back porch; right?
13    A.    Oh, yeah.  Yes, sir.
14    Q.    And you said he had clothes in
15  his truck?
16    A.    Yes, sir.
17    Q.    So, when did Lisa call?
18    A.    She kept calling about four or
19  five times, maybe.
20    Q.    Uh-huh.
21    A.    And, I mean, personally, I
22  didn't want to get involved in anything, so
23  I wasn't picking up my telephone.

Page 26

1    Q.    Okay.
2    A.    And, then, you know, she kept
3  calling, and showed -- I picked the phone up
4  and I showed it to Kenny, you know, that she
5  was calling.  He said, "Well, give me the
6  phone, I'll talk to her."
7    Q.    Okay.  So, you never spoke
8  with Lisa Thrower?
9    A.    No, no.  I never spoke with
10  her.
11    Q.    Okay.  And what time was it
12  that he answered the phone after -- I mean,
13  were there times where she called and you
14  didn't answer and she quit -- it quit
15  ringing?
16    A.    No.  She would keep calling
17  over and over.
18    Q.    Keep calling.  Oh, okay.  Did
19  you have an answering machine that ever
20  picked up?
21    A.    No.  She would hang up before
22  the answering machine came on.
23    Q.    Okay.  So, what time did you

Page 27

1  -- or did Kenny finally pick up the phone
2  and actually answer it?
3    A.    It was before nine o'clock.
4  Because right after -- shortly after he got
5  there, the phone started ringing.
6    Q.    Okay.  And could you hear the
7  conversation or just what Kenny was saying?
8    A.    What he was saying.
9    Q.    And do you know what the
10  conversation was about?
11    A.    All I heard him saying was
12  that, "Why have you called my family and
13  started all this trouble with my family,
14  lying on me?"  And, you know, just things
15  like that.
16        You know, why did she put us
17  in it?  You know, he pretty much told her,
18  "If you want to be free," he said, "Fly and
19  be free," and he slammed the phone down on
20  her.  And she kept calling back, but we
21  never answered the phone.
22    Q.    When was the last time that
23  Kenny spoke with her, that you're aware of,

Page 28

1  as far as on February 10th?
2    A.    I would say the phone call and
3  him talking to her on the phone probably
4  went on for about thirty minutes, the whole
5  time.
6    Q.    Okay.  What happened next?
7    A.    At ten-thirty exactly, I
8  remember the time, the school called me.
9  C.B. was sick.  I had to go to the school to
10  pick C.B. up.
11        I have pretty much a regular
12  routine.  I get up in the morning, get him
13  situated, get him ready to go to school, and
14  then start doing, like, things around the
15  house, washing clothes and, you know, my
16  wifely chores.
17        And when they called, I was
18  still, like, in my gown.  And C.B. went to
19  Dixie Elementary School at the time, so, you
20  know, it's, like, a real close-knit school,
21  everybody knows everybody.
22        And I personally know the
23  secretary.  So I asked her, I said, you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  know, "Can you just send C.B. out and I'll
2  get him?" And she kind of walked him out to
3  the door and waved to me and he got in the
4  car and we left and went back home. But I
5  left Kenny at my house, when I went to pick
6  C.B. up, with Sara, my niece.
7      Q.    Okay. I'm sorry. I didn't
8  understand the conversation with the school.
9      A.    They called me. C.B. was
10 sick.
11     Q.    Uh-huh. Yes.
12     A.    I left Kenny there, Kenny and
13 Sara at my house.
14     Q.    Okay.
15     A.    And I drove to the school to
16 pick C.B. up. The school is six miles from
17 my house, twelve miles round trip.
18     Q.    Okay. How long was it before
19 -- How long did it take you to get dressed
20 and leave to go to the school?
21     A.    I stayed in my gown and drove
22 up there.
23     Q.    Oh, okay. And what time did

Page 30

1  you get back with C.B.?
2      A.    I was home within fifteen
3  minutes, so I would say ten-forty-five,
4  maybe.
5      Q.    How many children do you have?
6      A.    One.
7      Q.    And that's C.B.?
8      A.    Yes, sir.
9      Q.    That's C.B.?
10     A.    C.B.
11         MR. NELMS:  That would be the
12 minor child, C.B.
13     Q.    And how old is C.B.?
14     A.    He's twelve.
15     Q.    How long have you and Jerry
16 been married?
17     A.    Eighteen years.
18     Q.    Who is Sara Cruz?
19     A.    My niece.
20     Q.    Would that be one of your
21 sister's children?
22     A.    Yes, sir. Mary Jane. Mary
23 Jane Pate is her mother.

Page 31

1      Q.    And do you have custody of
2  Sara?
3      A.    We never did anything legal,
4  but I've pretty much had her all her life.
5  She just pretty much handed her over to me.
6      Q.    And why was that?
7      A.    She's not really a responsible
8  parent, maybe.
9      Q.    How old is Mary Jane?
10     A.    Forty-two, I believe.
11     Q.    How old is Sara?
12     A.    Twenty.
13     Q.    Does she go to school?
14     A.    She graduated from Russell
15 County High School.
16     Q.    Does she work?
17     A.    No, sir. She has a
18 disability.
19     Q.    What's the disability?
20     A.    ADH, depression.
21     Q.    ADHD?
22     A.    Is that it?
23     Q.    And depression?

Page 32

1      A.    Yes, sir.
2      Q.    Does she receive disability
3  through the Social Security Administration?
4      A.    Yes, sir.
5      Q.    Okay. You were home with C.B.
6  about ten-forty-five; is that right?
7      A.    Yes, sir.
8      Q.    Okay. What happened next?
9      A.    Me and Kenny just kind of
10 talked. Nothing really in general. Just,
11 we were talking. And then my mother called
12 and asked me to ask Kenny if he would meet
13 her at El Vaquero for lunch.
14     Q.    Now, why did your mother call?
15     A.    Because she didn't get to see
16 him that morning. He come by to see her.
17 And she was just going to -- She wanted to
18 talk to him face to face about everything
19 that was supposedly had been said.
20     Q.    Did she know that he would be
21 at your house?
22     A.    No. She called and I told her
23 he was there.

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1    Q.   Oh, okay.
2    A.   Yeah.
3    Q.   Did your mother talk with
4 Kenny on the telephone?
5    A.   No, sir.  Just through me.
6    Q.   So, your mother wanted to meet
7 Kenny for lunch at El Vaquero?
8    A.   Yes, sir.  On 280.
9    Q.   What time were they to meet?
10    A.   To be honest, I can't remember
11 the exact time she said to meet him.  I
12 don't even think she said a time.  She just
13 said, "Tell him to meet me when he gets
14 through at El Vaquero," when he was at my
15 house.  I assume when he got through
16 talking, but, I mean, I don't know an exact
17 time.
18        I know that he was there at my
19 house, from the time I come back from
20 picking C.B. up, he was there at least
21 another hour.
22    Q.   Did you know that Kenny was in
23 trouble, that the law was looking for him?

Page 34

1    A.   I didn't think -- I mean, no.
2 I didn't know.
3    Q.   But you're aware from Lisa
4 Thrower that he had been at least accused of
5 molesting her daughter?
6    A.   Uh-huh.
7    Q.   And did Lisa Thrower ever tell
8 you that she had went to talk to the police?
9    A.   No, sir.
10    Q.   Okay.  So, he left sometime
11 after eleven-forty-five, would that be
12 correct?
13    A.   Yes, sir.
14    Q.   And what was he driving?
15    A.   A black truck.  I don't even
16 know.  I just know a black truck.
17    Q.   And this would have been
18 eleven-forty-five Eastern Time, sometime
19 after eleven-forty-five Eastern?
20    A.   Yes, sir.
21    Q.   You have to understand, I come
22 from the Central Time Zone.
23    A.   Oh, okay.

