FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER: 3:05CV473-B
6  LISA BARNETTE, et al.,
7     Plaintiffs,
8     vs.
9  CITY OF PHENIX CITY, et al.,
10    Defendants.
11
12    S T I P U L A T I O N
13    IT IS STIPULATED AND AGREED by and
14 between the parties through their respective
15 counsel, that the deposition of Jerry
16 Barnette may be taken before Angela Smith,
17 RPR, CRR, at the offices of McKoon, Thomas &
18 McKoon, at 925 Broad Street, Phenix City,
19 Alabama 36867, on the 4th day of October,
20 2006.
21
22    DEPOSITION OF JERRY BARNETTE
23

Page 2

1     IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating to
7  the taking of depositions.
8     IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10 any objections to be made by counsel to any
11 questions except as to form or leading
12 questions, and that counsel for the parties
13 may make objections and assign grounds at
14 the time of the trial, or at the time said
15 deposition is offered in evidence, or prior
16 thereto.
17    IT IS FURTHER STIPULATED AND
18 AGREED that the notice of filing of the
19 deposition by the Commissioner is waived.
20
21    * * * * * * * * * * *
22
23

PLAINTIFF'S EXHIBIT 2

Page 3

1  * * * * * * * * * * * *
2  I N D E X
3  EXAMINATION
4    PAGE
5  EXAMINATION CONTINUED
6    PAGE
7  PLAINTIFF'S EXHIBITS
8    PAGE
9  DEFENDANT'S EXHIBITS
10   PAGE
11 * * * * * * * * * * * *

Page 4

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER: 3:05CV473-B
6  LISA BARNETTE, et al.,
7     Plaintiff,
8     vs.
9  CITY OF PHENIX CITY, et al.,
10    Defendant.
11
12 BEFORE:
13    ANGELA SMITH, Commissioner.
14
15 APPEARANCES:
16    K. ANDERSON NELMS, ESQUIRE, of JAY
17 LEWIS, L.L.C., 847 S. McDonough St., Ste:
18 100, Montgomery, Alabama 36104, appearing on
19 behalf of the Plaintiff.
20    KENDRICK E. WEBB, ESQUIRE, of WEBB
21 & ELEY, 7475 Halcyon Pointe Road,
22 Montgomery, Alabama 36124, appearing on
23 behalf of the Defendant.

1 (Pages 1 to 4)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 9

1  attend high school, in Columbus?
2      A.   Morrow High School.
3      Q.   Morrow High School, okay, in
4  Morrow, Georgia.  And did you graduate from
5  high school?
6      A.   I got a GED later.
7      Q.   And then you left in 1982.
8  And where did you move?
9      A.   Leesburg, Florida.
10     Q.   And why did you move there?
11     A.   My parents owned a company.
12 They opened up a branch in Florida.
13     Q.   And how long were you in
14 Leesburg?
15     A.   About seven, eight years.
16     Q.   So, you would have left
17 Leesburg sometime in 1989 or 1990?
18     A.   Yeah.  That's -- Yes, sir.
19     Q.   And where did you move after
20 that?
21     A.   Phenix City -- Or Russell
22 County.
23     Q.   So, you live a few miles

Page 10

1  outside of Phenix City?
2      A.   Yes, sir.
3      Q.   Is that off Highway 80?
4      A.   Yes, sir.
5      Q.   What's your formal address?
6      A.   Number 3 Chapman Street,
7  Phenix City, Alabama.
8      Q.   And Chapman Street is a small,
9  dead end street off of Highway 80, it runs
10 perpendicular to Highway 80; is that
11 correct?
12     A.   Yes, sir.
13     Q.   And Chapman Street, is that --
14 that's a dirt road; is that right?
15     A.   Yes.
16     Q.   How many brothers and sisters
17 do you have?
18     A.   I got one brother and two
19 sisters -- two half sisters and one half
20 brother.  Total of one brother.  One half
21 brother and two half sisters.
22     Q.   And what's your brother's
23 name?

