IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LISA BARNETTE, et al.,            )
                                  )
        Plaintiffs,               )
                                  )
v.                                )          Civil Action No. 3:05-cv-473-DRB
                                  )
PHENIX CITY, ALABAMA, et al.,     )
                                  )
        Defendants.               )

DEFENDANTS HEATH TAYLOR AND GROVER GOODRICH'S
REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ ii

FACTS ........................................................................................................................ 2

ARGUMENT .............................................................................................................. 8

I.    LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH DID NOT
VIOLATE ANY OF THE PLAINTIFFS' FEDERALLY PROTECTED RIGHTS. ......... 8

    A.    The Warrantless Entry Into the Barnette Residence Was Lawful Due to
Exigent Circumstances.................................................................................... 9

    B.    The Existence of an Arrest Warrant for Kenny Thrower Is Irrelevant;
Nevertheless, Such a Warrant Was Obtained Prior to the Entry and Search........ 12

    C.    The Search Was Conducted Within Minutes After Kenny Thrower's
Departure; Nevertheless, the Time of Kenny Thrower's Departure from
the Barnette Residence Is Irrelevant. ............................................................. 13

    D.    Lieutenant Taylor and Investigator Goodrich Did Not Use Excessive
Force During the Entry and Search.................................................................. 17

        **1.**    The Degree of Force Used on the Plaintiffs Was Justified Under
the Circumstances. ...................................................................... 18

        **2.**    The Plaintiffs' Injuries were *de minimis*. ................................... 22

    E.    The Temporary Seizure of the Plaintiffs' ATVs Was Lawful............................ 24

II.    NO CLEARLY ESTABLISHED LAW PROVIDED FAIR WARNING TO
LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH THAT THEIR
CONDUCT WAS UNLAWFUL. ................................................................................. 29

CONCLUSION.......................................................................................................... 30

CERTIFICATE OF SERVICE ................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

Anderson v. Creighton, 483 U.S. 635 (1987). ............................................... 9, 16, 29, 30

Anderson v. U.S., 107 F. Supp. 2d 191 (E.D. N.Y. 2000) ............................................ 19

Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912 (9th Cir. 2001). ............................. 23

Bennett v. Parker, 898 F.2d 1530 (11th Cir. 1990). ............................................. 23

Bing v. City of Whitehall, Ohio, 456 F.3d 555 (6th Cir. 2006) ........................................ 21

Courson v. McMillian, 939 F.2d at 1479 (11th Cir. 1991) .......................................... 20

Crosby v. Monroe County, 394 F.3d 1328 (11th Cir. 2004). ...................................... 17

Florida v. Royer, 460 U.S. 491 (1983). ....................................................... 20

Graham v. Connor, 490 U.S. 386 (1989). ................................................. 17, 20

Hernandez v. Conde, 442 F. Supp. 2d 1141 (D. Kan. 2006). ..................................... 20

Jackson v. Sauls, 206 F.3d 1156 (11th Cir. 2000). ........................................... 20

Kirk v. Watkins, 182 F.3d 932 (10th Cir. 1999) ............................................. 20

Minnesota v. Olson, 495 U.S. 91 (1990). ................................................... 10

Muehler v. Mena, 544 U.S. 93 (2005). ................................................. 18, 19

Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000). ............................................. 22

Saucier v. Katz, 533 U.S. 194 (2001). ..................................................... 30

Storck v. City of Coral Springs, 354 F.3d 1307 (11th Cir. 2003) (citations omitted). ...................... 29

Taylor v. City of Middletown, 436 F. Supp. 2d 377 (D. Conn. 2006). ................................. 21

Thompson v. City of Lawrence, 58 F.3d 1511 (10th Cir. 1995) .................................... 19

U.S. v. Aldridge, 719 F.2d 368 (11th Cir. 1983) ............................................. 20

U.S. v. Burgos, 720 F.2d at 1526 (11th Cir. 1983). ....................................... 10, 11

U.S. v. Jacobs, 715 1343 (9th Cir. 1983). .................................................. 20

U.S. v. Jones, 214 F.3d 836 (7th Cir. 2000). ................................................ 21

U.S. v. Kingsley, No. 97-40095-01-RDR, 1998 WL 295577, *1 (D. Kan. May 21, 1998). ................. 22

U.S. v. Merritt, 695 F.2d 1263 (10th Cir. 1982). ............................................. 20

U.S. v. Myers, 106 F.3d 936 (10th Cir. 1997). .............................................. 20

U.S. v. Rojas, 671 F.2d 159 (5th Cir. 1982) ................................................ 11

U.S. v. Roper, 702 F.2d 984 (11th Cir. 1983) ............................................... 20

U.S. v. Taylor, 716 F.2d 701 (9th Cir. 1983) ............................................... 20

U.S. v. Virden, No. 06-12279, 2007 WL 1672331 at *2-3 (11th Cir. June 12, 2007). .... 26, 27, 28

Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002). .......................................... 29

Willingham v. Loughnan, 321 F.3d 1299 (11th Cir. 2003). ...................................... 29

**Statutes**

42 U.S.C. § 1983 .......................................................................... 25

42 U.S.C. § 1985(3) ....................................................................... 24

42 U.S.C. § 1986 .......................................................................... 24

Ala. Code (1975) § 13A-10-41 ............................................................. 11

Ala. Code (1975) § 15-10-3(a)(2),(3),(4) and (5). ............................................ 12

O.C.G.A. (2006) § 16-10-24. .............................................................. 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| LISA BARNETTE, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 3:05-cv-473-DRB** |
| | ) | |
| PHENIX CITY, ALABAMA, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS HEATH TAYLOR AND GROVER GOODRICH'S
REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Lieutenant Heath Taylor (hereafter, "Lieutenant Taylor") and Investigator Grover Goodrich (hereafter, "Investigator Goodrich") (collectively, the "Defendants"), and submit this Reply Brief in support of their Motion for Summary Judgment.

1.     The only remaining claims in this action are 42 U.S.C. § 1983 claims for unlawful search and seizure and excessive force related to the Defendants' attempts to apprehend fugitive Kenneth Thrower on February 10, 2005.

2.     The Defendants are immune from liability in this action under the doctrine of qualified immunity because (a) Lieutenant Taylor and Investigator Goodrich acted within their discretionary authority; (b) Lieutenant Taylor and Investigator Goodrich did not violate any of the Plaintiffs' federally protected rights; and (c) no clearly established law provided fair warning to Lieutenant Taylor and Investigator Goodrich that their conduct was unlawful.

3.     Specifically, the warrantless entry into the Barnette residence was lawful due to the presence of exigent circumstances.

4.      Lieutenant Taylor and Investigator Goodrich did not use excessive force during the entry and search because:

- These Defendants did not exercise any force against the Plaintiffs;

- The degree of force used on the Plaintiffs was justified under the circumstances; and

- The Plaintiffs' injuries were *de minimis*.

## FACTS

Defendants adopt the Facts set forth in their original Brief in Support of Their Motion for Summary Judgment.  In addition, Defendants submit the following facts in reply to the Plaintiffs' Response to Defendants Heath Taylor and Grover Goodrich's Motion for Summary Judgment (hereafter, the "Response"):[1]

During the search of the Plaintiff's residence, Lieutenant Taylor was informed by an officer that, during the search of an outbuilding, a red Honda four-wheeler was discovered with the ignition "popped" out (i.e. missing).  (Affidavit of Heath Taylor, attached to Defendants' Motion for Summary Judgment as Exhibit C (hereafter, "Taylor Aff."), at ¶ 10.)  Due to his training and experience as a law enforcement officer and as an investigator, Lieutenant Taylor recognized this as a significant indication that the four-wheeler had been stolen.  Id.  For reasons set forth below, he made a mental note to follow up on this information.  Id.

