IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LISA BARNETTE, *et al.*,            )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )        CASE NO. 3:05-cv-00473-WKW
                                    )
CITY OF PHENIX CITY, *et al.*,      )
                                    )
        Defendants.                 )

## <u>MEMORANDUM OPINION AND ORDER</u>

_____This case is before the court on the defendants' motions for summary judgment (Docs. # 48,

# 50 & #53), which will be denied in part and granted in part for the reasons set forth below.

## I.  FACTS AND PROCEDURAL HISTORY

Viewing the parties' evidentiary submissions in a light most favorable to the plaintiffs, the

court makes the following recitation of facts.

### A.    *Facts*

Plaintiffs are Lisa Barnette, Jerry Barnette, Sara Cruz, and C.B. (a minor), all of whom live

at the Barnette residence located at 3 Chapman Street, Phenix City, Russell County, Alabama.

(Compl. ¶¶ 3-6, 21; Lisa Barnette Dep. 11, 30-31; Jerry Barnette Dep. 10. )  Defendants Grover

Goodrich and Heath Taylor are deputy sheriffs for Russell County (collectively, the "county

defendants").  (Compl. ¶¶ 16-17.)  The City of Phenix City ("Phenix City"), which is located within

Russell County, is a named defendant.[1]  (*Id.* ¶ 7.)   The remaining defendants are police officers and

members of the SWAT team employed by  Phenix City: Officers Greg Lahr, Michael Bailey, Steve

---

[1]  However, the plaintiffs have conceded that their claims against Phenix City for the actions of the city
defendants, other than the state law claims, are due to be dismissed.  (*See* Doc. # 62, at 20, 22-23.)  With respect to
Phenix City, the court need only address the state law claims.

Nolin, Curtis Mitchell, Luis Coreano, Warren McLaughlin, Terrance Walker, and Jarrod Barr (collectively, the "city defendants"). (*Id*. ¶¶ 8-15.)

Before and in February 2005, Plaintiff Lisa Barnette's brother, Kenneth D. Thrower ("Thrower"), was investigated by Detective Len Wills ("Wills") and Detective Sherry Zieglar of the Columbus Police Department in Columbus, Georgia, for the alleged molestation of Thrower's stepdaughter . (Wills Aff. ¶ 3.) Wills avers that a Georgia warrant was issued for Thrower's arrest. (*Id*.) The Georgia arrest warrant submitted by the defendants evidences that it was issued on February 10, 2005, but the time of issuance is not clear from the record evidence. (Doc. # 64-2.) On February 10, 2005, Thrower's wife told Wills that Thrower was aware of the Georgia arrest warrant, fled to Russell County,[2] and would stay there briefly to see his mother. (Wills Aff. ¶ 4.) Thrower's wife also told Wills that Thrower was armed and homicidal or suicidal, kept a handgun in his truck, and had said that he was not going to jail. (*Id*. ¶ 4.) Wills avers that he was concerned because he knew that Thrower's brother had committed suicide. (*Id*. ¶ 5.) The record evidence does not reflect the time of this conversation.

Based on Thrower's wife's statements, Will avers that he then contacted the Russell County Sheriff's Department for assistance in apprehending Thrower. (*Id*. ¶ 6.) Wills claims that he first spoke to Lieutenant Steve Osteen and faxed him a copy of the Georgia arrest warrant. (*Id*. ¶ 6.) He then spoke with Defendant Lieutenant Heath Taylor ("Taylor") and told Taylor that, based on Thrower's wife's statements, Thrower was believed to be at his mother's house in Russell County.

---

[2] Phenix City borders Columbus, Georgia. The cities are separated only by a state line and the Chattahoochee River. Wills avers that Thrower's wife claimed that her husband "fled." On the evidence presented, and in the absence of direct testimony from Mrs. Thrower, it cannot be determined whether Wills or Thrower's wife came to what amounts to a legal conclusion. Traveling across the river to visit one's mother does not necessarily constitute flight.

(*Id.* ¶¶ 6-7.)  Wills also gave Taylor a description of Thrower's vehicle.  (*Id.* ¶ 7.)  The time of Wills's phone call to Taylor is not reflected in the record.

Taylor instructed Defendant Investigator Grover Goodrich ("Goodrich") to take the Georgia arrest warrant to a Russell County Circuit Court judge to have it "domesticated as a fugitive warrant."  (Taylor Aff. ¶ 3; Goodrich Aff. ¶ 3.)  Goodrich claims to have "had a fugitive warrant prepared by Sheriff's Department administrative personnel," which Judge Johnson signed after he returned early from lunch to the Russell County Courthouse.  (Goodrich Aff. ¶¶ 3-4.)  The "domesticated warrant" has not been submitted as evidence and the defendants have not suggested the time frame in which it was prepared and signed; however, the defendants have submitted a copy of what appears to be the executed Georgia arrest warrant, with a fax identifier showing that it was sent by the Columbus Police Department on February 10, 2005, at 12:39.[3]  (Doc. # 64-2.)  Jerry Barnette testified that Taylor later told him that Taylor did not have a warrant for Thrower's arrest.  (Jerry Barnette Dep. 92.)