Page 35

1    Q.   And I understand Phenix City
2 is on the Eastern Time zone; that's correct?
3    A.   Yes, sir.
4    Q.   Okay.  What happened after he
5 left?
6    A.   I would say probably anywhere
7 from -- he was gone for probably anywhere
8 from maybe thirty -- maybe thirty minutes to
9 an hour, I'm not sure.
10        And after he left, I finished
11 straightening up and then I went in my
12 bedroom and sat on the bed with my dog and
13 was watching TV.
14        All of a sudden, I heard a
15 loud boom.  I jumped up off my bed.  My dog
16 jumped up.  I stuck my head out my bedroom
17 door and I seen silhouettes of people and
18 smoke all in my house.
19        I kept screaming: "Who are
20 you?  What's wrong?"  In all honesty, I do
21 not know anything.  It was law enforcement.
22 They never said, "We're law enforcement."
23 They came through my house screaming,

Page 36

1 "Everybody get down, get down."
2        I kept screaming: "I'm a
3 heart patient.  I've had three heart
4 attacks.  I have a stent in my heart."  I
5 kept screaming that I was a heart patient.
6        I stayed in my bedroom.  I had
7 two men come in my bedroom and told me to
8 get down on the floor.  I kept telling them
9 that I was a heart patient.  They told me
10 they didn't care what I was, and I was
11 getting on that floor.
12        I got down on the floor.  I
13 know for a fact a black guy stepped over me
14 and looked in my closet.  Had an assault
15 rifle pointed to my head, and my kid
16 screaming in the room across from me.
17        MR. NELMS:  Just answer his
18 questions.
19    Q.   Do you know about what time
20 this was?
21    A.   No, sir.  To be honest, I
22 can't tell you.  It was just -- I don't
23 know.

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1      Q.    Do you know who came in to the
2  -- Do you know who was part of the entry
3  team?
4      A.    They had ski masks on their
5  face, shields in their hands, and assault
6  rifles in their hands.
7          MR. NELMS:  Answer his
8  questions.
9      Q.    So the answer is no?
10     A.    No, sir, I didn't know.  I
11 only knew two people that were there.
12     Q.    Okay.  Who were the two people
13 that were there?
14     A.    Heath Taylor and Grover
15 Goodrich.
16     Q.    Did either Heath Taylor or
17 Grover Goodrich have any ski masks on?
18     A.    No, sir.  No, sir, I don't
19 remember ski masks on either one of them.
20     Q.    And how long did it take for
21 them to search your residence?  Did they
22 tell you who they were looking for?
23     A.    Not at first.

Page 38

1      Q.    Okay.  When did they tell you
2  who they were looking for?
3      A.    I kept asking the officer over
4  me, "What's going on?  What's wrong?"  He
5  said, "He'll be here in a minute."  And
6  that's when Heath Taylor came to my bedroom
7  door.
8      Q.    Uh-huh.
9      A.    And asked me did I know where
10 my brother was -- No.  Did I know where my
11 -- "Where was my brother's truck?"
12     Q.    Uh-huh.
13     A.    And he told me to tell him, he
14 says, "I'm going to keep coming back over
15 and over until you tell me where your
16 brother is."
17     Q.    Did you not tell him where
18 your brother was?
19     A.    Yeah.  I told him where.  I
20 told him he was at El Vaquero on 280, after
21 he told me he was going to keep coming back,
22 which, I would have told him anyway.  But he
23 said that -- I told him, "He went to El

Page 39

1  Vaquero to meet my mom."  And then that's
2  pretty much when everybody was running out
3  of my house and pretty much getting gone.
4      Q.    What do you mean?  I'm sorry.
5  That was when everybody was running out of
6  your house?
7          MR. NELMS:  If you don't
8  understand his question, tell him you don't
9  understand it.
10     A.    I don't understand.
11     Q.    Okay.  Well, you mentioned
12 that that was when everybody was running out
13 of your house.  And I'm right now trying to
14 say, "When did that happen?"
15     A.    After they -- After I said
16 where my brother was.
17     Q.    Then everybody left?
18     A.    Well, they were on their way
19 out the door, yeah.  They were kind of like
20 huddling up outside in front of my house.
21 And then everybody got in their cars and
22 pretty much sped away.
23     Q.    And did Heath Taylor say

Page 40

1  anything else to you?
2      A.    I said something about -- I
3  have my brother that died, I have a wall in
4  my house like a monumental thing of him,
5  whatnots and things like that, and I
6  hollered and said, "Hey, what about my
7  whatnots, my whatnots are busted?"  And he
8  said, "Oh, well," and walked out my door.
9      Q.    And did he say anything else
10 to you?
11     A.    Just asked me which El Vaquero
12 they were at.  I told him the one on 280
13 bypass.
14     Q.    Did you tell him how long he'd
15 left?
16     A.    They didn't ask me.
17     Q.    Did you tell them how long
18 he'd left?
19     A.    No, sir.
20     Q.    Do you -- Did Grover Goodrich
21 say anything to you?
22     A.    Not the first time they were
23 there, no, sir.

10 (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1 was one of the ones that was out there,
2 because he knew where we lived.
3     Q.   Who was out there?
4     A.   Bailey, the black guy.
5     Q.   Who told you he was there
6 because he knew where you lived?
7     A.   Dennis is the one that said
8 that he realized it was his brother's house
9 when he walked out our front door and
10 noticed the racetrack across the street.
11     Q.   That was after the incident?
12     A.   Yes, sir.
13     Q.   Okay. Well, you just said he
14 was there because he knew where you lived.
15 I don't understand.
16         MR. NELMS: Object to the
17 form.
18     Q.   Now, why did Dennis Green say
19 that Officer Bailey was there?
20     A.   He's his best friend. I mean,
21 they're real good friends. And I guess they
22 were talking and he probably told him, "Hey,
23 we went to your brother's house." I mean, I

Page 50

1 don't know their conversation.
2     Q.   What else did your
3 brother-in-law say?
4     A.   That was pretty much it. We
5 didn't want to get him involved. He has to
6 have his job. So -- I mean, that was pretty
7 much it. And that was them talking, I
8 guess, on a friend-to-friend basis, just
9 talking in conversation. I don't know.
10     Q.   Do you have any guns in your
11 house?
12     A.   Yes, sir.
13     Q.   How many guns do you have in
14 your house?
15     A.   Maybe twenty.
16     Q.   Would you be surprised if it
17 was closer to thirty?
18     A.   Yeah. There are probably no
19 more than twenty.
20     Q.   Okay.
21     A.   Like, rifles and shotguns.
22     Q.   Did you say about twenty?
23     A.   Yes, sir.

Page 51

1     Q.   Rifles and shotguns?
2     A.   Yes, sir.
3     Q.   Do you and your husband
4 collect guns?
5     A.   I don't. He does.
6     Q.   So, these are your husband's?
7     A.   Yes, sir.
8     Q.   So, he has about twenty rifles
9 and shotguns?
10     A.   Yes, sir.
11     Q.   And does he also have
12 ammunition for those guns?
13     A.   Yes, sir.
14     Q.   During this incident, did
15 anybody touch you physically?
16     A.   No, sir.
17     Q.   And the people that were at
18 the house at this time were you, your niece,
19 Sara Cruz, and your son, C.B.?
20     A.   Yes, sir.
21     Q.   Did you see anybody touch
22 either of them physically?
23     A.   No, sir.

Page 52

1     Q.   Do you remember anybody else
2 saying anything else during this first
3 entry, that you haven't already told me?
4     A.   No, sir.
5     Q.   Okay. Do you remember
6 anything else you might have told them?
7     A.   No, sir.
8     Q.   After they left, did you call
9 your mom, to let her know that they were
10 coming to get --
11     A.   No, sir. No, sir.
12     Q.   And why?
13     A.   The first phone call I made
14 was to Russell County Sheriff's Department.
15     Q.   Okay. Who did you call?
16     A.   I spoke to a man. He said his
17 name was Alexander. I told him that my
18 house had been tore up. And he said that he
19 would send someone out there right away to
20 assess the damages.
21     Q.   And when did that person come
22 out to your house?
23     A.   I would say within forty-five

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 57

1   A.   I told her my house was tore
2  up.
3   Q.   Anything else?
4   A.   Nothing but what happened at
5  my house, them putting guns to our heads.
6   Q.   What did you tell her about
7  them putting guns to your head?
8   A.   Nothing in details, you know,
9  just what happened at the house. They came
10  and busted in my front door and burned up my
11  living room carpet and had us on the ground
12  with assault rifles to our heads. And about
13  -- That's pretty much it.
14   Q.   Okay. What happened next?
15   A.   McKenzie was fixing a -- Well,
16  working on the front door.
17   Q.   Uh-huh.
18   A.   And I was in the back of the
19  house. And I heard somebody yelling,
20  "Lisa." I stuck my head out of my bedroom
21  door, and Heath Taylor was standing in my
22  dining room.
23   Q.   Uh-huh.