Page 11

1      A.   Dennis Ray Green.
2      Q.   And where does he live?
3      A.   South of Phenix City.  I don't
4  know the -- I think it's Oochee Pines.
5      Q.   When was the last time you
6  talked with him?
7      A.   I talked to Dennis about three
8  weeks ago.
9      Q.   Did you call him or did he
10 call you, or did y'all see each other or
11 what?
12     A.   My grandmother is bedridden,
13 she lives with my mother.  I went to see my
14 grandmother, and he was there.
15     Q.   Okay.  Where is your
16 grandmother at?
17     A.   Montgomery.
18     Q.   Is he the one that works for
19 Phenix City Police Department?
20     A.   Yes.
21     Q.   Do you know how long he's
22 worked for them?
23     A.   Probably seven or eight years.

Page 12

1      Q.   What are your two half
2  sisters' names?
3      A.   Brandy Barnette and Denise
4  Green.
5      Q.   And where do they live?
6      A.   Brandy -- I think Brandy lives
7  in Macon, Georgia.
8      Q.   Okay.
9      A.   And my sister lives in Phenix
10 City.
11     Q.   Would that be Denise Green?
12     A.   Yeah.
13     Q.   And how old is Denise?
14     A.   Probably about thirty-eight, I
15 guess.
16     Q.   Now, your half brother, what's
17 his name?
18     A.   Sir?
19     Q.   Your half brother.
20     A.   Dennis Green.
21     Q.   Oh, that's your half brother?
22     A.   Yes, sir.
23     Q.   Okay.  Do you have another

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 13

1  brother?
2      A.   Just one.
3      Q.   Okay. So, one half brother. 
4  Did you mention two half sisters?
5      A.   Two half sisters.
6      Q.   Okay. Have you ever been 
7  arrested before?
8      A.   Yes, sir.
9      Q.   Okay. When was that?
10     A.   Six, seven, eight years ago.
11     Q.   And what was that for?
12     A.   Domestic violence.
13     Q.   And who arrested you?
14     A.   Russell County.
15     Q.   Russell County Sheriff's 
16 Department?
17     A.   Yes, sir.
18     Q.   And what came of that charge?
19     A.   It was dismissed.
20     Q.   Was that on condition that you 
21 go to counseling?
22     A.   Yes, sir.
23     Q.   Have you been arrested any

Page 14

1  other times?
2      A.   No, sir.
3      Q.   Now, on February 10th, what 
4  was the first time that you remember being 
5  contacted about something going on at your 
6  house on February 10, 2005?
7      A.   About 12:30, one o'clock.
8      Q.   And who called you? Or did 
9  someone call you?
10     A.   Lisa called me.
11     Q.   Okay. Did she call you on 
12 your cell phone?
13     A.   Yes, sir.
14     Q.   And what did she say?
15     A.   She told me that the police 
16 had broke into the house, looking for her 
17 brother.
18     Q.   And that would be Kenny 
19 Thrower?
20     A.   Yes, sir.
21     Q.   What else did she say?
22     A.   Well, it took me three or four 
23 minutes to get her to quit crying to where I

Page 15

1  could understand what she was talking about. 
2           She said that they knocked the 
3  front door -- they knocked the door frame 
4  off the front door. She said that there was 
5  glass everywhere. She said that they had 
6  burnt the carpet.
7           I asked her if he was there. 
8  She said he wasn't there. She told me that 
9  he was down at El Vaquero's, eating with his 
10 mama. That was pretty much it. It was -- 
11 The first conversation was short.
12     Q.   You don't remember anything 
13 else?
14     A.   No, sir. Not that -- Not that 
15 I can remember.
16     Q.   Okay. What was your next 
17 contact with anybody about the incident that 
18 happened on February 10, 2005?
19     A.   After I got off the phone with 
20 her, I called my brother. She did tell me 
21 that it was -- that the SWAT team come in 
22 the house. She did tell me that it was 
23 Phenix City. I called my brother, and --

Page 16

1  Can I cuss?
2      Q.   Go right ahead.
3      A.   I asked him what the F was 
4  going on. I know he's been into the SWAT 
5  team heavy for years. I know he used to be 
6  one of the first people in the door. He 
7  loved it. He told me that he didn't know, 
8  he was in Montgomery at school. He'd make a 
9  couple of phone calls and try to find out. 
10 I was pretty much in the blind.
11          I think -- It was a pretty 
12 short conversation. And that's pretty much 
13 all I asked him. He said he'd call me back.
14     Q.   And when did he call you back?
15     A.   I think I called him back 
16 before he called me back, I think.
17     Q.   And when did you call him 
18 back?
19     A.   Probably five or ten minutes 
20 later.
21     Q.   Okay. What did y'all talk 
22 about then?
23     A.   He said that all he knew was