Russell County continuously battles the theft of four-wheeler vehicles.  (Taylor Aff. at ¶ 15; Affidavit of Grover Goodrich, attached to Defendants' Motion for Summary Judgment as Exhibit D (hereafter, "Goodrich Aff."), at ¶ 7.)  These thefts increase during hunting season because four-wheelers are used extensively by hunters, making them both more desirable and readily available,

---

[1] These additional facts are included herein out of an abundance of caution, and in response to Plaintiffs' Statement of Material Facts.  However, as set forth below, Defendants contend that this Court has already dismissed all claims related to these particular facts, and therefore they are irrelevant to the remaining claims.

and thus easier to steal and sell.  Id.  The area along Highway 80 is especially susceptible to these particular thefts.  Id.  In 2005 the rash of four-wheeler thefts was even worse than usual.  Id.  All investigators, regardless of their particular area of expertise, had been tasked with investigating four-wheeler theft cases in addition to their regular cases.  Id.  The Russell County Sheriff's Department had even posted deputies along Highway 80 with instructions to stop every vehicle towing or carrying a four-wheeler and require proof of ownership.  Id.

Because of the foregoing problem of four-wheeler theft, the discovery of a four-wheeler with a "popped" ignition was significant to Lieutenant Taylor and Investigator Goodrich. (Goodrich Aff. at ¶ 16.)  Therefore, after the arrest of Mr. Thrower, they returned to the Barnette residence in Lieutenant Taylor's car to follow up on that discovery.  (Id.; Goodrich Aff. at ¶ 8.) When they arrived at the residence, an employee of the Russell County Sheriff's Department, along with Russell County Jail inmates, were already present, securing the Barnettes' front door due to the damage caused by the SWAT entry.[2]  Id.  Because the front door was temporarily secured in a fashion that did not permit it to open, the Defendants approached the back door, and Lieutenant Taylor announced himself to Ms. Barnette.  Id.

After re-introducing themselves, Lieutenant Taylor informed Ms. Barnette that Mr. Thrower had been arrested without incident or injury.  (Taylor Aff. at ¶ 17; Goodrich Aff. at ¶ 9.)  He then explained to her about the problem they had been having with four-wheeler thefts, and informed her that she possessed a four-wheeler that appeared to be stolen because of the "popped" ignition.  (Id.; L. Barnette Depo. at 58:9-13; 59:10-13; 65:3-6; 174:14-20; C.B. Barnette Depo. at 41:4-8; 42:10-

---

[2] Richard McKenzie, an employee of the Russell County Sheriff's Department, and two county inmates arrived at the Barnette residence within approximately forty-five (45) minutes after the SWAT team left to begin assessing and repairing the damage.  (L. Barnette Depo. at 52:13 – 53:14; C.B. Barnette Depo. at 53:3 – 54:12.)  Mr. McKenzie temporarily secured the front door and bought a new door that day (Thursday, February 10), and installed the new door the following day (Friday, February 11).  (Id. at 53:15 – 55:17; 69:1-21; C.B. Barnette Depo. at 54:5 – 55:18.) Mr. McKenzie and the inmates also replaced the Barnettes' storm door doorknob and fixed the door frame.  Id. at 69:6-21.

18; J. Barnette Depo. at 38:23-39:2.)  She informed them that the ignition on that vehicle had been broken out when they bought it.  (Taylor Aff. at ¶ 17; Goodrich Aff. at ¶ 9.)  He asked her if she had a bill of sale for that vehicle, and she indicated that she did.  Id.  At that point Ms. Barnette called her husband, Plaintiff Jerry Barnette (hereafter, "Mr. Barnette"), to inquire about the purchase of that four-wheeler, and to ask him where the bill of sale was.  Id.  However, upon searching, she was unable to locate a bill of sale for that vehicle.[3]  (Id.; J. Barnette Depo. at 29:6-11; 30:16-19.)  She did produce a bill of sale for one four-wheeler, but it was not the vehicle with the "popped" ignition, and it did not contain a VIN number.  (Taylor Aff. at ¶ 17; Goodrich Aff. at ¶ 9; L. Barnette Depo. at 59:14 – 60:8; 95:12-15; 186:23 – 188:4; 203:21 – 204:4; J. Barnette Depo. at 28:7-22.) Lieutenant Taylor suggested that she may have bought a stolen four-wheeler, and explained that she would not necessarily be arrested for that, but that his main concern was getting any potentially stolen property back to its rightful owner.  (Taylor Aff. at ¶ 17; Goodrich Aff. at ¶ 9.)  Ms. Barnette adamantly indicated that she did not want to own a stolen vehicle.  (Id.; L. Barnette Depo. at 61:11-20.)

Lieutenant Taylor asked Ms. Barnette if they could inspect her four-wheeler and check the Vehicle Identification Number (VIN) against a stolen vehicle database.  (Taylor Aff. at ¶ 18; Goodrich Aff. at ¶ 10.)  She gave her consent, and they proceeded to the outbuildings in the back yard of the property.  Id.  Lieutenant Taylor did not have any "consent to search" forms in his car for Ms. Barnette to sign.[4]  (Taylor Aff. at ¶ 19.)  However, both he and Investigator Goodrich believed that Ms. Barnette was giving her consent to search freely and without coercion.  (Id.;

---

[3] The Plaintiffs subsequently produced a bill of sale for that four-wheeler, but the bill of sale they produced was dated March 14, 2005 – over a month after the incident forming the basis of this lawsuit.  (L. Barnette Depo. at 87:7 – 88:6; 183:19 – 184:4; J. Barnette Depo. at 30:23 – 31:9.)

[4] Such forms are not required by law, but are merely used as additional evidence that consent was given.

Goodrich Aff. at ¶ 11.)  Had they believed otherwise, they would have obtained a search warrant as required by law.  (Taylor Aff. at ¶ 19.)

The four-wheeler with the "popped" ignition was located in an unlocked storage shed. (Taylor Aff. at ¶ 20; Goodrich Aff. at ¶ 12.)  The Defendants also observed a padlocked garage-type building with two four-wheelers visible from a window, and they asked Ms. Barnette if they could enter that building and inspect those vehicles.  Id.  Ms. Barnette consented and, after some searching, provided the key to the building.  (Id.; C.B. Barnette Depo. at 43:10 − 45:13.)  Again, Ms. Barnette's consent appeared to be freely given.  (Taylor Aff. at ¶ 20; Goodrich Aff. at ¶ 12.) Ms. Barnette informed them that she and/or her husband had bought one of those two vehicles new, and that they did not own the other, but that it was a friend's vehicle that her husband was working on.  (Id.; L. Barnette Depo. at 201:4 − 202:9; J. Barnette Depo. at 27:10-14.)

The Defendants entered the garage and inspected the vehicles inside.  (Taylor Aff. at ¶ 21; Goodrich Aff. at ¶ 13.)  However, upon inspection of all three four-wheelers, they were unable to locate the VIN(s) on one or two of the vehicles.  Id.  Had they been able to locate the VINs for all three four-wheelers, they nevertheless would have been unable to call them in to the Sheriff's dispatch office to check them against a stolen vehicle database, due to the fact that their mobile radios were not transmitting or receiving a signal at that location.  Id.  Further, even had they been able to reach the dispatch office and check the computer, such a cursory check would have been insufficient.  Id.  Despite the fact that four-wheelers do have VINs, most owners do not record that information, and therefore do not have it when reporting their four-wheeler stolen.  Id. Consequently, reports of stolen four-wheelers are predominantly dependant on vehicle descriptions, such as color, decals, and identifying marks and scratches, rather than VIN numbers.  Id.  This information is not recorded in the stolen vehicle computer database, and must be checked manually when a stolen or potentially stolen vehicle is recovered.  Id.