Taylor avers that, from his phone call with Wills, he determined that dispatching the Phenix City SWAT team would be the safest way to apprehend Thrower.  (Taylor Aff. ¶ 4.)  Because Thrower's mother resided in Russell County outside the city limits of Phenix City, Taylor assumed jurisdictional command over the joint SWAT team that included both city and county officers.  (Casteel Aff., at 2.)  Taylor briefed the SWAT team on the information he had, instructed them to assemble near Thrower's mother's house, and he and the SWAT team proceeded to that location.  (Taylor Aff. ¶¶ 4-5.) Taylor then received a second call from Wills, who reported that Thrower was at Lisa Barnette's house, which is located "a couple of houses down from Mr. Thrower's mother's

---

[3]  Neither "a.m." nor "p.m." appears on the time record.

address." (Wills Aff. ¶¶ 8-9; Taylor Aff. ¶ 5.)  Taylor reported to Wills that he did not see Thrower's truck at the Barnette residence.  (Taylor Aff. ¶ 5.)  Wills avers that, during this phone call with Taylor, Thrower's wife was in his office and talking on the phone with Thrower "at that very moment" and that the caller identification showed the Barnettes' telephone number.  (Wills Aff. ¶ 8; Taylor Aff. ¶ 5.)  Wills informed Taylor of this and speculated that Thrower's truck could be parked at his mother's house.  (*Id*.)  Plaintiffs allege that the only phone call between Thrower and Thrower's wife occurred at approximately 9:00 a.m. and lasted about thirty minutes.  (Lisa Barnette Dep. 25-28.)

Although Taylor considered setting up a perimeter of officers to covertly observe the house and to arrest Thrower when he exited the house, he ultimately determined that the perimeter officers would have been seen, thus "initiating a shootout or hostage situation."  (Taylor Aff. ¶ 6.)  Although "[a]t that time [he] had very little intelligence on the house," he determined that exigent circumstances were present.  (*Id*. ¶ 7.)  In the next five minutes, Taylor notified the SWAT team to prepare to enter, called Goodrich to verify he had a signed Alabama fugitive arrest warrant, and drove down the road to turn around.  (*Id*. ¶ 8.)  Taylor claims that during those five minutes, Thrower left the Barnette house unobserved.  (*Id*. ¶ 8.)  The plaintiffs contend that Thrower left the Barnette house at 11:45 a.m. to have lunch with his mother.  (Lisa Barnette Dep. 33-35.)

Lisa Barnette testified that approximately thirty minutes to one hour after Thrower left her home, the SWAT team burst into her home.  (*Id*. 35.)  On Taylor's signal, the SWAT team drove onto the Barnette property and quickly approached and entered the home.  (Taylor Aff. ¶ 9; Doc.

# 51.)  The SWAT team did not knock and announce their presence.[4]  (Lisa Barnette Dep. 145.)  It is undisputed that the SWAT team, wearing ski masks and carrying shields and assault rifles, broke down the front door with a ram and threw a "flash bang" device or a percussion bomb into the Barnette home, which exploded in the living room, burning the carpet and blowing out the television speakers.  (Bailey's Answers to First Interrogs. & Requests for Produc. # 15; Lisa Barnette Dep. 37, 197-198.)

Lisa Barnette was in her bedroom when she heard the loud explosion.  From her bedroom door, she saw smoke and the SWAT team at the end of the hallway.  The defendants did not indicate that they were law enforcement officers; they shouted at her and commanded she get face down on the floor.  She told the officers that she had a serious heart condition, but she obeyed the commands.  She screamed to them that her children were in the back room and not to hurt her kids.  They held her to the floor with the assault rifles to her head.  She kept asking, "What's going on? What's wrong?" but the officers did not answer her.  (Lisa Barnette Dep. 38, 57, 156-162.)

Plaintiff C.B., Lisa and Jerry Barnette's minor son, and Plaintiff Sara Cruz, Lisa Barnette's teen-aged niece, were in Sara's bedroom at the back of the house.  When C.B. heard the explosion, he was so scared that he soiled his clothing and jumped out of the window.  At the gun point of a SWAT team member, C.B. was forced back into the home through the window.  He fell to the floor, landing on Sara, who had by then been forced onto the floor by the defendants.  He sustained scrapes

---

[4]  One of the city defendants, Michael Bailey ("Bailey"), avers that an unidentified member of the SWAT team "announced the presence of the SWAT team, and knocked three times."  Bailey approximates "that the announcement and knocking lasted four seconds.  Because he did not receive a response within another four seconds, Bailey "used a hand ram to gain access."  (Bailey Aff.)

to his legs doing so. (C.B. Barnette Dep. 25-28, 52, 76, 88-89.) After the incident, C.B. went to counseling "for a long time" because he "just had to find a way to get it off [his] mind." (*Id*. 61-63.)

The SWAT team secured the residence, after which Taylor and Goodrich entered. (Taylor Aff. ¶ 9; Lisa Barnette Dep. 37.) Taylor questioned Lisa Barnette about Thrower, and she told Taylor that Thrower was at a certain restaurant for lunch.[5] (Lisa Barnette Dep. 38-39.) After searching the house and outbuildings for at least twenty minutes, (Nolin's Answers to First Interrogs. & Requests for Produc. # 15), all of the officers left the Barnette residence, located Thrower's truck at the restaurant, where he was arrested without incident. (Taylor Aff. ¶ 13; Goodrich Aff. ¶ 6.) None of the defendants gave or showed Lisa Barnette any kind of warrant. (Lisa Barnette Dep. 194-195.)