Page 58

1   A.   And he told me he come back to
2  seize our three four-wheelers.
3   Q.   Came back to seize what?
4   A.   We had three four-wheelers.
5  He came back to get the four-wheelers.
6   Q.   Okay. What exactly did he
7  tell you?
8   A.   Excuse me?
9   Q.   What exactly did he tell you?
10   A.   He said when they were
11  checking the premises, that there was a
12  four-wheeler in our shed that just had
13  suspicions that maybe it was stolen.
14   Q.   Did he tell you anything else?
15   A.   He went outside and came back
16  in and told me that he needed the keys to
17  our four-wheeler trailer. I told him that
18  that was our four-wheeler trailer; that, you
19  know, we didn't steal it. He said, "I have
20  to have the trailer to take the
21  four-wheelers down," because the one he had
22  would only hold one four-wheeler, that the
23  County has or whatever. I don't know.

Page 59

1   Q.   Did he ask you if it was okay
2  to take the trailer?
3   A.   No. He told me he had to have
4  the keys to the four-wheeler trailer to take
5  the four-wheelers down.
6   Q.   Did he ask you if he could
7  take the four-wheelers?
8   A.   No, sir. He told me he had
9  to.
10   Q.   Did he tell you that at least
11  one of the ignitions on the four-wheelers
12  was popped?
13   A.   Yes, sir.
14   Q.   Were you able to produce any
15  receipts for them?
16   A.   Yes, sir. Two of them. No.
17  One of them. I'm sorry.
18       (Defendant's Exhibit 1 was
19       marked for identification
20       purposes.)
21   Q.   I'm going to hand you what
22  I've marked as Defendant's Exhibit 1. Is
23  that the receipt that you gave to Lieutenant

Page 60

1  -- or showed Lieutenant Heath Taylor?
2   A.   Yes, sir.
3   Q.   Does that receipt have the VIN
4  number of the four-wheeler on the receipt?
5   A.   No, sir.
6   Q.   This is the only receipt you
7  had for the three four-wheelers?
8   A.   Yes, sir.
9   Q.   Who else was there with you
10  and Lieutenant Taylor? You said there was
11  the maintenance guy was working on the door
12  with the two prisoners.
13   A.   Yes, sir.
14   Q.   And who else was present?
15   A.   Goodrich.
16   Q.   Is this the first time you
17  remember seeing Grover Goodrich that day?
18   A.   Yes, sir.
19   Q.   Did he say anything?
20   A.   No, sir. No -- Well, yeah,
21  they had a piece of paper, and all it had on
22  it was the -- He stated for me to sign that
23  piece of paper, just showing that they took

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  property of the four-wheelers.
2       Q.    Did you sign that piece of
3  paper?
4       A.    Yes, sir.
5       Q.    Did they tell you when you
6  could pick it up?
7       A.    Heath Taylor just told me that
8  he had to run a check on them to make sure
9  they weren't stolen, and he would get back
10  with us.
11      Q.    Now, did you want -- Did you
12  want to make sure that you had not purchased
13  stolen four-wheelers?
14           MR. NELMS:  Object to the
15  form.
16      A.    I didn't never think anything
17  about stealing -- I mean, their being stolen
18  or anything.  No, I wouldn't want stolen
19  things, but I had no reason to feel like it
20  was stolen.
21      Q.    So, they wanted the --
22  Lieutenant Heath Taylor wanted to take the
23  four-wheelers to check the VIN numbers; is

Page 62

1  that correct?
2           MR. NELMS:  Object to the
3  form.
4       A.    Yes, sir.
5       Q.    Now, did he tell you that you
6  could pick them up the next day?
7       A.    Yes, sir.
8       Q.    Was it Lieutenant Taylor that
9  told you that?
10      A.    Yes, sir.
11      Q.    Did you, during this time,
12  ever call your husband?
13      A.    Yes, sir.
14      Q.    Did you do that from your home
15  phone or your cell phone?
16      A.    My home phone.
17      Q.    And when was this that they
18  came by the second time?  Or, actually, when
19  Heath Taylor came by the second time?
20      A.    Maybe one o'clock.
21           MR. GRAHAM:  Is that one
22  o'clock p.m.?
23           THE WITNESS:  Yes, sir.

Page 63

1       Q.    And why did you call your
2  husband?
3       A.    To let him know what all was
4  going on.
5       Q.    Okay.  And when did you call
6  your husband?
7       A.    After I talked to Alexander on
8  the phone.
9       Q.    Then you called your husband?
10      A.    Yes, sir.
11      Q.    And how long were you on the
12  telephone with him?
13      A.    Maybe ten minutes, maybe.
14      Q.    Did you call him on his cell
15  phone?
16      A.    Yes, sir.
17      Q.    What's his cell phone number?
18      A.    (706) 527-4155.
19      Q.    Now, was it during this time
20  that Lieutenant Taylor came by, or was this
21  after?
22      A.    After they left.
23      Q.    After who left?

Page 64

1       A.    Heath Taylor and --
2       Q.    Let me rephrase my question.
3  When did Heath Taylor come by the second
4  time?  Was this after you talked to your
5  husband?
6       A.    Yes, sir.
7       Q.    Okay.  Did you ever call your
8  husband while Heath Taylor was there?
9       A.    No, sir.
10      Q.    You did not.  So, you only
11  called your husband one time?
12      A.    I'm sure I called more than
13  once, but I never talked to him with Heath
14  Taylor standing there in the house.
15      Q.    Or how about with Heath Taylor
16  standing outside the house, when he was
17  there?
18      A.    No, sir.
19      Q.    Did anybody else come during
20  this time that Heath Taylor was there the
21  second time, when he came by because of the
22  -- telling you that he thought the ATVs
23  might be -- might possibly be stolen?

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1          MR. NELMS:  Object to the
2    form.
3          Q.    Isn't that what he said?  Did
4    he tell you he thought the ATVs might have
5    been stolen?
6          A.    Yes, sir.
7          Q.    Okay.  Did anybody else come
8    by while he was there the second time,
9    besides Grover Goodrich?
10         A.    There was a lady that had a
11   trailer, she was from the sheriff's
12   department.  She was pulling a trailer.
13         Q.    Was she pulling a trailer when
14   she came up?
15         A.    Yes, sir.  She had it on the
16   back of a pickup truck.
17         Q.    And she was pulling a trailer
18   on the back of a pickup truck?
19         A.    Yes, sir.
20         Q.    Do you know who this lady was?
21         A.    No, sir.
22         Q.    And then what did she do?
23   What do you remember her doing?

Page 66

1          A.    Just leaving.
2          Q.    Okay.  Did she -- Was she the
3    one that towed off the ATVs?
4          A.    I'm not sure who took them
5    off.
6          Q.    Okay.  Do you know who loaded
7    the four-wheelers or ATVs on the trailer?
8          A.    No, sir.
9          Q.    Did they load it onto your
10   trailer?
11         A.    Yes, sir.
12         Q.    Okay.  And you said they had
13   mentioned that you could come and pick them
14   up the next day?
15         A.    Yes, sir.
16         Q.    And was that because your
17   husband was supposed to be back the next
18   day?
19         A.    Yes, sir.
20         Q.    And where was he at the time,
21   your husband?
22         A.    In Atlanta, working.
23         Q.    And what's his job?

Page 67

1          A.    He's a crane operator.
2          Q.    Do you know what time he was
3    supposed to be home on Friday?
4          A.    No, sir.  He usually just
5    comes home whenever.
6          Q.    Now, do you recall anything
7    else that either Lieutenant Taylor or Grover
8    Goodrich told you the second time that Heath
9    Taylor was there, you said about one
10   o'clock, when they took the ATVs?  Do you
11   recall anybody else saying anything else at
12   that time?
13         A.    No, sir.
14         Q.    Did Lieutenant Taylor act
15   professional to you at this time?
16         MR. NELMS:  Object to the
17   form.
18         A.    I -- I mean, to be honest, I
19   was so upset, I wasn't -- nobody yelled out
20   at me.  I mean, nobody screamed at me or
21   anything.
22         Q.    Was he polite to you?
23         A.    Yes, sir.