4 (Pages 13 to 16)

**FREEDOM COURT REPORTING**

Page 49

1    A.   No. I think it -- I don't
2  think I went back to Atlanta.
3    Q.   Okay. Where do you think you
4  went?
5    A.   If I did go to work, it was in
6  Columbus, at our office. I just don't
7  remember being home.
8    Q.   Where do you work?
9    A.   All Crane.
10   Q.   Is that where you worked at
11 the time? Is that where you worked in
12 February of 2005?
13   A.   I'm thinking. February of
14 2005, February 2006. Yes, sir, I worked for
15 All Crane then.
16   Q.   When did you start to work for
17 All Crane?
18   A.   January the 3rd of 2005.
19   Q.   Where are they located?
20   A.   On Milgen Road in Columbus.
21   Q.   What do you do for them?
22   A.   I'm shop manager and crane
23 operator.

Page 50

1    Q.   So, you think you might have
2  gone out on some type of work project on
3  Saturday?
4    A.   No. I'd have been piddling
5  around the shop.
6    Q.   Okay. You would have gone
7  into Columbus?
8    A.   Yes, sir. I just don't
9  remember being home on that Saturday.
10   Q.   Okay. What time did you get
11 back home on Saturday -- Excuse me. Do you
12 know about what time you left for work on
13 Saturday?
14   A.   No.
15   Q.   Do you know about what time
16 you got home?
17   A.   I know we went and picked the
18 four-wheelers up about six or six-thirty.
19 And I got home right around dark with them.
20   Q.   And you got home about dark?
21   A.   Yes, sir.
22   Q.   Do you remember talking with
23 anybody while you were at work about this

Page 51

1  incident?
2    A.   No, sir.
3    Q.   How about before you left for
4  work on Saturday?
5    A.   No, sir.
6    Q.   Okay. How about when you came
7  home, but before you went to the sheriff's
8  office?
9    A.   No, sir. I haven't talked to
10 anybody about this.
11   Q.   Did you talk with -- Excuse
12 me. Did you go to the sheriff's office to
13 pick up the ATVs?
14   A.   Yes, sir.
15   Q.   Did you talk to anybody before
16 you went out there to pick them up?
17   A.   No, sir. My wife did.
18   Q.   Did she tell you she talked to
19 somebody?
20   A.   Uh-huh.
21   Q.   What did she say?
22   A.   I think she said that she had
23 called Heath and he said that we could come

Page 52

1  pick them up.
2    Q.   Did y'all arrange a time to
3  come?
4    A.   Yes, sir.
5    Q.   And what happened when you got
6  there to the sheriff's office at about six
7  or six-thirty?
8    A.   We knocked on the door of the
9  sheriff's department. Mr. Taylor opened the
10 door. We went into his office and we talked
11 for a little while.
12   Q.   Okay. What did you talk
13 about?
14   A.   We talked about the
15 four-wheelers. He said that he thought the
16 red one was stolen but he couldn't prove it.
17 He couldn't get anything back on his
18 computer about it.
19   Q.   Now, the red one, was that the
20 Honda?
21   A.   Yes, sir. The Honda 250.
22   Q.   The one with the ignition
23 switch that was missing?

13 (Pages 49 to 52)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 53

```
 1    A.   Uh-huh.
 2         MR. NELMS:  Is that a yes?
 3    A.   Yes, sir.
 4    Q.   Okay.  What else did he say?
 5    A.   This is a -- This is a invoice
 6  of the parts that I ordered for this
 7  four-wheeler before this incident took
 8  place.  Its invoice date was the day that it
 9  happened.  So I had to have ordered the
10  parts before this date happened.  I took the
11  ignition switch out of this four-wheeler to
12  order the parts.
13         I didn't pick the parts up on
14  that date.  I picked the parts up I think
15  about a week later, after the 10th.  But the
16  man I ordered them from -- I order a lot of
17  parts because I've got three four-wheelers,
18  or I had two at the time.
19         The man that I buy my parts
20  from, when the parts come in, he'll usually
21  put that piece of paper and all my parts in
22  a box and just set them to the side of the
23  counter, and he'll call me and tell me to
```