At this time the Defendants had the following probable cause to believe that one or more of the four-wheelers was stolen: (a) one four-wheeler had a "popped" ignition; (b) Ms. Barnette could only produce a bill of sale for one of the four-wheelers, and that bill of sale did not contain a VIN number; and (c) Ms. Barnette had admitted that one of the four-wheelers did not belong to them. (Taylor Aff. at ¶ 22; Goodrich Aff. at ¶ 14.)  Because they could not locate the VINs on some of the vehicles, they could not radio in the VINs from the residence, and it was getting dark, Lieutenant Taylor asked Ms. Barnette if they could take the four-wheelers to the Sheriff's Department and check them there.  Id.  Upon advice from her father, she consented to this.  (Id.; L. Barnette Depo. at 76:1-3; 82:17 – 84:17; 175:23 – 176:2.)  She did not indicate that there was any sense of urgency to get the four-wheelers back.  (Taylor Aff. at ¶ 22; Goodrich Aff. at ¶ 14.)  Lieutenant Taylor specifically asked Ms. Barnette if she or her family were intending to use the four-wheelers, because he did not want to interfere with their plans or use of the vehicles.  Id.  She informed him that they did not intend to use the vehicles until the next weekend, when they intended to go camping.  (Id.; J. Barnette Depo. at 78:17 – 79:8.)  He asked her if her husband was in town, and if she wanted to call him to check.  (Taylor Aff. at ¶ 22; Goodrich Aff. at ¶ 14.)  He told her that she would be able to pick up the vehicles the next day (Friday, February 11).  (Id.; L. Barnette Depo. at 62:5-10; 66:12-19.)  However, she indicated that they would pick up the four-wheelers on Saturday.  (Taylor Aff. at ¶ 22; Goodrich Aff. at ¶ 14.)  Lieutenant Taylor gave Ms. Barnette a receipt for the three four-wheelers.  (L. Barnette Depo. at 60:19 – 61:4; 77:13 – 78:18; 176:7-21.)

Upon receiving consent from Ms. Barnette to take the four-wheelers, Lieutenant Taylor called Sheriff's Department employee Amanda Jenkins to meet them at the residence.  (Taylor Aff. at ¶ 23; Goodrich Aff. at ¶ 15.)  Ms. Jenkins is a Road Crew Supervisor and at the time was driving a Suburban sports utility vehicle and towed a trailer that the Defendants believed could carry all three four-wheelers.  (Id.; L. Barnette Depo. at 65:10-19.)  However, upon Ms Jenkins's arrival,

they determined that her trailer would only be able to carry one (1) four-wheeler.  (Taylor Aff. at ¶ 23; Goodrich Aff. at ¶ 12; L. Barnette Depo. at 179:6-19.)

The Defendants had observed a trailer parked on the Barnette property, and Lieutenant Taylor asked Ms. Barnette whether they could borrow that trailer to transport the four-wheelers.  (Taylor Aff. at ¶ 24; Goodrich Aff. at ¶ 16.)  Ms. Barnette called her husband and asked him if they could use the trailer to transport the four-wheelers to the Sheriff's Department.  Id.  She then indicated to the Defendants that they could use the trailer, and that it was no problem.  Id.

During their second visit to the Barnette residence to examine the suspicious four-wheeler, Ms. Barnette mentioned to Lieutenant Taylor that she was shocked and fearful during the entry into her home earlier that day.  (Taylor Aff. at ¶ 25)  However, she did not appear at that time to be suffering from any shock or fear.   (Id.; Goodrich Aff. at ¶ 18.)   In fact, during the entire investigation of the four-wheelers she appeared warm, friendly, talkative, smiling, cooperative and helpful.  Id. She did not appear to be nervous, intimidated or fearful.  Id.  Further, her son was also friendly and helpful.  Id.  He was playing, running around and smiling, and appeared to be happy and eager to assist the Defendants.  Id.  He approached the Defendants and talked with them without apparent fear, apprehension or intimidation.  Id.

The Defendants transported the four-wheelers to the Sheriff's Department, where they located and checked the VINs against the stolen vehicle database on Thursday night or Friday.  (Taylor Aff. at ¶ 26; Goodrich Aff. at ¶ 19.)  The check did not reveal that the vehicles were stolen.  Id.

At about six-thirty (6:30) Saturday evening, Jerry Barnette and Lisa Barnette met Lieutenant Taylor at the Sheriff's Department to pick up the four-wheelers.  (Taylor Aff. at ¶ 27; L. Barnette Depo. at 76:4-17; J. Barnette Depo. at 50:17-18.)  Lieutenant Taylor spoke to the Barnettes for about an hour, during which they asked him a number of questions concerning the entry into their

house, the arrest of Mr. Thrower, and the four-wheelers. (Taylor Aff. at ¶ 27; L. Barnette Depo. at 76:18-5; 78:19 – 80:20; J. Barnette Depo. at 52:5-11.) This conversation was very friendly and amiable. (Taylor Aff. at ¶ 27.) During that conversation, Lieutenant Taylor assured the Barnettes that their carpet would be fixed. (Id.; L. Barnette Depo. at 78:23 – 79:10; J. Barnette Depo. at 55:2-8.) By this time the Barnettes' front door had been replaced. (Taylor Aff. at ¶ 27.) Further, after discussing the reason for the SWAT entry into their house, Mr. Barnette commented to his wife that it was a reasonable operation, and that he would probably have done things the same way given what he now knew. Id. The Barnettes retrieved the four-wheelers and departed. (Id.; L. Barnette Depo. at 76:4-9; 80:21 – 81:1; 177:3-6.)

## ARGUMENT

As demonstrated herein, there are no disputed material facts, and Defendants are entitled to summary judgment as a matter of law due to the fact that the Defendants are immune from liability under the doctrine of qualified immunity. Specifically, the Plaintiffs have failed to establish a constitutional violation by Investigator Goodrich and Lieutenant Taylor.

## I. LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH DID NOT VIOLATE ANY OF THE PLAINTIFFS' FEDERALLY PROTECTED RIGHTS.

The Plaintiffs have alleged two violations of their federally protected rights under the Fourth Amendment to the United States Constitution: unlawful search and seizure, and excessive force. As set forth below, the Plaintiffs cannot meet their burden of showing that Lieutenant Taylor and Investigator Goodrich violated their Fourth Amendment rights. The warrantless entry and search of the home due to exigent circumstances was valid, and Lieutenant Taylor and Investigator Goodrich did not use excessive force.

A.    **The Warrantless Entry Into the Barnette Residence Was Lawful Due to Exigent Circumstances.**

As Plaintiffs have recognized, an officer will be entitled to qualified immunity if an objectively reasonable officer in the same situation could have believed that it was lawful to enter and search Plaintiffs' residence without a search warrant.[5]  (Response at 9-10.)  In support of this proposition, Plaintiffs properly cite Anderson v. Creighton, 483 U.S. 635 (1987).  In that case, the United States District Court for the District of Minnesota granted summary judgment for an agent of the Federal Bureau of Investigation who entered and searched the plaintiff's residence without a warrant.  The United States Court of Appeals for the Eighth Circuit reversed the grant of summary judgment.  On appeal, the United States Supreme Court vacated the Eighth Circuit ruling and remanded the case, stating the following:

> We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable.  See *Malley, supra*, 475 U.S., at 344-345, 106 S.Ct., at 1097-1098.  The same is true of their conclusions regarding exigent circumstances.
>
> ***It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials.*** . . . The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, ***in light of clearly established law and the information the searching officers possessed***.  Anderson's subjective beliefs about the search are irrelevant.

Anderson, 483 U.S. at 641 (emphases added).

In the case at bar, the Defendants[6] entered the Plaintiffs' house without a search warrant because  they reasonably believed  that the time required to obtain a  search warrant  would have

---

[5] In their Response, the Plaintiffs agreed that it is undisputed that the Defendants were acting within the course and scope of their discretionary authority.  (Response at 10.)