Taylor avers that it is the policy of the Russell County Sheriff's Department to repair any damage caused by the operations of its officers, including the SWAT team. (Taylor Aff. ¶ 12.) Nevertheless, when Lisa Barnette asked about the damage they caused to her home, Taylor said, "Oh well," and walked out the door. (Lisa Barnette Dep. 40.) The cost of the damages to the home was approximately $7,500. (Jerry Barnette Dep. 67-68, 74-75.) After the officers left, Lisa Barnette called her husband, Jerry Barnette, to tell him what happened. It took three or four minutes to calm her down and get her to quit crying so that he could understand her. (*Id*. 14-15.)

Taylor and Goodrich returned to the Barnette residence at 1:00 p.m. (Lisa Barnette Dep. 58-62.) At that time, a sheriff's department employee was assessing the damages to the Barnette residence and beginning repairs. (*Id*. 57, 60.) Lisa Barnette testified that she found Taylor and

---

[5] Lisa Barnette testified that Taylor did not ask the time at which Thrower left her home. (Lisa Barnette Dep. 40.) However, Taylor claims that she said that Thrower "had just left" and she "was surprised that [the defendants] did not encounter him on the road as [the defendants] drove up." Taylor Aff. ¶ 11.)

Goodrich standing in her dining room calling her name. (*Id.* 57.) They had entered the Barnette residence without a warrant, consent, or even knocking.[6] Taylor told Lisa Barnette that he suspected that one of the three four-wheeled all-terrain vehicles (ATVs) on her property might be stolen.[7] (*Id.* 65, 75.) He told her that he was seizing all of the ATVs on her property and needed to take the Barnettes' trailer because his trailer was not large enough to transport all of the ATVS. (*Id.* 58-59, 174-175.) He did not have a warrant and did not ask for her consent. (*Id.* 73-75, 173-176, 178-179.) The Barnettes were permitted to retrieve the ATVs and trailer two days later. (Jerry Barnette Dep. 50.)

**B.    Procedural History**

Plaintiffs instituted this action on December 22, 2004, and later amended their complaint. Defendants Goodrich and Taylor filed a motion to dismiss, which was resolved in a previous memorandum opinion and order (Doc. # 21). The only claims remaining against Goodrich and Taylor are the § 1983 claims for unlawful search and seizure and excessive force in violation of the Fourth Amendment. Although the city defendants did not file a motion to dismiss, much of the reasoning in the prior opinion equally applies to the city defendants.[8] Thus, the city defendants face the following claims at this stage: (1) all state law claims; and (2) § 1983 claims for violations of the Fourth Amendment. Plaintiffs seek compensatory and punitive damages, costs and fees.

---

[6] Taylor avers that "[b]ecause the front door was temporarily secured in a fashion that did not permit it to open, I approached the back door and announced myself to Ms. Barnette." (Taylor Aff. ¶ 16.)

[7] Although Taylor did not mention it to Lisa Barnette, an unidentified officer during the earlier search discovered a four-wheeler with its ignition "popped" out. Taylor avers "that a "popped" ignition is a significant indication that a particular four-wheeler had been stolen." (Taylor Aff. ¶ 10.)

[8] Incorporating by reference the court's reasoning in its earlier opinion (Doc.# 21), the court will order the dismissal of the plaintiffs' Fifth Amendment takings claim, Fourteenth Amendment substantive and procedural due process claims, § 1985 and § 1986 claims, and § 1983 conspiracy claims against the city defendants. Plaintiffs concede the dismissal of these claims. (*See* Doc. # 62, at 23.)

## II. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343. The court finds adequate allegations of personal jurisdiction and venue.

## III. STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from

the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

The plaintiffs bring claims under § 1983, which provides a cause of action against any person acting under the color of state law for intentional deprivations of any right secured by the Constitution.[9] The plaintiffs' claims arise from the alleged violations of the Fourth Amendment rights to be free from unreasonable searches and seizures and from the use of excessive force. The plaintiffs also assert state law claims against the city defendants. The county and city defendants argue that they are entitled to qualified immunity. The court first considers the qualified immunity defense because it applies to both the city and county defendants.

### A.    *Qualified Immunity Standard*

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting 'within the scope of his discretionary authority.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995)). Defendants must show, for each act in question, that they were performing a legitimate job-related function through means that were

---

[9] The parties do not dispute that the defendants were acting under the color of state law.

9

within their power to utilize. *Id.* "If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity." *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003); *see Barker v. Norman*, 651 F.2d 1107, 1121 n.18 (5th Cir. 1981)[10] (noting that "an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance"). This is because an official who acts outside of his or her discretionary authority "ceases to act as a government official and instead acts on his own behalf;" therefore, "the policies underlying the doctrine of qualified immunity no longer support its application." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).