Page 68

1          Q.    Was Grover Goodrich polite to
2    you?
3          A.    Oh, yes, sir.
4          Q.    Was this lady who came up in a
5    pickup truck, was she polite?
6          A.    I never spoke with her.
7          Q.    Okay.  Did you ever hear her
8    say anything?
9          A.    No, sir.
10         Q.    Now, what time did your
11   husband -- Excuse me.  Let me back up.  Is
12   there anything else that happened on
13   February 10th involving any law enforcement
14   officers, with either the City of Phenix
15   City or the Russell County Sheriff's
16   Department?
17         A.    I don't understand.
18         Q.    Okay.  Is there anything else
19   that we haven't covered today, that happened
20   -- Did you have any other dealings with any
21   officer from either the City of Phenix City
22   or Russell County Sheriff's Department?
23         A.    No, sir.

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 73

1  him about?
2       A.    Pretty much everything that
3  went on.
4       Q.    Such as? What all did you
5  tell him?
6       A.    He asked me how my carpet got
7  burnt. And I mean, I just explained
8  everything that happened, step by step, like
9  I'm telling you.
10      Q.    And did he say anything, or
11 did he just listen?
12      A.    Pretty much, he listened to
13 me.
14      Q.    Was he professional to you?
15      A.    Oh, yeah, he was extremely
16 nice.
17           MR. NELMS: It's an hour and a
18 half in, can we take a break?
19           MR. WEBB: Sure.
20           (Recess taken.)
21           MR. WEBB: Andy Nelms and I
22 have talked during the break that wherever I
23 mentioned the name C.B., that it would be

Page 74

1  substituted C.B. in the deposition due to
2  the fact that he is a minor.
3           And during the course of the
4  deposition, I'm still going to probably
5  refer to him as C.B., just -- she's going to
6  put in there C.B. so the name would be
7  protected. Is that acceptable to you?
8           THE WITNESS: Yes, sir.
9       Q.    Now, you had mentioned that
10 your brother, Kenneth, left your house
11 sometime after 11:45 previously. Right
12 before he left, was he talking with his
13 wife, Lisa?
14      A.    No, sir.
15      Q.    Was she talking with anybody
16 before he left?
17      A.    No, sir.
18      Q.    Did he have a cell phone?
19      A.    My cell phone.
20      Q.    He had your cell phone?
21      A.    Yes, sir.
22      Q.    When did he obtain your cell
23 phone?

Page 75

1       A.    Before he left to go meet my
2  mother.
3       Q.    Why did you give him your cell
4  phone?
5       A.    Because he said he was coming
6  back, and I just told him he could take my
7  phone with him, because he didn't have a
8  phone.
9       Q.    Do you know his ex-wife,
10 Lisa's, cell phone number?
11      A.    At the time it was (706)
12 326-1726, I believe.
13      Q.    Now, when Lieutenant Taylor
14 talked to you about taking the ATVs, the
15 four-wheelers, did he ask you for your
16 consent?
17      A.    No. He told me he had to have
18 the keys to the four-wheeler trailer and he
19 was taking the four-wheelers down to see if
20 they were stolen.
21      Q.    Okay. So, your testimony is,
22 he never asked you for your consent?
23      A.    No, sir.

Page 76

1       Q.    Did you ever object to him
2  taking the four-wheelers?
3       A.    No, sir.
4       Q.    Now, when did you and your
5  husband get the four-wheelers back?
6       A.    The following Saturday.
7       Q.    Would that be Saturday,
8  February the 12th?
9       A.    The 12th, yes, sir.
10      Q.    What time?
11      A.    We were to meet Heath Taylor
12 there at six-thirty.
13      Q.    In the morning?
14      A.    No, sir. In the afternoon.
15      Q.    In the evening. Is that what
16 time you met him there?
17      A.    Yes, sir.
18      Q.    And what did y'all talk about
19 when you met him there?
20      A.    Just -- He just told us that
21 he didn't find anything with the
22 four-wheelers as to being stolen, but he
23 still believed that the red four-wheeler was

19  (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 141

1  Claim on that date?
2      A.    Yes, sir.
3            (Defendant's Exhibit 9 was
4            marked for identification
5            purposes.)
6      Q.    And did you -- Would you
7  please identify Defendant's Exhibit 9 for
8  the Record.
9      A.    From the FBI?  Is that what
10 this is?
11     Q.    I tell you what, is
12 Defendant's Exhibit 9 a letter from the U.S.
13 Department of Justice, Civil Rights
14 Division, dated April 22, 2005, and
15 addressed to you?
16     A.    I received that.
17     Q.    But is that what this
18 Defendant's Exhibit 9 is?
19     A.    Yes, sir.
20     Q.    And you would have received
21 this letter shortly after April 22, 2005?
22     A.    Yes, sir.
23     Q.    And you're aware that that

Page 142

1  letter states that, "After careful
2  consideration, we concluded that the
3  evidence does not establish a prosecutable
4  violation of Federal Civil Rights statutes?"
5      A.    Yes, sir.
6      Q.    In your opinion, is Sara Cruz
7  competent to testify?
8      A.    No, sir.
9      Q.    Okay.  And why is that?
10     A.    Well, I'll have to -- I stay
11 on her all the time.  To me, she has a
12 mental capability of less than C.B..  I have
13 to remind her every day, you know, to make
14 sure she takes a bath, to wash her hair, to
15 brush her teeth.
16          She gets nervous and gets
17 upset and, you know, she'll holler out and
18 just her -- she's a real emotional person,
19 aggressive emotional I guess you would call
20 it.  In my opinion, no.
21     MR. WEBB:  Okay.  I think
22 that's it.
23     MR. GRAHAM:  I have one more

Page 143

1  question.
2        EXAMINATION CONTINUED
3  BY MR. GRAHAM:
4      Q.    When did you and Mr. Barnette
5  hire Mr. Nelms and Mr. Lewis to represent
6  you, do you recall?  I would assume it would
7  be between the time that you received this
8  letter from Julian McPhillips and the time
9  that the lawsuit was filed; is that correct?
10     A.    It would have to be after
11 April.
12     Q.    All right.  So, it would have
13 been after April 19th, but before May the
14 20th of 2005, the date that the lawsuit was
15 filed?
16     A.    Yes, sir.
17     Q.    And how did y'all come to --
18 Why did Mr. McPhillips and Mr. Shinbaum quit
19 representing you, and how did you get to
20 Mr. Lewis and Mr. Nelms?
21     A.    We didn't really care for
22 Shinbaum.
23     Q.    I understand.

Page 144

1      A.    We just, on our own, left.
2      Q.    Okay.  Did someone refer you
3  to Mr. Lewis and Mr. Nelms?
4      A.    Yes, sir.
5      MR. GRAHAM:  Okay.  Thank you
6  very much.
7            (Off-the-Record discussion
8            was held.)
9            (Recess taken.)
10        EXAMINATION
11 BY MR. NELMS:
12     Q.    Lisa, I'm going to ask you a
13 few questions about the testimony that
14 you've given today and some of the things
15 that you've had an opportunity to tell us
16 about.  And I want to start back at the
17 beginning, chronologically.
18          That Thursday morning, I
19 believe you testified earlier, that you were
20 in your bedroom when you first heard a bang.
21 Okay?
22     A.    Yes.
23     Q.    Is that bang that you referred

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 145

1 to the grenade that went off in your living
2 room, to the best of your knowledge?
3      A.    Yes, sir.
4      Q.    Did you, at any time -- Do you
5 have a doorbell on your house?
6      A.    Yes, sir.
7      Q.    Okay. Did your doorbell, at
8 any time that morning -- Before you heard
9 that bang, did your doorbell ring?
10      A.    No, sir.
11      Q.    Okay. Did you hear anyone, or
12 have occasion to hear anyone knocking at the
13 door or anything that sounded like someone
14 knocking at the door?
15      A.    No, sir.
16      Q.    Okay. Did you have any
17 indication at all that there was -- and I'm
18 talking about sometime in close proximity to
19 when you heard this large bang, did you have
20 any indication that there was anyone on your
21 property?
22      A.    No, sir.
23      Q.    Okay. I assume you have

Page 146

1 windows in your house?
2      A.    Yes, sir.
3      Q.    Okay. Are they covered with
4 drapes or shades?
5      A.    Blinds.
6      Q.    Blinds. All right. Were the
7 blinds opened so that you could see out the
8 windows, or closed?
9      A.    I don't remember.
10      Q.    Okay. But in any event, you
11 did not witness anyone out in your yard or
12 on your property prior to your hearing the
13 large bang?
14      A.    No.
15      Q.    Okay. Referring back to
16 Defendant's Exhibit Number 4, I'm going to
17 give you a red pen, and if you would,
18 please, indicate which room you were sitting
19 in when you heard this loud bang.
20      A.    (Witness complies.)
21      Q.    And you've written on there
22 already, "My room."
23      A.    My room.