Page 54

```
 1  come get them.
 2         MR. WEBB:  Andy, would you
 3  like me to make a copy of this before I mark
 4  it?
 5         MR. MCKOON:  I'll make a
 6  couple of them.
 7    Q.   Do you have any other
 8  documents that you brought with you today?
 9    A.   Yes, sir.
10    Q.   What other documents did you
11  bring?
12    A.   This is the receipt that Heath
13  gave me when I picked the four-wheelers up.
14  And the other one was the one you asked for
15  yesterday about the carpet.
16    Q.   Now, let's get back to the
17  conversation you had with Lieutenant Taylor.
18  You mentioned that he mentioned that he
19  thought the red Honda, the one with the
20  missing ignition switch, might be stolen,
21  but he just wasn't -- he couldn't find out
22  that it was?
23    A.   Yeah.  He couldn't prove that
```

Page 55

```
 1  it was stolen.
 2    Q.   Okay.  Did he tell you
 3  anything else?
 4    A.   We talked about the house and
 5  about the damage to the house.  He said that
 6  he would -- he would replace a section of
 7  the carpet in the middle of my living room,
 8  but he wouldn't replace the whole carpet.
 9         The carpet in my house was a
10  couple of years old, and there is no way you
11  can match up a carpet with a square in the
12  middle of your living room.
13    Q.   Did he tell you anything else?
14    A.   I asked him -- I asked him why
15  he -- We got to talking about the house, and
16  he asked me -- or I asked him -- I can't
17  remember exactly how I asked him.  I asked
18  him if he had a search warrant, and he told
19  me no, that he didn't need one; that he had
20  probable cause to come into the house.
21         I'm trying to think of what we
22  said in his office.  I asked him how come --
23  I asked him where -- I don't remember
```

Page 56

```
 1  exactly how I asked him, how he got the
 2  information or something.
 3         And he told me that the
 4  Columbus Police Department had called him
 5  and told him that they had a warrant on
 6  Kenny.  And he told me that he had the
 7  Phenix City SWAT team in his office at the
 8  time the Columbus Police Department called,
 9  because he had been serving warrants that
10  morning.
11         And he said that he had asked
12  the guy from Columbus if he needed to take a
13  SWAT team to my house to get him or not, and
14  I don't think the Columbus officer gave him
15  an answer.  I think the way he presented it
16  to me was, it was his discretion.
17         That's pretty much all we
18  talked about at his office.  It was, I
19  guess, about a ten- or fifteen-minute
20  conversation.
21    Q.   Did you say anything else?
22    A.   No, sir.  Not that I can
23  remember.  We just talked general back and
```

14 (Pages 53 to 56)

Page 65

1  incident happened.
2  Q. How did you take out the
3  ignition switch?
4  A. Reached under it and pushed
5  the two little plastic tabs and popped it
6  out.
7  Q. And then you unhooked the
8  wires?
9  A. Yeah. They just got
10 terminals. You just unplug them.
11 Q. So, the wires were hanging
12 out?
13 A. They were hanging under the
14 fender.
15 Q. And when did you say you
16 ordered these parts?
17 A. About two weeks before that
18 date. A week to two weeks before that date.
19 Q. When did you get the ignition
20 switch part in?
21 A. I could not tell you.
22        (Defendant's Exhibit 13
23         was marked for

Page 66

1           identification purposes.)
2  Q. I'm going to hand you what has
3  been marked as Defendant's Exhibit 13.
4  Would you please identify this.
5  A. It's a receipt from Rusty's
6  Floor Covering, where I had the carpet in my
7  house replaced.
8  Q. When did you get this receipt
9  -- When did you get this estimate? Is this
10 an estimate or a receipt?
11 A. I don't know. It's a receipt.
12 Q. Okay. Did you actually pay
13 them this amount, then?
14 A. Yes.
15 Q. Okay. When was this work
16 done?
17 A. I don't know.
18 Q. Was it done in February,
19 March, April of 2005?
20 A. Probably around the first of
21 March.
22 Q. And when did you get an
23 estimate from Rusty's Floor Covering?