[6] "Defendants," as used in relation to the warrantless entry and search of the Plaintiffs' residence for Mr. Thrower,

allowed Mr. Thrower to escape.  The Defendants had information that Mr. Thrower was presently at the Plaintiffs' residence, but was only going to be at that location for a few minutes, and was imminently going to leave for destinations unknown, thereby eluding capture and arrest. The Defendants also had information that Mr. Thrower was armed, and further, that there were multiple weapons in the house.[7]  Inasmuch as the residence was not Mr. Thrower's abode, there was every reason for the Defendants to believe that there may be innocent bystanders inside the house who could become victims or hostages of Mr. Thrower if he chose to violently resist arrest.  All of the foregoing information turned out to be, in fact, true: Mr. Thrower was at the Plaintiffs' house for only a few minutes, and (unbeknownst to the Defendants) did indeed leave before the Defendants could even get inside the house without a search warrant; Mr. Thrower turned out to be armed, and multiple firearms were discovered in the house; and there were three innocent bystanders (the Plaintiffs) in the house.

The Eleventh Circuit Court of Appeals found exigent circumstances existed under similar circumstances in U.S. v. Burgos, where it stated:

> The [defendant ATF agents] were faced with a house laden with arms and an unknown number of people inside.  The officers could reasonably believe that the household was an arsenal.  The threat of injury to the neighborhood and arresting officers justified the avoidance of delay involved in obtaining a warrant.  Quick action increased the likelihood that no one would be injured. . . . Only by entering the house and searching for persons and weapons could the agents have control of all weapons which could be used against them or to effect an escape.  The societal costs of delay outweighed the social interest in resort to a neutral magistrate in this instance.  The exigencies of this situation made the warrantless entry lawful.

U.S. v. Burgos, 720 F.2d at 1526 (11th Cir. 1983).

Mr. Thrower had indicated to his wife that he would not permit the authorities to arrest him and take him to jail.  Compare, Minnesota v. Olson, 495 U.S. 91, 101 (1990) (holding that

---

refers to Lieutenant Taylor and the Phenix City defendants.  It is undisputed that Investigator Goodrich was not present during the initial entry and search.

no exigent circumstances existed to justify warrantless entry into a residence because the police had already recovered the suspect's weapon, there was no suggestion of danger to other residents of the house, and that there was no evidence that the suspect was going anywhere).  This indication was sufficient to justify the Defendants' concern that violence might ensue if Mr. Thrower was not arrested quickly.

Plaintiffs argue that Lieutenant Taylor and Investigator Goodrich relied on the arrest warrant to establish probable cause and legal authority to search the Plaintiffs' residence. (Response at 11, 12.)  This is only partially correct.  Lieutenant Taylor and Investigator Goodrich relied on the arrest warrant to establish probable cause to arrest Mr. Thrower.  They relied on the warrant, *along with Detective Wills's telephone calls and information that Mr. Thrower was at the Plaintiffs' residence*, to establish the probable cause necessary to search the property. Further, as Plaintiffs correctly point out, "[p]robable cause to search exists where the facts lead a reasonably cautious person to believe that the search will uncover evidence of a crime."  U.S. v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983) (quoting U.S. v. Rojas, 671 F.2d 159, 165 (5th Cir. 1982)).  Plaintiffs, however, go on to state that even given the presence of an arrest warrant for Mr. Thrower, searching the Plaintiffs' residence would not have uncovered evidence of a crime.  However, this is self-evidently untrue.  The presence of a criminal – in this case, the presence of Mr. Thrower, who was charged with Aggravated Child Molestation – was in itself evidence of a crime.  Further, it is undisputed that Mr. Thrower was aware of the warrant for his arrest and was fleeing arrest and prosecution.  In both Georgia and Alabama, it is illegal to attempt to evade or resist arrest.  Ala. Code (1975) § 13A-10-41; O.C.G.A. (2006) § 16-10-24.

---

[7] This information was accurate – Plaintiffs do not dispute that there were multiple handguns and long guns in the house.  Lieutenant Taylor, of course, had no way of knowing how or if those weapons were secured.

Again, Plaintiffs rely upon <u>Steagald v. U.S.</u>, 451 U.S. 204 (1981) to support their argument that the Defendants' search was unlawful. However, the Court in <u>Steagald</u> specifically recognized a caveat for exigent circumstances. <u>Id.</u> at 213.[8]

**B.    <u>The Existence of an Arrest Warrant for Kenny Thrower Is Irrelevant; Nevertheless, Such a Warrant Was Obtained Prior to the Entry and Search.</u>**

Plaintiffs make a great deal of fuss over the "disputed fact" concerning whether an arrest warrant was issued for Mr. Thrower prior to the incident forming the basis of their Complaint. (Plaintiffs' Supplement to Their Responses to Defendants' Motions for Summary Judgment.) As an initial matter, it is irrelevant whether an arrest warrant for Mr. Thrower existed at that time or not. The legality of the entry and search of the Plaintiffs' residence does not turn on whether a valid arrest warrant was issued at that time, but on whether a valid search warrant was issued for that residence and, if not, whether exigent circumstances existed to justify a warrantless entry and search.[9] Lieutenant Taylor and Investigator Goodrich have admitted that a search warrant <u>did not</u> exist, but have conclusively shown that exigent circumstances <u>did</u> exist to justify their warrantless entry and search.[10]

However, it is undisputed from all of the testimony on record that a valid arrest warrant did indeed exist at the time of the search. In opposition to the affidavit testimony of Lieutenant Taylor, Investigator Goodrich, and Detective Wills, Plaintiffs rely on the imperceptibly thin argument that a fax time stamp on Exhibit 1 to Detective Wills's affidavit (the Georgia arrest

---

[8] Plaintiffs cite the relevant passage in their Response. (Response at 13.)

[9] Searches by law enforcement officials occur on a daily basis without the existence of a valid *arrest* warrant at the time of the search.

[10] The Plaintiffs' "arrest warrant" argument is a red herring in any case. Under Alabama statutory law, an Alabama police officer may make an arrest without a warrant "when a felony has been committed, though not in the presence of the officer, by the person arrested; when a felony has been committed and the officer has reasonable cause to believe that the person arrested committed the felony; [or] when the officer has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed." Ala. Code (1975) § 15-10-3(a)(2),(3),(4) and (5). It is undisputed that Lieutenant Taylor and Investigator Goodrich reasonably believed, based on Detective Wills's information, that Mr. Thrower had committed a felony (aggravated child molestation).

warrant) is stamped 12:39 p.m.  Though it is impossible at this late date to positively state why the fax is stamped with that time, it takes very little technical expertise to understand that facsimile times are dependent on the clock on the facsimile machine being set correctly (and reset when the power goes out).  It is very possible that the clock on the Russell County fax machine was simply set incorrectly.  Or, perhaps the facsimile machine clock had never been set back from Daylight Savings Time, which would make it read an hour later (i.e. the true time would have been 11:39 a.m.).  Regardless, the facsimile time stamp is neither "genuine" nor "material"; the only testimony in the record as to the arrest warrant conclusively establishes that the arrest warrant was faxed to the Russell County Sheriff's Department and domesticated by Investigator Goodrich prior the instigation of the entry and search at the Plaintiffs' residence.

### C.    The Search Was Conducted Within Minutes After Kenny Thrower's Departure; Nevertheless, the Time of Kenny Thrower's Departure from the Barnette Residence Is Irrelevant.

Plaintiffs spend a great deal of time analyzing the time that Mr. Thrower was on the telephone to Ms. Thrower, the time that the arrest warrant was domesticated, and the time that the Defendants actually searched the house.  In other words, it is important to the Plaintiffs to establish that the Defendants entered their residence some significant amount of time after they were aware of Mr. Thrower's location at the Plaintiffs' residence.[11]  The crux of the Plaintiffs' argument is that, according to their statement of facts, Mr. Thrower only had one telephone conversation while at the Plaintiffs' residence, and that took place between 9:00 a.m. and 9:30 a.m.  (Response at 7, 13.)  Detective Wills and Lieutenant Taylor both testified that they knew Mr. Thrower was at the residence because Mrs. Thrower was at Detective Wills's office and on the telephone with Mr. Thrower at that moment, and that the caller identification feature identified the Plaintiffs' residence as Mr. Thrower's location. (Response at 13.)   Therefore,

according to the Plaintiffs, Lieutenant Taylor had to know that Mr. Thrower was at the Plaintiffs'

residence at least by 9:15 – three hours before the Defendants entered and searched the premises.