Once it is established that the defendant was acting within his discretionary authority, the burden shifts to the plaintiff to prove that qualified immunity is not warranted. *Vinyard*, 311 F.3d at 1346. The Supreme Court has articulated a two-part test in the qualified immunity analysis. First, the court must determine whether the plaintiff's allegations establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating that the court must evaluate the complaint to determine if, assuming the allegations are true, it pleads a cognizable violation of the constitution). If this is answered in the affirmative, the court's next step is to determine whether the right in question was clearly established. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.*

---

[10] The Eleventh Circuit has adopted all prior decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, as binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (stating that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.")).  In essence, a defendant is entitled to "fair warning" that his alleged conduct would be unconstitutional.  *Hope*, 536 U.S. at 741.  A plaintiff can establish that the law clearly provided notice to the officers that the conduct was unconstitutional by submitting fact-specific precedents or demonstrating that the conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent."  *See Vinyard*, 311 F.3d at 1355 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)).

**B.     *Qualified Immunity Analysis***

The court now will analyze the application of the qualified immunity defense to the plaintiffs' remaining claims against the county and city defendants and, where appropriate, references additional factual allegations in the discussion.  The parties do not dispute that the county and city defendants were acting within the scope of their discretionary authority.  Thus, the court must determine whether the events complained of constitute constitutional violations of clearly established law.

**1.     <u>The First Warrantless Entry and Search of the Barnette Residence</u>**

The plaintiffs contend that the defendants did not have a search warrant to enter and search the Barnette residence for Thrower.  The defendants do not deny that they did not have a search warrant for Thrower, but they assert that probable cause and exigent circumstances existed to justify the warrantless entry and search of the Barnette residence.[11]

---

[11]  The parties also dispute whether a valid Alabama fugitive arrest warrant existed for Thrower's arrest.

### a.     Warrantless Entries and Searches Generally

Warrantless searches inside a home are presumptively unreasonable; however, certain exceptions exist. *Brigham City, Utah v. Stuart*, __ U.S. __, 126 S. Ct. 1943, 1947 (2006).  One such exception is where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1974) (citation omitted).  The Supreme Court has emphasized "that exceptions to the warrant requirement are few in number and carefully delineated, and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) (internal quotation marks and citations omitted) (commenting that the only emergencies the Court has recognized are hot pursuit of a fleeing felon, destruction of evidence, and an ongoing fire); *see also Brigham City, Utah*, 126 S. Ct. at 1949 (upholding as an exigent circumstance a warrantless entry to break up a violent fight).  The Eleventh Circuit has recently reaffirmed these holdings.  *McClish v. Nugent*, 483 F.3d 1231, 1240-41 (11th Cir. 2007) ("Under . . . exigent circumstances, an officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified." ).  Whether an exigency exists is a matter to be determined objectively, *i.e.*, "[t]he officer's subjective motivation is irrelevant."  *Brigham City*, 126 S. Ct. at 1948.

This case invokes the Supreme Court precedents of *Payton v. New York* and *Steagald v. United States*.  In *Payton*, the Supreme Court held that, absent exigent circumstances, an entry into a suspect's home to effectuate his arrest is unreasonable under the Fourth Amendment unless done pursuant to an arrest warrant.  *Payton v. New York*, 445 U.S. 573, 590 (1980).  Probable cause that the suspect committed a felony is not sufficient to cross the threshold of the home.  *Id.*  The Supreme

12

Court extended this Fourth Amendment protection to the homes of third parties in *Steagald*. The issue before the Court was whether an arrest warrant was adequate to protect the Fourth Amendment interests of persons not named in the warrant when their homes are searched without their consent and in the absence of exigent circumstances. *Steagald v. United States*, 451 U.S. 204, 212 (1981). The Court held that although an arrest warrant may protect the suspect from an unreasonable seizure, it does nothing to protect the privacy interest of a third party. *Id*. at 213. A law enforcement agent's personal determination of probable cause to search, rather than such a determination by a neutral and detached magistrate, is insufficient because it creates a significant potential for abuse. *Id*. at 213-215. Therefore, a warrantless search is permissible only where both probable cause and exigent circumstances exist. *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000).

**(1) Probable Cause**

Probable cause to search exists where, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).[12] A probable cause determination "cannot be a mere ratification of the bare conclusions of others." *Id*. at 239. Thus, a sworn statement must provide a substantial basis for finding probable cause; a mere conclusory statement by the affiant will not do. *Id.* An affidavit may include hearsay information; however, a court must consider whether the affidavit contains enough information to ascertain whether the informant is credible, his information is reliable, and the informant's basis of knowledge is sufficiently detailed. *Id.* at 229-32. "[A]

---

[12] The court recognizes that Thrower is neither contraband nor evidence of a crime. Nevertheless, an officer who intends to execute an arrest warrant must have a reasonable belief, based on the totality of the circumstances, that the subject of the arrest warrant will be found in a particular place, *i.e.*, the third party's home. *See Steagald*, 451 U.S. at 213 ("A search warrant . . . is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place.").

deficiency in one [of these elements] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. The courts place a special value on the "corroboration of details of an informant's tip by independent police work." *Id.* at 241.

The issue before the court is not whether probable cause to search for Thrower actually existed. In the context of a qualified immunity analysis, the court must ask only, in viewing the facts in a light most favorable to the non-movant, whether there was ***arguable*** probable cause. *Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) (emphasis added). Arguable probable cause existed if "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990).