Page 147

1      Q.    Is that the master bedroom?
2      A.    Yes, sir.
3      Q.    May I put master on there?
4 Okay. And you've indicated that the house
5 -- or the property actually sits on Highway
6 80?
7      A.    Faces Highway 80, yes, sir.
8      Q.    Can you give me an arrow
9 towards Highway 80, please, on Defendant's
10 Exhibit 4?
11      A.    I don't understand.
12      Q.    Draw me Highway 80 on
13 Defendant's Exhibit 4, if you would, please.
14      A.    This is the front of my house
15 (indicating).
16      Q.    All right.
17      A.    And Highway 80 goes right in
18 front of my house.
19      Q.    All right. Where is Chapman?
20      A.    If this is Highway 80
21 (indicating), and Chapman Street runs off of
22 Highway 80.
23      Q.    And it comes straight up to

Page 148

1 your house, to your front door?
2      A.    You turn off of Highway 80 and
3 turn onto Chapman Street and my house is the
4 first one.
5      Q.    All right. So, your house
6 faces 80. Do you know your north, south,
7 east, west? Don't look at Jerry.
8      A.    No.
9      Q.    You don't? Okay. This is
10 Highway --
11      A.    West. I know I live Highway
12 80 West.
13      Q.    All right. But this is
14 Highway 80; right?
15      A.    Uh-huh.
16      Q.    All right. And your house
17 faces Highway 80; is that correct?
18      A.    Yes, sir.
19      Q.    All right. And Chapman runs
20 alongside of your house?
21      A.    Yes, sir.
22      Q.    Okay. Here (indicating)?
23      A.    Yes, sir.

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

1  to the side door.
2      Q.    Do you have a front porch?
3      A.    No, sir.
4      Q.    Do you have a stoop?
5      A.    Yes, sir.
6      Q.    Okay.  And it's right off the
7  front door?
8      A.    Yes, sir.
9      Q.    Can you draw that in?
10     A.    (Witness complies.)
11     Q.    Okay.  Now, are there any
12  steps up to the front door?
13     A.    It's just one little platform
14  you step up on.
15     Q.    Okay.  Just one step up?
16     A.    Yes, sir.
17     Q.    Okay.  And you said when you
18  heard this bang from the grenade, you were
19  in your bedroom back here in the back.  Can
20  you draw me where your bed is, in that
21  bedroom, to the best of your ability?
22     A.    Up against the front window of
23  the houses.

1      Q.    Okay.  So, this is Highway 80.
2  So the headboard faces that direction or
3  your foot -- Where is the foot of the bed?
4      A.    No.  Okay.  I'm sorry.  Right
5  here (indicating).  Because my bedroom was
6  right there at the front of the house, the
7  front bedroom window.
8      Q.    Okay.  So, this is your bed
9  right here that you've drawn this picture
10  of?
11     A.    Yes, sir.
12     Q.    All right.  And I believe you
13  testified that you were sitting on the bed;
14  is that correct?
15     A.    Yes, sir.
16     Q.    Okay.  Show me where the door
17  to your bedroom is.
18     A.    (Witness complies.)
19     Q.    Okay.  I'm having a hard time
20  reading this.  Is this Sara's room?
21     A.    Yes, sir.
22     Q.    Okay.  Where is the door to
23  Sara's room, is it directly across the

1  hallway?
2      A.    Uh-huh.
3      Q.    All right.  Okay.  And then
4  between your bedroom and your living room is
5  C.B.'s bedroom?
6      A.    Yes, sir.
7      Q.    Okay.  Can you put the door on
8  the outside of his bedroom, please?
9      A.    (Witness complies.)
10     Q.    Okay.  Do you have any windows
11  in your bedroom, the master bedroom?
12     A.    Yes, sir.
13     Q.    Okay.  Can you just kind of
14  indicate to us where the windows are?
15     A.    One of them was right here in
16  front of the bed, where the bed was in the
17  front of the house.
18     Q.    Is that the headboard?
19     A.    Yes, sir.  And then --
20     Q.    Draw it in with a couple of
21  lines so we'll know where the window is.
22     A.    Yes, sir.
23     Q.    Do you have any on this side

1  of the house?
2      A.    Yes.  On the side.
3      Q.    How many?
4      A.    One on my room.
5      Q.    All right.  Let's go to Sara's
6  bedroom and let's draw in the windows there.
7      A.    (Witness complies.)
8      Q.    Okay.  And you've drawn in
9  C.B.'s as well?
10     A.    Uh-huh.
11     Q.    So, he's got a window that
12  faces out on Highway 80?
13     A.    Yes, sir.
14     Q.    Okay.  And you testified for
15  Mr. Webb earlier that you heard a loud bang.
16  And you were sitting in your bedroom with
17  the TV on at the time you heard the bang; is
18  that correct?
19     A.    Yes, sir.
20     Q.    Did you ever leave your
21  bedroom after you heard the bang?
22     A.    I walked to my bedroom door.
23     Q.    Okay.  So kind of indicate

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1  where the door is, then.
2      A.    Right here (indicating).
3      Q.    Okay. So, you're standing
4  there. And when did you first see -- you
5  said silhouetted persons in your house?
6      A.    As soon as I kind of stuck my
7  head out the door, it was all smoky and I
8  could see people at the end of the hallway.
9      Q.    Okay. And what, if anything,
10 did they say?
11     A.    They just kept yelling to get
12 down on the floor.
13     Q.    Get down on the floor. Okay.
14 At any point in time, did they indicate to
15 you that they were law enforcement?
16     A.    No, sir.
17     Q.    Okay. Did there come a point
18 in time when you realized that they were law
19 enforcement?
20     A.    Whenever I -- the officer -- I
21 seen, like, they were -- had these big old
22 shields in their hands and they had guns in
23 their hands.

Page 158

1      Q.    Okay. Did the shields say
2  anything on them?
3      A.    I want to say Sheriff. I'm
4  not for sure. I don't -- I think.
5      Q.    Okay. And did you obey their
6  command to lay down?
7      A.    Yes, sir.
8      Q.    Okay. Approximately where
9  were you in your bedroom -- Excuse me. Were
10 you in your bedroom when you laid down?
11     A.    Yes, sir.
12     Q.    Okay. Approximately where in
13 your bedroom were you when you laid down?
14     A.    My bed was right here by the
15 front window (indicating), and then I have a
16 dresser that was laying right -- sitting up
17 against the wall right here (indicating),
18 and then I was in between the dresser and
19 the bed.
20     Q.    All right. And how much space
21 is there between the dresser and the bed?
22     A.    I'd say at least that much
23 room (indicating).

Page 159

1      Q.    Okay. Can you tell me how
2  many feet that is?
3      A.    Three, two.
4      Q.    Okay. I'll take your word for
5  it. And which way was your head facing?
6      A.    Toward the window.
7      Q.    Okay. And what were you
8  wearing?
9      A.    Just a nightgown.
10     Q.    Okay. And did law enforcement
11 officers enter the room with you?
12     A.    Yes, sir.
13     Q.    After you laid down?
14     A.    Yes, sir.
15     Q.    Okay. How many?
16     A.    I know for a fact two.
17     Q.    Okay. I believe you testified
18 earlier that -- And you were face down on
19 the ground?
20     A.    Yes, sir.
21     Q.    Okay. Did they tell you to
22 put your hands in any specific place?
23     A.    No, sir.