Page 67

1  A. A week or so before that. He
2  come out and gave us an estimate, and come
3  out the next week and put it in.
4  Q. And how much of the house was
5  recarpeted?
6  A. The living room.
7  Q. And that's it, just the living
8  room?
9  A. Yes, sir.
10 Q. How big is the living room?
11 A. Twenty-seven feet by thirteen
12 feet. It's an L shape, and probably
13 eighteen foot.
14 Q. Now, when did you submit an
15 insurance claim on this?
16 A. I couldn't tell you the date.
17 I looked for the receipt last night, and I
18 can't find it.
19 Q. Who is your homeowners
20 insurance with?
21 A. You'd have to ask my wife. I
22 think it's Liberty Mutual.
23 Q. And do you remember how much

Page 68

1  you received from Liberty Mutual?
2  A. The check was, I think,
3  fifty-two hundred dollars, and I think the
4  total was around seventy-five hundred, minus
5  the depreciation. I got a check for
6  fifty-two hundred.
7  Q. Who is your agent?
8  A. I don't know.
9  Q. Did you talk with anybody at
10 Liberty Mutual about the homeowners claim?
11 A. Yeah. But I couldn't tell you
12 his name right now.
13 Q. Did you receive any other
14 estimates on the carpeting, besides Rusty's
15 Floor Covering?
16 A. No, sir.
17 Q. What was the next thing you
18 remember that happened with regard to any of
19 this incident? Did you -- Who did you talk
20 to next about it?
21 A. I ain't talked to nobody.
22 Q. Okay. Did you talk with
23 anybody -- Have you talked with anybody at

17 (Pages 65 to 68)

Page 73

```
1   for that yourself?
2       A.    No, sir.  My insurance company
3   paid for that.
4       Q.    Who was that?
5       A.    I think it was Liberty Mutual.
6       Q.    Liberty Mutual.  Okay.  So,
7   you made a claim with them for that?
8       A.    Yes, sir.
9       Q.    And they paid for it?
10      A.    Yes, sir.
11      Q.    All right.  And that's been
12  done?
13      A.    Yes, sir.
14      Q.    Are you asking that you be
15  paid for that again in this case, as far as
16  the carpet goes?
17      A.    No, sir.
18      Q.    All right.  So maybe that was
19  the confusion about that.  Is there any
20  other items of personal property that you
21  lost that were inside the house, that were
22  either damaged or damaged to the extent that
23  they were made worthless, that you're
```

Page 74

```
1   claiming?
2       A.    I made a claim to the
3   insurance company for all the damages that
4   was in the house.
5       Q.    Okay.  Did they pay you for
6   all of them?
7       A.    No, sir.  They paid me, like I
8   said, a check of about fifty-two hundred
9   dollars.
10      Q.    Okay.
11      A.    With the depreciation, which
12  was around seventy-five hundred --
13  seventy-five hundred with a depreciation --
14      Q.    Are you saying the total
15  amount of damage, then, was, like, twelve
16  thousand?
17      A.    No, sir.
18      Q.    Okay.  What are you saying?
19      A.    Seven thousand, five hundred
20  was the total damage.
21      Q.    Okay.  Seventy-five hundred
22  dollars.  But after depreciation, they paid
23  you fifty-two hundred dollars?
```

Page 75

```
1       A.    Yes, sir.
2       Q.    Is that what you're saying?
3       A.    Yes, sir.
4       Q.    All right.  Did you -- When
5   you made that claim, who did you make it
6   with?  In other words, was it an agent or
7   somebody you made the claim with?
8       A.    Yes, sir.  There was a guy
9   that come to my house, but I don't know his
10  name right off hand right this minute.
11      Q.    I don't know if this has been
12  asked or not.  If it has, I apologize.  Do
13  you have copies of any of the claim forms?
14  Did you keep a file on any of that yourself
15  at your home?
16      A.    I gave everything that I had
17  to Mr. Nelms.
18          MR. MCKOON:  Andy, do you have
19  that stuff?
20          MR. NELMS:  No.
21          MR. MCKOON:  You don't have
22  that?
23          MR. NELMS:  Not anything from
```