Id.  Plaintiffs argue that in those three hours the Defendants could have obtained a search

warrant.  Id. at 14.

The problem with the Plaintiffs' argument is that it ignores significant, and uncontested,

testimony by Plaintiff C.B. Barnette.  It is uncontested on the record that Mr. Thrower was at the

Barnette residence for at least an hour after C.B. Barnette got home from school at 10:45 a.m. –

well after the 9:00 or 9:30 telephone call the Plaintiffs rely on.  (L. Barnette Depo. at 29:15 –

30:4; 32:5 – 34:13.)  However, C.B. Barnette's testimony is that *after he got home from school,*

*he heard Mr. Thrower talking on the telephone*.

> Q.    Do you know if he was talking on the telephone at any time while you
>       were there?
>
> A.    I heard him talking to somebody on the phone.
>
> Q.    Do you know who that was?
>
> A.    No, sir.
>
> Q.    Do you know – How long were you there when you heard him talking on
>       the phone to somebody?
>
> A.    What do you mean?
>
> Q.    How long had you been there when you heard him talking on the phone
>       with somebody?
>
> A.    I just went to go get something to drink in the kitchen.
>
> Q.    Okay.  So, you were in your room, then you went to get something to
>       drink?
>
> A.    Yes, sir.
>
> Q.    That was before you went to Sara's room or was that –

---

[11] It is, of course, undisputed that Mr. Thrower was in fact at the Plaintiffs' house that morning.

A.      After.  I went into Sara's room and then I went to go get something to drink.

Q.      Okay.  And then when you went to get something to drink, that's when you overheard your Uncle Kenny talking to somebody on the telephone?

A.      Yes, sir.

. . .

Q.      So, let me just kind of get this back together.  You got home sometime around 10:30.  And after you made small talk with your uncle, you took a Tums, you went back to your room, laid down for about an hour and a half.  Then you went to Sara's room, and then while you were in Sara's room you got up to get something to drink; correct?

A.      Yes, sir.

Q.      And while you were getting something to drink, you overheard your Uncle Kenny talking on the telephone; is that correct?

A.      Yes, sir.

Q.      And he seemed both mad and sad at the same time?

A.      Yes, sir.

Q.      And then you went back to Sara's room?

A.      Yes, sir.

Q.      And then how long after that did you hear the door open or close?

A.      About ten minutes.

Q.      About ten minutes?

A.      Yes, sir.

Q.      Okay.  And then how long after that did you hear the loud noise?

A.      About twenty.

(C.B. Barnette Depo. at 20:19-24:5.)

15

According to Plaintiff C.B. Barnette's testimony, Mr. Thrower was on the telephone to somebody approximately thirty minutes prior to the Defendants' entry and search of the Barnette residence. This testimony is uncontested, and consistent with the testimony of Detective Wills and Defendant Lieutenant Taylor. This time line is also consistent with Defendant Investigator Goodrich's testimony regarding his efforts to domesticate the arrest warrant.[12]

Ultimately, like Plaintiffs' arrest warrant argument, the time line argument is a red herring. Assuming, for the sake of argument, that Mr. Thrower was not on the telephone with Ms. Thrower just prior to the entry – assuming, even (to stretch a point) that Detective Wills was blatantly lying to Lieutenant Taylor – it is clear and undisputed from the testimony on the record that Lieutenant Taylor reasonably *believed*, based on Ms. Thrower and Detective Wills's information, that Mr. Thrower was at the Plaintiffs' residence.[13] Clearly it was reasonable for Lieutenant Taylor to believe and rely on the real-time information provided by Detective Wills, a fellow law enforcement officer with several years of experience. As set forth in Anderson, examination of the information possessed by Lieutenant Taylor clearly indicates that a reasonable officer could have believed that a warrantless search would be lawful, in light of clearly established law and the information Lieutenant Taylor possessed.

The controlling case law makes it very clear that the Defendants' entry in to the Plaintiffs' house was reasonable under the exigent circumstances. Therefore, no constitutional violation occurred, and the Defendants are entitled to qualified immunity with regard to this claim.

---

[12] Plaintiffs speculate that instead of domesticating the arrest warrant the Defendants should have tried to get a search warrant. However, it is uncontested that the Defendants did not know at what address Mr. Thrower was until the last minute telephone call from Len Wills, and Lieutenant Taylor testified in his affidavit that it would have taken an hour or more to obtain a search warrant – an hour the Defendants did not believe they had. (Taylor Aff. at ¶¶ 5, 7.)

[13] Again, ultimately, it is undisputed that Mr. Thrower was, indeed, at the Plaintiffs' residence mere minutes prior to the Defendants' entry and search of the property.

**D.    Lieutenant Taylor and Investigator Goodrich Did Not Use Excessive Force During the Entry and Search.**

Plaintiffs boldly state that "[i]t is apodictic that the use of <u>any</u> force against a person who has not committed a crime is wrong and that any such force used is unreasonable and excessive." (Response at 16 (emphasis in original).)  However, that is not the law, and Plaintiffs offer no statute or judicial decision to support this incorrect conclusion.  In fact, the United States Supreme Court has held that "[n]ot every push or shove,[14] even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989) (citation omitted).  The proper legal standard was set forth extensively in Defendants' Brief In Support of Their Motion for Summary Judgment.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  <u>Id.</u> at 396-97.  The Eleventh Circuit has added "[w]e must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction would prove fatal."  <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1333-34 (11th Cir. 2004).

Plaintiffs make the further unsupported conclusion that "holding an innocent person on the floor with a firearm pointed at her head constitutes unreasonable and excessive force." (Response at 16-17.)    Again, Plaintiffs offer no supporting case law for this sweeping

---

[14] This would be the "<u>any</u> force" referenced by the Plaintiffs in their Response.

conclusion.  It is apodictic that, in the interests of the safety of law enforcement personnel and

other individuals present during a search for a wanted felon, holding an innocent person on the

floor with a firearm pointed at her head is imminently reasonable until the police officers

determine that she *is* an innocent person, and that she poses no threat to the officers or other

bystanders.  The Plaintiffs are closely related to Kenneth Thrower – to the point that Mr.

Thrower visited them while a fugitive from arrest and prosecution – and the Defendants had no

way of knowing, upon entry into the house, if they would violently assist Mr. Thrower in

evading capture.

### 1. The Degree of Force Used on the Plaintiffs Was Justified Under the Circumstances.

Despite Plaintiffs' arguments that the Defendants had no right to detain them during the

search of the house, the well-established legal principle remains that "An officer's authority to

detain incident to a search is categorical."  Muehler v. Mena, 544 U.S. 93, 98 (2005).

> In *Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L.Ed.2d 340 (1981),
> we held that officers executing a search warrant for contraband have the authority
> "to detain the occupants of the premises while a proper search is conducted." *Id.*,
> at 705, 101 S. Ct. 2587.  Such detentions are appropriate, we explained, because
> the character of the additional intrusion caused by detention is slight and because
> the justifications for detention are substantial. *Id.*, at 701-705, 101 S. Ct. 2587.
> We made clear that the detention of an occupant is "surely less intrusive than the
> search itself," and the presence of a warrant assures that a neutral magistrate has
> determined that probable cause exists to search the home. *Id.*, at 701, 101 S. Ct.
> 2587.  Against this incremental intrusion, we posited three legitimate law
> enforcement interests that provide substantial justification for detaining an
> occupant: "preventing flight in the event that incriminating evidence is found";
> "minimizing the risk of harm to the officers"; and facilitating "the orderly
> completion of the search," as detainees' "self-interest may induce them to open
> locked doors or locked containers to avoid the use of force." *Id.*, at 702-703, 101
> S. Ct. 2587.
>
> . . .
>
> ***Inherent in Summers' authorization to detain an occupant of the place to be
> searched is the authority to use reasonable force to effectuate the detention.*** See
> *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989)
> ("Fourth Amendment jurisprudence has long recognized that the right to make an

arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). ***Indeed, Summers itself stressed that the risk of harm to officers and occupants is minimized "if the officers routinely exercise unquestioned command of the situation."*** 452 U.S., at 703, 101 S. Ct. 2587.