### (2) Exigent Circumstances

"The exigency exception only applies when 'the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.'" *Santa*, 236 F.3d at 669. The Court in *Payton* and *Steagald* did not explore the contours of exigent circumstances. *See Minnesota v. Olson*, 495 U.S. 91, 100 (1990). In *Olson*, however, the Court concluded that the state court had "applied essentially the correct standard" when it identified the following exigencies that justify a warrantless entry of a home: "hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." *Id.* (citing *Minnesota v. Olson*, 436 N.W.2d 92, 97 (Minn. 1989)) (internal citations omitted). The Supreme Court also impliedly approved the standard "that in the absence of hot pursuit there must be at least probable cause to believe that one or more of the other factors

14

justifying the entry were present and that in assessing the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered." *Id*. The Supreme Court did not disturb the state court's fact-specific determination that exigent circumstances did not exist. *Id*. In making this determination, the state court reasoned that:

> While it is true a grave crime was involved, it is also true that the suspect was known not to be the murderer but thought to be the driver of the getaway car. Probable cause to believe the suspect was the driver depended, as we have seen, in large part on the reliability of the unknown informant. The police had already recovered the murder weapon. The suspect had not left town by bus, at least not yet, as the telephone tip had indicated, but had returned to the duplex where he had stayed the previous night. The police knew that Louanne and Julie were with the suspect in the upstairs duplex with no suggestion of danger to them. Three or four Minneapolis police squads surrounded the house. The time was 3 p.m., Sunday.
>
> We do not think the particular circumstances of this case amount to exigent circumstances. It was evident the suspect was going nowhere. If he came out of the house he would have been promptly apprehended. This case is unlike *Lohnes,* for example, where the suspect was believed to have committed the crime of violence, probable cause was strong, and the weapon had not been found. In *Lohnes,* too, the dwelling was in an isolated rural area, distant from a magistrate, the time 5 a.m., and it was doubtful if sufficient police resources were on hand to contain the suspect until an arrest warrant could be obtained. *Lohnes,* 344 N.W.2d at 611-12.

*Olson*, 436 N.W.2d at 97. Another factor in the *Olson* state court's analysis is that the arrest was planned in advance. *Id*. at 97-98 ("Where, however, the arrest is planned in advance, it is less likely the police can claim exigent circumstances.").

### b.    Constitutional Violation Analysis

The defendants assert that they "had clear evidence that a search of the Plaintiff's [sic] residence would yield Mr. Thrower" because they had a valid fugitive warrant for his arrest and "very recent and credible reports that Mr. Thrower was talking to his wife from the Plaintiffs' house phone." (Doc. # 51, at 20). The plaintiffs dispute the existence of a valid Alabama fugitive arrest

15

warrant for Thrower and further claim that, even if it did exist, the fugitive arrest warrant does not provide probable cause to search the Barnette residence for Thrower.

The court agrees that the existence of a valid Georgia arrest warrant or a valid Alabama fugitive warrant is irrelevant to the determination of whether probable cause existed to search for Thrower in the Barnette residence.[13]  Other than their conclusory statement of "very recent and credible reports that Mr. Thrower was talking to his wife from the Plaintiffs' house phone," (*id.*), the defendants do not attempt to persuade the court that there was arguable probable cause to believe that Thrower was in the Barnette residence.  In his affidavit, Taylor avers that Wills informed him that Thrower was at his sister's house.  Although information from a fellow police officer is generally presumed reliable, this information about Thrower originated not from Wills but from Thrower's wife.  Therefore, the defendants were not entitled to conclude the information was reliable.  *See Bishop v. Alabama*, 518 So. 2d 829, 832 (Ala. Crim. App. 1987) ("[S]tatements by law enforcement officials **based on personal observation** or upon the **observation of fellow officials** participating in the same investigation are entitled to a presumption of reliability." (emphasis added)).  On the submitted evidence, there is no showing that Wills witnessed the telephone call between Mr. and Mrs. Thrower, that he viewed the caller identification feature on her phone, or that he even verified the time of the phone call.

The plaintiffs further argue that Thrower's wife's information is incredible on its face.  According to Officer Wills, Thrower's wife told him that Thrower knew about the Georgia arrest

---

[13]  However, the court must express its doubt as to the existence of a valid Alabama fugitive from justice warrant.  In support of their summary judgment motions, the defendants submitted only a copy of the executed Georgia warrant.  Because an out-of-state warrant is invalid in Alabama, a fugitive from justice warrant pursuant to Ala. Code §15-9-40 must be secured or the requirements of Ala. Code §15-9-41 must be met.  *Ex parte Morgan*, 641 So. 2d 840, 842 (Ala. 1994).

warrant and fled to Alabama. However, Thrower would have had to have left Georgia before the arrest warrant was issued on February 10, 2005. This incongruity, as well as the possible motivation of a woman whose husband had allegedly molested her daughter, *see Bush v. Alabama*, 523 So. 2d 538, 544-45 (Ala. Crim. App. 1988) (warning that, although a victim's statement may be presumed reliable, "the police must remain alert to the existence of any circumstances which could make that presumption inoperative in a particular case, such as, for example, any possible motive of the victim to falsify"), should have prompted a reasonable law enforcement officer to attempt to corroborate at least some of Thrower's wife's information. Her information might have been corroborated had Thrower's vehicle been parked at or near his sister's or his mother's house. In light of other information that Thrower was going to pay just a short visit to his family, the fact that Thrower's vehicle was not there weighs against the credibility and reliability of Thrower's wife's tip that Thrower was at his sister's house.