Page 160

1      Q.    Okay. How did you have your
2  hands located in relation to your body as
3  you lay face down on the ground --
4      A.    On my side.
5      Q.    Let me finish my question. As
6  you lay face down on the ground, in your
7  bedroom, between the dresser and the bed,
8  you had your hands down along your sides?
9      A.    Yes, sir.
10     Q.    Okay. And your head was faced
11 towards the headboard of your bed?
12     A.    Yes, sir.
13     Q.    Okay.
14     A.    No. I'm sorry, no. The door.
15     Q.    Your head was facing towards
16 the door?
17     A.    Yes, sir.
18     Q.    Okay. I know this is
19 difficult, we're running out of space, but
20 can you draw in where you were? Kind of do
21 a stick figure with your head, your arms and
22 your feet.
23     A.    (Witness complies.)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1    Q.    And you indicated at some
2   point in time you realized that one of the
3   law enforcement officers was
4   African-American; is that correct?
5        A.    Yes, sir.
6        Q.    Okay.  How did you learn that?
7        A.    I saw his arm.
8        Q.    Okay.  How did you see his
9   arm?
10       A.    Because I, like, kind of
11  turned my head and I could see his arm.
12       Q.    Okay.  Were you saying
13  anything to the law enforcement officers as
14  you lay there face down on the ground?
15       A.    Not when I was laying on the
16  floor.  Yes, I was.  Yeah, I was.
17       Q.    What, if anything?
18       A.    I just kept screaming and
19  telling them that my kids were in the back
20  room, not to hurt my kids.
21       Q.    Okay.  And I believe you
22  testified earlier, you said something about
23  your health conditions.

Page 162

1        A.    I said that before they made
2   me get on the floor.
3        Q.    Okay.  All right.  From where
4   you were lying on the ground face down, were
5   you able to see into the hallway?
6        A.    Yes, sir.
7        Q.    Were you able to see into
8   Sara's bedroom?
9        A.    The door was shut.
10       Q.    The door was shut.  Okay.  You
11  said there were two officers, to the best of
12  your knowledge, in your room at the time you
13  were on the floor face down.  One you saw
14  his wrist and you believed him to be
15  African-American.  Were you able to see the
16  other one at all?
17       A.    I knew he was white.  And I
18  knew he had a Phenix City Police uniform on
19  because he had them badges, like, on the
20  side that says, "Phenix City Police."
21       Q.    Okay.  And do you recognize
22  them when you see them?
23       A.    No, sir.  They had masks on.

Page 163

1        Q.    No, no.  I'm sorry.  The
2   insignia that they carry on their sleeves of
3   their shirts.  Are you familiar with that
4   insignia?  Do you recognize it when you see
5   it, generally?
6        A.    Yes, sir.
7        Q.    Okay.  And are you able to
8   discriminate between what's a sheriff's
9   department deputy and what's a City of
10  Phenix City Police officer, generally?
11       A.    Nothing, except the uniform.
12       Q.    Okay.  But when you see the
13  uniforms, you can tell which department they
14  belong to, whether it's the sheriff's
15  department or the police department?
16       A.    Yes, sir.
17       Q.    Okay.  Let me ask you this,
18  too.  I mean, if you saw an Alabama State
19  Trooper, would you recognize that uniform
20  and know that it's not a City police officer
21  or a County deputy?
22       A.    Just by the back -- I mean,
23  the patch on it.

Page 164

1        Q.    Okay.  So, we have you laying
2   on the ground, there are two officers in
3   your room, what exactly happens next in the
4   time frame?
5        A.    I kept asking them what was
6   going on, what did they want?  And one of
7   the officers told me that they would let me
8   know in a minute.  And then after that,
9   that's when Heath Taylor came to my bedroom
10  door and asked me where my brother was.
11       Q.    All right.  And quote for me
12  exactly what he said to you, as best you
13  recall it.
14       A.    He asked me where was my
15  brother's truck?  I told him, "I didn't know
16  where my brother's truck was."  He said,
17  "I'm going to keep coming over and over --
18  He said, "I'm going to keep coming back here
19  until you tell me where your brother is."
20            And then I told him that he
21  was going to meet my mama at El Vaquero's.
22  And that's when everybody was pretty much
23  walking out of -- walking down the hallway

41 (Pages 161 to 164)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 165

1   and they let us get up. And they started
2   going out the front door.
3       Q.    Okay. To the best of your
4   knowledge, did all the law enforcement
5   officers leave your house after you told
6   them that Kenny was at El Vaquero's?
7       A.    Everybody left.
8       Q.    Okay. They didn't leave
9   anybody behind?
10      A.    No, sir.
11      Q.    Okay. All right. During the
12  period of time that the officers were in
13  your house, did they search anywhere, to the
14  best of your knowledge?
15      A.    When they were in my bedroom,
16  the black officer looked in my bedroom
17  closet, and that's all I know.
18      Q.    Okay. Did you see anybody
19  look under a bed?
20      A.    No, sir.
21      Q.    Did you see anybody look in
22  closets?
23      A.    Just my bedroom closet.

Page 166

1       Q.    I'm sorry, other than your
2   bedroom closet, obviously. Bathroom? What
3   you know, now.
4       A.    I was just in my room. I just
5   seen them looking in my closet.
6       Q.    Is there an attic or a crawl
7   space above your ceiling in your house?
8       A.    Yes, sir.
9       Q.    Okay. Is it accessible from
10  inside the house?
11      A.    Yes, sir.
12      Q.    Okay. To the best of your
13  knowledge, did any of the officers go into
14  that attic or crawl space?
15      A.    No, sir.
16      Q.    Did you -- Other than the shed
17  that we've talked about that had the ATVs in
18  it, do you have any other outhouses on your
19  property?
20      A.    Yes, sir.
21      Q.    Okay. To the best of your
22  knowledge, other than the shed with the ATVs
23  in it, did the law enforcement officers

Page 167

1   search any of those sheds?
2       A.    Yes, sir.
3       Q.    They did. Okay. And you've
4   testified earlier that your mother's house
5   is directly behind your house; is that
6   correct?
7       A.    On the opposite side of the
8   street.
9       Q.    Okay. Do you have any
10  knowledge as to whether or not those law
11  enforcement officers knew that that's your
12  mother's house?
13      A.    No, sir.
14      Q.    You don't know?
15      A.    No, sir.
16      Q.    Okay. Do you know -- And I'm
17  asking what you know specifically. Do you
18  know as to whether or not any of those law
19  enforcement officers searched your mother's
20  property?
21      A.    No, they didn't.
22      Q.    Okay. Do you have a dog?
23      A.    Yes, sir.