Page 76

```
1   claims against the insurance and claims on
2   insurance, the payments from insurance
3   companies, of course, I do not have.
4           MR. MCKOON:  You don't have
5   any of that stuff?
6           MR. NELMS:  No.
7       Q.    So, where could we get it?
8   That's what I'm asking.  Who is your
9   insurance agent that you bought your Liberty
10  Mutual homeowners policy from, if that's who
11  it's with?
12      A.    I couldn't tell you right
13  offhand this minute.
14      Q.    Does your wife handle that?
15      A.    Uh-huh.
16      Q.    Okay.  Do you have a mortgage
17  on your home?
18      A.    Yes, sir.
19      Q.    Who is it with?
20      A.    I think it's -- I think it's
21  Brinks Home -- It's one of those.
22          MR. MCKOON:  Let me do it this
23  way.  Maybe this will make this short.
```

19 (Pages 73 to 76)

Page 89

1    a lawsuit, I'm not talking about a letter,
2    I'm talking about like you personally making
3    a phone call or having any personal
4    communication with those people?
5         A.    No, sir.
6         Q.    All right. Where is your
7    brother-in-law now, the one they were
8    looking for?
9         A.    He's in prison.
10        Q.    He's in prison?
11        A.    Yes.
12        Q.    Do you know what he's in
13   prison for?
14        A.    Child molestation.
15        Q.    Is he -- Tell me how he's your
16   brother-in-law. In other words, whose
17   brother is he?
18        A.    Not by choice.
19        Q.    I understand that. A lot of
20   us are like that. But, I mean, who is he
21   related to?
22        A.    He's my wife's brother.
23        Q.    Your wife's brother. After

Page 90

1    this incident occurred, I assume you talked
2    to your wife and the other people that were
3    in the house there. Did any of them tell
4    you that they were able to tell the police
5    at the time they came in -- the police came
6    into the house, did any of those folks that
7    were there tell you they were able to tell
8    the police the location of your
9    brother-in-law?
10        A.    My wife did.
11        Q.    Okay. And do you know how it
12   was that she knew where he was?
13        A.    Yes, sir.
14        Q.    How was that?
15        A.    Kenny had come to my house
16   that morning --
17        Q.    Let me stop you just a minute.
18   A minute ago you told me you didn't think
19   he'd been there in a year. So you didn't
20   know he had been there that morning, is what
21   you're saying?
22        A.    No. I didn't know he was
23   there.

Page 91

1         Q.    Okay.
2         A.    I had left at five o'clock,
3    going to Atlanta.
4         Q.    So, when he came to your house
5    that morning, that was after you had left
6    the house?
7         A.    Uh-huh.
8         Q.    All right. Go ahead from
9    there.
10        A.    Can you tell me what your
11   question was again?
12        Q.    That's a good question. My
13   question was how did -- I started out by
14   asking, "Did anybody at your home tell you
15   that they were able to tell the police where
16   your brother-in-law was?" You said, "Yes,
17   my wife did." And then I said, "How did she
18   know?" You started to say, "He come by my
19   house that morning."
20        A.    Yes, sir. He had went to his
21   mother's house and she wasn't home. She had
22   went to the doctor. My wife called him up
23   to the house. They had carried on a

Page 92

1    conversation for an hour or two, couple of
2    hours.
3         Q.    So, to your knowledge, then,
4    he had physically been present at your house
5    for about two hours previous to the police
6    arriving?
7         A.    Yes, sir.
8         Q.    Okay. Go ahead.
9         A.    And there wasn't a warrant on
10   him at that time either.
11        Q.    Okay. I didn't say anything
12   about whether there was a warrant on him at
13   the time, I just wanted to know where he
14   was. How did you know there was not a
15   warrant on him at that time?
16        A.    Because Mr. Taylor told me so.
17        Q.    Told you that later?
18        A.    Yes, sir.
19        Q.    Oh, okay. All right. Well,
20   go ahead. He came over to your wife's house
21   and -- or your house and had a visit with
22   your wife about two hours earlier that day.
23   Do you know about what time of the day it

23 (Pages 89 to 92)