Meuhler, 544 U.S. at 98-99 (emphases added).

Clearly, according to the United States Supreme Court, it is ***not*** "apodictic that the use of any force against a person who had not committed a crime is wrong and that any such force used is unreasonable and excessive." (Response at 16.) In fact, according the Supreme Court, officers should routinely exercise unquestioned command of the situation, including using reasonable force to effectuate a detention, in order to minimize the risk of harm to officers and occupants. That is precisely what the Defendants did in the instant case.

This case involves the execution of a felony arrest warrant. The Defendants had reliable information that the arrestee, Mr. Thrower, was armed and dangerous, homicidal and/or suicidal, and determined not to be arrested. The short detention of the Plaintiffs – less than five minutes – was necessary to ensure the safety of the officers, the safety of the Plaintiffs, and the orderly completion of the search of the house.

The Plaintiffs complain that the Defendants pointed firearms at them. However, the use of a gun in connection with a detention is permissible when an officer reasonable believes it is necessary for his protection. See Thompson v. City of Lawrence, 58 F.3d 1511, 1516 (10th Cir. 1995) (holding that it was not unreasonable for police officers to carry weapons into a home and handcuff a suspect who had a reputation for possessing firearms); Anderson v. U.S., 107 F. Supp. 2d 191, 199 (E.D. N.Y. 2000) (holding that "there is nothing inherently unreasonable about an officer conducting a protective sweep with his or her weapon drawn[;] nor is it unreasonable to expect the officer to sometimes aim that weapon at an individual until an assessment can be made as to whether the individual poses a threat"). See also U.S. v. Aldridge,

19

719 F.2d 368, 371 (11th Cir. 1983); Courson v. McMillian, 939 F.2d at 1479, 1494, n.25 (11th

Cir. 1991); U.S. v. Roper, 702 F.2d 984, 988 (11th Cir. 1983); U.S. v. Merritt, 695 F.2d 1263,

1273 (10th Cir. 1982).

In short, forcing the Plaintiffs to lie on the ground for less than five minutes, and aiming

firearms at them during that time, was not an unreasonable use of force under the circumstances,

and therefore did not constitute a constitutional violation.  See also, Florida v. Royer, 460 U.S.

491, 504 (1983) (holding that officers may detain a person without probable cause while

executing a search warrant if justified by the circumstances); U.S. v. Taylor, 716 F.2d 701 (9th

Cir. 1983) (agent was within the confines of a Terry stop when he approached a vehicle with his

gun drawn, aimed at the passenger, and directed the passenger to lie face down in a ditch where

he was handcuffed and frisked); U.S. v. Jacobs, 715 1343, 1346 (9th Cir. 1983) (deputy was

within Terry confines when he ordered occupants of vehicle to "prone out" at gunpoint while he

investigated); Jackson v. Sauls, 206 F.3d 1156, 1171-72 (11th Cir. 2000).

Plaintiffs also complain of the use of the distraction and diversionary device, sometimes

referred to as a "flashbang," in their home.[15]  However, as explained in the original Motion for

Summary Judgment, use of a flashbang does not constitute excessive force in violation of the

Fourth Amendment.  "The reasonableness of [the use of a flashbang] depends on the facts and

circumstances of each case."  Hernandez v. Conde, 442 F. Supp. 2d 1141, 1157 (D. Kan. 2006);

U.S. v. Myers, 106 F.3d 936, 940 (10th Cir. 1997); Kirk v. Watkins, 182 F.3d 932 (10th Cir.

1999).  The use of a  flashbang is analyzed under the Graham v. Connor test (490 U.S. 386, 396

---

[15] Plaintiffs, in their Response, refer to this devise as a "flash bang," a "percussion bomb," an "explosive device," a "flashbomb," and a "hand grenade," which "exploded."  The use of the designation "percussion bomb," "flashbomb" and "hand grenade" is excessive and objectionable rhetoric designed solely to misconstrue the purpose and exaggerate the destructive capabilities of this device.

(1989)).  Taylor v. City of Middletown, 436 F. Supp. 2d 377, 386 (D. Conn. 2006).   As

explained by the Sixth Circuit in Bing v. City of Whitehall, Ohio, 456 F.3d 555 (6th Cir. 2006):

> *Graham* requires this court to determine the reasonableness of the police use of
> . . . the flashbang devices by performing a "careful balancing of the nature and
> quality of the intrusion on the individual's Fourth Amendment interests against
> the countervailing governmental interests at stake."  [Graham, 490 U.S. at 396.]
> When judging the objective reasonableness of a use of force, this court may not
> use 20/20 hindsight.  *See id.* at 396-97.  The court must adopt the perspective of a
> reasonable policeman on the scene.  *See id.*  The court weighs [the plaintiff's]
> interest in avoiding . . . the . . . flashbang against the officers' interest in using
> these methods as measured by the "severity of the crime at issue, whether the
> suspect poses an immediate threat to the safety of the officers or others, and
> whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*
>
> Under *Graham's* balancing test, the officers' use of . . . the . . . flashbang were
> reasonable because their interest in employing these devices outweighed [the
> plaintiff's] interest in avoiding them.  [The plaintiff] of course has a significant
> interest in . . . avoiding having a flashbang device explode in his home.  But the
> police's interest here outweighed [the plaintiff's] interest because, as noted above
> regarding exigency, [the plaintiff] posed a serious and immediate threat to others
> and refused to come out of his house to be arrested.  The police had a great need
> to disarm [the plaintiff] and place him under arrest to abate the threat that he
> posed to people in the area.  This interest outweighed [the plaintiff's] significant
> interest in avoiding this use of force.

Bing, 456 F. 3d at 569-70.

Here, the Defendants had a significant, overriding interest in employing all the force

used, including the flashbang.   The crime for which Mr. Thrower was being arrested was

Aggravated Child Molestation, a felony and a crime against a person.  Mr. Thrower was believed

to be armed, in a house containing multiple weapons and potentially innocent bystanders,

homicidal and/or suicidal, and had verbalized an intention to resist arrest.   Further, the whole

reason that the Defendants, Alabama law enforcement officers, were executing a Georgia arrest

warrant was that Mr. Thrower was actively fleeing Georgia to evade arrest.   Therefore, all the

Graham factors were satisfied, and justified the amount of force used, particularly the use of the

flashbang.  See also U.S. v. Jones, 214 F.3d 836, 844-45 (7th Cir. 2000) (find that the use of a

flashbang is an appropriate means of disorienting the occupant of a building so that officers can protect themselves when entering in order to search the premises); U.S. v. Kingsley, No. 97-40095-01-RDR, 1998 WL 295577, *1 (D. Kan. May 21, 1998) (finding the use of a flashbang reasonable where officers knew, *inter alia*, that individuals who frequented the defendant's residence carried firearms, and officers knew about a recent incident at the residence where an armed individual fled upon arrival of police officers).

### 2.    The Plaintiffs' Injuries were *de minimis*.

The *de minimis* nature of the Plaintiffs' alleged injuries also mandates judgment in Lieutenant Taylor and Investigator Goodrich's favor as a matter of law.  Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000) (holding that the application of *de minimis* force will not support a claim for excessive force in violation of the Fourth Amendment).  In Nolin, the defendant officer grabbed the plaintiff from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back, pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and placed the plaintiff in handcuffs.  Nolin, 207 F.3d at 1255. The plaintiff allegedly suffered bruising to his forehead, chest, and wrists.  Id.