Viewing the facts before the court in a light most favorable to the plaintiffs, reasonable officers in the same circumstances and possessing the same knowledge as the defendants could not have believed that probable cause to search for Thrower in the Barnette residence existed. This applies equally well to the SWAT team officers. They argue that Taylor had jurisdictional authority over the SWAT team, made the probable cause and exigent circumstances determination, and that they relied on his direction. However, there is no "just following orders" defense. *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004). The undisputed facts show that Taylor briefed the SWAT team on all of the information he had. Like Taylor, these officers should have known that there was no probable cause to search for Thrower in the Barnette residence. Therefore, they may be held liable under § 1983, even though they were following someone else's lead. *Id*.

Even if arguable probable cause did exist, the evidence before the court does not demonstrate that an exigency existed such that the warrantless entry into the Barnette residence was reasonable. The county defendants argue that the officers entered the Barnette residence without a search warrant "because the time required to obtain a search warrant would have allowed Mr. Thrower to escape. The Defendants had information that Mr. Thrower was only at that location for a few minutes, and was imminently going to leave for destinations unknown, thereby eluding capture and arrest." (Doc. # 51, at 21.)  The defendants further argue that Thrower "was armed" and "innocent bystanders inside the house . . . could become victims or hostages of Mr. Thrower if he chose to violently resist arrest," which the defendants argue was a reasonable conclusion in light of Thrower's wife's statement that Thrower "would not permit the authorities to arrest him and take him to jail." (*Id.*) In arguing for the existence of exigent circumstances, the defendants again rely on the information Taylor received from Wills.  However, as stated above, Wills was merely a conduit through which Thrower's wife conveyed information.

The plaintiffs counter that there was sufficient "time to secure a warrant" and thus no exigency. *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002).  The court notes that the affidavits in support of the defendants' summary judgment motions exhibit a conspicuous lack of the times that events occurred.  From the plaintiffs' undisputed evidence, the court calculates the following time line.  Thrower arrived at his sister's home at 8:30 a.m.  Thrower did indeed have a telephone conversation with his wife from the Barnette residence.  This conversation took place from 9:00 a.m. to 9:30 a.m.  During or immediately after this conversation,  Wills called Taylor to report that Mrs. Thrower now believed that Thrower was at the Barnette residence.  At 11:45 a.m., Thrower left the Barnette residence to have lunch with his mother.  Between 12: 15 p.m. and

18

12:45 p.m., approximately three hours after Taylor was informed of Thrower's location, the defendants entered the Barnette residence.  In that three-hour period, Goodrich allegedly prepared an Alabama fugitive from justice arrest warrant, including securing the sworn statement of one of the Georgia police officers in accordance with § 15-9-40 of the Alabama Code, arrived at the courthouse at lunchtime, looked for judges at nearby restaurants, finally secured the signature of a judge who returned early from his lunch, and then reported this achievement to Taylor.  Taylor avers that it would have taken approximately one hour to secure a search warrant.  (Taylor Aff. ¶ 7.)  The defendants do not attempt to explain why they did not seek to obtain a search warrant simultaneously with the Alabama fugitive from justice arrest warrant.  Because Thrower's arrest was planned at least three hours in advance, *see Olson*, 436 N.W.2d at 97-98, and the evidence demonstrates that there was in fact sufficient time to obtain a search warrant, the defendants' claim of exigent circumstances is simply not reasonable.

The plaintiffs further point out a discrepancy in the timing of the defendants' version of events.  (*See* Doc. # 68.)  At,12:39, the Georgia arrest warrant was faxed to the Russell County Sheriff's Department.  The plaintiffs argue that it was 12:39 *in the afternoon*.  The defendants argue that the date and time on the faxed copy of the arrest warrant could be wrong.  However, they have not submitted any evidence to contradict the timing of the fax, other than the defendants' general averments that they received the fax prior to conducting the search.  All reasonable inferences must be made in favor of the plaintiffs, and it is reasonable to infer, in the absence of evidence to the contrary, that the arrest warrant was faxed at 12:39 p.m.  The plaintiffs conclude that "[e]ither there was no arrest warrant prior to entering the Barnettes' home, or [Goodrich secured the domesticated

19

warrant] all within six minutes." (*Id.* at 3-4.)  The latter is improbable, and the former calls into serious question the sworn testimony of three law enforcement officers.

Even if three hours were determined to be sufficiently exigent, or if the actual window of time was proved to be much smaller, the defendants' argument that a warrantless search was necessary to prevent Thrower's escape is weak.  It is not strengthened much by their claims that Thrower was armed and a danger to his family.  Defendants rely on *United States v. Burgos*, 720 F.2d 1520 (11th Cir. 1983), but *Burgos* presents a scenario distinguishable from Thrower's situation.[14]  Exigent circumstances were found to justify a  warrantless search of the defendant's home in *Burgos*, where ATF agents, after a seven-month investigation into the illegal dealing of 192 firearms, actually observed the defendant carry two large boxes of firearms into his own residence. Not only did the ATF agents have probable cause to believe that the Burgos's home contained a dangerous arsenal, but the agents also had personal knowledge of these facts.  In stark contrast, the defendants here relied solely upon the uncorroborated and speculative hearsay of an informant whose credibility and reliability were questionable.  Moreover, they made the warrantless entry into the home of a third party, not Thrower's home.