Page 168

1       Q.    What kind of dog do you have?
2       A.    A Dachshund.
3       Q.    Did you have the dog on
4   February 10, 2005?
5       A.    Yes, sir.
6       Q.    Does your dog bark?
7       A.    Yes, sir.
8       Q.    Frequently?
9       A.    When he hears something.
10      Q.    How often is that?
11      A.    When somebody comes to the
12  door or, you know, he hears a car door slam
13  outside.
14      Q.    Okay. When you heard the
15  grenade go off, the bang that you had
16  described for us, where was Gordon?
17      A.    On the bed with me.
18      Q.    In your bedroom?
19      A.    Yes, sir.
20      Q.    Okay. Did he bark, growl,
21  indicate at any point in time before the
22  bang that he heard a noise?
23      A.    No, sir.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  Q.  Okay.  What did Gordon do when
2  the law enforcement officers were inside
3  your house?
4  A.  He jumped off the bed and got
5  up under the bed and just kept barking.
6  Q.  Okay.  So, he barked pretty
7  much the whole time they were there?
8  A.  Yes, sir.
9  Q.  Okay.  You said that to the
10  best of your recollection, you had three
11  four-wheelers?
12  A.  Yes, sir.
13  Q.  Or three ATVs on February 10,
14  2005; is that correct?
15  A.  Yes, sir.
16  Q.  And we've already heard them
17  described.  And you've heard Mr. Webb
18  describe the ignitions or the switches that
19  turn the motors on on the ATVs.  Do you
20  recall that?
21  A.  Yes, sir.
22  Q.  Okay.  And he describes or
23  characterizes one of the ignitions as being

Page 170

1  popped.
2  A.  Yes, sir.
3  Q.  Okay.  Do you understand what
4  that means?
5  A.  I assume they thought it was
6  stolen.  It was broke or something.
7  Q.  So, when he says popped, you
8  understand that to mean broken?
9  A.  Yes, sir.
10  Q.  Okay.  Do you know of the
11  condition of the ignition switches or the
12  switches on the other two ATVs on February
13  10, 2005?
14  A.  Huh-uh.  I didn't mess with
15  the four-wheelers.
16  Q.  So, you don't know one way or
17  the other?
18  A.  Huh-uh.  I don't ride them.
19  Q.  Okay.  There was testimony
20  earlier about there being some guns in the
21  house; is that correct?
22  A.  Yes, sir.
23  Q.  Describe the guns that are in

Page 171

1  your house.
2  A.  A gun is a gun, to me.
3  They're just long guns, shotguns or rifles.
4  Q.  Differentiate between a long
5  gun and a short gun.
6  A.  A handgun and a hunting gun.
7  Q.  Okay.  And how many long guns
8  do you believe were in the house?
9  A.  Probably at least twenty.
10  Q.  Okay.  And short guns?
11  A.  Two.
12  Q.  Two.  All right.  And how were
13  the short guns kept?
14  A.  All of them stays locked up
15  under a key in the gun cabinet.
16  Q.  Okay.  And Mr. Webb asked you
17  about some ammunition.  How was the
18  ammunition kept?
19  A.  Locked up under the gun
20  cabinet.
21  Q.  Okay.  Is that a separate
22  location?
23  A.  It's all one gun cabinet, but

Page 172

1  there's two separate -- You've got one
2  cabinet where you lock the guns, and up
3  underneath it there's a place for the
4  bullets to be locked up.
5  Q.  Okay.  You testified that of
6  the three ATVs that you knew of that were in
7  the shed at the time, on February 10, 2005,
8  you were not familiar with the condition of
9  the ignitions.  Are you familiar as to
10  whether or not there were visible VIN
11  numbers on each of the individual three ATVs
12  on February 10, 2005?
13  A.  No, sir.  I didn't know
14  anything about them.
15  Q.  Okay.  Generally, not specific
16  to your three ATVs, but generally, are you
17  aware or not as to whether there are VIN
18  numbers on ATVs, just generally?
19  A.  Yes, sir.
20  Q.  You believe there are?
21  A.  Yes, sir.
22  Q.  Okay.  Do you know the years
23  of manufacture of the three ATVs that were

43 (Pages 169 to 172)

# FREEDOM COURT REPORTING

Page 173

1  in your shed on February 10, 2005?
2      A.    Yes, sir. I believe we had
3  one that was a 2004 -- No. I'm sorry. That
4  one wasn't there. Jerry's was a 2003
5  Polaris.
6      Q.    All right. And the other two?
7      A.    The other one I knew was an
8  older one in that when we bought it, we knew
9  we had to put work in it. And then the
10 other one didn't belong to us, the third
11 one.
12     Q.    All right. Do you know what
13 year it was?
14     A.    No, sir.
15     Q.    We've talked about -- Or you
16 testified earlier for Mr. Webb that there
17 was an occasion when Heath Taylor came back
18 to your house?
19     A.    Yes.
20     Q.    After the first event where
21 the grenade went off and they held you in
22 the bedroom, then there was a second event
23 sometime later, and Heath Taylor came back,

Page 174

1  and where you testified that you just turned
2  around and he was standing in your living
3  room?
4      A.    My dining room.
5      Q.    Dining room. Okay. And he
6  indicated that -- What did he first ask you
7  in regard to the ATVs?
8      A.    I just heard somebody call my
9  name. And I walked out of my bedroom, and
10 he was standing in my dining room and he
11 told me he had to come back to get the
12 four-wheelers.
13     Q.    Okay. Did you ask him why?
14     A.    He told me that when they were
15 searching the house, that there was one of
16 them in the back that they believed that it
17 was stolen.
18     Q.    Okay. So, he indicated that
19 he believed one of them to be stolen?
20     A.    Yes, sir.
21     Q.    Okay. Did he indicate that he
22 would be taking all three of the ATVs?
23     A.    He just said he had to take

Page 175

1  the four-wheelers down to make sure they
2  weren't all stolen.
3      Q.    Did you understand that he
4  would be taking all three of the ATVs?
5      A.    I just assumed he was taking
6  all three, when he said four-wheelers.
7      Q.    If he indicated that one of
8  them might be stolen, did he give you any
9  indication as to why he was taking the other
10 two?
11     A.    No, sir.
12     Q.    Okay. Did you feel that you
13 had a choice, or that Mr. Taylor was going
14 to take the ATVs whether you agreed that he
15 could take them or not?
16     A.    Well, at the time, I figured
17 they were law enforcement, I had to do what
18 they say. I didn't know.
19     Q.    Okay. So, you felt like you
20 did not have a choice?
21         MR. WEBB:  Object to the form.
22     A.    Yes, sir.
23     Q.    Did you ever tell Mr. Taylor,

Page 176

1  that, no, he could not take the three ATVs?
2      A.    No, sir.
3      Q.    Why not?
4      A.    Because I felt like they were
5  the law. I had to do whatever they said. I
6  didn't know.
7      Q.    Okay. There was some talk
8  about you signed a piece of paper. Was that
9  on February 10, 2005?
10     A.    Yes, sir.
11     Q.    Was that before he took the
12 ATVs?
13     A.    Before they left with them.
14     Q.    Okay. What did the paper say?
15     A.    I was all nervous and crying
16 and upset, and Goodrich had came and asked
17 me, he said, "Ma'am, I need you to sign this
18 piece of paper." He said, "All this piece
19 of paper is saying is the property that
20 we're taking from your house," and I signed
21 it.
22     Q.    Okay. And did he leave a copy
23 with you?

44  (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1    A.    I don't remember.
2    Q.    Okay.  And then later -- This
3  was on Thursday, when he took the ATVs.  And
4  then later on Saturday afternoon, you picked
5  the ATVs back up?
6    A.    Yes, sir.
7    Q.    Did they give you any
8  paperwork to sign when you picked the ATVs
9  back up?
10    A.    Yes, sir.  Jerry did.
11    Q.    Okay.  Did they give you a
12  copy of the paperwork that you signed then?
13    A.    I don't remember.
14    Q.    Okay.  If you had either
15  copies of the paperwork that you signed on
16  Thursday, the 10th, that we've referred to
17  just now, or copies of the paperwork that
18  you signed the following Saturday, when you
19  picked up the ATVs, would you keep them in a
20  special place?
21    A.    Yeah.
22    Q.    Where?
23    A.    With all of our paperwork that

Page 178

1  we have.
2    Q.    Okay.  Would that be at your
3  house?
4    A.    Yes, sir.
5    Q.    Okay.  Any particular place in
6  your house?
7    A.    In the file cabinet.
8    Q.    Okay.  It would be important
9  to us if you go and look and see if you can
10  find either one of those documents, because
11  I don't have them, that I'm aware of.
12    MR. NELMS:  And I don't
13  believe you have them either, Mr. Webb.
14    MR. WEBB:  No.
15    Q.    We would really like to see,
16  that.  Can you promise us that you'll make
17  an attempt to find those?
18    A.    Okay.
19    Q.    Okay.  When Mr. Taylor came
20  and explained to you that -- however you
21  characterize it, wished to take or was going
22  to take the ATVs, did he show you a warrant
23  of any type?