Here, there is no evidence that any plaintiff suffered any injury whatsoever from the actions of the Defendants.  In her deposition testimony, Ms. Barnette revealed that neither she nor Ms. Cruz nor C.B. was touched during the entry and search of the house.

Q.    During this incident, did anybody touch you physically?

A.    No, sir.

Q.    And the people that were at the house at this time were you, your niece, Sara Cruz, and your son, C.B.?

A.    Yes, sir.

Q.    Did you see anybody touch either of them physically?

A.    No, sir.

(L. Barnette Depo. at 51:14-23.)

Indeed, the only physical injury sustained at all were some minor scrapes to Plaintiff C.B.'s legs resulting from his own actions of jumping out and back in a bedroom window. C.B.'s own testimony, as well as the testimony of his mother, were that the scrapes were minor, and did not hurt or exhibit any blood or bruising.  (L. Barnette Depo. at 207:3-209:8; C.B. Barnette Depo. at 52:1-21.)

In fact, on the record before the Court, there was no injury inflicted whatsoever, as the Plaintiffs have failed to offer any medical testimony or other evidence to substantiate their claims of physical injury.  See, e.g., Bennett v. Parker, 898 F.2d 1530, 1534 (11th Cir. 1990) (reversing district court's denial of summary judgment and holding that a conclusory allegation of injury without supporting physical evidence, medical records, or corroborating witness testimony were insufficient to raise a genuine issue of material fact where qualified immunity is at issue); Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (finding that plaintiff's claim that injury was caused by handcuffing was conclusory and without supporting facts or medical records could not create a genuine issue of material fact).

Further, the Plaintiffs' household damage is also de minimus, inasmuch as the Plaintiffs have already been reimbursed for the damage done to their house by the entry of the Defendants. It is undisputed that the Russell County Sheriff's Department has already replaced the Plaintiffs' front door, door frame, and door handle.  (L. Barnette Depo. at 52:13 – 53:14; 69:6-21; C.B. Barnette Depo. at 53:3 – 54:12.)  The Plaintiffs were without a front door only for a period of a few minutes, perhaps a couple of hours.  Id.  In addition, the Plaintiffs' insurance company has already compensated them for the carpet and other household items damaged or destroyed by the Defendants' entry, by way of a check for five thousand two hundred dollars ($5,200).  (L.

Barnette Depo. at 97:7-22, 98:11-14, 220:8-11; J. Barnette Depo. at 67:23 – 68:6, 72:10 – 73:17, 80:2-8.)

Given the extreme initial risk to the officers and the persons present at the house, and the lack of any injury whatsoever, the use of force here cannot be said to be unreasonable as a matter of law.  Accordingly, the Defendants are entitled dismissal of this claim.

### E.    The Temporary Seizure of the Plaintiffs' ATVs Was Lawful.

In their Complaint, Plaintiffs sued the Defendants for (a) unlawful entry, search and seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution; (b) violation of their procedural and substantive due process rights under the Fourteenth Amendment; (c) unlawful seizure in violation of the Fifth and/or Fourteenth Amendments; (d) excessive force in violation of the Fourth Amendment; (e) conspiracy to violate civil rights under 42 U.S.C. § 1985(3); (f) neglect to prevent violation of civil rights under 42 U.S.C. § 1986; (g) state law trespass; (h) state law assault and battery; (i) state law invasion of privacy; (j) state law intentional infliction of emotional distress; (k) state law conversion and/or intermeddling with chattels; and (l) state law false arrest/false imprisonment.  Plaintiffs prayed for declaratory relief, as well as compensatory and punitive damages.

On March 15, 2006, this Honorable Court issued a Memorandum Opinion and Order dismissing, as to Defendants Taylor and Goodrich, all of the Plaintiff's state law claims, all official capacity claims, the Fifth Amendment claim(s), all of the Fourteenth Amendment procedural and substantive due process claims, the §§ 1985 and 1986 conspiracy claims, and all declaratory claims. This Court also declared any § 1983 conspiracy claims and any injunctive claims moot.  However, this Court denied the Defendants' motion to dismiss the Plaintiff's Fourth Amendment search and seizure claims and Fourth Amendment excessive force claims *with respect to the SWAT team's warrantless entry and search of the residence for Mr. Thrower*, recognizing that law enforcement

officers may not, absent exigent circumstances, execute an arrest warrant in the home of a third party without first obtaining a search warrant for that residence. (Memorandum Opinion and Order dated March 15, 2006 (hereafter, the "Order"), at 12-13.)[16]  In its Order, this Court correctly analyzed Plaintiffs' ATV claims under the Just Compensation Clause of the Fifth Amendment, and held that "[b]ecause the plaintiffs' vehicles were returned after two days, and because no pecuniary harm from this seizure has been alleged, the plaintiffs have not stated a claim for a Fifth Amendment constitutional violation based on the defendants' seizure of the four-wheeled vehicles."[17] Id. at 7. The Court then dismissed all of Plaintiffs' Fifth Amendment claims. Id. at 8.

Based on this Court's Order, it appears that Plaintiffs' claims regarding the alleged seizure of the Plaintiffs' ATVs were dismissed. In their Brief In Support of Their Motion for Summary Judgment, Defendants Lieutenant Taylor and Investigator Goodrich specifically argued that "the only remaining claims in this action are 42 U.S.C. § 1983 claims for unlawful search and seizure and excessive force related to the Defendants' attempts to apprehend fugitive Kenneth Thrower on February 10, 2005." (Brief in Support of Their Motion for Summary Judgment at 1.) Accordingly, Defendants briefed and argued these claims, and asked this Court to "enter summary judgment in their favor and against the Plaintiffs as to all remaining claims." Id. at 31.

Plaintiffs apparently concede that their claims related to the ATVs were dismissed by this Court's Order, in light of the noticeable lack of argument on that issue in their Response.

---

[16] The Court, in its Order, stated that "[b]ecause the Complaint states that the officers entered the Barnette home to search for a third party without a search warrant and without the presence of exigent circumstances, the plaintiffs have alleged sufficient facts to state a Fourth Amendment violation of their right to be free from an unreasonable search." (Order at 13.) This Court also went on to rule that "the plaintiffs have alleged sufficient facts to establish a violation of their Fourth Amendment right to be free from the use of excessive force." (Order at 14-15.)

[17] Nowhere else in the Order – noticeably not in its analysis of Plaintiffs' Fourth and Fourteenth Amendment claims – does this Court address the search and seizure of the ATVs. In fact, in its treatment of the Plaintiffs' Fourth Amendment search and seizure claims, this Court is careful to address only the Defendants' efforts to "search for the subject of an arrest warrant in the home of a third person." (Order at 13.)

Though Plaintiffs devote four of the thirty-one paragraphs in their Statement of Material Facts to the ATVs, they offer no material argument relating to that claim. (Response at 5-6.) Indeed, the bulk of their reference to those facts is contained in a two-sentence footnote. (Response at 15.)

Nevertheless, out of an abundance of caution, it is clear that the Plaintiffs' claims related to the temporary seizure of their ATVs are due to be dismissed.