Defendants further rely on *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294 (1967). Again, this authority is distinguishable from the case at bar.  In *Hayden*, the seizures at issue occurred as part of an effort to find a suspected armed robber within a house into which he had run only minutes before the police arrived.  The suspect's mother consented to the officers entry into the home.  The officers searched the home for the suspect and his weapons.  The Court held that the

---

[14]  The Eleventh Circuit in Burgos also found an alternate basis for finding the warrantless entry constitutional.  *See Burgos*, 720 F.2d at 1526.

search of the entire house was "reasonably necessary to prevent the dangers that the suspect at large . . . may resist or escape." *Id*. at 299. The facts of the case at bar do not demonstrate the "hot pursuit" of a fleeing felon as in *Hayden*. Thrower was not known to use a firearm, during the course of his alleged crime or otherwise. The defendants did not follow Thrower into the Barnette residence. No one in the Barnette residence consented to its search. *Hayden* is inapposite.

This case is more akin to *Olson*, in which the state court considered all of the relevant factors and did not place undue emphasis on any one of them. Here, Thrower allegedly committed a weaponless crime not considered to be "grave" at least a year before his arrest. All of the information about the exigency of the situation came from an informant whose reliability was unknown if not questionable. Although he had a firearm, there was no suggestion of a criminal history or a history of violence or that he posed a danger to his sister or any occupant of the Barnette residence. A SWAT team surrounded the Barnette residence in the middle of the day. As in *Olson*, these facts do not rise to the level of exigent circumstances. Like the defendant in *Olson*, Thrower "would have been promptly apprehended" if he had come out of the house. *Olson*, 436 N.W.2d at 97.

Because the facts show that arguable probable cause and exigent circumstances did not exist, the court concludes that, for the purposes of a qualified immunity analysis at the summary judgment stage, the plaintiffs have demonstrated a violation of the Fourth Amendment rights of the occupants and owners of the Barnette residence. Moving to the second prong of the qualified immunity analysis, the defendants assert that, if there is a violation, the law was not clearly established on February 10, 2005. However, it was clearly established on that date that, absent exigent circumstances, a law enforcement officer could not legally search for the subject of an arrest in the

21

home of a third party without first obtaining a search warrant. *See Steagald*, 451 U.S. at 205-06. There are genuine issues of fact as to whether a valid arrest warrant existed. Moreover, there is absolutely no doubt that on February 10, 2005, the Fourth Amendment guaranteed the right to be free from warrantless searches unless certain "carefully delineated" exigent circumstances existed, *i.e.*, hot pursuit of a fleeing felon, destruction of evidence, emergency such as a fire, or immediate danger to human life. *Olson*, 495 U.S. at 100; *Welsh*, 466 U.S. at 749-50; *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002). The exigency defendants claim existed has never been a recognized exception to the general ban on warrantless searches of or entry into a home. Therefore, the plaintiffs have carried their burden under the qualified immunity analysis of showing that the constitutional right alleged to be violated was clearly established at the time of the alleged violation. *See Lepone-Dempsey v. Carroll County Comm'nrs*, 159 Fed. Appx. 916, 919 (11th Cir. 2005).

Accordingly, the defendants are not entitled to qualified immunity at this stage, and the summary judgment motions are denied as to the first warrantless entry and search of the Barnette residence.

## 2. Excessive Force Against the Occupants of the Barnette Residence

The plaintiffs assert the defendants used excessive force against the occupants of the Barnette residence by employing the flash bang device, pointing firearms at them, and forcing them down to lie on the floor. A claim of excessive force that was used during an unlawful search or seizure is generally subsumed into the unlawful search and seizure claim as a measure of damages; it does not constitute an independent cause of action. This is because any amount of force is excessive when there is no legal basis for the search and seizure. *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1331-33 (11th Cir. 2006) (explaining that an officer who does not have the right to make an arrest

necessarily does not have the right to use any degree of force); *Jackson v Sauls*, 206 F.3d 1156, 1170-71 (11th Cir. 2000) (finding that the claim that force used in an illegal stop or arrest is excessive is subsumed into the illegal stop or arrest claim); *Smith v. Mattox*, 127 F.3d 1416, 1418-19 (11th Cir. 1997) (implicitly recognizing that force used during an unlawful search is subsumed into the unlawful search claim); *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995) (unlawful arrest); *Motes v. Myers*, 810 F.2d 1055, 1059 (11th Cir. 1987) (unlawful arrest). At this stage of the litigation, it has been determined that the entry and search of the Barnette residence, which necessarily includes the detention of its occupants, was unlawful; therefore, the court need not consider the use of excessive force as a separate claim.