Page 179

1    A.    No, sir.
2    Q.    Did he ever at any time tell
3  you that he had a warrant that allowed him
4  to take that property?
5    A.    No, sir.
6    Q.    Okay.  And I believe you
7  testified that someone from the sheriff's
8  department showed up with a truck and a
9  trailer.
10    A.    Yes, sir.
11    Q.    But they were not able to take
12  the ATVs on the trailer that they showed up
13  with; is that correct?
14    MR. WEBB:  Object to the form.
15    A.    Yes, sir.
16    Q.    Okay.  Why is that?
17    A.    Because it was, like, only
18  would hold one of them.  It was a
19  little-bitty trailer.
20    Q.    Okay.  So, Mr. Taylor used
21  your trailer or Jerry's trailer to haul the
22  three ATVs; is that correct?
23    A.    Yes, sir.

Page 180

1    Q.    Okay.  On the receipt that you
2  received -- Excuse me.  Check that.
3    On the document that you
4  received from Mr. Taylor indicating that he
5  was going to have possession of the three
6  ATVs, was the trailer mentioned?
7    A.    No, sir.  It was just the
8  three four-wheelers.
9    Q.    Okay.  It did not mention the
10  trailer?
11    A.    No, sir.
12    Q.    Okay.  Did he at any time
13  indicate that he had a warrant specifically
14  for the trailer?
15    A.    No, sir.
16    Q.    Did he at any time indicate
17  that the trailer may be stolen?
18    A.    No, sir.
19    Q.    Okay.  Did Mr. Taylor ever
20  indicate to you that he had been told by
21  some third party that the ATVs were stolen,
22  or one of the ATVs may be stolen?
23    A.    No, sir.

45 (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 193

1    A.    Yes, sir.
2    Q.    Whose handwriting is that?
3    A.    Jerry's.
4    Q.    Okay.  And what is it,
5    basically?
6    A.    The damages to the house.
7    Q.    All right.  Let's start at the
8    beginning.  First of all, in the left-hand
9    top corner it says, "By Sheriff's
10   Department."  What does that mean, if you
11   know?
12       A.    I just assumed that the
13   sheriff's department, because they came out
14   there, that's why he put sheriff's
15   department.
16       Q.    Okay.  Well, if you don't
17   know, and he wrote it, you don't know.  Or
18   do you know?
19       A.    I don't know.
20       Q.    All right.  But there are a
21   list of items that are there.  Why do you
22   have that list of items?
23       A.    So we knew what got tore up.

Page 194

1    Q.    Okay.  And is that an accurate
2    list of items that were tore up in your
3    house after February 10th?
4    A.    Yes, sir.
5    Q.    And if you would, just for the
6    Record, read off of the list for the Court.
7    A.    "The front glass door, the
8    handle on it; the front door; the front
9    doorknob; the living room paneling and tape;
10   TV speakers; living room carpet; laundry
11   room door; the patch that was in the
12   ceiling; three seahorses in the bathroom;
13   crack in the living room ceiling; and two
14   lamps knocked over.
15       Q.    Okay.  When the law
16   enforcement officers first entered your
17   house, did you ask them to produce any
18   warrants or paperwork giving them authority
19   to be there?
20       A.    No, sir.
21       Q.    Did they ever offer you any
22   warrant or search warrant giving them
23   authority to be in your house?

Page 195

1    A.    No, sir.
2    Q.    Okay.  Regarding your brother,
3    Kenny.  Have you ever known him to be a
4    violent person?
5    A.    No, sir.
6    Q.    Okay.  Other than the child
7    molestation, are you aware of whether or not
8    he has ever had any criminal charges against
9    him?
10       A.    No, sir.
11       Q.    Okay.  Do you know him to
12   carry weapons on his person regularly?
13       A.    Just like during hunting
14   season or something.
15       Q.    Okay.  When Kenny Thrower
16   visited your house on the morning of the
17   10th, to the best of your knowledge, did he
18   have any weapons on his person?
19       A.    No, sir.
20       Q.    Okay.  Did you have any reason
21   to believe that he had any intentions of
22   committing an act of violence that day?
23       A.    No, sir.

Page 196

1    Q.    Okay.  Do you know -- Do you
2    know whether or not Mr. Thrower resisted
3    arrest when he was ultimately arrested on
4    the 10th?
5    A.    No, sir.
6    Q.    No, sir, you don't know or no,
7    sir, he did not?
8    A.    He did not.
9    Q.    Okay.  And how did you learn
10   that?
11       A.    My mother was there when it
12   happened.
13       Q.    Okay.  Did she tell you of the
14   events at the restaurant that day?
15       A.    Yes, sir.
16       Q.    Tell me what she told you.
17       A.    She told me they were sitting
18   in El Vaquero, and she happened to look out
19   the window and she said seen a bunch of
20   people with masks and stuff on surrounding
21   the building.
22       And she said she looked at
23   Kenny and told Kenny, she said, "God, what

49 (Pages 193 to 196)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 197

1    are all them people running around with
2    masks on?" And she said Kenny just said, "I
3    don't know," and turned around. She said,
4    "Kenny was still sitting there."
5         And mama said the next thing
6    she knows -- she didn't say who, but an
7    officer, I assumed, came up and asked him
8    was he Kenny Thrower and he said, "Yeah."
9    And then they told him to get up, and they
10   went outside into the parking lot.
11        Q.   Okay. I'm sure that scared
12   all the nice Mexicans there quite a bit.
13        A.   Oh, yeah. She said it did.
14             (Off-the-Record discussion
15             was held.)
16        MR. NELMS:  That's all I have.
17        EXAMINATION CONTINUED
18   BY MR. WEBB:
19        Q.   You mentioned that the
20   officers threw in a grenade. Would you
21   please give me your definition of a grenade.
22        MR. NELMS:  Object to the
23   form.

Page 198

1         A.   I was just told -- That's what
2    I was told, it was a percussion bomb.
3         Q.   Flash bang, has that term ever
4    come up?
5         A.   I've heard that before.
6         Q.   Okay. But it wasn't a grenade
7    that sent shrapnel through the air; right?
8         MR. NELMS:  Object to the
9    form.
10        Q.   Do you know what shrapnel is?
11        A.   Yes, sir. No.
12        Q.   Okay. Where was the TV that
13   had its speakers blown out?
14        A.   Right in front of the burn
15   mark, where the carpet was burnt, it was
16   right in front of that.
17        Q.   And how old a TV is that?
18        A.   I think it's a '99 model,
19   Zenith.
20        Q.   1999?
21        A.   It might have been 2002. I
22   don't know.
23        Q.   This is a cabinet TV?

Page 199

1         A.   Yes, sir.
2         Q.   Do they make those anymore?
3         A.   Not anymore.
4         Q.   How old did you say that was?
5         A.   It's either a '99 -- I know
6    it's either a '99 or a 2002. The date is on
7    the back of it. We can find out.
8         Q.   And who did you take it to to
9    get the speakers fixed? Are the speakers
10   fixed?
11        A.   No, sir. We don't use it.
12   No, sir.
13        Q.   Did y'all use it at the time?
14        A.   At the time.
15        Q.   Okay. And you were reimbursed
16   by the insurance company for the speakers;
17   right?
18        A.   Yes, sir. Everything was
19   depreciated we got reimbursed for.
20        Q.   Okay. But you just elected
21   not to get the speakers fixed?
22        A.   Nobody goes in my living room.
23   We don't even watch TV in my living room,

Page 200

1    so, no, the speakers weren't fixed.
2         Q.   Okay. So, now, you -- Now,
3    right after you told the officers that your
4    brother was at El Vaquero, they left, didn't
5    they?
6         A.   They gathered up in the front
7    yard for I would say maybe two or three
8    minutes, I assume, and then everybody left.
9         Q.   Okay. Do you know where the
10   VIN numbers are located on your ATVs?
11        A.   Yes, sir.
12        Q.   Where are they located?
13        A.   Down at the bottom. Or one of
14   them it's down at the bottom by where the
15   clutch thing is, where you push the clutch
16   on the four-wheeler, on a piece of bar like.
17        Q.   Okay. Facing down toward the
18   ground?
19        A.   Yes, sir.
20        Q.   And how about the other ones?
21        A.   I just know about the two that
22   we looked at the VIN numbers on.
23        Q.   Okay. When did you look at

50 (Pages 197 to 200)