> A seizure occurs when there is a meaningful interference with a person's possessory interest in property. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The bounds of investigative detention of personal property are defined by the limits applicable to the detention of a person. *United States v. Place*, 462 U.S. 696, 708-09, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny, an investigatory detention can be supported by reasonable suspicion; however, an arrest, i.e. the seizure of a person, must be supported by probable cause. Therefore, the factors used to determine whether a *Terry* stop has matured into an arrest are also useful in evaluating whether a seizure of property required probable cause. The non-exclusive factors we consider in evaluating the reasonableness of a *Terry* stop are: "'[1] the law enforcement purposes served by the detention, [2] the diligence with which the police pursue the investigation, [3] the scope and intrusiveness of the detention, and [4] the duration of the detention.'" *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir.2004) (citations omitted).
>
> . . .
>
> The Fourth Amendment only prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily, the seizure of personal property is per se unreasonable unless the seizure is pursuant to a warrant issued upon probable cause. *Place*, 462 U.S. at 701, 103 S.Ct. at 2641. However, the search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband. *United States v. Watts*, 329 F.3d 1282, 1285 (11th Cir.2003)(per curiam); *United States v. Holloman*, 113 F.3d 192, 195 (11th Cir.1997)(per curiam). Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quotation marks and citation omitted).

U.S. v. Virden, No. 06-12279, 2007 WL 1672331 at *2-3 (11th Cir. June 12, 2007).

In the case at bar, there was clearly no illegal search and seizure. Assuming that the initial entry and search of the Plaintiffs' residence was lawful, as set forth *supra*, the ATVs were discovered as a result of a lawful search. Lieutenant Taylor and Investigator Goodrich did not

return to the Plaintiffs' residence to search the property again; they returned to follow up on the previous discovery of suspicious vehicles. When he arrived at the Barnette property, there were already Russell County Sheriffs' personnel inside the house replacing the Plaintiffs' front door, just as Lieutenant Taylor promised they would. Because the front door was secured and would not open, Lieutenant Taylor stepped inside the back door of the house and announced himself to Ms. Barnette. This was not a search for purposes of the Fourth Amendment – it is common courtesy. Inasmuch as there were already Russell County Sheriff's personnel present inside the house – as well as Russell County inmates – it would have been unreasonable for Lieutenant Taylor to assume that he could not step inside to check on the status of the repair work which he ordered done, and to discuss with Ms. Barnette the suspicious ATVs located on her property.[18] There is no testimony in the record, and no allegations whatsoever, that Lieutenant Taylor took any action inside the house that could be construed in any way as a search.

As quoted above, "the search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband." Virden, 2007 WL 1672331 at *3. In the case at bar, the Defendants had probable cause to believe that the vehicles *were* contraband. Russell County continuously battles ATV thefts, particularly along Highway 80, where the Plaintiffs' house is located. It is admitted by the Plaintiffs that one of the ATVs had a "popped" ignition, which is an indication that it may have been stolen. The Plaintiffs could not produce a bill of sale for the ATV with the popped ignition, and the sole bill of sale they could produce did not have a Vehicle Identification Number ("VIN") on it. Finally, Ms. Barnette admitted that one of the ATVs did not belong to them.[19]

---

[18] Ms. Barnette had, in fact, consented to the presence of Sheriff's Department personnel when she allowed the repair crew to enter her home. There is no indication from the record that her consent did not extend to Lieutenant Taylor.

[19] Significantly, because one of the ATVs did not belong to the Plaintiffs, they do not have standing to bring suit based on the deprivation of that ATV.

The temporary seizure and investigation of the ATVs was reasonable under the Terry[20] factors. The seizure was justified for the purposes of ensuring that the ATVs were not stolen – a significant problem in Russell County. Lieutenant Taylor and Investigator Goodrich were diligent in their investigation. They initially attempted to verify the ownership of the ATVs by asking for proof of ownership. When that method failed, the Defendants visually inspected the ATVs at the residence in an attempt to locate the VINs. Unable to locate the VINs at that time and location, they removed the ATVs to the Sheriff's Department, and kept them for only two days.

Plaintiffs claim that Ms. Barnette "complied with Taylor's instructions because she felt that she had no choice and had to do whatever the defendants said since they were armed law enforcement officers." (Response at 6.) However, there is no testimony or other evidence in the record that either Lieutenant Taylor, or Investigator Goodrich, or both, in any way intimidated any of the Plaintiffs. There is no evidence that they drew their weapons, or threatened, either verbally or visually, to do so. There is no evidence that either of these Defendants even spoke harshly with any Plaintiff. In fact, the uncontroverted testimony from both Lieutenant Taylor and Investigator Goodrich is that Ms. Barnette and C.B. Barnette were friendly, talkative, smiling, and helpful. If Ms. Barnette was fearful or intimidated, these Defendants had no way to know that. There is no evidence in the record – and Ms. Barnette did not testify – that she in any way objected to the temporary confiscation of the ATVs.

From the record, it is undisputed that the Plaintiffs did not object to the temporary seizure of the ATVs. However, even had they objected, pursuant to Terry and Virden, the Defendants could still have legally seized the ATVs. The seizure was reasonable both in scope, manner and duration, and therefore the Plaintiffs' constitutional rights have not been violated.

---

[20] 392 U.S. 1 (1968).

## II.    NO CLEARLY ESTABLISHED LAW PROVIDED FAIR WARNING TO LIEUTENANT TAYLOR AND INVESTIGATOR GOODRICH THAT THEIR CONDUCT WAS UNLAWFUL.

Assuming, *arguendo*, that the Plaintiffs could demonstrate a constitutional violation, they must still show that clearly established law provided Lieutenant Taylor and Investigator Goodrich with fair warning that their conduct was unlawful.  The Plaintiffs may do so by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision is specific enough to demonstrate conduct was illegal, even in the total absence of case law.  Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted).  The Eleventh Circuit has identified the latter method as an "obvious clarity" case.  Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002).

Plaintiffs do not even begin to argue any pre-existing law with materially similar facts that would put the Defendants on notice that their conduct was illegal.  Therefore, Plaintiffs argue that the Defendants' conduct was obviously illegal, despite the existence of relevant case law.  In order to show that the conduct of Lieutenant Taylor and Investigator Goodrich was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent."  Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).  "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit."  Storck, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

The United States Supreme Court has applied this standard to cases involving the warrantless search of a residence.  In Anderson v. Creighton, 483 U.S. 635 (1987), the Court stated:

> . . . It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [the defendant's] search was

objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable. See *Malley, supra*, 475 U.S., at 344-345, 106 S. Ct., at 1097-1098. The same is true of their conclusions regarding exigent circumstances.

It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials. . . . The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the defendant's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.

Anderson, 483 U.S. at 641. See also, Saucier v. Katz, 533 U.S. 194, 206 (2001).

In light of Anderson, as well as the case law extensively cited in the previous sections, it is plainly evident that no clearly established law existed to put the Defendants on notice that their conduct was unconstitutional. Accordingly, these Defendants are entitled to qualified immunity, and dismissal of the Plaintiffs' claims.

## **CONCLUSION**

It is clear from the foregoing case law that the Defendants are immune from liability under the doctrine of qualified immunity. Therefore, Defendants pray that this Court will enter summary judgment in their favor, finding that the doctrine of qualified immunity shields them from liability for their actions in entering the Plaintiffs' residence and searching for Mr. Thrower in order to apprehend him pursuant to a valid arrest warrant. Further, to the extent that these claims are not already dismissed, Defendants pray that this Court will find that the doctrine of qualified immunity shields them from liability for their actions in seizing the Plaintiffs' ATVs.

WHEREFORE, PREMISES CONSIDERED, the Defendants move this Court to enter summary judgment in their favor and against the Plaintiffs as to all remaining claims.

Respectfully submitted this the 19th day of June, 2007.

**s/Scott W. Gosnell**
KENDRICK E. WEBB, Bar Number: WEB022
SCOTT W. GOSNELL, Bar Number: GOS002
Attorneys for Defendants Goodrich and Taylor
WEBB & ELEY, P.C.
7475 Halcyon Pointe Road (36117)
P. O. Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  sgosnell@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the **19th day of June, 2007**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  **Jay Lewis, Esq.; Keith Anderson Nelms, Esq.; Carol Gerard, Esq.; Ronald G. Davenport, Esq.;** and **R. Brett Garrett, Esq.**

**s/Scott W. Gosnell**
OF COUNSEL