### 3.    The Second Warrantless Entry of the Barnette Residence and Seizure of the Barnettes' Property

The complaint can reasonably be construed as containing a separate claim for the second warrantless entry of the Barnette residence and seizure of the Barnettes' property. (Compl. ¶¶ 37-42, 57-58, 60, 64-73, 74-82, 83-89.) The county defendants argue that this claim was dismissed by the court in its March 15, 2006 order (Doc. # 21), when it dismissed the Fifth Amendment Takings claim. Although the takings claim was dismissed, the court did not opine on whether the facts, which the plaintiffs erroneously believed supported the takings claim, stated a claim for a Fourth Amendment violation. (*Id*. at 6-8, 20.) The court did not undertake this analysis because the defendants did not raise the issue in their motion for partial dismissal. Therefore, upon the resolution of the motion to dismiss, a § 1983 claim remained against Defendants Taylor and Goodrich for a violation of the Fourth Amendment based on the second warrantless entry and seizure of the vehicles.

The county defendants further argue that the second warrantless entry and seizure claim should be dismissed because the plaintiffs failed to include any argument in support of this claim in their response to the defendants' summary judgment motion.  However, once again, the county defendants failed to move for summary judgment on this claim.  Their analysis of the claim in their reply brief is insufficient.  It is improper to raise new arguments in a reply brief, denying the non-movant the opportunity to respond.  *See, e.g., United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court."); *Fisher v. CIBA Specialty Chem. Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("[T]his argument is not properly raised because [the movants] submitted it for the first time in their reply brief."); *Sweet v. Pfizer*, 232 F.R.D. 360, 364 n.7 (C.D. Cal. 2005) ("[T]he moving party in a motion cannot submit new information as part of its Reply.").  Therefore, this claim remains for trial.

## C.    *State Law Claims*

The city defendants claim peace officer immunity with regard to the plaintiffs' state law claims .  Phenix City's immunity is dependent on whether its officers are immune from liability.  *See Howard v. City of Atmore*, 887 So.2d 201, 211 (Ala. 2003) ("It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune.").

Section 6-5-338(a) of the Alabama Code provides peace officers immunity from tort liability for conduct in performance of law enforcement duties in certain instances.[15]  The determination of

_____

[15]  The statute reads in relevant part:

(a)  Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ

whether a peace officer is entitled to immunity is governed by the restatement of state-agent immunity as set forth in *Ex parte Cranman*. *Ex parte Tuskegee*, 932 So.2d 895, 904-05 (Ala. 2005) (discussing *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)).  A peace officer shall be immune from civil liability when the conduct made the basis of the claim against the officer is based upon the officer's "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." *Id.* at 903 (citing *Ex parte Cranman*, 792 So. 2d at 405).  An arrest or attempt to arrest involves an exercise of judgment within the meaning of *Cranman*. *Swan v. City of Hueytown*, 920 So.2d 1075, 1079 (Ala. 2005).

Peace officer immunity is not absolute, however. *Ex parte Cranman*, 792 So. 2d at 405 ("[A] State agent shall not be immune from civil liability in his or her personal capacity . . . when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.").  Applying these principles to the conduct of the city defendants, who are Phenix City police officers, the court concludes that they have not demonstrated that they are entitled to state agent immunity under the peace officer immunity statute.  They assert that "[t]he

---

police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

(b)   This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers.  No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off-duty hours.

Ala. Code § 6-5-338 (1975).

Plaintiffs have established no evidence showing that the Defendants acted with malicious, willful and egregious conduct," (Doc. # 49, at 25), but they do not discuss the issue of whether they acted beyond their authority or under a mistaken interpretation of the law.  Under the facts presented, the unlawful entry, search, and seizure at the Barnette residence was pursuant to an invalid warrant, without probable cause and without exigent circumstances.  The city defendants exceeded their authority and acted under a mistaken interpretation of the law, which forecloses the defense of peace officer immunity under § 6-5-338.  *See Moore v. Crocker*, 852 So. 2d 89, 92 (Ala. 2002).  The motion for summary judgment will be denied with respect to peace officer immunity.

## V.  CONCLUSION

Accordingly, it is ORDERED that

1.    The Motion for Summary Judgment (Doc. # 50) filed by Defendants Heath Taylor and Grover Goodrich is DENIED; and the plaintiffs' § 1983 Fourth Amendment claims remain;

2.    The Motions for Summary Judgment (Docs. # 48 & 53) filed by Defendants Greg Lahr, Michael Bailey, Steve Nolin, Curtis Mitchell, Luis Coreano, Warren McLaughlin, Terrance Walker, Jarrod Barr, and the City of Phenix City are GRANTED in part and DENIED in part;

 a.    They are GRANTED with respect to:

  (1) the § 1983 Fourth Amendment claims against the City of Phenix City,

  (2) the Fifth Amendment and Fourteenth Amendment claims,

  (3) the § 1985 and § 1986 claims,

  (4) the claims for injunctive and declaratory relief;

 b.    These claims are DISMISSED with prejudice;

 c.    They are DENIED with respect to:

(1)  the § 1983 Fourth Amendment claims against the individual defendants,

(2) the state law claims against the individual defendants and the Phenix City; and

d.      These claims remain for trial.

3.      The parties shall jointly prepare a revised proposed pretrial order, as discussed at the pretrial hearing held on October 26, and submit it to the chambers of the undersigned **on or before November 9, 2007.**

DONE this 6th day of November, 2007.

/s/   W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

27